# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NANCY SANTANA,           :
                           :
           Plaintiff,       :
                           :
      v.                 :      C.A. No. 06-666-GMS
                           :
STATE OF DELAWARE,     :
DEPARTMENT OF HEALTH and  :
SOCIAL SERVICES, DIVISION OF  :
CHILD SUPPORT ENFORCMENT,  :
                           :
           Defendant.   :

## DEFENDANT'S OPENING BRIEF IN SUPPORT

## OF SUMMARY JUDGMENT

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

Marc P. Niedzielski (# 2616)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302)  577-8400
Attorney for Defendant

DATED: October 19, 2007

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................3

NATURE AND STAGE OF PROCEEDINGS ......................................................5

SUMMARY OF THE ARGUMENT .......................................................6

STATEMENT OF THE FACTS ...........................................................7

## <u>ARGUMENT I.</u>

DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
TITLE VII CLAIMS ................................................................8

## <u>ARGUMENT II.</u>

PLAINTIFF'S CLAIM UNDER THE DELAWARE DISCRIMINATION IN
EMPLOYMENT ACT, 19 *DEL.C*. SUBCHAPTER II, MUST BE DISMISSED
IN ACCORDANCE WITH DELAWARE LAW AND THE COURT LACKS
JURISDICTION TO ENTERTAIN THE CLAIM UNDER THE ELEVENTH
AMENDMENT.........................................................................14

CONCLUSION ......................................................................16

## <u>TABLE OF AUTHORITIES</u>

*Abramson v. William Paterson Coll. Of N.J.,* 260 F.3d 265 (3d Cir. 2001) ............... 12

*Alden v. Maine*, 527 U.S. 706 (1999) ........................................................................ 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 8

*Board of Trustees v. Garrett*, 531 U.S. 356 (2001) .................................................... 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................ 8

*City of Boerne v. Flores*, 521 U.S. 507 (1997) .......................................................... 15

*Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994) ........................................................ 10

*Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107 (3d Cir. 1996) ........... 9

*Jones v. School Dist. of Philadelphia,* 198 F.3d 403 (3d Cir. 1999) .......................... 12

*Jones v. Wilmington*, 2004 WL 1534778 (D.Del. June 14, 2004) .............................. 10

*Lavia v. Pennsylvania Department of Corrections*, 224 F.3d 190 (3d Cir. 2000) ....... 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) ............... 9

*McDonnell-Douglas v. Green,* 411 U.S. 792 (1973) ......................................... 9, 10

*Sheridan v. DuPont*, 100 F.3d 1061 (3d Cir. 1996) ................................................... 10

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993) ........................................... 10

*Storey v. Burns International Security Services,* 390 F.3d 760 (3d Cir. 2004) ..... 11, 12

*Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248 (1981) ........................... 9

*Waldron v. SL Industries*, 56 F.3d 491 (3d Cir. 1995) ................................................. 9

Statutes and Other Authorities

Eleventh Amendment of the United States Constitution ..................................... *passim*

Fourteenth Amendment of the United States Constitution ......................................... 15

42 U.S.C. § 2000e-3(a)(2000)............................................................................................13

19 Del.C. § 710 -718 ......................................................................................................14

19 Del.C. § 713(c)..........................................................................................................15

19 Del.C. § 714(a)..........................................................................................................14

19 Del.C. § 714(b)..........................................................................................................14

19 Del.C. § 714(c)..........................................................................................................14

Fed. R. Civ. P. 56(c)..................................................................................................8, 16

## NATURE AND STAGE OF THE PROCEEDINGS

On October 30, 2006, plaintiff commenced this *pro se* action by filing a complaint[1]. (D.I. 1)

On November 27, 2006, defendant answered the complaint and asserted a number of defenses. (D.I. 3) On the same date, the Court entered a Scheduling Order. (D.I. 4)

On February 28, 2007, counsel entered his appearance on behalf of plaintiff. (D.I. 10) Thereafter, plaintiff moved the Court for a number of extensions to respond to discovery. (D.I. 11, 12)

On July 18, 2007, the Court entered a new Scheduling Order that provided a discovery cutoff of October 5, 2007 and case dispositive motion deadline of October 19, 2007. (D.I. 18)

This is defendant's Opening Brief in support of summary judgment.

---

[1] Plaintiff testified at her deposition that her present counsel in fact drafted the complaint. (Santana Transcript July 20, 2007 at p. 118)

## SUMMARY OF THE ARGUMENT

### I.

To the extent plaintiff states a legal claim for racial discrimination and retaliation under Title VII, the record is devoid of sufficient evidence for the matter to go forward.

### II.

Plaintiff cannot maintain a state law claim as the law itself divests plaintiff of the state law claim and is otherwise barred by the Eleventh Amendment.

## STATEMENT OF THE FACTS

On January 4, 1999, plaintiff commenced employment with the State of Delaware, Department of Health and Social Services, Division of Child Support Enforcement. (Santana Tr. p.16) From January 2003 to January 2004, plaintiff was on active duty with the armed forces. (Santana Tr. p.97) Again from September 30, 2005 to the present plaintiff is on active duty with the armed forces. (Santana Tr. p.11) Plaintiff holds the position of Child Support Specialist ["CSS"] in the Consumer Service Unit. (Santana Tr. 16-18)

The position of CSS requires the employee to answer the phone and type on a computer keyboard the entire work day. The telephone calls come from non-custodial parents who are required to pay child support and the custodial parents who are supposed to be receiving the child support. (Santana Tr. 22-34)

In the complaint, plaintiff alleges: that she was yelled at by one of her two supervisors in early March 2005 (paragraph 12); she testified at a Workers Compensation Hearing on March 24, 2005 (paragraph 13); she received a written warning for being away from her desk for 14 minutes on April 5, 2005 (paragraph 14); and, plaintiff's performance review contained negative comments on April 20, 2005 (paragraph 15).

On June 3, 2005, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ["EEOC"] in its Philadelphia Office. (Santana Tr. 64) Thereafter, the EEOC dismissed the matter with a right to sue letter on August 7, 2006.

## **ARGUMENT I.**

DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S TITLE VII CLAIMS

### **(a)      Introduction:**

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact is one that "may reasonably be resolved in favor of either Party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 259 (1986). The moving party bears the initial burden of demonstrating the absence of material issues of fact. *Celotex Corp.*, at 323. However, the moving party need not support its motion with affidavits or other documents disproving the nonmoving party's claim, but need only "show - - that is point out to the district court - - that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The nonmoving party must go beyond the pleadings and through affidavits or other evidence demonstrate the existence of a genuine issue of material fact. *Id.* at 314. The district court is

required to construe the evidentiary record so as to give the nonmoving party reasonable factual inferences. *Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 112 (3d Cir. 1996). Summary judgment should be granted if the court finds, in consideration of all of the evidence, that no reasonable trier of fact could find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

For the reasons that follow, the defendant is entitled to judgment as a matter of law as to plaintiff's Title VII claims.

### (b)    Racial discrimination claim

The legal analysis for a discrimination claim under Title VII is well-settled. Since plaintiff has not identified any direct evidence of discrimination, he must establish a prima facie case as set forth under *McDonnell-Douglas v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* analysis, a plaintiff may rely upon indirect evidence that race was a motivating factor in an employment action. The plaintiff must produce evidence that (1) he is a member of a protected class, that (2) he was qualified for the position at issue, and that (3) any adverse employment action for the position was "under circumstances that give rise to an inference of unlawful discrimination." *Waldron v. SL Industries*, 56 F.3d 491, 494 (3d Cir. 1995) (citing *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981). Upon the plaintiff's production of evidence to establish this prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason"

for the purported adverse action.  *McDonnell-Douglas v. Green*, 411 U.S. 792, 802 (1973).  The defendant is free to articulate any legitimate reason for the purported adverse action; he does not need to show that the articulated reason motivated the purported adverse action.  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

Once the defendant has articulated that reason, the burden shifts back to the plaintiff, who must prove that the reason the defendant articulated was a pretext and that the purported adverse action was in fact racially motivated.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 512 (1993).  A plaintiff may withstand a motion for summary judgment only if the plaintiff is able to point to some evidence, direct or circumspect, from which a fact-finder could reasonably either disbelieve the defendant's articulated legitimate reason for the purported adverse action or believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the purported adverse action.  *Fuentes v. Perskie*, 32 F.3d at 764; *Sheridan  v. DuPont*, 100 F.3d 1061, 1067 (3d Cir. 1996). A plaintiff may not rely upon evidence that members of the protected class were generally treated differently; such generalizations are not relevant to the question whether others not in the protected class were treated more favorably.  *Jones v. Wilmington*, 2004 WL 1534778 at * 5, n.8 (D.Del. June 14, 2004).

In the present matter, plaintiff contends that her protected class is that she is Hispanic with family roots in Puerto Rico.  (Complaint ¶ 6)  In her June 3, 2005 EEOC change of discrimination she claimed that the discrimination was based on national origin only. (Santana Deposition Exhibit No. 1) The first problem with

plaintiff's Title VII claim is whether she can claim status based on national origin. Plaintiff was born and raised in Wilmington, Delaware, and has lived here most of her life. (Santana Tr. p. 4) Having family roots in Puerto Rice does not change the fact that plaintiff's and her ancestries' national origin is the United States of America. *See Storey v. Burns International Security Services,* 390 F.3d 760 (3d Cir. 2004). The Court of Appeals struggled with the same issue but decided the matter on the whether the employee suffered an adverse employment action.

Like the present matter, plaintiff has failed to identify any adverse employment action or retaliation due to commencing the EEOC administrative proceedings in June 3, 2005. Plaintiff does complain about one of her two supervisors, a Brenda Annand. Plaintiff testified that she does not like the way the supervisor communicates with her on three occasions. However, she does not evince an adverse employment action. Plaintiff complains that her Employee Performance Review contains "negative comments." (Santana Deposition Exhibit 4) The Performance Review was signed by both of plaintiff's supervisors, their supervisors' supervisor and the plaintiff herself. The Review concludes that plaintiff's performance meets expectations. While the review does suggest areas for plaintiff to focus on to improve her performance, it states:

> "Nancy meets the expectations of the Unit. She is professional, courteous to clients, and goes the extra mile to give callers quality customer service. Her notes are thorough and contain the needed information to expedite resolution. Since her last performance review, Nancy's call volume has increased which indicates she has improved in the area of not getting too involved in a case then she should."

The above performance review is not an adverse employment action. "[A]n adverse employment action under Title VII is an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" (citations omitted) *Storey*, 390 F.3d at 764. In the present matter, there was no reduction in pay or change in plaintiff's duties or status in any respect, and therefore, there is no factual basis for a Title VII claim and defendant is entitled to judgment.

### (c)    Retaliation claim

The plaintiff also contends that DCSE retaliated against her for her March 24, 2005 appearance as a witness in a Worker Compensation Hearing. (Complaint ¶ 22) Plaintiff does not contend that she suffered retaliation as a result of filing a charge of discrimination with the EEOC.

In a typical retaliation claim under Title VII , a plaintiff must show that: (1) she engaged in a protected activity; (2) the employer took an adverse employment action against her after or contemporaneous with the protected activity; and (3) that there is a causal link between her participation in the protected activity and the adverse employment action. *See Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 286 (3d Cir. 2001); *Jones v. School Dist. of Philadelphia,* 198 F.3d 403, 410 (3d Cir.1999). The scope of the "protected activity" is defined by the law or constitutional provision the plaintiff alleges is violated by the retaliation. In this case, Santana identifies that the retaliation resulted from her testimony in a

Workers Compensation Hearing.   However, that is not a protected activity under Title VII.   Instead, Title VII protects those who "opposed any practice made an unlawful employment practice by [Title VII] or those who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]. 42 U.S.C. § 2000e-3(a) (2000).   The anti-retaliation provisions of Title VII do not authorize a claim against an employer for conduct that is unrelated to the Title VII proceedings.   Defendant is entitled to judgment on the retaliation claim.

## ARGUMENT II.

PLAINTIFF'S CLAIM UNDER THE DELAWARE DISCRIMINATION IN EMPLOYMENT ACT, 19 *DEL.C*. SUBCHAPTER II, MUST BE DISMISSED IN ACCORDANCE WITH DELAWARE LAW AND THE COURT LACKS JURISDICTION TO ENTERTAIN THE CLAIM UNDER THE ELEVENTH AMENDMENT.

### (a)    Delaware Discrimination in Employment claim.

Under Count III of the complaint, plaintiff alleges a state law claim under the Delaware Discrimination in Employment Act, 19 *Del.C*. § 710- 718. However, provisions of the state law mandate that such a claim may only be brought in the Superior Court and only after receiving a "Delaware Right to Sue Notice." 19 *Del.C*. § 714(a) & (b).   Plaintiff has never received nor sought a Delaware Right to Sue Notice as she went to the EEOC office in Philadelphia and did not file a charge with the Delaware Department of Labor.  Additionally, 19 *Del.C*. § 714(c) provides plaintiff with a mandatory election of remedies.   If plaintiff files in federal court as she has done, she may not pursue her claim under state law.

### (b)    The Eleventh Amendment:

The Eleventh Amendment to the United States Constitution provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

The Supreme Court in describing the immunity of states from suit observed that "Eleventh Amendment immunity ... is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from nor is limited by, the terms of the Eleventh Amendment." *Alden v. Maine*, 527 U.S. 706, 713 (1999). Instead, "the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today except as altered by the plan of the Convention or certain constitutional Amendments." *Id*.

Congress's sole constitutional authority to subject States to suit by individuals must arise under section 5 of the Fourteenth Amendment and not its Article I powers[2]. *Board of Trustees v. Garrett*, 531 U.S. 356, 364 (2001); *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997); *Lavia v. Pennsylvania Department of Corrections*, 224 F.3d 190 (3d Cir. 2000). There is no federal statue that abrogates the State's immunity regarding state law claims and the Delaware Discrimination in Employment Act clearly states that the state law claims evaporate when a claim is filed in federal court. 19 Del.C. § 713(c).

---

[2] Since the Eleventh Amendment was enacted after Article I of the Constitution.

## <u>CONCLUSION</u>

For the above reasons, the defendant is entitled to judgment pursuant to Rule 56(c) as matter of law in this matter.

Respectfully submitted,

STATE OF DELAWARE
DEPARTMENT OF JUSTICE


<u>/s/ Marc P. Niedzielski</u>
Marc P. Niedzielski (#2616)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8324
Attorney for Defendant

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

NANCY SANTANA,                          :
                                        :
          Plaintiff,                    :
                                        :
     v.                                 :          C.A. No. 06-666-GMS
                                        :
STATE OF DELAWARE,                      :
DEPARTMENT OF HEALTH and                :
SOCIAL SERVICES, DIVISION OF            :
CHILD SUPPORT ENFORCMENT,               :
                                        :
          Defendant.                    :

**CERTIFICATE OF MAILING AND/OR DELIVERY**

The undersigned certifies that on October 19, 2007, he caused the attached

document to be delivered electronically to the following person:

     Herbert G. Feuerhake, Esquire
     521 West Street
     Wilmington, DE  19801


                              /s/ Marc P. Niedzielski
                              Marc P. Niedzielski, I.D. No. 2616
                              Deputy Attorney General
                              Carvel State Office Building
                              820 N. French Street, 6th Floor
                              Wilmington, DE  19801
                              (302)577-8400
                              Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

NANCY SANTANA,                    )
                                  )    C.A. No. 06-666-GMS
                    Plaintiff,    )
                                  )
    -vs-                          )
                                  )
STATE OF DELAWARE, DEPT. OF,      )
HEALTH AND SOCIAL SERVICES        )
DIVISION OF CHILD SUPPORT         )
ENFORCEMENT,                      )
                                  )
                    Defendant.    )


            Deposition of NANCY SANTANA taken pursuant
to notice at the Department of Justice, 820 N. French
Street, 6th Floor, Wilmington, Delaware, beginning at
9:55 a.m. on July 20, 2007, before Julianne LaBadia,
Registered Diplomate Reporter and Notary Public.


APPEARANCES:

        HERBERT G. FEUERHAKE, ESQ.
        THE LAW OFFICE OF HERBERT G. FEUERHAKE
          521 West Street
          Wilmington, Delaware  19801
          For the Plaintiff

        MARC P. NIEDZIELSKI, ESQ.
        DEPUTY ATTORNEY GENERAL
          820 N. French Street - 6th Floor
          Wilmington, Delaware  19801
          For the Defendant

            WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com

Case 1:06-cv-00666-GMS   Document 22-2   Filed 10/19/2007   Page 2 of 32
Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

## Page 2

1    NANCY SANTANA
2    The deponent herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5          DIRECT EXAMINATION
6    BY MR. NIEDZIELSKI:
7    Q.   Could you state your name for the record,
8    please.
9    A.   Nancy Santana.
10   Q.   Do you have a middle name?
11   A.   No.
12   Q.   What is your date of birth?
13   A.   March 16, 1963.
14   Q.   What is your present residence?
15   A.   Would be 2545 Cumberland Creek Road, apartment
16   205, Fayetteville, North Carolina 28306.
17   Q.   Now, you are there presently on military
18   service, correct?
19   A.   Yes.
20   Q.   Do you have a permanent address, other than
21   that?
22   A.   Yes.  It is 14 White Oak Drive, Middletown,
23   Delaware 19709.
24   Q.   Have you ever had your deposition taken before?

## Page 3

1    A.   Yes.  I have had a deposition taken before.
2    Q.   And in what context was your deposition taken
3    prior?
4    A.   It would have been for Calvin Parsons, a
5    workmen's compensation claim.  I had to testify with a
6    court reporter.  I'm not sure if that would be a
7    deposition, per se.
8    Q.   Okay.  Well, let me just go over -- that was to
9    testify at an IAB hearing?  Industrial Accident Board
10   hearing?
11   A.   Yes.  Correct.
12   Q.   Just some basic rules.  Obviously, the court
13   reporter's job is to stenographically record the
14   questions and your answers to those questions.  She can
15   only do that if you give a verbal response, so it's
16   important to remember that although in normal
17   conversation, people frequently use nods of heads and the
18   like, that you have to remember you have to give a verbal
19   response, so that it can be recorded.  Okay?
20   A.   Yes.
21   Q.   It's also important that you understand my
22   question.  If for any reason you don't understand my
23   question, simply let me know, and I shall rephrase the
24   question.  Okay?

## Page 4

1    A.   Yes.
2    Q.   If for any reason you need to take a break,
3    just let us know and we'll arrange that, okay?
4    A.   Okay.
5    Q.   Are you presently on any medication?
6    A.   No.  I just take vitamins.
7    Q.   Tell me, where were you born?
8    A.   Wilmington, Delaware.
9    Q.   Have you lived in Delaware all your life?
10   A.   The majority of my life, correct.
11   Q.   Where did you go to high school?
12   A.   Delaware High School and William Penn High
13   School.
14   Q.   Did they close Delaware?
15   A.   Yes.  They closed it and made it into an
16   elementary school, and all the high school people had to
17   go to William Penn for the last year.
18   Q.   When was that?
19   A.   1978 to 1979.
20   Q.   And then, after high school, what did you do?
21   A.   After high school, I went to Goldey-Beacom
22   College for two years, and then in August of 1981, I
23   joined the military, active duty.
24   Q.   All right.  So, you graduated from William Penn

## Page 5

1    High School in 1979?
2    A.   Correct.
3    Q.   All right.  And from there you went to
4    Goldey-Beacom?
5    A.   College, correct.
6    Q.   And did you get a degree from Goldey-Beacom?
7    A.   I didn't get it in 1981.  I went back and got
8    it later on, in 1988, I finished up.
9    Q.   And then you indicated in 1981, you went full
10   time in the military?
11   A.   Yes, I did.  In August, 1981.
12   Q.   August, 1981?
13   A.   To August, 1983.
14   Q.   And what branch of the service were you in?
15   A.   U.S. Army.
16   Q.   And do you recall what your MOS was?
17   A.   I was a 71 Lima, which is a military
18   occupational specialty of an administrative specialist.
19   Q.   A clerk?
20   A.   Yes.
21   Q.   Okay.  And then what happened in 1983?
22   A.   I got out of the military, went to Job Corps
23   for a while, to just get away.  And then I went through
24   Marine Corps in 1984, in March of 1984.  Active duty

Case 1:06-cv-00666-GMS    Document 22-2    Filed 10/19/2007    Page 3 of 32
Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

**6**

1 Marine Corps.
2 Q. And how long were you active duty Marine Corps?
3 A. From March, 1984, to November of 1986.
4 Q. What was the term of your enlistment?
5 A. They were both honorable discharges.
6 Q. No, but what was the enlistment term?
7 A. The Army was two years. And the Marine Corps
8 was four years.
9 Q. Okay. And March of 1984 to November of 1986 is
10 not four years, correct?
11 A. Correct.
12 Q. Why is it you were separated early?
13 A. I requested separation, because I was pregnant.
14 Q. And in 1986, when you were separated from
15 service with the Marine Corps, what did you do after
16 that?
17 A. I went to school part time at Goldey-Beacom
18 College, and graduated there in June of 1988.
19 Q. All right. Now, I take it that in 1986, you
20 had a child?
21 A. Yes, I had a son.
22 Q. And how old is your son now?
23 A. My son passed away.
24 Q. How old was he when he passed on?

**7**

1 A. He was a day old.
2 Q. And do you have any other children?
3 A. I have a daughter that was born on June 4th,
4 1988.
5 Q. Around the same time as you graduated from
6 Goldey-Beacom?
7 A. As a matter of fact, she was born on the same
8 day I graduated Goldey-Beacom, June 4, 1988.
9 Q. Cap and gown?
10 A. Yes. I was in a cap and gown, my water broke.
11 Graduated just in time.
12 Q. Okay. So, thus far, you've got how many years
13 active service in the various branches?
14 A. This is hypothetical. I have about 14 years of
15 active duty, on and off during the years.
16 Q. Does it all count?
17 A. As far as retirement? Yes.
18 Q. Yes.
19 A. Yes. But it's broken time. I have bits and
20 pieces but they all add up to about 15 years active duty.
21 Q. All right. So, what was your military status
22 after 1986?
23 A. Well, I took a break to go to school. I didn't
24 go back into the military until July of 1993. So

**8**

1 basically, I went to college and worked during the times
2 of -- it would be probably '88 to about '90 -- '88 to
3 about '91 or '92, I went and worked.
4 Q. Okay. I'm just going to go through your
5 military for right now, then we'll go back and fill in
6 the other employment. Okay? So you went back in the
7 military in around 1993, in July?
8 A. Went into the Army National Guard in July of
9 1993.
10 Q. And how long were you in the Army National
11 Guard?
12 A. I would have been in there until around August
13 of 1994, and then I went into the Air National Guard from
14 '94 to around '95, '96.
15 Q. Okay. And then let me just make sure I got
16 this right. So in August of 1994 you switched from the
17 Army National Guard to the Air National Guard?
18 A. Air Force National Guard, correct.
19 Q. And then how long were you in the Air Guard?
20 A. 1994 till 1996, and then I transferred over to
21 the Army Reserve.
22 Q. Was there any reason why you switched to the
23 Army Reserve?
24 A. I got a commission as an officer, and I could

**9**

1 not be enlisted in the Air National Guard if I wanted to
2 seek a commission in the Army Reserve, so I got out of
3 the Air National Guard so I could get commissioned to an
4 officer.
5 Q. Have you been deployed overseas?
6 A. No. I have never been deployed overseas.
7 Q. Are you able to be deployed overseas?
8 A. Yes. I am able to be deployed overseas,
9 correct.
10 Q. So in 1996, you got a commission in the Army
11 Reserve, correct?
12 A. Correct.
13 Q. And you've remained in the Army Reserve since
14 1996?
15 A. Yes.
16 Q. All right. And you were commissioned as a
17 second lieutenant, I take it, in '96?
18 A. Right.
19 Q. What is your present rank in the Army Reserve?
20 A. Present rank in Army Reserve is captain.
21 Q. And what is your occupational specialty?
22 A. I'm a medical supply officer.
23 Q. Does that mean you are in the medical corps?
24 A. Medical service corps. Not the medical corps.

3 (Pages 6 to 9)

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

## 10

1   Q.   And presently, you are stationed at Fort Bragg?
2   A.   Correct.
3   Q.   Actually, you are at the -- there's a big
4   hospital there, isn't there?
5   A.   Womack Army Medical Center.
6   Q.   And what are you doing at the Womack Army
7   Medical Center?
8   A.   Currently I deal with injured and wounded
9   soldiers, and I work in the patient administration
10  department.
11  Q.   What does that mean?
12  A.   Basically, soldiers come in with injuries and
13  hurt, they're hurt, and we seek treatment for them or ask
14  them to be discharged or help them get their paperwork
15  processed for disability.  So, we just treat the soldier,
16  whatever needs comes up.  Sometimes they have to get out
17  of the military for extended illnesses and injuries.
18  Q.   Now, is that part of your occupational
19  specialty?
20  A.   No.  That was an additional assignment.
21  Q.   What's your annual salary as a captain in the
22  Army Reserve?
23  A.   This is hypothetical.  I think it was $67,000.
24  Q.   What do you mean it's hypothetical?

## 11

1   A.   I'm not sure exactly the amount but --
2   Q.   Is it around 67,000?
3   A.   67,000.
4   Q.   Is it substantially more than you get paid in
5   your State employment job?
6   A.   Yes.  It is substantially more than I get paid
7   in my State job.
8   Q.   Now, when is the most recent time you have been
9   on active duty for the Army Reserve?
10  A.   Would be when I left, September 30th, 2005, and
11  it won't end until September 29, 2007.
12  Q.   Did you volunteer for that term?
13  A.   No.  It was involuntary.
14  Q.   It was involuntary?
15  A.   Yes.
16  Q.   Is a reservist able to volunteer for tours?
17  A.   If they want to, correct.
18  Q.   Have you ever done that?
19  A.   No.
20  Q.   Now, when you graduated from high school, did
21  you go right to Goldey-Beacom or did you work?
22  A.   I went straight to Goldey-Beacom.
23  Q.   And I've seen your responses to
24  Interrogatories, and it indicates a number of jobs.  One

## 12

1   of them was, I believe, was a casual seasonal with
2   probation parole.
3   A.   Yes.
4   Q.   Was that one of your first jobs?
5   A.   No.  It wasn't one of my first jobs.  I think
6   before I went Army, I don't remember when, but I remember
7   right when I was at Goldey-Beacom, I think I worked at
8   KFC, Kentucky Fried Chicken at one time.  Then I had a
9   co-op job with Goldey-Beacom College.  I worked for
10  General Motors as a co-op.
11  Q.   Okay.  And then after Goldey, you went into the
12  military full time?  Or was there a period of time
13  there --
14  A.   No.  I worked for ICI Americas.
15  Q.   What did you do for them?
16  A.   I was a secretary for ICI Americas.
17  Q.   And how long did you work for ICI Americas?
18  A.   Gosh, I'm not too familiar with those years.  I
19  would say 1988 -- gosh.  I don't remember the year I
20  left.  1992.
21  Q.   And why is it you left ICI Americas?
22  A.   I wanted a job something to do with legal, and
23  I went to school for paralegal.  So, I wanted to do
24  something legal.

## 13

1   Q.   So, what job did you get in 1992, when you left
2   ICI?
3   A.   I was temping at AIG, and different temp
4   agencies.
5   Q.   AIG stands for American Insurance Group?
6   A.   Right.  And I temped with them, and other type
7   of temp jobs that I had.
8   Q.   All right.  And how long did that last, did you
9   do that temp work after 1992?
10  A.   That would have been till I worked for the
11  National Guard.  I think I started with them in 1995.
12  Q.   Was that a civilian job with the National
13  Guard?
14  A.   Yes.  It was a State of Delaware job.  You had
15  to be in a military outfit to take the job.
16  Q.   All right.  What was that job?
17  A.   That was a budget clerk GS-5.
18  Q.   Okay.  And how long did you hold that job as a
19  GS-5, with the National Guard?
20  A.   I started in 1995, in May, and I left there in
21  December, 1996.
22  Q.   Was that to transfer to the Air National Guard?
23  A.   Say what?
24  Q.   Was that to transfer to the Air National Guard?

4  (Pages 10 to 13)

Case 1:06-cv-00666-GMS    Document 22-2    Filed 10/19/2007    Page 5 of 32
Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

**14**

1    A.  No.  I transferred from the Air National Guard
2    to the Army Reserve, but the job was a National Guard
3    job.  So once I got out of the National Guard, I could no
4    longer hold the GS-5.  It was a National Guard slot and I
5    became Army Reserve, so I had to leave.
6    Q.  Okay.  But I thought you started with the Army
7    National Guard.
8    A.  Army National Guard.
9    Q.  But then did you become Air National Guard?
10    A.  Air National Guard, correct.  Then I left there
11    to seek a commission in the Army Reserve.
12    Q.  All right.
13    A.  Once they realized that I was Army Reserve, and
14    I was no longer National Guard to accept a commission,
15    then they said I could not stay there.  I had to leave.
16    Q.  Okay.  But now I'm just focusing on the fact
17    that you started in the Army National Guard, but at some
18    point you transferred to the Air Force National Guard or
19    the Air National Guard?
20    A.  Yeah.  They downsized my National Guard unit.
21    The Army National Guard, I was a 75 bravo, personnel
22    admin specialist.  They downgraded that whole unit, which
23    means certain MOSs, one of mine, the 75 bravo, they got
24    rid of it.  So I had to seek another type of job.

**15**

1    The Air National Guard was right down the
2    street from where I was at in the Army National Guard.  I
3    raised my hand up and became an information management
4    specialist, which is the same thing as a clerk in the
5    Army National Guard.
6    Q.  Okay.  How many people presently report to you
7    in the Army Reserve?
8    A.  At this time, I'm on special project.  No one.
9    I'm not in charge of anybody.
10    Q.  What's the special project mean?
11    A.  Just means that I handle a specific type of
12    need that they had at the time.  They needed some people
13    to work in med board to help those people out.  So I help
14    them out in the med board section, processing the cases.
15    Q.  All right.  So you don't have anybody reporting
16    to you, or nobody that you supervise presently?
17    A.  No.  I don't.
18    Q.  Okay.  So, after 1996, you took a commission,
19    as I understand it, with the Army Reserve, correct?
20    A.  1996, I went into the Army Reserve, enlisted,
21    first, and then I took my commission in '97.
22    Q.  Okay.
23    A.  I had to do the paperwork.  There was a lot of
24    paperwork involved.  I had to get the paperwork done, and

**16**

1    in 1997 I got my commission.
2    Q.  And so, where were you working in 1997?
3    A.  I would have been -- hmm.  It probably was with
4    the criminal justice council, that was a temp state job.
5    I was there -- I don't remember the months.  And then I
6    worked for probation and parole as a miscellaneous
7    investigator.  And those are the two jobs that I'm aware
8    of during that time I had.
9    Q.  And then did you start back with the State on a
10    full-time basis in '99?
11    A.  I started with Division of Child Support
12    January 4th, 1999.
13    Q.  And what was your first job in the Division of
14    Child Support Enforcement?
15    A.  I was a child support enforcement specialist I,
16    which is the same thing as a caseworker.
17    Q.  And what unit were you in?
18    A.  I was in Michael Morgan's non public assistance
19    unit.
20    Q.  What's that mean, non public assistance unit?
21    A.  That we didn't handle out of state cases.  We
22    didn't handle welfare cases, either.  So it was the non
23    public assistance unit.
24    Q.  What would be the distinction?  I mean non

**17**

1    public assistance, does that mean --
2    A.  There's a section that handled welfare cases.
3    We handled in-state cases, or people that were not
4    getting welfare.  So non public assistance, State cases.
5    Not out of state or welfare.  There's different sections
6    that handle different things.  Ours was the NPA, non
7    public assistance in state cases.
8    Q.  And how many people were in that unit in
9    addition to you?
10    A.  I can take a guess, about 15 people, besides
11    me.
12    Q.  And essentially, what was the nature of the
13    job?  I mean would you perform this job in your office or
14    in an office, or would you do it in a cubicle?  Would you
15    go out?
16    A.  I was in my office processing cases and
17    preparing the legal documents.  Went to court, sat in on
18    mediation hearings, and basically, it was basically --
19    mostly it was sedentary, in the office, and then we had
20    court appearances to help the clients get their child
21    support.
22    Q.  Okay.  And how long were you in that unit?
23    A.  I would say from January 4, 1999, till sometime
24    in 2000.  I don't remember the month I left there.

5  (Pages 14 to 17)

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

---

**18**

1    Q.  And what unit did you transfer in to?
2    A.  The customer service unit.
3    Q.  What does the customer service unit do?
4    A.  They answer calls, and they direct clients to
5  different types of -- you know, they just give
6  information as far as how to handle cases and what to do
7  with their cases and process cases.  And then they send
8  e-mails to the actually workers if there's some things
9  that need to be done, and the workers follow up with the
10  client as far as what other additional things they need
11  to do to process their case.
12    Q.  Is the customer service unit like a call in
13  center?
14    A.  Yes.  Clients do call in to the customer
15  service unit, and ask questions of the workers that
16  answer the phones, which is the customer service people
17  like myself, correct.
18    Q.  All right.  Now, how are the workers arranged
19  in the customer service unit?  I mean do they work in
20  private offices?  Are they in --
21    A.  We're in cubicles.  We sit next to each other
22  in cubicles.
23    Q.  Now, when you are sitting in your cubical, what
24  other employees can you see from your cubicle?

---

**19**

1    A.  I can't see anyone from my cubicle, as I look
2  down the hall there, and look at who is coming in and
3  out, coming and going.
4    Q.  In other words, you would have to kind of poke
5  your head outside your cubicle to be able to do that?
6    A.  No.  Where I was sitting, I can look straight
7  down the aisleway, at who is coming and going.  Because I
8  sat straight like this.  So if you come down, I could see
9  who was coming toward me.
10    Q.  All right.  Well, were the workers clustered in
11  groups?
12    A.  We all had a -- what do you call it?  A team
13  leader, where a team leader was in charge of maybe four
14  or five people, and there were three or four team leaders
15  assigned to four or five people.
16    Q.  And where was your team leader in relationship
17  to you?  Where was he --
18    A.  He sat next to me.  It was Calvin Parsons to my
19  right at one time, and then someone else to my left.
20  Different team leaders.
21    Q.  When you say to your left, are they in a
22  separate cubicle?
23    A.  Separate cubicle, correct.
24    Q.  Is there a separation between you and them?  A

---

**20**

1  wall?
2    A.  A partition, correct.
3    Q.  And were they generally grouped in fours?
4    A.  I don't know.  It depends how many people.  We
5  had such staffing issues that, you know, it could have
6  been two or three people that was in charge of some
7  people.  Then they would shift around different amounts.
8  Somebody had more people in their section, someone had
9  left, the fact people were coming and going, they would
10  shift them around.
11    Q.  What do you mean you had a lot of staffing
12  issues?
13    A.  I'm just saying at one point, people were out
14  on sickness, injury, illness.  Sometimes for some reason
15  they would actually take one person and put them in
16  another section, for whatever reason, and they would take
17  another person and put them in another section for
18  whatever reason.  So you never knew why they were -- you
19  know, messing around with the -- with the people.
20    Q.  Did you work in the same cubicle every day you
21  came to work?
22    A.  Well, we moved from one building to another,
23  but when I went to child support in the new building, I
24  stayed in the same cubicle, correct.

---

**21**

1    Q.  When you first started working for the customer
2  service unit in child support enforcement, where was,
3  physically, where were you located?
4    A.  I was in another building in Newark, and I sat
5  directly behind the receptionist at child support when I
6  was in that old building in Newark, before we moved.
7    Q.  Do you remember the name of that building in
8  Newark?
9    A.  The Stockton building, Newark, Delaware.
10    Q.  Were you in a cubicle there, as well?
11    A.  I was in a partition, but yeah, a cubicle.
12    Q.  In other words, the partition went around three
13  sides of you?
14    A.  No.  It was the receptionist and one thing
15  branching me off in the back and that was it.  I only had
16  one partition blocking me from the receptionist there.
17    Q.  Could the receptionist turn around and look at
18  you?
19    A.  No.  There was a partition between us.
20    Q.  And did you have a desk?
21    A.  Yes.
22    Q.  Now, who could you see from where you were?
23  Seated at your desk.
24    A.  I can look over where Selena Lloyd was sitting

---

6 (Pages 18 to 21)

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
## Nancy Santana

22

1  and that's about it. She was over to my left.
2  Q. Now, would you have to look over a partition to
3  see her?
4  A. I would have to kind of step out of my
5  partition to see her, yes.
6  Q. All right. Now, was the job the same at
7  Stockton as when they moved it to the second location?
8  A. They would always have updates and changes in
9  how they did the customer service things. I mean they
10  always had changes. Basically it was the same job, but
11  there were always changes and updates and things that
12  changed. You always had to be briefed if you left for
13  certain periods of time, because things changed almost
14  constantly. There were always e-mails updating things.
15  So it was the same type of job, you answered phones, but
16  as far as how they dealt with certain types of procedures
17  and priorities, it could change. Never knew when it was
18  going to change.
19  Q. When you came to work in the morning, did you
20  have a certain time you had to report to work?
21  A. I usually was there -- you're talking about
22  when I was with Michael Morgan it was 7:30 to 4:00. And
23  I think when I worked in customer service, it was 7:30 to
24  4:00, and then I think I changed it to 8:00 to 4:00.

23

1  Q. So, you think it was 8:00 to 4:00? And during
2  that period of time, were you allowed a lunch hour?
3  A. I think at one point I had an hour lunch and I
4  changed it to a half hour at some point.
5  Q. Would that reduce the amount of time you would
6  be on the job if you reduced your lunch hour?
7  A. No. Like I said, at one time I think I worked
8  8:00 to 4:30, then I changed it from 8:00 to 4:00.
9  Q. With a half hour lunch?
10  A. Correct. So I can get out of there earlier.
11  Q. Now, in addition to your lunch, did you have
12  breaks during the day.
13  A. We had breaks. Most of the time I did not take
14  them.
15  Q. You did not take your breaks?
16  A. No.
17  Q. What was allotted, I mean what was an employee,
18  doing whatever job yours was, what were they allowed to
19  take?
20  A. 10 minutes in the morning and 10 minutes in the
21  afternoon.
22  Q. Did the breaks have to be scheduled?
23  A. Not that I'm aware of, no. They wanted you to
24  take them between a certain time frame. I don't remember

24

1  the times, because I never took them. They had a certain
2  time in the morning you had to take it, and a certain
3  time, like a two-hour window in the afternoon to take
4  them. I didn't pay attention to that because I never
5  took breaks hardly.
6  Q. What about lunches? Could you take a lunch any
7  time you wanted or did it have to be scheduled?
8  A. You gave them a time you took lunch. But if
9  you needed to do something, had to be out of the office,
10  sometimes you would tell them I need to go somewhere, can
11  I use my lunch to go to an appointment. You can always
12  go early or later, if there is something you need to be
13  at during your lunch hour, you could always talk to a
14  supervisor about changing it.
15  Q. You talked about a person you could see, Selena
16  Lloyd, when you were at Stockton?
17  A. I actually have to walk a couple of steps out
18  of the cubicle to see her cubicle, correct.
19  Q. What's Selena Lloyd's last name now, do you
20  know?
21  A. Selena Johnson.
22  Q. And what's her ethnicity?
23  A. She is Black.
24  Q. Now, when you came to work and you indicated

25

1  you didn't take breaks, does that mean you were
2  essentially seated at the desk, at a desk, answering
3  phone calls?
4  A. Yes.
5  Q. The entire day?
6  A. Yes. Unless I had to take a bathroom break. I
7  did not sign out for break to go to the bathroom. I just
8  went to the bathroom.
9  Q. Who would arrange what phone calls, who would
10  assign you the phone calls you were getting?
11  A. Clients call into a database, and the calls get
12  distributed on the phone. The phone system just
13  distributes the calls to different areas, all set up by
14  the phone system.
15  Q. Now, how does the phone know that you are
16  available to take a call?
17  A. How does the phone know? I mean we turn on the
18  ACD, and the phone calls come in through the system.
19  Q. ACD?
20  A. I think --
21  Q. What's that stand for?
22  A. I'm not sure too sure. I forgot what it's
23  called.
24  Q. So, when you come in in the morning and you're

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

26

1  ready to start your job, at 8:00, let's say, what did you
2  do, physically, what did you do?
3      A.  You sign in that you're coming in, and you turn
4  on the ACD, and you open up your computer, I mean the
5  screens to take calls.
6      Q.  Okay.  Now, do you wear a headset?
7      A.  No.  I didn't wear headsets.
8      Q.  Do you use a speaker phone?
9      A.  No.  I didn't use a speaker phone.
10     Q.  You physically raised the phone?
11     A.  To my ear, correct.
12     Q.  Did other employees use one of those headsets?
13     A.  Most of them did, yes.
14     Q.  But you did not?
15     A.  No.  Because I couldn't hear the clients and
16 the clients couldn't hear me.  So I just took the headset
17 off.  And then when I did wear the headset, I was too
18 loud, and other workers saying you're too loud.  I
19 couldn't hear my clients.  For some reason when I
20 couldn't hear them, I would speak louder for some strange
21 reason, and it got to be annoying to the other people so
22 that didn't last very long at all.
23     Q.  Was there something wrong with the headset you
24 couldn't hear clients?

27

1      A.  I have no idea.  I just could not hear them
2  through that headset.  And then when they said they
3  couldn't hear me, I would speak louder.  And the people
4  around me saying you're too loud, so I couldn't wear the
5  headset.  I had to take off the headset.
6      Q.  Okay.  But essentially, would the phone ring or
7  light up when the next call came in?
8      A.  It would ring.  And then you would push --
9      Q.  Was the telephone console you had, had a phone
10 on it and a number of buttons?
11     A.  No.  You --
12     Q.  Or just one button?
13     A.  When you hear the phone ring you pick it up and
14 the call would come through to your line.
15     Q.  Okay.  And was there a formalized greeting you
16 were supposed to give?
17     A.  "Good morning, customer service."  I think I
18 remember that's the only thing I said.  I remember that.
19     Q.  Okay.  And now, what kinds of individuals are
20 calling?
21     A.  It could be anybody.  Could be instate cases,
22 out of state cases.  Someone crying about child support.
23 You had a number of different types of people.  There's
24 no set people that call.  Anyone who had a question about

28

1  child support could call that number and get someone to
2  talk to them about their case.
3      Q.  Well, would you get calls from social workers?
4      A.  Yes.  You would get calls from social workers
5  and different agencies, correct.
6      Q.  Would you get calls from out of state agencies
7  for child support?
8      A.  Yes.  Yes.
9      Q.  Typically, what kind of calls would you be
10 getting?  People seeking basic updates or statuses, or
11 information like that?
12     A.  Clients that we had cases in our databases is
13 the majority of the calls we got.  They had cases in our
14 system, they were calling about their cases.  So it would
15 be basically in state cases and clients who had cases
16 already there at child support.
17     Q.  Would you say people with cases was the
18 overwhelming majority of the calls you would receive?
19     A.  Yes.
20     Q.  Now, the category of people that were calling
21 you, they were called what?
22     A.  I would call them clients.
23     Q.  I know that.  But for instance, some people
24 would be calling you about money that was being garnished

29

1  from their wages.
2      A.  Correct.
3      Q.  And those are called what?
4      A.  I don't remember that.
5      Q.  Non-custodial parents?
6      A.  Non-custodial parents, correct.
7      Q.  You get calls from non-custodial parents,
8  correct?
9      A.  Correct.
10     Q.  What kind of typical questions would you get
11 from non-custodial parent?
12     A.  Basically, about when they're going to receive
13 their next checks, what is going on with their case, when
14 they're going to court.  What type of legal situations
15 that they can encounter later on if they want to do
16 certain things with their cases, basic questions.
17     Q.  If you get a non-custodial parent, generally
18 that is the individual paying child support, right?
19     A.  The non-custodial parent is usually the one
20 paying child support, correct.
21     Q.  And would he typically be calling you to say,
22 hey listen, you took too much out, or something like
23 that?  Or they are taking too much money out of my check
24 or something like that?

8  (Pages 26 to 29)

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement

Nancy Santana

---

30

1   A.  It could be a number of questions they ask.
2  You never knew what they were going to ask.  But any type
3  of question is relevant.  They could ask any type of
4  question that could be a relevant question if that person
5  felt the need to ask it, yes.
6   Q.  And the way that you would provide service to
7  the people calling is you also had a computer screen?
8   A.  Correct.
9   Q.  I take it once a person gave you their name,
10  you would be able to run their name through a system?
11   A.  Correct.
12   Q.  What was that system called?
13   A.  I don't remember.
14   Q.  And when you would type in whatever it was, the
15  name, would a screen come up and give you information
16  about what the claim was, or the status?
17   A.  Yes.
18   Q.  And you would be able to relay that
19  information?
20   A.  Yes.
21   Q.  Now, we talked about non-custodial parents
22  calling.  The other category of persons calling would be
23  the custodial parents, correct?
24   A.  The custodial parents, correct.

---

31

1   Q.  And they would be typically calling you about
2  when they are going to get their check, correct?
3   A.  Most of the time, yes.
4   Q.  All right.  Now, when these people would call,
5  would they generally -- I mean how many calls would you
6  receive a day?
7   A.  I have no idea.  I could never tell you how
8  much calls I receive a day.  It's just way out of the
9  ballpark.  A lot.  I just don't know how many.  No set
10  amount a day.
11   Q.  Would certain days be worse than others?
12   A.  Every day was always a bad day, as far as I was
13  concerned.
14   Q.  Because what?  How many calls were you getting?
15  Could you approximate?
16   A.  There is no way I could verify that.  Every day
17  is a different day.  You get calls, you're on the phone
18  for a second.  You get calls you're on the phone for 10
19  or 15 minutes, sometimes three minutes.  You could never
20  know how many people were going to call in and what type
21  of questions they were going to ask.
22   Q.  And would a number of people that would call
23  that you would field these calls for, would they be
24  upset?

---

32

1   A.  Some of them would be upset.  Most of the times
2  they wasn't upset.  But you get people that for whatever
3  reason want to argue and give you a hard time for
4  whatever reason.
5   Q.  And does that raise your stress level?
6   A.  It does, but the basic thing when you do have
7  to deal with irrational clients is just to try to calm
8  them down and talk rationally to them.
9   Q.  Now, how many employees, coworkers were there
10  in the customer service unit?
11   A.  I can take a hypothetical guess.  I mean 15.  I
12  don't know.  I didn't -- I didn't put them on paper.  I
13  don't have the number in my head.
14   Q.  Were these people all doing the same thing that
15  you were doing?
16   A.  Yes.  No.  One exception.  There was a girl
17  named Beth, she handled the Congressional and the
18  Senatorial and the Governor's complaints, so she was
19  never on the phone.  She was handling the -- she was on a
20  different type of assignment within customer service, but
21  she had to deal with the people that called in to
22  complain about their cases that were outside the agency,
23  basically complaining about how the workers
24  inappropriately handled the cases, and she had to resolve

---

33

1  the issues that they had.
2   Q.  So the majority of the interaction you would
3  have on a daily basis is people that are trying to get
4  information about child support, one way or the other?
5   A.  Correct.
6   Q.  And sometimes, these people were upset?
7   A.  Yes.
8   Q.  And you agree that there was a large number of
9  calls, no matter what?
10   A.  Yes.
11   Q.  Okay.  Now, what happens, the phone system you
12  talked about, does it automatically know who is on the
13  phone, or not?  I mean --
14   A.  Does the phone know?  Does the phone -- I don't
15  understand your question.
16   Q.  Well, when you're done with a call, what do you
17  do?
18   A.  You got a minute -- the system allows you a
19  minute to wrap up the call and then another phone call
20  will go through automatically.
21   Q.  Suppose you need more time than that minute?
22   A.  Then you would put -- you would click a certain
23  button on there, and it will be unavailable, and you can
24  go on for about another minute.

---

9 (Pages 30 to 33)

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement

Nancy Santana

---

**34**

1  Q.  Do you know what the period of time is from
2  unavailable?
3  A.  I think the wrap-up time was two minutes.
4  Q.  And if you needed more time, you would push the
5  unavailable button?
6  A.  Yes.
7  Q.  And as you understood the job, how long are you
8  allowed to be unavailable?
9  A.  I don't remember.
10  Q.  All right.  Was there a time limitation?
11  A.  Not that I'm aware of.  I don't remember.  I
12  don't remember.
13  Q.  All right.  Would people ask you what's going
14  on, if you were unavailable for a longer period of time?
15  A.  Sometimes, Brenda will call you through the
16  intercom and ask what's wrong.  And I say a person called
17  with five different cases.  I got to put five different
18  cases in the system.  I need the time to put them in.  Or
19  she will send me an e-mail and I will send it back,
20  depending on what she wanted to do.
21  Q.  So you are on the computer, correct, and
22  generally on the telephone.  And in addition to the case
23  information on that particular child support enforcement
24  case, you would also be able to receive and send e-mails?

---

**35**

1  A.  Yes.
2  Q.  Did you send e-mails to other workers all the
3  time?
4  A.  Yes.  Yes.  Not all the time, but the majority
5  of the time, yes.
6  Q.  I mean the majority of times you would
7  communicate with other employees, of either your division
8  and other units, was through e-mail, wasn't it?
9  A.  Correct.  Sometimes we could call each other.
10  Depending on if the person was still on the phone and
11  there was something we couldn't answer and we needed
12  verification right away.  Sometimes we will put the
13  client on hold and call the other agency and see if we
14  can get ahold of them at that moment.
15  Q.  Okay.  But it was fairly typical to be
16  communicated amongst employees by e-mail?
17  A.  Correct.
18  Q.  If you had a request that you needed additional
19  time to be away from your desk, or to do something, would
20  you do that by e-mail, generally?
21  A.  E-mail, or I would go –
22  Q.  You mean as far as another worker sending an
23  e-mail to another worker?
24  A.  No.

---

**36**

1  Q.  Let's say you needed, because something arose,
2  you needed to either leave your desk or be away from it
3  for some period of time.  Could you do that by e-mail?
4  A.  I can do it by e-mail, and talk to my -- there
5  was a guy called my team leader, or I would go to speak
6  to the supervisor.
7  Q.  Okay.  And was that easily accomplished?
8  A.  Yes.
9  Q.  All right.  But could you do it by e-mail
10  instead of talking to them?
11  A.  You can do it either way.  It depends on what I
12  felt at the moment.  If I had to get away quickly, I
13  would talk to my team leader.
14  Q.  All right.  And would your team leader talk to
15  the supervisor?
16  A.  No.  He would give me permission, depending on
17  what it was to do, whatever I needed to do by myself.
18  But if it was something he couldn't control, he didn't
19  have authorization, I would have to go to my supervisor.
20  Q.  Okay.  The team leader, you said, three or four
21  people might report to the team leader, right?
22  A.  Right.
23  Q.  And the team leader could, if you needed to do
24  something and be away from the desk, he was authorized to

---

**37**

1  cover for you, by using the other employees in that unit,
2  correct?
3  A.  Cover for me?
4  Q.  For the period of time?
5  A.  He can authorize me to be away from my desk.
6  Q.  All right.  Have you ever been at the customer
7  service unit when there was very few, either through
8  illness or something, there were very few people working
9  there, and you were getting barraged with telephone
10  calls?
11  A.  Repeat that question again.
12  Q.  For instance, you indicated there was
13  approximately, and this is an approximation, 15 people
14  that worked in the customer service unit, correct?  If
15  more people on a given day, customer service workers are
16  ill or not available --
17  A.  Right.
18  Q.  -- does that mean the remaining number of
19  customer service employees have to take all the calls
20  that come in?
21  A.  Take as many calls as we can.  We don't take
22  all of them, but we take as many as we can.  Sometimes we
23  can't answer them all, and people will be on queue for a
24  while.  15 people waiting to come into the queue, means

---

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement

Nancy Santana

38

1  we will be on the phone. Whatever we can get done that
2  day we get done.
3      Q. My point is to the extent you have other
4  coemployees that are not at work, that means there is
5  more work for those that are there?
6      A. We didn't have much time to mess around, so to
7  speak. I mean we was aware that there was calls in
8  queue, and the supervisor made sure that people was aware
9  that people wasn't there. We answered calls the way they
10  came in. We can't sit there and rush people on the phone
11  because there was 15 people in the queue. We did what we
12  had to.
13      Q. And I'm not suggesting you did. Maybe my
14  question wasn't clear. My point is that if there are
15  approximately 15 customer service workers answering
16  telephones, responding to questions, if only 12 of those
17  people, or only 10 of those people are at work on a given
18  day, that means those 10 have to handle whatever calls
19  come in during that period of time.
20      A. Yes.
21      MR. FEUERHAKE: I think she's answered
22  the question, the way she wants to answer it. I
23  mean what you're talking about is the totality, if
24  there's 12 people and the same number of calls, if

39

1  you divide it by 12 you will get a bigger number
2  than if you divided it by 15. She provided her
3  answer that they were busy before, and they did the
4  best they could.
5      MR. NIEDZIELSKI: No, no. That wasn't
6  my question. My question was simply as you pointed
7  it out, and that's why I rephrased it, because I
8  thought I wasn't being clear.
9      MR. FEUERHAKE: And I think she tried
10  to answer.
11      MR. NIEDZIELSKI: I think she did.
12      MR. FEUERHAKE: All right.
13  BY MR. NIEDZIELSKI:
14      Q. So you agree, as he says, that if only 10
15  people show up for work, that means those 10 people would
16  have to handle all the calls that would normally be
17  handled by 15?
18      A. Right, right.
19      Q. Now, when you went to the customer -- did you
20  ask to go in the customer service unit?
21      A. Yes, I did.
22      Q. When you went in the customer service unit, who
23  was the supervisor?
24      A. At that time, it was Dianne Walters.

40

1      Q. And how long was she your supervisor?
2      A. I don't know. I would say from 2000 to 2004.
3  I don't remember. I know she got promoted into
4  management, so I'm not sure what those years are.
5      Q. Do you know, is she still there?
6      A. Yes. She -- from my knowledge, she's still
7  there. I've been gone for a while.
8      Q. You haven't been there since September, right,
9  of 2005?
10      A. September 27th, 2005. Correct.
11      Q. All right. Did Dianne Walters remain your
12  supervisor during that period of time, from 2001 to 2004?
13      A. She was a supervisor, and then there was a
14  Joyce Updike, who passed on, I've heard, and she was also
15  like another supervisor in the customer service unit.
16      Q. All right. And then did you get different
17  supervisors?
18      A. And then Joyce Updike retired, and then Brenda
19  Annand came on.
20      Q. And did you have any other supervisors, other
21  than Brenda Annand?
22      A. You're talking about customer service only?
23      Q. Yes.
24      A. When I first went to child support it was

41

1  Michael Morgan.
2      Q. Right.
3      A. No. Other than Dianne, Joyce Updike and Brenda
4  Annand, that was it for customer service. Oh, Stacy
5  Saylor came by later on. She was a worker and then got
6  promoted to supervisor. So eventually -- she came on
7  board later on.
8      Q. Okay. So, as of 2005, or 2004, you actually
9  had two supervisors you reported to?
10      A. Yes. Dianne Walters was the main person. When
11  they started growing the customer service -- there was
12  only a set number of customer service workers. As we got
13  more people, then they got Joyce Updike in, because it
14  was a lot more people, and they wanted to give it to
15  another supervisor. So Dianne was it for a while, a
16  little bit. As it started to grow, they added Joyce
17  Updike.
18      Q. Okay. Then Brenda Annand came in as your
19  supervisor?
20      A. Joyce Updike retires and then Brenda Annand
21  stepped in to take her place.
22      Q. Do you recall when she stepped in to take
23  Updike's place?
24      A. I would say 2001 or 2002. I'm not aware of

11  (Pages 38 to 41)

Case 1:06-cv-00666-GMS    Document 22-2    Filed 10/19/2007    Page 12 of 32
Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

42

1    what year.

2    Q. What about Stacy Saylor?

3    A. I think Stacy was like 2003 or 2004. I'm not

4    aware of that. I know it was those years, during those

5    years.

6    Q. All right. But do all the customer service

7    workers report to those two supervisors?

8    A. To Dianne Walters at first, and then later on

9    it was Dianne Walters and Joyce Updike. And then later

10    on it became Joyce Updike and Brenda Annand, and then

11    later on, Brenda Annand and Stacy Saylor.

12    Q. Now, when you left in 2005, who were your two

13    supervisors?

14    A. Would have been Brenda Annand and Stacy Saylor.

15    Q. Who did they report to?

16    A. Dianne Walters.

17    Q. Do you know who she reported to?

18    A. No idea.

19    Q. Now, you had co-supervisors?

20    A. Correct.

21    Q. Who, on any given day, which supervisor would

22    you, if you had a question, you needed a supervisor's

23    approval, which one would you go to?

24    A. If it was a choice between Brenda and Stacy, I

43

1    would go to Stacy.

2    Q. Yeah, but were there separate questions?

3    A. No. It depended on who was available at the

4    time. If Brenda was in her office or had someone in

5    there, I would automatically go to Stacy. But who I

6    preferred to go to would have been Stacy, correct.

7    Q. And why is that?

8    A. Because Stacy was a lot nicer and calmer and

9    she took the time to listen to what you had to say.

10    Q. And Brenda was not?

11    A. Brenda was a bit more abrasive, with how she

12    treated certain people in that unit.

13    Q. Okay. Now, did Stacy and Brenda both have the

14    same responsibility as supervisors in 2005?

15    A. I have no idea. I don't know what their -- I

16    know they was in charge of certain groups of people,

17    correct. But what exactly their responsibilities are, I

18    don't remember. I know there was a list of what they do,

19    but I didn't pay attention to what each of them did

20    individually. They were in charge of certain groups of

21    people. Stacy had her group and Brenda had her group.

22    Q. Okay. If you had an evaluation, who would sign

23    off on the evaluation?

24    A. Brenda Annand would sign off on the evaluation.

44

1    Q. Anybody else?

2    A. Not that I'm aware of, no.

3    Q. Do you recall that Stacy Saylor would also sign

4    off on it?

5    A. I don't recall. I know Brenda Annand had to

6    sign. I know I had to sign and Brenda had to sign. But

7    I'm not aware if Stacy had to sign.

8    (Santana Exhibit 1 marked)

9    BY MR. NIEDZIELSKI:

10    Q. Ms. Santana, I'm handing you a document marked

11    Santa that Exhibit Number 1. Can you identify what that

12    document is?

13    A. This is what the EEOC Complaint drafted up for

14    me when I made the EEOC complaint against Brenda Annand.

15    Q. All right. And what's the date on that?

16    A. It's signed at the bottom on June 3, 2005.

17    Q. Now, as I understand this complaint, in

18    paragraph 1, you indicate that "On or about March 1,

19    2005, I received a verbal warning."

20    A. Uh-huh.

21    Q. A verbal warning about what?

22    A. Well, what happened is, Brenda Annand -- I was

23    in the hallway. She came to my face, and started yelling

24    and screaming about me being a bad worker, people talking

45

1    about me. And I was just coming back to my desk, and she

2    basically came in my face and started ranting and raving

3    about me as a person. And that's basically what had me

4    write her up.

5    Q. I'm sorry. That had what?

6    A. I had to write her up. Because it was a series

7    of incidents where I was away from my desk, and she would

8    just literally come at me, from nowhere, and start

9    yelling and screaming, and saying everything I did at

10    child support is terrible. You're a terrible person.

11    People are talking about you. You take a lot of sick

12    leave. It just went on and on into a tirade.

13    Q. Okay. And you indicated that she screamed at

14    you for being away from your desk?

15    A. Yes.

16    Q. Were you away from your desk?

17    A. Yes.

18    Q. And why were you away from your desk?

19    A. Because I went to the bathroom at the time. I

20    was coming back to my desk.

21    Q. In paragraph two, you see where it says, "On or

22    about March 1, 2005, Ms. Annand screamed at me for being

23    away from my desk."

24    A. Yes.

12 (Pages 42 to 45)

46

1    Q.  It indicates, "I stepped away from my desk to
2  retrieve documents from the printer."
3    A.  I went to the bathroom, got the documents, and
4  I was coming back to my desk, correct.
5    Q.  Well, what is the procedure that you are
6  supposed to follow when you do that?  Is there a
7  procedure that you are supposed to follow when you do
8  that?
9    A.  As far as what?
10    Q.  Going to the printer, retrieving things, being
11  away from the desk?
12    A.  At that moment, I had a very bad call, I went
13  to the bathroom, I was trying to get my composure.  So I
14  went somewhere to calm down.  I walked to the printer,
15  because I knew there were some documents there that
16  pertained to me, and I went back to my desk.  I was very
17  upset and I stepped away from my desk to calm myself
18  down.
19    Q.  All right.
20    A.  Obviously, in that situation, I never got a
21  chance to tell Brenda that, because after the tirade was
22  over, she left.
23    Q.  Well, why didn't you e-mail her?
24    A.  I was highly upset about the phone call, and

47

1  then I got screamed at by Brenda Annand.  I wasn't in no
2  mood to talk to anybody.
3    Q.  That's what I mean.  Why didn't you send her an
4  e-mail to explain the circumstances?
5    A.  Because I had to go to the bathroom at the
6  time.  And I went to the bathroom first because I had to
7  go and I went to go get my document.  I do tell my team
8  leader that if I get a disturbing phone call I'm going to
9  walk away from my desk.  I do tell him that I'm going to
10  step away.  He says it's okay.  I don't feel the need to
11  tell Brenda Annand if my team leader is there and I'm
12  upset, I tell him I'm going to step away.
13    Q.  How would Brenda know you are away from your
14  desk?
15    A.  I guess my queue would be unavailable.  If a
16  call comes in, if I go away to go to the bathroom if I
17  sign out, fine.  Sometimes I was made unavailable.  I
18  would let the queue go into unavailable and go to the
19  bathroom.  And the team leader knew.
20    Q.  Did they have some sort of a screen in their
21  office that would tell them that?
22    A.  She had a screen in her office, correct.  A
23  call would wrap up and the queue would be unavailable.
24  During the time if the queue was unavailable, I would go

48

1  run to the bathroom and do what I had to do and come back
2  quickly.
3    Q.  Okay.  Then in paragraph 2 it says, "On or
4  about April 5, 2005, Ms. Annand sent me an e-mail about
5  being away from my desk for more than 14 minutes."
6    A.  Yes.
7    Q.  And you follow that by saying, "I acknowledge
8  being away from my desk because of miscommunication
9  regarding when I was to take my lunch"?
10    A.  Right.
11    Q.  So she sent you an e-mail this time on April 5,
12  that you were away from your desk for more than 14
13  minutes?
14    A.  Every time I was away from my desk, there would
15  always be an e-mail from Brenda accusing me of being away
16  from my desk.  What happened on that date, the system was
17  down.  We could not accept phone calls.  Two workers in
18  the area told me that Brenda Annand verbally told them
19  that they could go to lunch.
20      So, since I couldn't find my team leader, I
21  didn't know whether I could sign out for lunch.  I didn't
22  sign out for lunch.  I went somewhere to talk to a
23  worker, because our system was down and the workers said
24  Brenda told us to go to lunch.  I think you need to go to

49

1  lunch.  Because -- they only had 15 minutes left and they
2  were told to take their lunch earlier since the system
3  was down.
4      I couldn't sign on the log sheet, because I
5  didn't know if I was supposed to be at lunch.  I didn't
6  get no verification from the team leader and Brenda was
7  nowhere in it.  When I got back to my desk, there was
8  this e-mail saying I was away from my desk and I was
9  written up.  We never discussed it.  She just wrote me
10  up.  But I talked to my team leader about it.
11      Eventually I did send an e-mail back
12  because I was upset about it.  It was accusing me of
13  being away for an unauthorized reason.  It was totally
14  unfair, a miscommunication.  She didn't not tell me off
15  for lunch.  I couldn't figure out if it was or not.  I
16  couldn't talk to my team leader.  She sent me the e-mail
17  because I wasn't signed out.  There was a whole
18  miscommunication that came back from her.  I sent her an
19  e-mail to respond back.
20    Q.  When did you respond back?
21    A.  I think I responded back that afternoon.  As
22  soon as I got the e-mail I responded back that afternoon.
23    Q.  And you explained the circumstances?
24    A.  Explained what circumstances?

13  (Pages 46 to 49)

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement

Nancy Santana

50

1   Q.   What you just explained.
2   A.   I got the e-mail, saw it, talked to my team
3   leader. I explained to him what was going on and I
4   responded backing to her e-mail telling her this is a
5   miscommunication. You did not speak to me about it. I
6   said these two workers did specify that I was supposed to
7   be at lunch. I didn't know, so I didn't sign out. I
8   actually went and spoke to her about it, also. And she
9   said it was okay, but apparently it wasn't okay, because
10  this e-mail -- there was nothing in the e-mail saying I
11  was right or wrong. She wouldn't respond back clearly
12  about it. So the e-mail stuck.
13  Q.   Okay. What do you mean the e-mail stuck?
14  A.   She would not clarify that she was wrong. She
15  would not ever acknowledge that I was right. She
16  wouldn't -- we just went back and forth with these
17  e-mails, basically explaining our positions. So you
18  know, she didn't clarify whether I was or was not at
19  lunch. She didn't want to clarify anything. She just
20  said you're away from your desk. I had an e-mail that
21  wrote me up for being away from my desk. I clarified the
22  issue and she did not say I agree or disagree with you.
23  I never even took lunch that day afterwards.
24  Q.   But you said you eventually responded after you

51

1   talked to your team leader, you responded by e-mail
2   explaining the circumstances.
3   A.   Correct.
4   Q.   There was some miscommunication.
5   A.   Right.
6   Q.   You indicated you went and spoke with her in
7   her office and she said okay?
8   A.   Uh-huh.
9   Q.   Correct?
10  A.   Correct.
11  Q.   How many e-mails do you get a day from a
12  supervisor in this --
13  A.   How many e-mails do I get a day from a
14  supervisor?
15  Q.   Yes.
16  A.   The only e-mails I usually get from a
17  supervisor is something to do with cases that pertain to
18  their unit, sometimes. Or whenever Brenda wrote me up
19  for something or accused me of doing something.
20  Q.   When you say she wrote you up, she sent you an
21  e-mail, right, asking you were away from your desk for 14
22  minutes, correct?
23  A.   More like an accusing e-mail, accusing me of
24  being away from my desk for 14 minutes.

52

1   Q.   That was true, you were away from your desk for
2   14 minutes?
3   A.   I was away -- I wouldn't know how long I was
4   away from my desk, the amount of time. The system was
5   down. So there is no clarification how long I was
6   away -- I don't think I was away from my desk that long,
7   that was a disputed question, too, because I wasn't away
8   from my desk for that long a time.
9   Q.   But you were away from your desk?
10  A.   Correct.
11  Q.   So she sent you an e-mail about it?
12  A.   Correct.
13  Q.   And eventually you talked to your team leader?
14  A.   Yes.
15  Q.   Eventually you talked to your team leader?
16  A.   Yes.
17  Q.   And you e-mailed her back?
18  A.   Correct.
19  Q.   And then you followed it up with a
20  conversation?
21  A.   Right.
22  Q.   And she said okay?
23  A.   Uh-huh. But the e-mail still stuck. She
24  didn't clarify anything. I explained to her what was

53

1   going on and she explained her position. The same thing
2   the e-mails that we had. Basically she clarified what
3   her position was, didn't clarify mine. So we basically
4   left -- okay. Whatever. Basically she didn't clarify
5   anything. She didn't apologize. She didn't clarify
6   whether I could take my lunch. I never took lunch that
7   day. She just acknowledged the e-mails were sent and we
8   both disagreed about it.
9        And I talked to my team leader. It was a
10  miscommunication on her part. She wasn't apologizing,
11  she didn't say I could take lunch. I didn't take lunch
12  that whole day. She just said okay. The e-mails were
13  spent. There was never an e-mail saying I'm sorry, we
14  misunderstood, the e-mail still stuck. It stayed with
15  me.
16  Q.   What do you mean it stayed with you?
17  A.   She should have sent an e-mail like she usually
18  does when I get written up for something in her office,
19  she would send me an e-mail, I was written up, did we
20  clarify the issues. If I spoke to her on that specific
21  occasion, I would think she would send me an e-mail
22  saying we talked, this issue was resolved, blah, blah.
23  There was no return e-mail about this.
24  Q.   Did you get disciplined or something?

14  (Pages 50 to 53)

Case 1:06-cv-00666-GMS    Document 22-2    Filed 10/19/2007    Page 15 of 32
Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

54

1    A.   Disciplined?

2    Q.   Yeah.  For being away from your desk for 14

3  minutes?

4    A.   Her e-mails always say I was away from my desk

5  and there's always e-mails that are written up before she

6  ever had the facts in any matter.  And I had clarified

7  the issues, as opposed to what had actually happened.

8  The e-mails were always sent accusing me of being away

9  from my desk without clarification of why I was away.

10    Q.   Here is my question.  As of the April 5, 2005

11  e-mail she sent you, as a result of that, were you

12  disciplined?  Were you suspended from work?  Was your

13  pay -- were you demoted?

14    A.   The only thing I remember from that particular

15  incident is I never took lunch that day.  I never got —

16  and I take lunch at 2:30, because the e-mails were

17  such -- we kept exchanging them, such the fact that I got

18  so frustrated.

19        When my lunch hour came, I didn't even want

20  to take lunch.  She never even clarified it.  I was

21  afraid if I took lunch, my God, she would write up

22  another e-mail, who told you to take lunch.  I think that

23  15 minutes you were gone was supposed to be your lunch

24  break.  I didn't want to do anything else that would

55

1  cause any more aggravation.  I was already upset about

2  the whole situation as it was.

3    Q.   In paragraph 2, continuing on Exhibit Number 1,

4  it goes on to say, "On or about April 20th, 2005, my

5  employee performance review contained negative comments

6  regarding my improving in policies and procedures and

7  notifying supervision when I am unavailable for more than

8  four minutes."

9    A.   Right.

10    Q.   What was your evaluation in April 20th, 2005?

11    A.   What was my evaluation?

12    Q.   Yeah.  What was, the bottom line, what was the

13  evaluation?  Were you found to be unsatisfactory?

14    A.   My performance review said meets expectations.

15  She mentioned something about the performance review as

16  far as the policy and procedures on notifying supervision

17  when I am unavailable for more than four minutes.  I felt

18  that was retaliation.

19    Q.   Well, is there a requirement that you notify

20  them when you are going to be unavailable for more than

21  four minutes?

22    A.   Not when you're going to the bathroom.  There

23  is no such thing as notifying supervision that you got to

24  go to the bathroom.  The only time I left my area was to

56

1  go to the bathroom.  I clarified that to her.  I don't

2  see any other workers in customer service sending you an

3  e-mail or on the wall board to let you know they are

4  going to the bathroom.  I am not going to sit there and

5  e-mail you that I got to go to the bathroom.  Next time

6  you think about it, you're going to ask me what I was

7  doing in the bathroom.  I told her I was not going to do

8  that.

9    Q.   Let me ask you this:  Other than going to the

10  bathroom, have there been times you were unavailable but

11  did not involve you going to the bathroom?

12    A.   I would put in case notes on other cases or if

13  there was a situation that there was something that had

14  to be done and a supervisor told me to do something, I

15  had to put in more extensive case notes, I was made

16  unavailable, correct.

17    Q.   Were there period of times that you were not

18  even in the work area?

19    A.   There were periods of time when I was not in

20  the work area.  When I went to lunch I stepped away from

21  my desk, and I didn't take breaks.  I went to the

22  bathroom.  Those were the times I was away from the work

23  area.

24    Q.   Were there any times you were away from your

57

1  work area, not going to the bathroom, in which you should

2  have notified your supervisor but you did not?

3    A.   Not that I'm aware of, no.

4    Q.   Okay.  You go on to say in paragraph 2 that you

5  have been subjected to retaliation, and it has 704A.

6  What does that mean?

7    A.   I don't know what 704A is.  I'm not sure what

8  that is.  I guess maybe that is the EEOC statute or

9  something.  But I felt I was retaliated against because I

10  testified for Calvin Parsons that year.

11    Q.   On March 24, 2005, you were called as a witness

12  and you testified?

13    A.   For Calvin Parsons, correct.

14    Q.   And that was at an Industrial Accident Board

15  hearing?

16    A.   Correct.

17    Q.   Do you know what Mr. Parsons was seeking in

18  that hearing?

19    A.   I have no idea what he was seeking in that

20  hearing.  I wasn't -- I knew he told me, but I forgot

21  what he was seeking in that hearing.  I know it was

22  something to do with workmen's compensation issues.  I

23  think he was seeking some kind of compensation, but I

24  don't remember exactly what.

15  (Pages 54 to 57)

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement

Nancy Santana

58

1    Q.   Okay. But you were testifying at a workmen's
2    compensation hearing?
3    A.   Correct.
4    Q.   In other words, you are not claiming that
5    Brenda Annand retaliated against you for filing this EEOC
6    complaint?
7    A.   Repeat the question again.
8    Q.   You're not alleging that Ms. Annand retaliated
9    against you for filing this charge of discrimination?
10    A.   I allege that Ms. Annand was going after me for
11    testifying on Calvin Parsons' behalf when she gave me
12    that written evaluation, and some things that she said to
13    me during the evaluations, I had to wonder what her
14    disposition was about Calvin Parsons' workmen's comp
15    hearing.
16    Q.   But you hadn't even filed this when you got
17    what your claim to be the evaluation with negative
18    comments on it.
19    A.   I filed that in March, 2005. I think I got my
20    evaluation after that.
21    Q.   Well, this is dated June the 3rd of 2005,
22    correct?
23    A.   I was actually in the EEOC office back in early
24    March of 2005. That's when they actually typed this up.

59

1    But I was actually in that office at the beginning of
2    March of 2005.
3    Q.   But your charge of discrimination wasn't
4    published or sent out until sometime after June 3, 2005,
5    correct?
6    A.   I have nothing to do with EEOC, the way they
7    type their stuff and send it out. That's the date they
8    typed this up and sent it out to her. But the actual
9    written complaint was done in March of 2005.
10    Q.   Well, did you receive a copy of this?
11    A.   Yes.
12    Q.   Do you recall when you received your copy of
13    this written?
14    A.   I don't remember exactly the date, but it was
15    the same time that they told me that Brenda Annand
16    received it.
17    Q.   Okay. Well, if you see the top there? Do you
18    see a stamp?
19    A.   Yes. I do see a stamp.
20    Q.   It says received. Do you see, what's the date
21    there?
22    A.   It looks like it says June 21, 2005.
23    Q.   So you agree, that would be after your
24    evaluation for 2005?

60

1    A.   I don't remember the date of my evaluation. So
2    that's hard to answer the question.
3    Q.   In paragraph 2, you say the date of your
4    evaluation is April the 20th, 2005.
5    A.   Uh-huh. And I wrote her up in March.
6    Q.   But she wouldn't have known that, would she,
7    until she got a charge of discrimination?
8    A.   That I went to EEOC?
9    Q.   Yes.
10    A.   Why would I go tell her that I went to the EEOC
11    office in March of 2005? That's something I did on my
12    own.
13    Q.   No. I understand that. My point was, until
14    this is typed, signed by you, and sent out, she wouldn't
15    know that you made a complaint against her in EEOC,
16    correct?
17    A.   No.
18       MR. FEUERHAKE: Well, I mean I'm going
19    to object to that, just because --
20       MR. NIEDZIELSKI: Your objection --
21       MR. FEUERHAKE: -- she doesn't know
22    what is in Brenda Annand's mind.
23       MR. NIEDZIELSKI: Your objection --
24    okay.

61

1    BY MR. NIEDZIELSKI:
2    Q.   Do you understand?
3    A.   No. I don't know what you're trying to lead
4    to.
5    Q.   No. I'm asking you, you said that you went to
6    the EEOC back in March.
7    A.   Yes.
8    Q.   Of 2005.
9    A.   Correct.
10    Q.   And you said you did not tell Brenda that.
11    A.   No. Did not tell her I was --
12    Q.   You would not tell her that, correct?
13    A.   No. I would not discuss that with her.
14    Q.   So the only way that Brenda Annand would know
15    that you went to the EEOC and made a charge of
16    discrimination, is when she received a copy of this
17    charge of discrimination, correct?
18    A.   Correct.
19    Q.   And that would have been --
20       MR. FEUERHAKE: Well, you know, she
21    doesn't know what is Brenda Annand's -- she
22    answered.
23       MR. NIEDZIELSKI: I'm not asking her
24    that.

16 (Pages 58 to 61)

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement

Nancy Santana

62

1     MR. FEUERHAKE: But you're asking her
2  the only way Brenda Annand would know --
3     MR. NIEDZIELSKI: You're not supposed
4  to make speaking objections, either.
5     MR. FEUERHAKE: You're not supposed to
6  ask your questions --
7     MR. NIEDZIELSKI: You're not supposed
8  to make speaking objections.
9     MR. FEUERHAKE: Well, I object to the
10  form.
11     MR. NIEDZIELSKI: Fine.
12     MR. FEUERHAKE: The information you
13  want, get it, but she doesn't know what is in Brenda
14  Annand's head.
15     MR. NIEDZIELSKI: I'm not asking her
16  that.
17     MR. FEUERHAKE: She doesn't know what
18  other people --
19     MR. NIEDZIELSKI: I'm asking her what
20  she did.
21     MR. FEUERHAKE: Nor does she need to
22  make a conclusion.
23     MR. NIEDZIELSKI: Speaking objection.
24  Stop. Stop.

63

1     MR. FEUERHAKE: Ask your question
2  again. Let's see what the question is.
3  BY MR. NIEDZIELSKI:
4     Q.  Your prior testimony, you indicated that you
5  went to the EEOC sometime in March of 2005?
6     A.  Correct.
7     Q.  All right. You did not tell your supervisor
8  you went to the EEOC to complain about her, did you?
9     A.  No. I did not.
10     Q.  And you would not tell her, that was your
11  testimony?
12     A.  Yes.
13     Q.  Correct? So the only way that Brenda Annand
14  would know that you went and filed a complaint against
15  her with the EEOC is when she received a copy of this
16  typed, written charge of discrimination correct?
17     A.  Correct.
18     MR. FEUERHAKE: Well, that's the
19  question that I object to. There's a thousand ways
20  that Brenda Annand could find out. You could ask
21  her about the facts of the things she knows. You're
22  asking for a conclusion.
23  BY MR. NIEDZIELSKI:
24     Q.  Did you tell Brenda you were going to the EEOC?

64

1     A.  No, I did not. The people who went with me
2  that day --
3     Q.  Who went with you?
4     A.  Calvin Parsons and Jackie Berry.
5     Q.  And you went to the Philadelphia office or the
6  Wilmington office?
7     A.  The Philadelphia office.
8     Q.  And you all went together?
9     A.  Yes.
10     Q.  Did you discuss your matters with the EOC
11  together?
12     A.  We spoke individually to the EEOC reps.
13     Q.  Did you drive up together?
14     A.  Yes.
15     Q.  Do you remember what day that was?
16     A.  I have no idea. The beginning of March, 2005.
17  Sometime in the middle, mid, somewhere around there. It
18  was before Calvin Parsons' March 24th workmen's comp
19  hearing.
20     Q.  Okay. And whose idea was it to get together
21  with the three of you?
22     A.  It was the three of us come to a conclusion
23  that the stuff that was happening to us was retaliation
24  from her, based on our race, and we felt as though we

65

1  needed to resolve it quickly, or other people would be
2  hurt because of Brenda Annand. And we each had problems
3  with her. We each had race discrimination issues with
4  her.
5     Q.  And Calvin Parsons was terminated, right?
6     A.  I think Calvin was terminated in 2005. 2004 --
7     Q.  4.
8     A.  2004.
9     Q.  And he was terminated by Charles Hayward?
10     A.  I don't know who he was terminated by.
11     Q.  Do you know why he was terminated?
12     A.  Because they said he was performing
13  insufficiently. That's what I assumed.
14     Q.  So you, Ms. Berry and Mr. Parsons went together
15  to the EEOC office?
16     A.  Yes.
17     Q.  So the three of you knew you were going up
18  there and making these complaints, correct?
19     A.  Correct.
20     Q.  Do you have any information that Jackie Berry
21  shared this information with Brenda Annand?
22     A.  I was not aware that Jackie shared anything
23  with Brenda Annand.
24     Q.  Were you aware whether Calvin Parsons shared

17 (Pages 62 to 65)

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement

Nancy Santana

66

1  any of this information with Brenda Annand?
2      A.  I'm not aware if Calvin Parsons shared any of
3  this with Brenda Annand.  I do not know that.
4      Q.  Did you, Calvin and Jackie agree to keep this
5  quiet?  Keep this secret?
6      A.  People amongst us knew.  We talked to other
7  workers about what we planned on doing.  So they -- other
8  workers in that area were aware of what we planned on
9  doing.  Now the actual date we did it, no, they didn't
10  know the actual date we were doing it.  It was all just
11  talk amongst the three of us, and we did share with other
12  workers.
13      Q.  Okay.  And you indicated you went up there
14  sometime in March.  And then did the EEOC contact you to
15  come up and sign the document sometime later?
16      A.  Yes.
17      Q.  And did you go back up to Philadelphia to sign
18  the document?
19      A.  Yes.
20      Q.  All right.  And shortly thereafter, did you
21  receive a copy of it in the mail?
22      A.  Yes.
23      Q.  The document you signed?  Now, you indicated in
24  your EEOC complaint, you talk about, and I just want to

67

1  make sure this is correct, you talk about two incidents,
2  correct?
3      A.  Uh-huh.
4      Q.  One was March 1, 2005, when she, quote,
5  screamed at you for being away from your desk, correct?
6      A.  Correct.
7      Q.  And you talked about an incident on April 5,
8  when she sent you an e-mail about being away from your
9  desk?
10      A.  Correct.
11      Q.  And the third thing is, on April the 20th,
12  2005, you indicate that you believe your employee
13  performance review contained negative comments?
14      A.  Correct.
15      Q.  And those are the three things you discussed
16  with the EEOC?
17      A.  Yes.  And the situation in which she yelled and
18  screamed at me and all the workers of color in the
19  customer service unit.
20      Q.  On those days?
21      A.  No.  Not on those particular days.  I just gave
22  them a sheet about how we were treated differently than
23  White employees in that customer service unit.  So I had
24  to give them a statement.  And they wrapped up my

68

1  statement into their statement, and put it here on paper.
2      Q.  Which is what?
3      A.  What?
4      Q.  Which is what?
5      A.  No.  I wrote a written document to them, and
6  they summed it up into this written statement.
7      Q.  The first document, I will mark as Exhibit 2,
8  it is produced by plaintiffs and Bates stamped 00070
9  through 00072.
10          (Santana Exhibit 2 marked)
11  BY MR. NIEDZIELSKI:
12      Q.  Could you please identify that three-page
13  document for us, Ms. Santana.
14      A.  That was my written response when I first went
15  into the EEOC office.
16          MR. FEUERHAKE:  I'm sorry.  That's
17  00070 through 00072; is that right?
18          THE WITNESS:  00070 --
19          MR. FEUERHAKE:  To 00072.  And that's
20  going to be Exhibit 2?
21          MR. NIEDZIELSKI:  Yes.
22          MR. FEUERHAKE:  Okay.
23  BY MR. NIEDZIELSKI:
24      Q.  Is that what you're talking about?

69

1      A.  Yes.
2      Q.  Is there a date on that?  I don't see a date on
3  that.
4      A.  March 1, 2005.
5      Q.  Now I'm going to hand you a document I'm going
6  to mark as 3, and it's a series of e-mails produced by
7  plaintiff that are Bates stamped 00073 through 78.
8          (Santana Exhibit 3 marked)
9  BY MR. NIEDZIELSKI:
10      Q.  Take some time and go through them.  Are these
11  the e-mails you were speaking about?
12      A.  This is the e-mail where the system was down,
13  and the two coworkers said they were at lunch and that I
14  needed to take a lunch.  And these are personal e-mails
15  between me and coworkers involving the incident, because
16  I was so upset that I sent e-mails to my other workers
17  besides my team leader, about the situation, and the
18  miscommunication on Brenda's part.
19      Q.  Tell me if I'm correctly reading this.  This
20  started with an e-mail from Brenda Annand to you on April
21  25, 2005, at 1:25 p.m., correct?
22      A.  Yes.
23      Q.  And the e-mail says, "Nancy, it is after 1:00,
24  and you have been unavailable for over 14 minutes without

18  (Pages 66 to 69)

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
## Nancy Santana

70

1  using the wall board to notify supervision as to why. I
2  attempted to call you, but you didn't answer, and when I
3  went to your desk, you were not there. In addition, you
4  were not signed out for lunch or anywhere in the CSU
5  unit. When the phones came back on, you were needed to
6  take incoming calls."
7  And the next paragraph, "As stated before,
8  you need to remember to use the wall board to notify
9  supervision when you are unavailable for over four
10 minutes, so we know why. This is not the first time this
11 issue has been brought to your attention. If this
12 continues to be an issue, and you fail to follow unit
13 procedures, I will have no recourse but to take
14 disciplinary action."
15 Have I correctly read that e-mail?
16 A.  Correct.
17 Q.  And was she factually correctly reporting that
18 you were unavailable?
19 A.  I don't think I was gone for 14 minutes, no. I
20 don't think she was factual about that at all.
21 Q.  Did she call you, your office phone?
22 A.  I wasn't at my desk, so I have no idea whether
23 she called or not.
24 Q.  And then she indicates she went to your desk

71

1  and you were not there. Would that have also been true?
2  A.  I was not at my desk. That would have been
3  true, correct.
4  Q.  And then you sent her back an e-mail in
5  response at 1:50 p.m.
6  A.  Uh-huh.
7  Q.  And you told her, in your estimation, you told
8  her what was reported to you by other coworkers?
9  A.  Correct.
10 Q.  And then you close by saying, "This is a
11 serious miscommunication on your part. You didn't speak
12 to me directly; therefore, no disciplinary action is
13 needed. You need to clarify your intent clearly."
14 A.  Correct.
15 Q.  Did she take disciplinary action against you?
16 Any disciplinary?
17 A.  This was a miscommunication on her part. This
18 is a series of e-mails that I received from her, in
19 reference to always being away from my desk. She doesn't
20 ask me or clarify with me before she sends these e-mails,
21 stating -- writing me up for being away from my desk.
22 E-mail is sent and clarification is given later on.
23 After the clarification is given, she doesn't delete the
24 e-mails or apologize for the e-mails. The e-mails

72

1  somehow get to be part of my personnel record. And she
2  does end a lot of her e-mails about taking disciplinary
3  action against me. It wasn't needed or justified, and
4  any time she sent e-mails it wasn't needed or justified.
5  Q.  Well, let me ask you this: She had been your
6  supervisor since 2001?
7  A.  I don't remember what year she was my
8  supervisor.
9  Q.  When did you start having problems with her?
10 A.  When she became my supervisor.
11 Q.  Did you complain about it?
12 A.  We kept it amongst ourselves until we got to
13 the point we started realizing there were racial
14 overtones to a lot of thing she was doing.
15 Q.  You said you realized it. Who realized it?
16 A.  We talked amongst coworkers ourselves.
17 Q.  Was it something you yourself observed?
18 A.  Me, amongst other coworkers, people of color,
19 started noticing things happening.
20 Q.  I'm not asking what people told you. What did
21 you observe?
22 A.  Her yelling and screaming at people of color
23 for being away from their desk.
24 Q.  Who?

73

1  A.  Calvin Parsons.
2  Q.  When?
3  A.  I don't remember. She screamed at Calvin
4  Parsons a lot.
5  Q.  For being away from his desk?
6  A.  Yes.
7  Q.  Was he away from his desk?
8  A.  Yes. Sometimes she would actually go into his
9  cubicle and accuse him of being away from his desk,
10 though. Sometimes I overheard conversations where she
11 was yelling and screaming at him. Sometimes she had him
12 in her office yelling and screaming at him.
13 Q.  Where is Calvin Parsons' desk in comparison to
14 yours?
15 A.  He was next to me in my cubicle.
16 Q.  Now, he stopped being a team leader in 2004,
17 correct?
18 A.  Yes. He was. He left child support and
19 eventually later on he got fired.
20 Q.  Who else do you indicate you saw her treat
21 differently?
22 A.  Jackie Berry.
23 Q.  And when did you see that?
24 A.  I don't remember the times I overheard Brenda

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement

Nancy Santana

74

1  Annand screaming at Jackie.
2      Q.  Could you hear what she was saying to her?
3      A.  Same thing she would tell us.  She just said
4  nasty things to her about her work performance and how
5  she was as a person.  She actually said to Jackie one
6  time, "you people."  I remember that being a derogatory
7  term she used with Jackie and Jackie being discussed with
8  me it hurt her because --
9      Q.  You heard that?
10     A.  Yes.
11     Q.  When?
12     A.  I don't remember.  I heard it in a conversation
13  when she was yelling at Jackie Berry.  She is loud and we
14  are in cubicle.  I don't mark down dates.  When I'm on
15  the phone, I hear or see something, and it's loud.  It
16  takes away from the call.  I have to stop the call to
17  find out who is she yelling at and why is she yelling at,
18  and tell the client on the phone hold on, so I could
19  figure out what is the deal going on, because she was
20  loud.
21     Q.  My point is that you are saying these things
22  happened or you observed them, and I'm trying to get
23  them --
24     A.  I overheard them.  I didn't observe.  I can't

75

1  see it.  I hear it.
2      Q.  And I'm trying to get you to tell me when.
3      A.  I can't clarify that.  She yelled and screamed
4  at Calvin and Jackie.  And Jackie didn't sit that far
5  from me.  I overheard the stuff she was saying.
6      Q.  How many times?
7      A.  Geez.  A lot.  I can't clarify.  It was quite a
8  few times.
9      Q.  How many times?
10     A.  I can't give a number.  It was quite a few
11  times.  I can't clarify an actual number.  It was quite a
12  few times.
13     Q.  How about Calvin Parsons?  How many times?
14     A.  Brenda was at his desk a lot.  There were a lot
15  of times with Calvin.
16     Q.  Was Calvin away from his desk a lot?
17     A.  No.  He wasn't.  Some of the confrontations
18  were right there in his cubicle.
19     Q.  And what were they about?
20     A.  About the same things, about his work
21  performance, him being a bad person, the negativity about
22  him.  She would just rant and rave about everything
23  negative about him.  There was no justification.  She
24  would just snap.

76

1      Q.  Did you complain about it?
2      A.  We talked amongst Calvin and Jackie and myself.
3  We went to EEOC together to make the complaints.  Because
4  other people would eventually end up getting hurt by the
5  same thing if we didn't stop her.
6      Q.  Well, who is your division director?
7      A.  I don't know who that is.
8      Q.  Is who the division director of the Division of
9  Child Support Enforcement?
10     A.  Charles Hayward, I think is the director.  I
11  don't know if he is the division director.  Charles
12  Hayward is the director of child support.
13     Q.  Isn't it the Division of Child Support
14  Enforcement?
15     A.  It's the Division of Child Support Enforcement.
16     Q.  Isn't he the director of the Division of Child
17  Support Enforcement?
18     A.  He is the director of Child Support
19  Enforcement.  You said the Division of Child Support, or
20  something like that.
21     Q.  He is the director, correct?
22     A.  Yes.  He is a director.
23     Q.  Why couldn't you approach him about a problem?
24     A.  Why would I approach him about a problem?  I

77

1  talked to the team leader and amongst ourselves.  I
2  wouldn't go to him if I could talk to my supervision.
3  Obviously, if the supervision is the problem, I wouldn't
4  go to her if she is the problem.
5      Q.  Do you have any problem with Stacy Saylor?
6      A.  I don't have any problem with Stacy Saylor.
7      Q.  You could go to her.
8      A.  At the time we kept it amongst ourselves and
9  talked amongst ourselves until we figured out what needed
10  to be done.  I didn't feel the reason or the liberty to
11  talk to supervisors about something we wanted to discuss
12  amongst ourselves.
13     Q.  I thought you wanted to solve the problem.
14     A.  Solve what problem?
15     Q.  You indicated there was a problem.
16     A.  Yes.
17     Q.  And you wanted to resolve it.
18     A.  It was escalating to become such a bigger
19  problem, the only way I felt to resolve the problem was
20  to take it to the EOC.
21     Q.  Do you have an EEO officer that works for the
22  Department of Health and Social Services?
23     A.  Yes.
24     Q.  Did you go to them?

20  (Pages 74 to 77)

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement

Nancy Santana

78

1    A. No. I didn't go to the EEOC officer at all.
2    Q. Why not?
3    A. Because I didn't feel a need to go to the EEOC
4    officer. I had a problem with them a couple years ago
5    with Dianne Walters, and I didn't trust the management
6    after we went to a State grievance hearing. I didn't
7    want to be involved with management anymore, because of
8    that grievance hearing.
9    Q. Well, what happened in that grievance hearing?
10    A. They basically, it's a grievance hearing where
11    you allege certain things happened, and a bunch of state
12    workers are there, and they basically clarify the issues,
13    don't listen to your issues, and then they resolve it by
14    saying oh, we believe our issues are correct. End of
15    story. That's how that goes.
16    Q. What was the subject matter of your dispute
17    with Ms. Walters?
18    A. It was military discrimination.
19    Q. And when was that? What year was that?
20    A. That would have been back in 2000 and 2001.
21    Q. What was the military discrimination you were
22    alleging?
23    A. She falsified information on an evaluation she
24    gave me in 2000. And she mentioned issues about military

79

1    being a problem, and it was against the law that she put
2    that in there. Because that was not the problem.
3    Q. What was the problem?
4    A. She said I was going on military leave, and
5    that affected my work performance. And my military leave
6    has no basis or reason for being in a performance review
7    to deny me a meets expectation, so I could get promoted.
8    She puts needs improvement and I was denied promotion.
9    Q. Oh. Am I correct that you grieved an
10    evaluation by Dianne Walters?
11    A. Correct.
12    Q. And what was that system or process?
13    A. Basically, you send a letter to people at the
14    personnel and say I want to grieve the evaluation given
15    by Dianne Walters. They set you a series of settings as
16    far as going through the State of Delaware's grievance
17    hearing. You go through different hearings, and the
18    State decides in favor of the State. That's how it went.
19    Q. Well, can you take that further?
20    A. Well, what happened is there was an absolute
21    lie in that e-mail -- I mean in that evaluation, and she
22    never would be asked about it. And I kept asking about
23    specific questions in that evaluation. They kept going
24    over case notes. And I said well, let's answer the

80

1    questions in the actual evaluation.
2    And they never answered it. And then at
3    the very end, oh, well, there's 5,000 case notes against
4    you, and we believe what Dianne Walters says, basically.
5    And we don't believe what you say. So that was how it
6    ended. The State decided for the State. I thought it
7    would be an independent panel. Someone totally
8    independent. But looking over the facts of the case and
9    giving a conclusion. It was nothing to do with that. I
10    had no idea what I was in for.
11    Q. So, as I understand it, you grieved a
12    performance evaluation in 2001?
13    A. Correct.
14    Q. Or was it 2000?
15    A. 2000.
16    Q. That Dianne Walters, she had some negative
17    comments about you?
18    A. She had negative comments as far as my military
19    discrimination. As far as my military leave and stuff.
20    She had negative comments in there about me, my actual
21    job as far as taking phone calls, she put an absolute lie
22    inside that evaluation, and I didn't like it or
23    appreciate it. But they never clarified that, either.
24    Q. You grieved that, and they didn't find in your

81

1    favor, correct?
2    A. I didn't even get a chance to answer anything
3    in that evaluation. It was all a bunch of these case
4    notes that Dianne said she is a bad person. These are
5    case notes regarding -- the stuff I grieved was the
6    actual evaluation. We never even talked about it. The
7    State wouldn't let me get a word in on it. They wouldn't
8    let me answer a question.
9    Q. My point is you got a chance and went through a
10    grievance procedure?
11    A. Correct.
12    Q. And they didn't see it your way? They ruled
13    against you?
14    A. Correct.
15    Q. And you were free, if you wanted to, to take it
16    further, were you not?
17    A. I did take it further.
18    Q. Where did you go?
19    A. I went to the Department of Labor and spoke to
20    the Department of Labor guy, somebody named Mr. White,
21    David White.
22    Q. And what did you do with Mr. White?
23    A. He went to a hearing with them, and we sat
24    down, and I had a problem with Mr. White, and I took it

21  (Pages 78 to 81)

Case 1:06-cv-00666-GMS    Document 22-2    Filed 10/19/2007    Page 22 of 32
Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

82

1  further to his supervisor. He made a comment about
2  something that was said in the actual interview that we
3  had to try to clarify the issue, and he didn't speak to
4  me about it beforehand.
5         And there were some issues with him saying
6  things that were inappropriately said during that
7  hearing, and I complained to his supervisor. And then at
8  the end of that, I complained to his supervisor, wrote
9  him a letter. They said we don't have time to look at
10 this. You need to take it to the Federal level for the
11 Department of Labor. The Department of Labor said you
12 need to get an attorney, we have too many cases. We
13 can't handle it. I had to let it go. The statute of
14 limitations had already run out.
15     Q. So was that a separate complaint you were
16 making?
17     A. It was the same situation. The military was
18 actually in the evaluation. I took it further, to the
19 Department of Labor, because it had the military
20 information in it.
21        There was a disagreement with Mr. White at
22 that hearing. And I -- I told him about what I saw that
23 he did was inappropriate. I complained to his
24 supervisor. His supervisor said, well, let's take it to

83

1  another level. Go take it to the Federal level. And I
2  got a letter from the Feds saying they didn't have time
3  to look at my information. You need to take it to
4  counsel. By the time I took it to counsel, two years had
5  already expired. I didn't realize the statute of
6  limitations was up. I had to let it go.
7      Q. Okay. Now, do you believe that you got a
8  negative evaluation from Dianne Walters, that you
9  complained about, because of your race?
10     A. I think she was racist, yes.
11     Q. Do you think she is a racist? What race are
12 you?
13     A. Hispanic.
14     Q. Do you speak Spanish?
15     A. I'm not fluent. I speak some Spanish, not a
16 lot.
17     Q. So, you believe Dianne Walters has a racial
18 problem?
19     A. I think she is a racist.
20     Q. Why is that?
21     A. Because of some of the things she did to me.
22     Q. Well, do you think anybody that does something
23 you don't like is a racist?
24     A. Well, let's put it this way: There were some

84

1  things she did to me that she didn't do to anybody else,
2  and I don't understand it was only directed to me, and at
3  the time, I was the only Hispanic in that unit. So yeah,
4  based on some of the stuff I grew up dealing with, you
5  can pretty much tell some of the things people do and say
6  to you, if it's racist or not. It comes from being
7  discriminated against most of your life.
8      Q. So, have you been discriminated against, you
9  believe, most of your life?
10     A. In some situations, yes.
11     Q. Did you at one time file an EEOC complaint
12 about promotion?
13     A. Yes. I did file it against a fellow coworker
14 who got a pay grade 13, and she did not meet the
15 qualifications to get it. And that was when Dianne
16 Walters was still a supervisor in that unit.
17     Q. And what happened to that complaint?
18     A. Basically, I was told by the EEOC that unless I
19 had actual concrete evidence of discrimination, I
20 couldn't pursue it. I couldn't just tell them she didn't
21 meet it, because obviously, they would have no reason to
22 look in her file. I had to have something actually
23 showing them, proof that discrimination took place. I
24 could not come up with factual stuff, other than what I

85

1  actually said. So they said they couldn't pursue it
2  further.
3      Q. So they dismissed the case and gave you a right
4  to sue letter?
5      A. No. They just dismissed the case. I didn't
6  want to do a right to sue. They were right, I didn't
7  know how that system works, but other than me telling
8  them she didn't meet the qualifications, I couldn't
9  produce anything showing she didn't meet it. I didn't
10 want to do a right to sue. I had to let it go, because I
11 couldn't produce any information to clarify that EEOC
12 complaint.
13        MR. NIEDZIELSKI: This will be
14 plaintiff's Bates stamp 00079.
15        (Santana Exhibit 4 marked)
16        MR. FEUERHAKE: Just the one page?
17        MR. NIEDZIELSKI: Yeah. 00079.
18        (Brief discussion off the record)
19 BY MR. NIEDZIELSKI:
20     Q. Have you seen this before?
21     A. Yes, I have.
22     Q. What is this?
23     A. This is Brenda Annand's performance review of
24 me.

22 (Pages 82 to 85)

86

1    Q.    And it's for the period of what?

2    A.    January 1, 2004, to December 31, 2004.

3    Q.    Okay.  And what is the evaluation?

4    A.    What do you mean what is it?

5    Q.    What's the conclusion?

6    A.    The conclusion, as far as what?  I don't

7    understand the question.

8    Q.    Your evaluation.

9    A.    I don't understand, the conclusion?  This is an

10    evaluation.

11    Q.    Right.

12    A.    So the conclusion is an evaluation.  I don't

13    understand what you're saying.

14    Q.    Well, what was the bottom line of the

15    evaluation?  What did they find?  Did they find you meet

16    expectations?

17    A.    It says in here meets expectations.

18    Q.    And it was signed by you?

19    A.    Yes, it is.

20    Q.    Signed by Dianne Walters, correct?

21    A.    Correct.

22    Q.    Signed by Brenda Annand?

23    A.    Right.

24    Q.    And it's also signed by Stacy Saylor?

87

1    A.    Right.

2    Q.    And if you disagreed with anything in here, you

3    would have a right to attach something, correct?

4    A.    Well, I had my EEOC complaint back in March.

5    So I was going to bring up the information when it came

6    time to bring up the information.  That's when the EEOC

7    case hit.  So I did my filing.  I didn't feel I had to

8    clarify anything with her.  Because if I was to tell her

9    about the EEOC complaint, why would I tell her during

10    this evaluation?  I knew that stuff was going to come to

11    pass eventually.

12    Q.    In other words, she didn't know about it yet,

13    but you figured that when she did find out about it,

14    would that be your like response to this evaluation?

15    A.    Well, no.  I put in there about my evaluation

16    containing comments that it didn't have to have in it.

17    Q.    Now, when would you have received this

18    evaluation?

19    A.    I signed it the 29th of April, '05.  So that

20    had to have been the day I received it.

21    Q.    Okay.  So, you could only have reported about

22    that to the EEOC after April 29th, 2005?

23    A.    I had a series of discussions with the EEOC, as

24    far as situations happening after.  They said anything

88

1    else that you need to add or -- to this thing, let us

2    know.  I did talk to them afterwards, and I did talk

3    about the evaluation with them afterwards.

4    Q.    Would you tell me or show or explain to us,

5    where are the negative comments?

6    A.    "The other area Nancy needs to focus on

7    improving is following the unit policies and procedures.

8    This entails notifying supervision when she is

9    unavailable for more than four minutes and submitting

10    leave slips within one hour of returning to work after an

11    absence from the office."

12    Q.    Were you supposed to notify your supervisor

13    when you were unavailable for more than four minutes?

14    A.    We talked about me going to the bathroom.  I

15    told her the only time I'm away from my desk is to go to

16    the bathroom.  I clarified, I'm not going to send her an

17    e-mail to tell her I'm going to the bathroom, if other

18    people in the unit aren't going to tell her they are

19    going to the bathroom.

20    Q.    What about the submitting leave slips?

21    A.    Brenda only handed out leave slips.  Most of us

22    didn't have leave slips, and it was hard to get something

23    out in an hour, especially when she only gave three or

24    four.  A lot of us didn't have leave slips, plus then on

89

1    them she would resubmit them back to you.  Most of us

2    don't have leave slips.  I told her that was a problem.

3    Other units, supervisors left plenty of leave slips out.

4    We were trying to scramble amongst ourselves just to

5    submit a slip for a person being out on sick leave.

6    Q.    Is there a regulation or rule that you are

7    supposed to fill out a leave slip for sick leave within

8    an hour of return after an absence?

9    A.    She said that in an e-mail.  And the problem I

10    told her, my team leader knew it.  The leave slips, she

11    only gives out three or four.  A lot of us didn't have

12    leave slips and we can't grab anything.  And we couldn't

13    go outside of our cubicle to look for some.  We didn't

14    have leave slips.

15    I clarified that to Brenda.  I said you

16    want me to submit a leave slip.  There's no leave slips

17    available.  We got to be on the phones.  We can't go

18    running around to other agencies to collect leave slips.

19    She only handed out two or three at a time.  We took a

20    lot of leave.  We were out of leave slips, and it was

21    hard to do anything within an hour, because there were no

22    leave slips, because everybody kept what they had.

23    Q.    Did you write an e-mail requesting leave slips?

24    A.    I talked to Brenda.  I didn't need to send an

23  (Pages 86 to 89)

Case 1:06-cv-00666-GMS    Document 22-2    Filed 10/19/2007    Page 24 of 32
Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

90

1  e-mail. When we got a chance we went to other sections
2  and grabbed boxes of slips left out in the areas. So
3  when we had a chance we went to other areas and grabbed a
4  bunch and handed them out amongst ourselves.
5      Q.  The rest of the comments there, are they
6  negative?
7      A.  The unit policies and procedures. I think they
8  were negative. Like I said, a lot of times when she sent
9  me e-mails she didn't talk to me about it. She sent
10  e-mails to me and accusing me of stuff. The thing is
11  once I clarified the issues with her, she did not take
12  back the e-mail, or apologize for what she had done. And
13  like I said, she had a habit of when I came in the office
14  and we discussed the problem, I've always had to sign a
15  piece of paper saying what we talked about.
16          Then when I got back to my desk, there was
17  a further e-mail to me that was CCed to other supervisors
18  or maybe sometimes to Dianne Walters, and I thought that
19  was a bit much. And to actually have -- again, insulted
20  with "failure to follow unit policies and procedures."
21  If we talked about it in the office, you send me an
22  e-mail about it.
23      Q.  I'm sorry. I hate to interrupt you,
24  Ms. Santana. Where does it say you are failing to --

91

1      A.  The e-mail that she sent, was always derogatory
2  about failing to follow procedure and all that. And
3  disciplinary action warranted. It says the other area
4  Nancy needs to focus on is improvement of following unit
5  policies and procedures.
6          I think if you talk to me, and you have me
7  write on a piece of paper that we talked and you follow
8  me with an e-mail clarifying the same issues, why does it
9  need to be in the evaluation? Because this to me is like
10  you are basically dogging me three separate times,
11  because when she wrote me up, for these e-mails, and we
12  talked about it and we confirmed that we talked about it,
13  she didn't take the e-mails back.
14          And the fact that when I signed that I --
15  we talked, when she talked to other people about
16  inconsistencies that they were doing, they didn't sign
17  any documents. I signed documents, saying that we
18  talked. Then when I went back to my desk, there was
19  another e-mail, CCed to Stacy Saylor or Dianne Walters or
20  both, clarifying what we talked about. So I think it's
21  redundant to actually say in here something about failing
22  unit policies and procedures, when you constantly,
23  constantly made me do things other people didn't do to
24  clarify something that was in my part corrected when we

92

1  spoke.
2      Q.  Well, what I am saying is, if you look at it,
3  it doesn't chastise you. It says, "The other area Nancy
4  needs to focus on in improving is following the unit
5  policies and procedures. This entails notifying
6  supervision when she is unavailable for over four minutes
7  and submitting leave requests within one hour of return
8  to work, after an absence from the office." Right? It
9  says that's something you need to focus on improving.
10  She doesn't say you don't do it.
11      A.  Yeah. But why is it in there at all when you
12  constantly have me in your office about the same thing?
13  Every time I did anything that was inappropriate, I'm
14  constantly in the office signing pieces of paper and
15  e-mails are sent. Why do I need to be reminded of
16  something that we talked about, and resolved in the
17  office?
18          But apparently it wasn't. Because then
19  again when I signed the piece of paper acknowledging that
20  we talked, then that e-mail would follow me, verifying
21  what we said again. And then it's here again. How many
22  more times are we going to keep regurgitating the same
23  problem over and over again? Like I said, when I signed
24  that I spoke to her, no one else in that office, when

93

1  they talked about issues or problems that they had with
2  her, or whatever the case she had with them, they didn't
3  sign no documents. I signed documents. I also got
4  followed with an e-mail. Each and every time.
5          Why would it take an e-mail if we resolved
6  it in her office and I signed something? Why do I have
7  to sign something stating that we talked about it? Why
8  do I got to keep doing that when other people wasn't
9  doing that? And then it's got to come -- then another
10  slap in the face to sit there and look at it once again?
11  How many more times do we have to keep throwing it back
12  in my face before it's like -- where are you coming from?
13  Where is your angle?
14      Q.  Well, I thought -- didn't the evaluation form
15  itself say, areas where growth or skills, knowledge,
16  development is suggested or needed?
17      A.  What's that got to do with me being out, you
18  know, going to bathroom breaks in the four minutes about
19  being away from my desk? What does that have to do with
20  that? I don't understand your question.
21      Q.  Okay. Just see if I read this correctly. It
22  starts by saying, "Nancy meets the expectations of the
23  unit. She is professional, courteous to clients and goes
24  the extra mile to give callers quality customer service.

24 (Pages 90 to 93)

Case 1:06-cv-00666-GMS    Document 22-2    Filed 10/19/2007    Page 25 of 32
Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

94

1    Her notes are thorough and contain the needed information
2    to expedite resolution." Did I read that correctly?
3    A. Yes. You did read it correctly.
4    Q. "Since her last performance review, Nancy's
5    call volume has increased, which indicates that she has
6    improved in the area of not getting too involved in a
7    case than she should."
8    Did I read that correctly?
9    A. Yes.
10    Q. "One area that Nancy needs to focus on
11    improving is her ability to retain information. In
12    addition, she needs to focus on keeping her e-mail up to
13    date, so she is aware of policy changes. CSU is a
14    fast-paced environment, with constant changes, and
15    because of this, e-mails need to be read in a timely
16    manner. This helps to ensure our customers are receiving
17    consistent, accurate information which in turn helps
18    prevent complaints." Did I read that accurately?
19    A. Yes.
20    Q. Is it correct, what's said there?
21    A. Yes.
22    Q. And we've already talked about the next
23    paragraph. Okay. And then, the last paragraph says,
24    "Nancy needs to focus on retaining information provided

95

1    to her, so once she receives the required training as
2    outlined in the career ladder workplan, she will be able
3    to move up the career ladder and advance to CSSII."
4    MR. FEUERHAKE: There is no question
5    pending.
6    Q. Did I read that correctly?
7    A. Yes. You read it.
8    Q. And the only paragraph you find to be negative
9    is the fourth one?
10    A. Yes. It's very negative.
11    Q. Okay.
12    MR. NIEDZIELSKI: Let's take a break
13    now.
14    MR. FEUERHAKE: Okay.
15    (Brief recess held)
16    BY MR. NIEDZIELSKI:
17    Q. Are you ready, Ms. Santana?
18    A. I'm ready.
19    Q. Ms. Santana, are you presently under the care
20    of a doctor or healthcare provider?
21    A. Not at this time, I'm not.
22    Q. Have you been under the care of a psychiatrist?
23    A. Yes. I was at the VA Hospital under
24    psychiatric care, outpatient treatment.

96

1    Q. Is that the Wilmington?
2    A. Yes. The Wilmington, Delaware VA center.
3    Q. Actually, they call it Ellsmere, I think.
4    A. Yes. They call it Ellsmere, correct.
5    Q. And when did that occur? From what period of
6    time to what period of time?
7    A. I handed you the documents. I'm not aware of
8    the dates. I think it was 2004 into 2005.
9    Q. Had you sought or treated with a psychiatrist
10    prior to that time?
11    A. No. I have not.
12    Q. You started January the 4th, 1999, with the
13    Division of Child Support Enforcement, correct?
14    A. Correct.
15    Q. Let's just talk about the periods that you were
16    on military leave during that period of time, okay?
17    A. Okay.
18    Q. What was the first period of military leave?
19    A. Oh, gosh. It's too many periods of leave. I
20    couldn't even begin to tell you. I was on two weeks of
21    annual training. I was at school for four months. I
22    couldn't give you dates. There's so many of them I have
23    listed there. I couldn't even give you breakdown of
24    dates. I can tell you for long periods of time the dates

97

1    of the longer periods of time, but not -- I could not
2    remember AT. Every year I was there for AT.
3    Q. Can you recall longer periods of time?
4    A. I was gone from January, 2003, until January,
5    2004. And then I was gone from -- just now, from
6    September 30th -- well, my last day at Child Support was
7    September 27, 2005. And I am due to return October 1,
8    2007 again. So those are the two long periods that I can
9    remember.
10    Q. All right. So, from 1999 to January of 2000,
11    you were at the Division of Child Support Enforcement.
12    You may have had periods of time there where you were at
13    annual training, or some other education, correct?
14    A. Yes. I was away for two types of schooling. I
15    was going away for nine weeks or more for two types of
16    schooling that I was there. I remember those times,
17    also.
18    Q. But then, after that, from 2003, 2004, you were
19    gone that entire year?
20    A. 2003, in January, until January, 2004. Yes. I
21    was gone.
22    Q. And then you came back for about a year and a
23    half? And you have been gone since?
24    A. Correct.

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

98

1    Q. Do you recall ever telling a doctor or
2    healthcare provider that you were diagnosed with neck and
3    back problems after having taken anthrax vaccine in 2003?
4        A. Yes. I did recall telling -- either the social
5    worker or the psychiatrist that.
6        Q. Do you keep pretty close contact with
7    Mr. Calvin Parsons? And Jackie Berry?
8        A. I keep contact with Jackie more so than Calvin,
9    but I do speak to Calvin on occasion.
10       Q. On what frequency, do you believe?
11       A. I will say once every six months. I mean not
12   that much at all. I do go by his house, and if he's
13   there, we will talk. It's not like I go down there every
14   day to speak to him. But just once in a while I will see
15   him.
16       Q. How about Ms. Berry?
17       A. I talk to her on the phone. I haven't seen
18   Jackie in a while.
19       Q. In response to Interrogatories, it indicates,
20   in response number 10, you identify -- let's see. Let me
21   get you a copy of that. I'm going to have this marked as
22   the next document. It's going to be the Plaintiff
23   Santana's Responses to Interrogatories and Requests for
24   Production, and there is separately attached to that, is

99

1    what's called attachments to Interrogatory number 13.
2    And I guess what we will do is we'll mark the primary
3    document as a document, the next numbered one would be --
4        THE COURT REPORTER: 5.
5        MR. NIEDZIELSKI: And the attachment
6    to that will be 6.
7        (Santana Exhibits 5 and 6 marked)
8    BY MR. NIEDZIELSKI:
9        Q. Have you seen that before, Ms. Santana?
10       A. Yes.
11       Q. And those are the responses, the factual
12   responses, it's your information that you provided to
13   your lawyer, correct?
14       A. Correct.
15       Q. In response to those Interrogatories?
16       A. Correct.
17       Q. Okay. In response to Interrogatory number 10,
18   it asks you to essentially provide any efforts you've
19   undertaken to gain other employment. Correct?
20       A. Yes.
21       Q. And you indicated a number of things.
22       A. Correct.
23       Q. In the year 2000, you mailed an application to
24   go full time as an active Guard Reserve officer with the

100

1    U.S. Army Reserve, correct?
2        A. Correct.
3        Q. Now, how does that process work? You just mail
4    an application in?
5        A. Yes. Now you can do it online. You can
6    actually do it online. But yeah, you have to fill
7    something out and submit it to them, and they look at it,
8    and if they have openings, they'll call you. If not, you
9    do it again the next year.
10       Q. So I take it that they've never responded, yes,
11   we have openings --
12       A. No, no. They accepted me, but there was no
13   positions available that met my needs as a medical supply
14   officer.
15       Q. Okay.
16       A. So they said there's no need for you, so you
17   know, try again next year.
18       Q. So then in 2002, it says you mailed an
19   application to go full-time active duty with the U.S.
20   Army Reserve.
21       A. Correct.
22       Q. Did they say yea or nay or --
23       A. Yeah. They said I was approved, but once
24   again, there is no positions available, then I couldn't

101

1    go in. So there was no positions pertaining to what I
2    do, which is a medical supply officer for AGR.
3        Q. In 2002, it also says you interviewed with the
4    State of Delaware as a family service specialist.
5        A. Correct.
6        Q. Where was that? Was that with kids department?
7        A. Yes. Division of Family Services, which is
8    right next to the Stockton building where we used to work
9    for child support a while back.
10       Q. Okay. And also the same year you interviewed
11   for a federal position with the Social Security
12   Administration?
13       A. Correct.
14       Q. What was the position, do you recall?
15       A. No. I have no idea what the name of it was.
16       Q. And also in 2002, you submitted an application
17   for future federal positions with the Defense Services
18   Agency in Maryland.
19       A. That was a resume I submitted to them. But the
20   only thing they required was submitting a resume. So,
21   yeah, it was a resume that I submitted to them.
22       Q. All right. And it indicates in 2003, you
23   applied for online, for a Federal position with the FBI.
24       A. Correct.

Wilcox and Fetzer, Ltd.    Registered Professional Reporters          302-655-0477

Case 1:06-cv-00666-GMS    Document 22-2    Filed 10/19/2007    Page 27 of 32
Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

102

1    Q.  Did you hear back from them?

2    A.  I was over 35.  It was -- for some reason, they

3    needed people to be under 35, and I was over 35, for the

4    position I wanted, basically, the requirement age was a

5    maximum of 35, and I was older than that when I applied,

6    so I got rejected.

7    Q.  And in 2004, you applied and interviewed for a

8    position with the National Security Agency?

9    A.  Correct.

10    Q.  What position was that?

11    A.  I -- they didn't -- it was just a position

12    there.  They didn't clarify what it was.  So I just --

13    they said there were a lot of openings.  I went and

14    interviewed, and -- it's a basic position, but I don't

15    remember the title of it.  But I didn't get that one,

16    either.

17    Q.  Do you know what the National Security Agency

18    does?

19    A.  Yes.  They do a lot of top-secret background

20    checks and stuff.  That deal with national security.

21    Q.  They do encryption and decrypting codes.  Did

22    you know that?

23    A.  Yes.  They do a lot of technical --

24    Q.  Do you know how boring that is?

103

1    A.  I've looked at it as a job that paid well.

2    That's what I looked at it as.

3    Q.  Do you know why it pays well?

4    A.  Because it's stressful.

5    Q.  It's a really boring job.  Then you mailed a

6    written application with FEMA?

7    A.  Correct.

8    Q.  And submitted an application for future Federal

9    positions, again at the same place, the Defense Services

10    Agency, right?

11    A.  Yeah.  I did do an application that time

12    around.  Someone gave me an application for them and I

13    submitted another resume, but that --

14    Q.  From all these efforts, have you gotten any

15    offers?

16    A.  No.  There was different reasons why I didn't

17    get the positions.  So --

18    Q.  All right.  Nevertheless, you verified these

19    responses as true and correct?

20    A.  From what I recall, these are the ones that I

21    put in for.

22    Q.  Okay.  The next document 6, did you put this

23    together yourself?

24    A.  Yes.

104

1    Q.  This is your own typing and everything?

2    A.  Yes.

3    Q.  Can I ask you just some basic questions about

4    it?

5    A.  Okay.  We're on Exhibit 6?

6    Q.  Yes.

7    A.  Okay.

8    Q.  What I don't understand is the cover page says

9    attachment to Interrogatory Number 3.  Do you see that?

10    A.  Yes.

11    Q.  If you go to the next page, it says Exhibits 2

12    through 20.

13    A.  Yes.

14    Q.  All right.  And the very last sentence says,

15    "See Exhibit 2, written documentation, for a complete

16    explanation of supervisor Brenda Annand's actions that

17    day."  What are you referring to, when you say "See

18    Exhibit 2, written documentation"?

19    A.  I attached a bunch of stuff to it, so -- I

20    don't have copies of my exhibits that I can refer to.

21    MR. FEUERHAKE:  Do you want to go off

22    the record just for a moment?

23    MR. NIEDZIELSKI:  Well, no.  I think I

24    can -- let's see if we can clear this up.

105

1    BY MR. NIEDZIELSKI:

2    Q.  Were you referring to these other documents

3    that we've discussed in part?

4    A.  No.  I have to see it.  I actually put Exhibit

5    2 on it.  If you see something that says Exhibit 2, that

6    was the document I put Exhibit 2 on.

7    MR. FEUERHAKE:  Well, we can stay on

8    the record, but I can give you a little head's up.

9    I mean if you are looking for information here.

10    Q.  All right.  I think I've figured this out.  In

11    other words, you produced all these documents, right?

12    A.  Correct.

13    Q.  Okay.  And so, what you are referring to is the

14    documents in here that are marked Exhibit 2, Exhibit 1,

15    and all that sort of stuff, correct?

16    A.  Correct.

17    Q.  I took off the back of them, but I think I

18    understand what we're talking about.  Okay.  I think I

19    know what we're talking about now.  For instance, these

20    are marked Exhibit 1 --

21    A.  Correct.

22    Q.  -- and that's like 000001, production that goes

23    on to -- I've taken some of them out and used some of

24    them during examination.  I just wanted to make sure I

27 (Pages 102 to 105)

Case 1:06-cv-00666-GMS   Document 22-2   Filed 10/19/2007   Page 28 of 32
Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

106

1 understood the sequence.
2      Has Brenda Annand ever cursed you?
3      A.  No.  She never used profanity.
4      Q.  Did she ever use racial comments?
5      A.  She made reference to "you people."  I consider
6 that a racial --
7      Q.  Did she ever use the N word?
8      A.  Not that I'm aware of, no.
9      Q.  Did she ever call you any term that is
10 considered pejorative based on your Hispanic background?
11      A.  I don't understand that term, pejorative.
12      Q.  Oh.  Unwanted.
13      A.  Unwanted?
14      Q.  Well, a term that would be an insult to a
15 person of a certain ethnic or racial group.
16      A.  Pertaining to me as "you people" is --
17      Q.  She wasn't referring to you, though.
18      A.  "You people," it's a class of people, isn't it?
19 "You people" is not a positive spin.  It's "you people."
20 What do you mean by "you people"?
21      Q.  Well, it could mean Republicans, I don't know.
22      A.  When she said it to me yelling and screaming,
23 more likely it meant --
24      Q.  I thought she said that to Jackie.

107

1      A.  She did say it to Jackie.  And I overheard her
2 saying it to Jackie.
3      Q.  Did you say she said it to you, too?
4      A.  Yeah.  She said it to me.
5      Q.  When did she say it to you?
6      A.  When she screamed at me.
7      Q.  When?
8      A.  She screamed at me a number of times.  You want
9 a date when she said it to me?
10      Q.  Yes.
11      A.  I can't verify.  She yelled at me a lot.  How
12 would I know when exactly she said it?
13      Q.  When you say she yelled at you a lot, did she
14 have a loud voice?  Is she loud?
15      A.  Yes.  She is loud.  The problem is also she is
16 in your face, and spitting at you when she is talking to
17 you, and pointing her fingers and gritting her teeth.
18 Not only is she loud, she is so close other people can
19 hear it, and she is in your face.  You can't get away
20 from hearing it, she is right close to your face.
21      Q.  Okay.  Have you ever had conversations with her
22 that were not that way?
23      A.  When she sat me in the office and talked to me
24 about my case notes and made me write a little sign that

108

1      I did, yeah.  We talked in her office, yes.
2      Q.  Was it at a reduced tone?
3      A.  Yes.
4      Q.  Was she professional with you?
5      A.  During those times, yes.
6      Q.  Did she treat you courteously?
7      A.  Yes.  She was fine there.
8      Q.  Has she complimented you?
9      A.  Complimented me?
10      Q.  Yes.  On handling a case well or a good job or
11 things like that?
12      A.  Once in a while, yes, she did.
13      Q.  And in the evaluation we just went over, she
14 made a lot of positive comments about you, didn't she?
15      A.  In what -- read the comments that you felt were
16 positive.
17      Q.  All right.  This is from Exhibit 4.  Would you
18 agree with me that, "Nancy meets expectations of the
19 unit.  She is professional, courteous to clients, goes to
20 extra mile to give callers quality customer service."
21      A.  I consider that okay.  I don't consider that --
22      Q.  "Her notes are thorough and contain the needed
23 information to expedite resolution."
24      A.  Okay.

109

1      Q.  "Since her last performance review, Nancy's
2 call volume has increased, which indicates she has
3 improved in the area of not getting too involved in a
4 case than she should."
5      A.  That's okay, also.  I wouldn't consider that a
6 compliment.  No.
7      Q.  All right.
8      A.  Is it possible that I can make a statement in
9 regards to that performance review that she sat in the
10 office and did that took away from the performance review
11 when she gave it to me?  There was a comment she made, I
12 did not like at all, and it took away from everything she
13 put in that evaluation.
14      And she had -- when we first met in that
15 office, she -- the first couple minutes, she went on
16 about Calvin Parsons' workmen's comp issue.  She said,
17 "I'm not a racist, I don't know how you can go about
18 saying that.  I'm not a racist.  I don't treat people
19 unfairly."  She went on for a couple minutes about that
20 workmen's comp, what I said about her.  She said, "I'm
21 not prejudiced against people, I'm not a racist."
22      And I'm like -- I looked at her like why do
23 you -- I didn't say anything to her.  I just thought why
24 do you pick a performance review to tell me you're not

28  (Pages 106 to 109)

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement

Nancy Santana

110

1    racist and you don't treat people differently?  What
2    relevance does that have during my performance
3    evaluation?
4            That totally colored my mind on anything
5    she said in there to me. I'm like why do you got to
6    bring that issue up?  What I said is done under oath. I
7    meant what I said.  So you clarifying with me during a
8    performance evaluation, makes me think what are you up
9    to?  What are you trying to lead up to.  And give me that
10   evaluation. I didn't think anything --
11        Q.  Suppose it's not true.  Suppose she is not
12   racist at all.
13        A.  That is her opinion.  That's not my opinion. I
14   stated the facts at --
15        Q.  Well, I believe you actually stated what your
16   opinion was that day.
17        A.  Exactly.  For her to clarify her opinion at
18   that time was not --
19        Q.  Do you know whether Brenda Annand likes you or
20   not?
21        A.  I think me and Brenda get along. I don't know
22   if she likes me, but I think we get along.  I don't see
23   her as -- if I got hurt in the middle of the street, I
24   don't think she would not render, you know, any type of

111

1    medical aid to me. But I think she is okay with me as a
2    person.  I think.
3        Q.  Would you be surprised if she actually liked
4    you?
5        A.  I would be amused. I don't think I would be
6    surprised.
7        Q.  Is it true that while you worked there, you
8    used to on occasion bring in food and things like that
9    for the other employees?
10       A.  I bring in food all the time for everybody.
11       Q.  And that you tried to make it as a positive
12   environment as possible?
13       A.  I always do that. Yes.
14       Q.  And that, in fact, it's a high-stress job,
15   isn't it?
16       A.  It's very stressful.
17       Q.  And you made efforts to make it enjoyable for
18   all the employees that work there, correct?
19       A.  Correct.
20       Q.  Other than what you've described, and other
21   than what other people have told you, and what you
22   observed or heard regarding Jackie Berry, and Calvin
23   Parsons, what other indications, or what other evidence
24   do you have to offer regarding Brenda Annand's views or

112

1    racial attitudes?
2        A.  I mean when she yelled at people of color, we
3    would talk on breaks, and we would talk to each other
4    about what she said to that particular person.  But like
5    I said, it was just talking amongst us. I remember a
6    situation where there was a Nicole Waters, who had a
7    situation with Brenda, yelling at her for something, and
8    she actually quit and took another position, due to the
9    fact that she felt the same way I did, Brenda was racist,
10   and she made a habit of yelling and screaming at people
11   of color.
12          And I remember her crying at her desk that
13   day, she was very shaken up.  And when she left, I wasn't
14   surprised because she told Brenda and told us, like she
15   did later on that day, she told Brenda she was going to
16   be leaving there, because what she did was unwarranted.
17       Q.  Suppose Brenda yells at everybody that way.
18       A.  She only did it to people of color.
19       Q.  Suppose you are incorrect about that.  Suppose
20   you are wrong about that.
21       A.  I don't think so.
22       Q.  Have you talked to everyone that works in CSU?
23       A.  Yes.
24       Q.  You have?

113

1        A.  Yes. I talked to quite a few people about what
2    she does and what she doesn't do. I talked to people of
3    color, and I spoke to White employees. They're like no,
4    we're not aware of Brenda yelling and screaming at us.
5    We talked.  We talked casually to each other. It wasn't
6    like I was fact finding, but I asked them.
7        Q.  Did she yell at Ernie Eggleston?
8        A.  I'm not aware about Ernie Eggleston. I know I
9    talked to him numerous times about Brenda. I'm not too
10   sure if she ever yelled at Ernie Eggleston.
11       Q.  All right.  What about Selena Lloyd?
12       A.  Her and Selena had some moments, but I don't
13   know if it was considered yelling and screaming, but they
14   had disagreements, correct.
15       Q.  Did you get any special recognitions while you
16   worked in customer service?
17       A.  They gave me something about being away in the
18   military.  Some kind of award for being away in the
19   military service.
20       Q.  Do you remember when that was?
21       A.  Sometime in 2004 or 2005.
22       Q.  Does Brenda Annand have the authority to fire
23   you?
24       A.  I don't know. I don't know that answer.

29  (Pages 110 to 113)

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

---

**114**

1    Q.  You indicated that you were aware that Calvin
2    Parsons was terminated.
3    A.  Eventually, yes.
4    Q.  Do you understand that the division director
5    terminated him?
6    A.  I had no idea. I didn't really refer to it. I
7    know all the run-ins with Brenda and all the stuff he had
8    told me, a lot of the stuff that she submitted had to
9    have been documentation that she had at least submitted
10   to him in order for him to be terminated. I don't know
11   who terminated Calvin.
12   Q.  You don't know anything about Calvin Parsons'
13   problems, do you?
14   A.  I know some. Not all.
15   Q.  Which problems were you aware of that he had?
16   A.  That Brenda was always up in his face harassing
17   him, following him, yelling at him behind closed doors,
18   always in his cubicle, you know, on a tirade against him
19   when he was on his -- he was on a performance improvement
20   plan, and it just seemed like everything he did was
21   wrong, and she stayed on him, and like I said, the verbal
22   remarks she said was what she said to the rest of us,
23   just downgrading him until he was terminated.
24   Q.  How long had you known Parsons before when you

---

**115**

1    started working there?
2    A.  I known Calvin since I started there on January
3    4, 1999.
4    Q.  But you are not aware of, other than the things
5    he -- Mr. Parsons may have told you, or you may have
6    overheard, or seen, you are not aware of his particular
7    situation?
8    A.  Particular --
9    Q.  Or problems he may have had, independent of
10   Brenda Annand?
11   A.  I'm aware of some things, some problems he had.
12   I know he was seeing a psychiatrist. I know he did some
13   drugs in his past. I knew that. But I don't know -- we
14   didn't really go into detail about all that, no.
15   Q.  Well, you attended the IAB hearing, didn't you?
16   A.  Correct.
17   Q.  Do you remember that Mr. Parsons was
18   cross-examined on his drug addiction?
19   A.  I wasn't in for that part of the --
20   Q.  Oh. They would only call you in as --
21   A.  For my part.
22   Q.  Okay. Do you know what Calvin Parsons received
23   from the board?
24   A.  He received a settlement. I don't know how

---

**116**

1    much it was.
2    Q.  You mean a monetary award?
3    A.  Yes. He received it from the State EEOC. I
4    know he went to a State EEOC hearing in Wilmington and
5    the settlement was done through that office. I don't
6    know how much it was. I don't think he is allowed to
7    disclose that, anyway, but no, I don't know how much it
8    was.
9    Q.  Are you sure he didn't recover for a workmens'
10   compensation claim?
11   A.  I think he told me he lost the workmen's comp.
12   The thing I testified for, they said he lost that. Later
13   on there was a State EEOC hearing, he went on for another
14   issue, and they basically settled, I guess out of court
15   and he got a monetary settlement for that. Because he
16   still had his EEOC, just like mine, with the Federal
17   government.
18   Q.  Whatever you know about that would simply be
19   what he told you?
20   A.  It would be simply what he told me.
21   Q.  You don't have any direct information one way
22   or the other?
23   A.  All I have was the actual hearing where I
24   testified for Calvin, I did get a copy of that

---

**117**

1    deposition, but no. As far as the settlement and the
2    terms of it, no. I have no privileged information on
3    that.
4    Q.  All right. Do you maintain contact with
5    anybody that's still working at the CSU?
6    A.  I get ahold of Tomeka Lester on occasion.
7    Marjorie, Mary Lindsey, Selena Lloyd Johnson, Ernie
8    Eggleston. Sometimes I speak to Sandy Rossi. That's
9    pretty much it. And someone named Carrie James, I do
10   talk to her on occasion. Not a lot, but I talk to her
11   sometimes.
12   Q.  And when you call them, will you discuss what's
13   going on at the work site?
14   A.  I ask them what's going on in that child
15   support agency now, and they tell me what's going on in
16   the agency as far as what they see and what they believe.
17   We do discuss the past, but I also ask them what's going
18   on now, what's changed, what's the updates, what's new,
19   what's happening.
20   Q.  And what do they say?
21   A.  That it's gotten worse since I left.
22   Q.  It's gotten worse?
23   A.  Yeah. As far as the job, and the supervisors
24   and how they get along with the employees. It's -- it's

---

30 (Pages 114 to 117)

Case 1:06-cv-00666-GMS    Document 22-2    Filed 10/19/2007    Page 31 of 32
Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement
Nancy Santana

118

1  not a happy environment.  A lot of changes that they say
2  are just -- it's just a very unhappy environment.
3      MR. NIEDZIELSKI:  I think that's all I
4  got.  Let me review my notes, and kick it around.
5      MR. FEUERHAKE:  Okay.
6      MR. NIEDZIELSKI:  If you want to, you
7  can take a break.  Okay?
8      (Brief recess held)
9      (Santana Exhibits 7 and 8 marked)
10  BY MR. NIEDZIELSKI:
11     Q.  Ms. Santana, I've placed in front of you a
12  document which is marked Deposition Exhibit 7, Santana.
13  Do you recognize that document?
14     A.  Yes.
15     Q.  What is that document?
16     A.  It's the Complaint that I filed in the District
17  Court.
18     Q.  Did anybody help you with the document?
19     A.  Yes.
20     Q.  Who helped you drafting the document?
21     A.  Mr. Feuerhake, next to me.
22     Q.  He helped you draft this document?
23     A.  Yes.
24     Q.  Now, at page 5, do you see your address?

119

1  Underneath your name?
2      A.  Yes.
3      Q.  I thought you lived in Middletown.
4      A.  I do, but since I was never there and mail
5  comes that I need to see, especially any legal documents,
6  I want it to come to my sister who is there all the time.
7  My mother is always away in Puerto Rico.  I live with my
8  mom.  Since she is gone a lot, I want to make sure any
9  mail I get is sent to a place where I know my sister sees
10  it every day because she lives there, so I wanted to use
11  her address for this situation.
12     Q.  And the next document is marked as Deposition
13  Exhibit 8.  This is your sworn statement.  Correct?
14     A.  What page are we on?
15     Q.  It's the next document.  Oh, I'm sorry.  I have
16  it.  No wonder you couldn't see it.
17     A.  Yes.
18     Q.  And that document 8 is a sworn statement that
19  you made, correct?
20     A.  I made it, yeah, in reference to Ms. Berry's
21  case.
22     Q.  Who drafted this document?
23     A.  I drafted this document.
24     Q.  Well, did you discuss what you wanted to say in

120

1  it --
2      A.  I wrote --
3      Q.  -- with Ms. Berry?
4      A.  No.  I wrote down what I wanted to say, and I
5  had written it, drafted it and gave her the after effects
6  of it, which was this.  No.  I didn't tell her what I was
7  going to put in here.  We talked about the case and her
8  strong points, her weak points.  But as far as exactly
9  what's in here, no.  I drafted this on my own.
10     Q.  You didn't discuss it with her at all?
11     A.  I talked with her about what she wanted me to
12  say and her strong points and weak points and what I
13  wanted to say on here.  I told her at the end I'll just
14  put something together.  She wanted certain things.  I
15  told her I need to do it the way I want to do it.  I
16  discussed with her her strong points and I put it
17  together on my own and she saw it after I drafted it.
18     Q.  After you drafted it and signed it, or did you
19  first draft it, let her look at it --
20     A.  I actually signed it, sent a copy, and when I
21  actually sent it to her in the mail, I called her and
22  told her what I had put on here, but it was already sent
23  to her in the mail.
24     Q.  Well, did she provide you with any documents?

121

1      A.  I don't know what you mean by documents.
2      Q.  Well, did she give you documents to look at,
3  prior to you preparing this sworn statement?
4      A.  No.  When she officially filed her complaint in
5  the District Court, she gave me a copy of the complaint,
6  and I was aware of that.  And I actually bought Jackie's
7  deposition when you deposed her, I bought that myself,
8  for my case.
9      MR. NIEDZIELSKI:  All right.  That's
10  all the questions I have.
11     MR. FEUERHAKE:  I have nothing on
12  cross.  We'll read and sign.
13     (Deposition concluded at 12:20 p.m.)
14
15
16
17
18
19
20
21
22
23
24

Santana v. State of Delaware, Department of Health and Social Services Division of Child Support Enforcement

Nancy Santana

---

122

1              INDEX
2      DEPONENT: NANCY SANTANA           PAGE
3      Examination by Mr. Niedzielski        2
4              E X H I B I T S
5      DEFENDANT'S DEPOSITION EXHIBITS      MARKED
6      1. EEOC charge                44
7      2. 3/1/05 handwritten EEOC complaint    68
8      3. Multiple e-mails, Annand to Santana    69
9      4. Employee performance review      85
10     5. Plf's response to interrogatories    99
11     6. Attachment to Interrogatory 3      99
12     7. Complaint              118
13     8. Santana's sworn statement      118
14     ERRATA SHEET/DEPONENT'S SIGNATURE    123
15     CERTIFICATE OF REPORTER        124
16
17
18
19
20
21
22
23
24

---

124

1     State of Delaware  )
2                        )
2     New Castle County  )
3
4            CERTIFICATE OF REPORTER
5        I, Julianne LaBadia, Registered Diplomate
      Reporter and Notary Public, do hereby certify that
6     there came before me on July 20, 2007, the deponent
      herein, NANCY SANTANA who was duly sworn by me and
7     thereafter examined by counsel for the respective
      parties; that the questions asked of said deponent
8     and the answers given were taken down by me in
      Stenotype notes and thereafter transcribed by use of
9     computer-aided transcription and computer printer
      under my direction.
10
          I further certify that the foregoing is a true
11    and correct transcript of the testimony given at
      said examination of said witness.
12
          I further certify that reading and signing of
13    the deposition was required by the deponent and
      counsel.
14
          I further certify that I am not counsel,
15    attorney, or relative of either party, or other wise
      interested in the event of this suit.
16
17
18    _____
19        Julianne LaBadia, RDR, CRR
20        Certification No. 267-RPR
21        License Expires: 1/31/08
22
23
24

---

123

1
2
3
4
5         REPLACE THIS PAGE
6      WITH THE ERRATA SHEET
7        AFTER IT HAS BEEN
8      COMPLETE AND SIGNED
9        BY THE DEPONENT
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Wilcox and Fetzer, Ltd.    Registered Professional Reporters          302-655-0477

EEOC Form 5 (5/01)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
| --- | --- |
| ☐ FEPA | JUN 21 2005 |
| ☒ EEOC | Labor Relations D.M.S.-D.H.S. |
| | 170-2005-01720 |

**Delaware Department of Labor** _____ and EEOC

_State or local Agency, if any_

| Name _(Indicate Mr., Ms., Mrs.)_ | Home Phone No. _(Incl Area Code)_ | Date of Birth |
| --- | --- | --- |
| **Ms. Nancy Santana** | **(302) 378-0344** | **03-16-1963** |

Street Address — **14 White Oak Drive Middletown, DE 19709** — City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. _(If more than two, list under PARTICULARS below.)_

| Name | No. Employees, Members | Phone No. _(Include Area Code)_ |
| --- | --- | --- |
| **DEL. DIVISION OF CHILD SUPPORT** | **500 or More** | **(302) 326-6024** |

Street Address — **84a Christiana Road, Churchmen's Center, New Castle, DE 19720** — City, State and ZIP Code

| Name | No. Employees, Members | Phone No. _(Include Area Code)_ |
| --- | --- | --- |

Street Address — City, State and ZIP Code

DISCRIMINATION BASED ON _(Check appropriate box(es).)_

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☒ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER _(Specify below.)_

| DATE(S) DISCRIMINATION TOOK PLACE | |
| --- | --- |
| Earliest | Latest |
| **03-01-2005** | **04-29-2005** |
| ☐ CONTINUING ACTION | |

THE PARTICULARS ARE _(If additional paper is needed, attach extra sheet(s)):_

**I.**    I was hired on or about January 4, 1999 for the position of Child Support Specialist I.  At hire my immediate supervisor was Diane Walters (W).  Since approximately April 2001 Brenda Annand (W), Child Support Supervisor has been my immediate supervisor.  Ms. Walters is Ms. Annand's immediate supervisor.  On or about March 1, 2005 I received a verbal warning.   On or about April 5, 2005 I received a written warning.  On or about April 29, 2005 I received my annual Employee Performance Review.  This review contained negative comments.

**II.**    I believe that I have been discriminated against because of my national origin, Hispanic.  Ms. Annand supervises approximately eighteen (18) employees, of whom ten (10) are black, two (2) are Hispanic and six (6) are white.  On or about March 1, 2005 Ms. Annand "screamed" at me for being away from my desk.  I stepped away from my desk to retrieve documents from the printer.  On or about April 5, 2005 Ms. Annand sent me an e-mail about being away from my desk for more than fourteen (14) minutes.  I acknowledge being away from my desk because of a mis-communication regarding when I was to take my lunch.  On or about April 20, 2005 my Employee Performance Review contained negative comments regarding my improving in the policies and procedures of notifying supervision when I am unavailable for more than four (4) minutes.  I further allege that I have been subjected to retaliation

| | |
| --- | --- |
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
| I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. | |
| ... e under penalty of perjury that the above is true and correct. | SIGNATURE OF COMPLAINANT |
| **Jun 03, 2005**     _Nancy Santana_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE _(month, day, year)_ |
| Date          Charging Party Signature | |

DEPOSITION EXHIBIT 1

DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 170-2005-01720 |

**Delaware Department of Labor** _____ and EEOC
*State or local Agency, if any*

THE PARTICULARS ARE *(Continued from previous page):*

**(704a) because on March 24, 2005 I testified on behalf of a former employee, who was discharged, against Ms. Annand. In my statement I indicated that Ms. Annand treats non-white employees in a less favorable manner in comparison to her treatment of white employees.**

**III. I allege that Ms. Annand subjects her non-white employees to disparate treatment in the terms and conditions of their employment.**

JUN 2005
Received
EEOC - Philadelphia
District Office

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the above is true and correct. | SIGNATURE OF COMPLAINANT |
| | |
| **Jun 03, 2005** _____ *Nancy Sertoro* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year )* |
| Date - Charging Party Signature | |

Exhibit 4



# The State *of* Delaware  Employee Performance Review

Name, Job Title: Nancy Santana, Child Support Specialist I          [SS#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]
Department-Division-Section: DHSS/Division of Child Support Enforcement, Customer Service Unit
Supervisors, Job Title: Brenda Annand and Stacy Saylor, Child Support Supervisors
Date, or time period covered: January 1, 2004-December 31, 2004

Areas where performance is distinguished or exceeds expectations, if any:

Areas of specific performance deficiencies or unsatisfactory work, if any:

Areas where growth and/or skills/knowledge development is suggested or needed.  If not applicable, please use this space and/or attach summary explanation of how employee met expectations.
Nancy meets the expectations of the unit.  She is professional, courteous to clients, and goes the extra mile to give callers quality customer service.  Her notes are thorough and contain the needed information to expedite resolution.

Since her last performance review, Nancy's call volume has increased which indicates that she has improved in the area of not getting too involved in a case then she should.

One area that Nancy needs to focus on improving is her ability to retain information.  In addition, she needs to focus on keeping her email up to date so she is aware of policy changes.  CSU is a fast paced environment with constant changes and because of this, emails need to be read in a timely manner.  This helps to ensure our customers are receiving consistent, accurate information which in turn, helps prevent complaints.

The other area Nancy to to focus on improving is following the unit policies and procedures.  This entails notifying supervision when she's unavailable for over 4 minutes and submitting leave requests within 1 hour of return to work after an absence from the office.

Nancy needs to focus on retaining information provided to her so once she receives the required training as outlined in the "Career Ladder Workplan", she will be able to move up the career ladder and advance to a CSSII.

Employee documentation of performance events, comments and/or self-review:

We have met and discussed this document.  The employee's overall performance is (Distinguished), (Exceeds Expectations), (Meets Expectations), (Needs Improvement) or is (Unsatisfactory).
*Please circle one*

Nancy Santana 29Apr05          Brenda Annand 4/29/05          Stacy Saylor 4/29/05
Employee/date                  Evaluator/date                 Evaluator/date

Dianne Walters 5/11/05
Reviewer/date



DEPOSITION
EXHIBIT
4

PENGAD 800-631-6989

000079