## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NANCY SANTANA,                          )
                                        )
       Plaintiff,                      )
                                        )        Civ. A. No. 06-666 GMS
vs.                                     )
                                        )
STATE OF DELAWARE, DEPT. OF             )
HEALTH AND SOCIAL SERVICES,             )
DIV. OF CHILD SUPPORT                   )
ENFORCEMENT,                            )
                                        )
       Defendant.                      )

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO MOTION FOR
## SUMMARY JUDGM,ENT

DATE: November 19, 2007      Herbert G. Feuerhake, Esq.
                              The Law Office of Herbert G. Feuerhake
                              521 West Street
                              Wilmington, Delaware 19801
                              (302) 658-6101
                              Atty. ID No. 2590

## <u>TABLE OF CONTENTS</u>

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Nature and Stage of Proceedings . . . . . . . . . . . . . . Page 1

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . Page 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . Page 1

Argument
    I.    <u>There is a genuine issue of material fact as to the hostile nature of Nancy Santana's work environment under relevant substantive Title VII precedent.</u>
        . . . . . . . . . . . Page 10

    II.    <u>There is a genuine issue of material fact as to whether the hostile nature of Nancy Santana's work environment constitutes retaliation under relevant Title VII precedent.</u>
        . . . . . . . . . . . . Page 13

Conclusion . . . . . . . . . . . . . . Page 14

## TABLE OF AUTHORITIES

<u>**CASES**</u>

<u>Burlington North. & Santa Fe Ry. Co. v. White</u>, 548 U.S. __, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) . . . . . . . . .**pages 13, 14**

<u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 114 S. Ct. 367, 126 L.Ed.2d 295 (1993) . . . .**page 11**

<u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133 (2000) . . . . **page 10**

<u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1482 (3rd Cir. 1990) . . . . **page 11**

<u>Caver v. City of Trenton</u>, 420 F.3d 243 (3rd Cir. 2005) . . . . . . . **pages 10, 11, 12, 13, 14**

**Nature and stage of proceedings**

Plaintiff Nancy Santana has filed this action (Complaint, D.I. #1) alleging racial and national origin discrimination on the part of her employer, defendant State of Delaware Department of Health and Social Services, Division of Child Support Enforcement (hereinafter sometimes referred to as the "State" or "defendant" or "DCSE").

The State has filed a Motion for Summary Judgment (D.I. #21) and an opening brief in support thereof with attachments (D.I. #22, hereinafter sometimes referred to as "Opening Brief").

This is plaintiff Santana's Answering Brief on the motion for summary judgment.

**Summary of Argument**

There are genuine issues of material fact precluding summary judgment on the hostile environment claim, see Caver v. City of Trenton, 420 F.3d 243 (3rd Cir. 2005), and on the retaliation claim, see Burlington North. & Santa Fe Ry. Co. v. White, 548 U.S. __, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

**Statement of Facts**

Plaintiff Nancy Santana asserts racially-based employment discrimination against her employer, the State of Delaware Department of Health and Social Services, Division of Child Support Enforcement ("DCSE").

Ms. Santana has stated in her complaint (D.I. #1) that she is of Hispanic background with roots in Puerto Rico, and she has identified her race as "Hispanic" in her deposition at page 83

(her deposition has been made Attachment 1 to the State's Opening Brief; references to that deposition will hereinafter be by page reference to that transcript, as for example "Dep-83"). She commenced employment with DCSE on approximately January 4, 1999 (Dep-16).

Interspersed with her civilian employment career, Ms. Santana has served several tours of duty in the military, with the Army, Marines, Army National Guard, Air Force National Guard, and currently the Army Reserve, where she holds the rank of Captain and is a medical supply officer (Dep-5 to Dep-11). She has been on involuntary leave from DCSE and serving full-time with the Army Reserve since September 30, 2005 (Dep 11), continuing to the present time.

Ms. Santana has worked in the customer service unit of DCSE since sometime in 2000 (Dep-17). The customer service center of DCSE is a call-in center to which clients call in with questions, and the workers provide information about how to handle cases and send e-mails to other workers where necessary (Dep-18). The workers in this unit sit next to each other in cubicles (Dep-18).

Ms. Santana recalls that Brenda Annand became her supervisor in approximately 2001 or 2002, serving as one of two supervisors in the customer service unit (Dep-41-42). On or about March 1, 2005, Ms. Santana relates that Brenda Annand "came to my face, and started yelling and screaming about me being a bad worker, people talking about me. And I was just coming back to my desk, and she basically came in my face and started ranting and raving about me as a person. And that's basically what had me write her up" for an EEOC complaint (Dep-44-45). She indicates that she wrote up the EEOC complaint because "it was a series of incidents where I was away from my desk, and she would just literally come at me, from nowhere, and start yelling and screaming, and saying everything I did at the child support is terrible. You're a terrible person. People are talking about you. You take a lot of sick leave. It just went on and on into a

2

tirade" (Dep-45). Approximately one month later, on April 5, 2005, Ms. Santana received an e-mail from Ms. Annand criticizing her for being away from her desk for 14 minutes (Dep-48); the end result of discussions and e-mails between Ms. Santana and Ms. Annand after this e-mail was received was that "[b]asically she clarified what her position was, didn't clarify mine. . . . Basically she didn't clarify anything. She didn't apologize. She didn't clarify whether I could take my lunch. I never took lunch that day. She just acknowledged the e-mails were sent and we both disagreed about it. And I talked to my team leader [i.e. Ms. Annand]. It was a miscommunication on her part. She wasn't apologizing, she didn't say I could take lunch. I didn't take lunch that whole day. . . . [T]he e-mail still stuck. It stayed with me" (Dep-52-53). Some of the e-mails that were exchanged are found at B-46 to B-51 (all references with page numbers in the format "B-__" are to the plaintiff's Appendix hereto). Ms. Annand then rendered some unjustified negative comments in Ms. Santana's performance evaluation (Dep-55-56; see reference to unavailability for "over 4 minutes" on performance evaluation at B-52) shortly thereafter, on or about April 20, 2005.

In the midst of this period, Ms. Santana had testified in an Industrial Accident Board hearing on behalf of her co-worker, Calvin Parsons, which hearing occurred on March 24, 2005 amd related to workers compensation issues (Dep-57). The transcript of Mr. Parsons' hearing is found in the plaintiff's Appendix filed herewith at page B-53 to B-122. The gravamen of Mr. Parsons' claim was that he "sustained mental distress from supervisor Brenda Annan [sic]" (B-63). Ms. Santana testified that the work environment at her unit in the DCSE was "an open hostile environment" and that the problem was "racial" (B-112). When asked by a board member what she meant by the problem being "racial," Ms. Santana stated at B-112 to B-113:

> What I think is racial is it seems like the only people that I here [sic] that Brenda goes off on seems to be people of color. I've never noticed a white person out in

the hallway or any inappropriate moments having a finger stuck in their face or yelling at them. I've always noticed black folks that were always on the firing line and other people of color come to me saying that she got them and different locations and yelled at them about them being away. But I've never had any instances or either of us ever saw any instances of any white people in there that got caught off guard by Brenda approaching them about different things that they were doing while they were away from their desk.

The entire transcript, with testimony by Mr. Parsons, Nicole Waters, and DCSE employee Ernest Eggleston, is worth reviewing for the common thread of hostile behavior that it delineates.

Ms. Santana has also identified several other incidents regarding the hostile and discriminatory management of Brenda Annand. She discusses harassment of Jackie Berry and Calvin Parsons at Dep-72 to Dep-77. She discusses an issue with leave slips, Dep-88 to Dep-89, and see B-126 to B-131. She notes that Brenda Annand used the phrase "you people," understood to mean minorities, Dep-106 to Dep-107. There was also a critical e-mail from Ms. Annand to Ms. Santana, explained by Ms. Santana to the EEOC in the memo at B-133 to B-134.

Ms. Santana has offered the affidavits of four co-workers from her unit in the Division of Child Support Enforcement in support of her claims. Those co-workers are: Ernest Eggleston (B-1 to B-3); Marjorie Marion-Lindsay (B-4 to B-6); Tomeka Lester (B-7 to B-8); and Jacqueline Berry (B-10 to B-13). Of these four, the first three continue to work at the Division of Child Support Enforcement (as referenced in their affidavits); Jacqueline Berry has left as a result of the treatment she received, and has filed a lawsuit based upon her experiences (civil action no. 06-217-GMS) (also referenced in her affidavit).

The affidavits filed by Ms. Santana's co-workers paint a picture of Brenda Annand's conduct that is greatly troubling. The general tone of these affidavits is perhaps best captured in the comment of Ernest Eggleston, who characterized Ms. Annand as "insecure" and stated:

I would say that she acts as if she is Scarlett O'Hara and the department is her Tara; she sees herself as above people of color. She *managed* white people with

4

respect, and she *bossed around* people of color with disrespect, based upon my observations.

Page B-2 to B-3, emphasis in original.

Mr. Eggleston added that "Brenda Annand doesn't seem to have problems with Caucasians in her unit, but seems always to criticize people of color. Basically, all her problems with people in the unit seem to stem from people of color. I believe that Brenda Annand's management style was drastically tougher on people of color than on Caucasians" (B-1 to B-2).

The general comments of Mr. Eggleston about Brenda Annand are echoed in the affidavit of Tomeka Lester. Ms. Lester states:

> Brenda's negative attitude towards black women, or a Hispanic woman like Nancy, was different from the way she treated Caucasians, leading me to conclude over time that she was racist. I didn't want to jump to that conclusion, but after many incidents in sort of a cycle of time, you start to see it and your start to feel it.

In another passage, Ms. Lester states:

> Brenda yelled at me from time to time, even when I was in another unit. Brenda yelled at me inappropriately at least four times on the phone, and in person twice. On these occasions her tone of voice was accusatory, accusing me of things I didn't do, and she was stating a lot of assumptions that were false. I have some backbone, and I believe that by standing up to Brenda, I caused her to back down more than she did with other minority employees. If Brenda sees that you have backbone, she'll back off, but if you show fear she rides you if you are a minority.

Jacqueline Berry's affidavit is in the same vein:

> In general, Ms. Annand showed Caucasian employees preferential treatment over black and Hispanic employees and minorities in general, which I observed first-hand. . . . Caucasian employees would be spoken to by Brenda in a professional and soft-spoken manner, using words like "honey" or "sweetie" as compared to yelling and shouting and threatening hand motions (i.e. finger-pointing) towards minorities. I have cried as a result of Brenda's hostility, Nicole Waters has cried in the same manner, and Nancy Santana has cried in response to Brenda's derogatory and threatening remarks, all of which I attribute to Brenda's apparent racially discriminatory attitudes. . . . Clients often get irate with the call center

5

personnel, using profanity and often upsetting them. If Caucasian employees became upset, Brenda would often exit her office and come out and terminate the call and comfort the Caucasian person, but she would not do the same for minorities.

Ms. Marion-Lindsay echoes all these comments. In particular, she states:

In my personal opinion, it appeared to me (based upon my observations of the manner in which Brenda Annand managed her department) that Brenda disfavored minorities when it came to attending conferences, or taking career ladder tests. To expand on the preceding [statement], I have heard that whenever minorities would ask Brenda Annand about taking career ladder tests, it seemed that she always would tell the minority person that he or she hadn't take[n] a certain class or perhaps some other excuse, and because of that Brenda concluded that the person couldn't take the test. On other occasions, I have heard that Brenda would indicate that the department needed phone coverage at the time of the career ladder test, or at the time one of the classes was being offered, so that the minority person couldn't be spared for the time to take the test, or the class.

The same sort of general commentary carries over to the observations of the four affiants with regard to specific employees, including themselves. For example, Ms. Marion-Lindsay avers:

An example of Brenda's race-based wrongful actions that I personally experienced was when I requested to go to the Women's Expo, which is an annual conference. Brenda put me off, telling me that I could go "next year." I didn't get to go to that year's conference, and by the "next year," I was working in a different department with a different supervisor.
    A Caucasian woman named Elizabeth Orndorff came to work in the department, and she was allowed to take a career ladder test when she had only been there for approximately one year.

Tomeka Lester states:

I saw Brenda yelling, for example, in an inappropriate and abusive fashion at Calvin Parsons (a black male), and at least twice in the same abusive way at Nicole Waters, a black female.

And Ernest Eggleston states:

We had an Hispanic girl named Judine in the department, who I believe was driven out of the department because of Brenda Annand's derogatory treatment of her, and because of Brenda Annand's unnecessary micro-management, all of which I attribute to Brenda Annand's unfair treatment of her because she was a

non-Caucasian. Judine seemed to me to be a capable worker, who over time began to deteriorate due to stress caused by Brenda Annand. Calvin Parsons was an African-American worker who was bright and knew his job well, and I believe Brenda Annand (and Dianne Walters, who was also part of the management structure) envied his capabilities and knowledge. Calvin bent over backwards to try to stay in compliance with Brenda Annand's guidelines, but no matter what he did, it appeared to me that he couldn't satisfy her. I saw Brenda's treatement affect his health. I attribute Brenda's conduct toward's Calvin to her unfair and discriminatory attitude towards people of color.

Jacqueline Bery states:

I know for a fact that certain Caucasian employees, such as Sandy Rossi, Elizabeth Orndorff, and "Cathy" (whose last name I cannot remember) had lower credentials than Nancy or I, but were allowed to take career ladder tests by Brenda Annand. Elizabeth Orndorff had been there less than a year at the time she was allowed to take the test, and Brenda would often give Elizabeth special assignments that enabled her to get away from phone duty (which was viewed as difficult by the workers), while minority employees would not get similar opportunities for special assignments. . . . I am aware that Sandy Rossi, a Caucasian, used profanity with clients on the phone, and hung up on clients, within earshot of Brenda, with no reprimand from Brenda; whereas I have personally experienced (and witnessed with regard to Nancy) situations much less serious leading to hostile reprimands from Brenda.

It is also worthwhile to review the deposition transcript of Ms. Berry identified in, and appended to, her affidavit, found at pages B-14 to B-45, for a general overview of her experiences in the unit.

All of the above negative attitudes are mirrored in specific comments which the affidavit witnesses made with regard to Ms. Annand's specific management of Nancy Santana. Ernie Eggleston stated as follows:

When our current unit first started back in 2000, Nancy and I were original members. Almost immediately after being assigned, Nancy went out on military leave. In my opinion the manager at the time appeared to resent Nancy's absence, and this resentment appeared to carry over to Brenda Annand.
I observed nit-picky management by Brenda Annand with regard to Nancy Santana's job performance. Brenda would criticize Nancy for little things.
I was in a position to know whether Nancy was doing a good job, and it was my opinion that criticisms from Brenda were greater than they would have been if Nancy had been Caucasian; in fact, Brenda would not have criticized

7

Nancy for little things if she had been Caucasian. I have seen Nancy Santana upset after being criticized by Brenda Annand for being on the phone too long with a client, which criticism seemed unfair to me based upon my knowledge of the manner in which phone calls were handled.

I could visibly see Nancy Santana's very upset demeanor when Nancy would relate to me examples of Brenda's unnecessary micro-management right after it happened. Again, I believe that this micro-management was motivated by Brenda Annand's discriminatory reaction to Nancy's non-caucasian race.

Marjorie Marion Lindsay states:

On one occasion I came back from lunch, and observed Nancy Santana in an upset condition. I asked her what was wrong with her, and she said that Brenda had given her a hard time in a confrontation near the printer. Nancy said that Brenda complained about Nancy leaving her desk, and that Brenda was hollering at her and had her finger in Nancy's face. I would describe Nancy as being upset and angry on this occasion, and it appeared that she had been crying.

On another occasion, I observed Brenda Annand giving Nancy a hard time about taking time off when Nancy's daughter was sick.

Jacqueline Berry states:

Whenever Brenda Annand would address something to Nancy, her voice was often irate and threatening and she would often point her finger in Nancy's face within an arm's length, and sometimes within six inches of Nancy's face. This would happen in front of co-workers in the hallway and elsewhere, which appeared to be degrading and disrespectful towards Nancy, and intimidating. Events such as this happened once of twice a week, many of which I witnessed.

Nancy and I worked in the call center. Brenda would say on occasion that Nancy was on the phone too long with clients, but other Caucasian employees would take longer on the phone without being criticized by Brenda.

. . . I am aware that Nancy had been denied the opportunity to take a career ladder test even where her application was word-for-word identical to the application of another employee who had been allowed to take the test.

There was an awards ceremony in March of 2004 where Nancy was given an award for being an active participant in the military, and Brenda denied Nancy the opportunity to go the ceremony because Nancy had not made an e-mail request in a timely manner, even though Nancy had still been on military leave when the time for the e-mail request passed.

And Tomeka Lester states:

8

I sat right behind Nancy Santana when I started and I remember 2 specific incidents around that time. In one, Brenda came over to Nancy and started yelling at her in front of all her co-workers because Nancy was leaving for the military; afterwards, I had to console Nancy. The second incident occurred when Nancy had to take time off to help her daughter; Brenda sent her an abusive e-mail, which was nasty with content that was uncalled for.

Ms. Santana ultimately filed a Charge of Discrimination with the EEOC on or about June 3, 2005, see B-135 to B-136, including explanatory notes that had been provided to the EEOC prior to the charge having been taken, see B-123 to B-125.

**Argument**

I.     **There is a genuine issue of material fact as to the hostile nature of Nancy Santana's work environment under relevant substantive Title VII precedent.**

*1. Standard of Review*

The basic standard of review of a motion for summary – determining the existence of a genuine issue of material fact – has been well stated in the section I-A of the Opening Brief, and need not be repeated hear. We would add only the following passage from <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133 (2000), which in reviewing a motion for judgment as a matter of law noted that the standard on such a motion "'mirrors'" that of summary judgment under Rule 56 such that "'the inquiry under each is the same'" (530 U.S. at 150, citation omitted), and stated:

> [T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. . . ."Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."

530U.S. at 150 [citations omitted].

This same standard of review applies throughout the analysis in this brief.

*2. Discussion*

In <u>Caver v. City of Trenton</u>, 420 F.3d 243, 262 (3rd Cir. 2005), the Third Circuit stated that the plaintiff in a Title VII case alleging a racially-based hostile environment must establish the following elements:

> 1. she suffered intentional discrimination because of her race;
> 2. the discrimination was pervasive and regular;
> 3. it detrimentally affected her;
> 4. it would have detrimentally affected a reasonable person of the same protected class; and

5. there is a basis for vicarious liability.

In evaluating the evidence of these elements, the Third Circuit stated that the court must

proceed as follows:

> In determining whether the conduct at issue is sufficiently extreme, we consider
> "the totality of the circumstances." Andrews v. City of Philadelphia, 895 F.2d
> 1469, 1482 (3rd Cir. 1990). As such, "a discrimination analysis must concentrate
> not on individual incidents, but on the overall scenario." Id. at 1484; see also
> Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L.Ed.2d 295
> (1993) ([W]hether an environment is 'hostile' or 'abusive' can be determined
> only by looking at all the circumstances.") . . . The types of circumstances we
> consider "may include the frequency of the discriminatory conduct; its severity;
> whether it is physically threatening or humiliating, or a mere offensive utterance;
> and whether it unreasonably interferes with an employee's work performance."
> Harris, 510 U.S. at 23 . . .

420F.3d at 262-263.

Analysis of the Caver opinion is directly applicable to, and extremely helpful in, the instant

matter. In Caver, the Third Circuit evaluated the District Court's "dismissal" of a claim

asserting a racially hostile work environment in the Trenton Police Department ("dismissal"

is in quotes because there was some confusion over the manner in which the claim was

resolved, see discussion in 420 F.3d at 260-262, and especially at footnote 14; in any event,

the matter went to trial on a related retaliation claim that was still intact, and hence there was

an evidentiary record with regard to the "racially charged atmosphere in the Department"). In

evaluating the evidence, the Third Circuit found that facially neutral comments directed at

plaintiff Lawrence Davis (all other plaintiffs had "settled their claims," 420 F.3d at 249)

along with certain racist comments directed at others as well as certain racist graffiti and

flyers placed around the Department by unidentified individuals (see list, 420 F.3d at 263)

were found to present "an admittedly close issue" of hostile work environment, 420 F.3d at

262. In evaluating this evidence, the Third Circuit noted that "'[T]he advent of more

11

sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment in evaluating a hostile work environment claim" (420 F.3d at 264, citations omitted) and further noted in a footnote that offensive statements towards *others* can contribute to a hostile work environment and can be relied on "to bolster the plaintiff's case," 420 F.3d at 264 fn. 17, citation omitted.

Finding that a reasonable jury could have concluded that certain harassment did indeed occur (e.g. intentionally false memos; improper recommendation for psychiatric treatment; 420 F.3d at 264), the Third Circuit noted that this **called into question whether plaintiff Davis's case really had failed *as a matter of law*.** They declined to reverse, however, on the theory that this jury had in fact specifically resolved the closely related retaliation claim brought by Davis, and its findings (in a special verdict sheet) on that issue could be relied on in resolving the hostile environment issue.

The importance of <u>Caver</u> to the instant matter is this: on a factual record not dramatically different in scope from that in the instant matter, the Third Circuit was not adverse to finding genuine issues of fact that required a jury's resolution. Because the issues had been decided by the jury on the closely related retaliation claim, the court did not need to remand; but it certainly seems, from reading the various portions of <u>Caver</u> cited above, that they would have remanded for jury resolution had the issue been decided against the plaintiff as a matter of law.

And that brings us to the facts of the instant matter, as set forth above in the Statement of Facts. We submit that the facts of Nancy Santana's case present genuine issues of material fact requiring resolution by a jury on the question of her exposure to a hostile environment.

12

The extensive testimony in the affidavits of Tomeka Lester, Ernest Eggleston, Marjorie

Marion-Lindsay, and Jacqueline Berry (three of whom still work in DCSE, and have shown

courage in participating in this case) regarding Brenda Annand's discriminatory attitudes, the

disputes that erupted after Ms. Santana testified about "racial" problems in an "open hostile

environment" in the Calvin Parsons hearing, the yelling and screaming of Brenda Annand

that is consistently directed at minorities but not Caucasians, when viewed in the light most

favorable to Ms. Santana, is sufficient to create genuine issues of fact under Caver.


**II.    There is a genuine issue of material fact as to whether the hostile nature of Nancy Santana's work environment constitutes retaliation under relevant Title VII precedent.**

The Supreme Court found, in Burlington North. & Santa Fe Ry. Co. v. White, 548 U.S.

__, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) that the retaliation provisions of Title VII "are

not coterminous" with Title VII's substantive provisions (Slip opinion of June 22, 2006,

majority opinion of Justice Breyer at page 12), but are rather somewhat easier to satisfy.

Under Burlington:

> [A] plaintiff must show that a reasonable employee would have found the
> challenged action materially adverse, "which in this context means it well might
> have 'dissuaded a reasonable worker from making or supporting a charge of
> discrimination'"

Slip opinion, majority opinion at page 13 [citations omitted].

Next explaining that it seeks to separate significant from trivial harms, the court then expands

on its choice of phrasing:

> We phrase the standard in general terms because the significance of any given act
> of retaliation will often depend upon the particular circumstances. Context
> matters. "The real social impact of workplace behavior often depends on a
> constellation of surrounding circumstances, expectations, and relationships which

are not fully captured by a simple recitation of the words used or the physical acts performed." . . . A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children. . . . A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training luch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. . . . Hence a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an "act that would be immaterial in some situations is material in others." . . .

. . . By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination.

Slip opinion, majority opinion at page 14-15 [some citations and some text omitted].

Applying these standards to the instant matter, it is readily apparent that Ms. Santana has raised genuine issues of material fact with regard to retaliation. She raised issues of racially-based discrimination and hostile environment in the March 24, 2005 Calvin Parsons hearing, as detailed in the Statement of Facts, and the many episodes occurring thereafter, including disputes over leave slips and the performance review, and the ongoing hostile atmosphere, are sufficient to create a genuine issue of fact under <u>Burlington</u>, particularly in light of the strong case even under the somewhat stricter standard of <u>Caver</u> discussed in Section I above.

## <u>Conclusion</u>

For all of the reasons set forth herein, it is hereby submitted that the Motion for Summary Judgment filed by defendant should be denied.

14

DATE: November 19, 2007                    THE PLAINTIFF,

                                    By: _____
                                           Herbert G. Feuerhake, Esq.
                                           The Law Office of H. G. Feuerhake
                                           521 West Street
                                           Wilmington, Delaware 19801
                                           (302) 658-6101
                                           Atty. ID No. 2590

15