IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NANCY SANTANA,                          )
                                        )
              Plaintiff,                )
                                        )        Civ. A. No. 06-666 GMS
vs.                                     )
                                        )
STATE OF DELAWARE, DEPT. OF             )
HEALTH AND SOCIAL SERVICES,             )
DIV. OF CHILD SUPPORT                   )
ENFORCEMENT,                            )
                                        )
              Defendant.                )


# APPENDIX

## to

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGM.ENT


DATE: November 19, 2007          Herbert G. Feuerhake, Esq.
                                 The Law Office of Herbert G. Feuerhake
                                 521 West Street
                                 Wilmington, Delaware 19801
                                 (302) 658-6101
                                 Atty. ID No. 2590

## TABLE OF CONTENTS

Affidavit of Ernest Eggleston . . . . . . . . . . . . . . . . . . . . . . .          B-1

Affidavit of Marjorie Marion Lindsay . . . . . . . . . . . . . .          B-4

Affidavit of Tomeka Lester . . . . . . . . . . . . . . . . . . . . . . .          B-7

Affidavit of Jacqueline Berry (with deposition transcript attached) . . .          B-10

Miscellaneous e-mails . . . . . . . . . . . . . . . . . . . . . . . . . . .          B-46

Performance Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . .          B-52

Transcript of Calvin Parsons hearing . . . . . . . . . . . . . . . . .          B-53

Letter filed with EEOC in March 2005 . . . . . . . . . . . . . . .          B-123

E-mails re leave slips . . . . . . . . . . . . . . . . . . . . . . . . . . . . .          B-126

Memo re excess printing, and Nancy Santana's explanation to EEOC          B-132

Charge of Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . .          B-135

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NANCY SANTANA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civ. A. No. 06-666-GMS |
| vs. | ) | |
| | ) | |
| STATE OF DELAWARE, DEPT. OF | ) | |
| HEALTH AND SOCIAL SERVICES, | ) | |
| DIVISION OF CHILD SUPPORT | ) | |
| ENFORCEMENT | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT of ERNEST EGGLESTON

I, Ernest Eggleston, being duly sworn, do hereby depose and say as follows:

1. I am over the age of eighteen years and understand the obligation of an oath.

2. I am of the African-American race.

3. I have worked for the State of Delaware Division of Child Support Enforcement ("DCSE") for approximately ten years, and I am currently a child support specialist III.

4. During my time at the DCSE, I had occasion to work with Nancy Santana and also under the supervision of Brenda Annand.

5. In my personal opinion, it appears to me (based upon my observations of the manner in which Brenda Annand manages her department) that Brenda Annand doesn't seem to have problems with caucasions in her unit, but seems always to criticize people of color. Basically, all her problems with people in the unit seem to stem from people of color.

B-1

6. I believe that Brenda Annand's management style was drastically tougher on people of color than on Caucasians.

7. When our current unit first started back in 2000, Nancy and I were original members. Almost immediately after being assigned, Nancy went out on military leave. In my opinion the manager at the time appeared to resent Nancy's absence, and this resentment appeared to carry over to Brenda Annand.

8. I observed nit-picky management by Brenda Annand with regard to Nancy Santana's job performance. Brenda would criticize Nancy for little things.

9. I was in a position to know whether Nancy was doing a good job, and it was my opinion that criticisms from Brenda were greater than they would have been if Nancy had been Caucasian; in fact, Brenda would not have criticized Nancy for little things if she had been Caucasian.

10. I have seen Nancy Santana upset after being criticized by Brenda Annand for being on the phone too long with a client, which criticism seemed unfair to me based upon my knowledge of the manner in which phone calls were handled.

11. I could visibly see Nancy Santana's very upset demeanor when Nancy would relate to me examples of Brenda's unnecessary micro-management right after it happened. Again, I believe that this micro-management was motivated by Brenda Annand's discriminatory reaction to Nancy's non-caucasian race.

12. In my opinion, Brenda Annand is insecure because of her poor background. I would say that she acts as if she is Scarlett O'Hara and the department is her Tara; she sees herself as above people of color. She *managed* white people with respect,

Eggleston 2

B-2

and she *bossed around* people of color with disrespect, based upon my observations.

13. Brenda Annand's expertise is in accounting, and her management skills are weak.

14. We had an Hispanic girl named Judine in the department, who I believe was driven out of the department because of Brenda Annand's derogatory treatment of her, and because of Brenda Annand's unnecessary micro-management, all of which I attribute to Brenda Annand's unfair treatment of her because she was a non-caucasian. Judine seemed to me to be a capable worker, who over time began to deteriorate due to stress caused by Brenda Annand.

15. Calvin Parsons was an African-American worker who was bright and knew his job well, and I believe Brenda Annand (and Dianne Walters, who was also part of the management structure) envied his capabilities and knowledge. Calvin bent over backwards to try to stay in compliance with Brenda Annand's guidelines, but no matter what he did, it appeared to me that he couldn't satisfy her. I saw Brenda's treatment affect his health. I attribute Brenda's conduct toward's Calvin to her unfair and discriminatory attitude towards people of color.

_Ernest Eggleston_
Ernest Eggleston
DATE: 1-17-07

On this the 17th day of November , 2007, personally appeared before me, Herbert G. Feuerhake, an attorney-at-law authorized to take acknowledgements under 29 Del. C. §4323, the affiant, **Ernest Eggleston**, who, being duly sworn, did depose and say that the foregoing statements were true and correct to the best of his knowledge.

_Herbert G. Feuerhake_
Herbert G. Feuerhake, Esq.
Attorney-at-Law

Eggleston 3                                                    B-3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

NANCY SANTANA,                          )
                                        )
      Plaintiff,                   )
                                        )    Civ. A. No. 06-666-GMS
vs.                                     )
                                        )
STATE OF DELAWARE, DEPT. OF             )
HEALTH AND SOCIAL SERVICES,             )
DIVISION OF CHILD SUPPORT               )
ENFORCEMENT                             )
                                        )
      Defendant.                   )

## AFFIDAVIT of MARJORIE MARION-LINDSAY

I, Marjorie Marion-Lindsay, being duly sworn, do hereby depose and say as follows:

1.  I am over the age of eighteen years and understand the obligation of an oath.

2.  I am of the African-American race.

3.  I worked for the State of Delaware Division of Child Support Enforcement ("DCSE") from approximately August of 2002 until the present, currently as a child support specialist with the license suspension unit.

4.  During my time at the DCSE, I had occasion to work with Nancy Santana and also under the supervision of Brenda Annand.

5.  In my personal opinion, it appeared to me (based upon my observations of the manner in which Brenda Annand managed her department) that Brenda disfavored minorities when it came to attending conferences, or taking career ladder tests.

Marion-Lindsay - 1

B-4

6. To expand on the preceding paragraph, I have heard that whenever minorities would ask Brenda Annand about taking career ladder tests, it seemed that she always would tell the minority person that he or she hadn't take a certain class or perhaps some other excuse, and because of that Brenda concluded that the person couldn't take the test.

7. On other occasions, I have heard that Brenda would indicate that the department needed phone coverage at the time of the career ladder test, or at the time one of the classes was being offered, so that the minority person couldn't be spared for the time to take the test, or the class.

8. An example of Brenda's race-based wrongful actions that I personally experienced was when I requested to go to the Women's Expo, which is an annual conference. Brenda put me off, telling me that I could go "next year." I didn't get to go to that year's conference, and by the "next year," I was working in a different department with a different supervisor.

9. A caucasion woman named Elizabeth Orndorff came to work in the department, and she was allowed to take a career ladder test when she had only been there for approximately one year.

10. On one occasion I came back from lunch, and observed Nancy Santana in an upset condition. I asked her what was wrong with her, and she said that Brenda had given her a hard time in a confrontation near the printer. Nancy said that Brenda complained about Nancy leaving her desk, and that Brenda was hollering at her and had her finger in Nancy's face. I would describe Nancy as being upset and angry on this occasion, and it appeared that she had been crying.

Marion-Lindsey 2                                                        B-5

11. On another occasion, I observed Brenda Annand giving Nancy a hard time about

taking time off when Nancy's daughter was sick.

Marjorie Marion-Lindsay

DATE: 11/15/07

On this the 15th day of November, 2007, personally appeared before me,
Herbert G. Feuerhake, an attorney-at-law authorized to take acknowledgements under 29
Del. C. §4323, the affiant, **Marjorie Marion-Lindsay**, who, being duly sworn, did
depose and say that the foregoing statements were true and correct to the best of her
knowledge.

Herbert G. Feuerhake, Esq.
Attorney-at-Law

Marion-Lindsay 3                                    B-6

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

NANCY SANTANA,        )
                              )
        Plaintiff,       )
                              )    Civ. A. No. 06-666-GMS
vs.                         )
                              )
STATE OF DELAWARE, DEPT. OF   )
HEALTH AND SOCIAL SERVICES,   )
DIVISION OF CHILD SUPPORT     )
ENFORCEMENT              )
                              )
        Defendant.     )

## AFFIDAVIT of TOMEKA LESTER

I, Tomeka Lester, being duly sworn, do hereby depose and say as follows:

1. I am over the age of eighteen years and understand the obligation of an oath.

2. I am of the African-American race.

3. I have worked for the State of Delaware Division of Child Support Enforcement ("DCSE") from approximately September of 2002 until the present, currently as a child support specialist II.

4. During my time at the DCSE, I had occasion to work with Nancy Santana and also under the supervision of Brenda Annand.

5. I sat right behind Nancy Santana when I started and I remember 2 specific incidents around that time. In one, Brenda came over to Nancy and started yelling at her in front of all her co-workers because Nancy was leaving for the military; afterwards, I had to console Nancy. The second incident occurred when Nancy

B-7

had to take time off to help her daughter; Brenda sent her an abusive e-mail, which was nasty with content that was uncalled for.

6. Brenda yelled at me from time to time, even when I was in another unit. Brenda yelled at me inappropriately at least four times on the phone, and in person twice. On these occasions her tone of voice was accusatory, accusing me of things I didn't do, and she was stating a lot of assumptions that were false.

7. I have some backbone, and I believe that by standing up to Brenda, I caused her to back down more than she did with other minority employees. If Brenda sees that you have backbone, she'll back off, but if you show fear she rides you if you are a minority.

8. Brenda's negative attitude towards black women, or a Hispanic woman like Nancy, was different from the way she treated Caucasians, leading me to conclude over time that she was racist. I didn't want to jump to that conclusion, but after many incidents in sort of a cycle of time, you start to see it and you start to feel it.

9. I saw Brenda yelling, for example, in an inappropriate and abusive fashion at Calvin Parsons (a black male), and at least twice in the same abusive way at Nicole Waters, a black female.

10. It seemed to me that Brenda was helping white workers move up the "career ladder" in a faster and more efficient manner than minority employees, but I can't say for sure because I don't personally know the specifics.

Tomeka Lester
DATE: 11/18/2007

Tomeka Lester 2

B-8

On this the 18th day of November, 2007, personally appeared before me, Herbert G. Feuerhake, an attorney-at-law authorized to take acknowledgements under 29 Del. C. §4323, the affiant, **Tomeka Lester**, who, being duly sworn, did depose and say that the foregoing statements were true and correct to the best of her knowledge.

_____

Herbert G. Feuerhake, Esq.
Attorney-at-Law

Tomeka Lester 3

B-9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NANCY SANTANA,                          )
                                        )
    Plaintiff,                        )
                                        )    Civ. A. No. 06-666-GMS
vs.                                     )
                                        )
STATE OF DELAWARE, DEPT. OF             )
HEALTH AND SOCIAL SERVICES,             )
DIVISION OF CHILD SUPPORT               )
ENFORCEMENT                             )
                                        )
    Defendant.                        )

## <u>AFFIDAVIT of JACQUELINE BERRY</u>

I, Jacqueline Berry, being duly sworn, do hereby depose and say as follows:

1. I am over the age of eighteen years and understand the obligation of an oath.

2. I am of the African-American race.

3. I worked for the State of Delaware Division of Child Support Enforcement

    ("DCSE") from approximately October of 2000 until August of 2005; I resigned

    at that time, but they thereafter "terminated" me two months later. My job title

    was child support specialist I in the customer service unit.

4. During my time at the DCSE, I had occasion to work with Nancy Santana and

    also under the supervision of Brenda Annand.

5. Whenever Brenda Annand would address something to Nancy, her voice was

    often irate and threatening and she would often point her finger in Nancy's face

    within an arm's length, and sometimes within six inches of Nancy's face. This

    would happen in front of co-workers in the hallway and elsewhere, which

B-10

appeared to be degrading and disrespectful towards Nancy, and intimidating. Events such as this happened once of twice a week, many of which I witnessed.

6. In general, Ms. Annand showed Caucasian employees preferential treatment over black and Hispanic employees and minorities in general, which I observed first-hand.

7. Nancy and I worked in the call center. Brenda would say on occasion that Nancy was on the phone too long with clients, but other Caucasian employees would take longer on the phone without being criticized by Brenda.

8. Caucasian employees would be spoken to by Brenda in a professional and soft-spoken manner, using words like "honey" or "sweetie" as compared to yelling and shouting and threatening hand motions (i.e. finger-pointing) towards minorities. I have cried as a result of Brenda's hostility, Nicole Waters has cried in the same manner, and Nancy Santana has cried in response to Brenda's derogatory and threatening remarks, all of which I attribute to Brenda's apparent racially discriminatory attitudes.

9. I know for a fact that certain Caucasian employees, such as Sandy Rossi, Elizabeth Orndorff, and "Cathy" (whose last name I cannot remember) had lower credentials than Nancy or I, but were allowed to take career ladder tests by Brenda Annand. Elizabeth Orndorff had been there less than a year at the time she was allowed to take the test, and Brenda would often give Elizabeth special assignments that enabled her to get away from phone duty (which was viewed as difficult by the workers), while minority employees would not get similar opportunities for special assignments.

Berry 2

B-11

10. I am aware that Nancy had been denied the opportunity to take a career ladder test even where her application was word-for-word identical to the application of another employee who had been allowed to take the test.

11. I am aware that Sandy Rossi, a Caucasian, used profanity with clients on the phone, and hung up on clients, within earshot of Brenda, with no reprimand from Brenda; whereas I have personally experienced (and witnessed with regard to Nancy) situations much less serious leading to hostile reprimands from Brenda.

12. Clients often get irate with the call center personnel, using profanity and often upsetting them. If Caucasian employees became upset, Brenda would often exit her office and come out and terminate the call and comfort the Caucasian person, but she would not do the same thing for minorities.

13. Nancy Santana was well-liked by her peers.

14. There was an awards ceremony in March of 2004 where Nancy was given an award for being an active participant in the military, and Brenda denied Nancy the opportunity to go the ceremony because Nancy had not made an e-mail request in a timely manner, even though Nancy had still been on military leave when the time for the e-mail request passed.

15. I have filed a lawsuit against the DCSE as a result of the treatment I received, and gave my deposition in that lawsuit, a copy of which is attached hereto and is my true testimony.

Jacqueline Berry     11/18/2007
Jacqueline Berry
DATE: 11/18/2007

Berry 3

B-12

On this the 18th day of November, 2007, personally appeared before me, Herbert G. Feuerhake, an attorney-at-law authorized to take acknowledgements under 29 Del. C. §4323, the affiant, **Jacqueline Berry**, who, being duly sworn, did depose and say that the foregoing statements were true and correct to the best of her knowledge.

_____
Herbert G. Feuerhake, Esq.
Attorney-at-Law

Berry 4

B-13

IN THE UNITED STATES DISTRICT COURT
IN THE DISTRICT OF DELAWARE


JACQUELINE D. BERRY,         )
                             )
       Plaintiff;        )
                             ) Civil Action No.
v.                         ) 06-217-GMS
                             )
STATE OF DELAWARE,         )
DIVISION OF CHILD SUPPORT,  )
                             )
       Defendant.        )


        Deposition of JACQUELINE D. BERRY taken
pursuant to notice at the Department of Justice,
Carvel State Office Building, 820 North French Street,
Wilmington, Delaware, beginning at 1:00 p.m. on
Wednesday, February 28, 2007, before Ann M. Calligan,
Registered Merit Reporter and Notary Public.


APPEARANCES:

        JACQUELINE D. BERRY, pro se;

        MARC P. NIEDZIELSKI, Esquire
          Department of Justice
          Carvel State Office Building
          820 North French Street
          Wilmington, Delaware  19801
          on behalf of the Defendant.

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

Berry v. State of Delaware, Division of Child Support

2

1  JACQUELINE D. BERRY,
2  the witness herein, having first been
3  duly sworn on oath, was examined and
4  testified as follows:
5  EXAMINATION
6  BY MR. NIEDZIELSKI:
7  Q.  Ms. Berry, my name is Marc Niedzielski. Have
8  you ever had your deposition taken before?
9  A.  For this?
10  Q.  For anything.
11  A.  I think. I think.
12  Q.  Let me just go over some of the basic rules so
13  you understand. I will be asking you a series of
14  questions. It's important that, before you answer the
15  question, you understand the question. So if, for
16  some reason, I ask you a question you don't understand
17  what I'm asking, you should just let me know and I
18  will rephrase the question.
19      It's also important to understand that the
20  court reporter next to me is reporting
21  stenographically both the questions and the responses
22  to them. But there has to be a verbal response. In
23  conversations, frequently we talk to one another and
24  nod our heads and things like that. That doesn't

3

1  transcribe. Okay? So when I ask you a question, try
2  to give a verbal response to the question. If you
3  want to take a break at any time, let me know and
4  we'll make arrangements to do that. Okay?
5  A.  (Indicating.)
6  Q.  Ms. Berry, prior to going on the record here, I
7  asked you about -- do you recall receiving two
8  authorizations for release of information from me by
9  letter?
10  A.  Yes.
11  Q.  And I asked you if you would be willing to sign
12  them?
13  A.  And I said no.
14  Q.  That's still the case, is that correct?
15  A.  Yes.
16  Q.  All right.
17      What I'd like to do is I'm going to put in
18  front of you a document, and it's going to look
19  familiar because you were the one that produced it.
20  What's different about this document is you see
21  there's numbers in the lower right-hand side?
22  A.  Mm-hmm.
23  Q.  Those are called Bates stamp numbers. We had
24  them put on. So these documents go from Bates stamp

4

1  B0001 through B00152, am I correct?
2  A.  Yes.
3  Q.  And these just generally are your responses to
4  my interrogatories, correct --
5  A.  Yes.
6  Q.  -- that I propounded on you? All right.
7      Before we get into those, I would like to
8  ask you some other background questions about you
9  actually. What's your date of birth?
10  A.  May 31st, 1956.
11  Q.  And where were you born?
12  A.  Dover, Delaware.
13  Q.  Are your parents still living?
14  A.  My mother is. My father is deceased.
15  Q.  Does your mother still live in Dover?
16  A.  Yes.
17  Q.  What's her name?
18  A.  Phyllis Scott.
19  Q.  And what's her address?
20  A.  20 Hickory Lane, Dover, Delaware.
21  Q.  And what's your present address?
22  A.  20 Hickory Lane, Dover, Delaware.
23  Q.  Is that your mother's house, or is it your
24  house?

5

1  A.  My mother's house.
2  Q.  Does she own it or is she buying it?
3  A.  She's buying it.
4  Q.  As a child were you raised there?
5  A.  Not as a child.
6  Q.  Do you remember when your mother acquired that
7  house?
8  A.  No, I don't.
9  Q.  How long have you most recently been living at
10  20 Hickory Lane?
11  A.  Pretty near all my life.
12  Q.  Well, was there a period of time most recently
13  where you had moved from out of the state or some
14  other address?
15  A.  Yes.
16  Q.  Where did you move from?
17  A.  I went to stay with my son.
18  Q.  Where is your son?
19  A.  In North Carolina.
20  Q.  What's your son's name?
21  A.  Donnie Berry.
22  Q.  And he lives in North Carolina?
23  A.  Mm-hmm.
24  Q.  What city? What's the address in North

2 (Pages 2 to 5)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

6

1  Carolina?
2      A.  5018 Oak Pasture Lane, Charlotte, North
3  Carolina.
4      Q.  What was the reason that you went to live with
5  your son?
6      A.  Because I was out on workman's comp. Division
7  of Child Support would not let me return to work and I
8  started seeking employment and was offered a job at
9  North Carolina.
10      Q.  And how old is your son?
11      A.  25.
12      Q.  And do you remember the first day you moved
13  down there to live with your son?
14      A.  To North Carolina?
15      Q.  Mm-hmm.
16      A.  I left on August 29th of 2005 to drive down.
17      Q.  And you remained with your son for how long
18  approximately?
19      A.  Well, I mean, I periodically go back and forth
20  to help him manage his properties because he has
21  employment which requires him to be out of state a
22  lot. So currently I help him manage his properties.
23      Q.  All right. So you go back there on occasion?
24      A.  Basically every weekend I go down there.

7

1          Now, when I went down there before the
2  work, I would come back to Delaware basically every
3  weekend.
4      Q.  From August 29, 2005, did you get your job in
5  North Carolina the same day?
6      A.  No. I didn't start working until September
7  1st.
8      Q.  And who did you go get a job with?
9      A.  Division of Child Support in North Carolina.
10      Q.  Is that a state office or a county office?
11      A.  It was state employment.
12      Q.  And did you fill in an application for that
13  job?
14      A.  Did I fill an application? Yes, I did.
15      Q.  And when did you fill out the application for
16  the job?
17      A.  I don't recall the date when I filled out the
18  application for the job. I don't recall the exact
19  date, but I did fill an application.
20      Q.  Do you recall if it was sometime prior to
21  August 29th, 2005?
22      A.  Yes, it was prior to that because I was offered
23  the job prior to August 29th.
24      Q.  Do you recall when you were offered the job?

8

1      A.  I don't recall the date. I was offered the
2  job. I think -- I don't know. I don't remember the
3  exact date. It was early August.
4      Q.  So does that mean that whenever you did your
5  application was sometime prior to when you were
6  offered the job?
7      A.  Yes.
8      Q.  Did they ask you for references?
9      A.  On my application?
10      Q.  Yes.
11      A.  Yes, they did.
12      Q.  And who did you list as references?
13      A.  An ex-supervisor from another agency I used to
14  work with. Telemine Corporation, I know that. As far
15  as the other references on the application, I don't
16  recall. But I know I used that supervisor there
17  because I currently still use her.
18      Q.  What was the job that you got in North
19  Carolina?
20      A.  Child support agent 2.
21      Q.  What were the duties of that job?
22      A.  Enforcement of child support orders.
23      Q.  Was it similar to the job you had had with the
24  Division of Child Support Enforcement in Delaware?

9

1      A.  Not the job that I -- when I resigned from the
2  child support because I was in the customer service
3  unit. When I worked in the Sussex County child
4  support office doing case processing, it was similar
5  to those job duties.
6      Q.  So do you recall the date you resigned from
7  the -- let's make this -- we have a lot of child
8  support divisions floating around here. I'm going to
9  ask you the date you resigned from the Division of
10  Child Support Enforcement, State of Delaware.
11      A.  I made a call to HR. I think it was like
12  August 15th, on or about August 15th. I spoke with
13  LaTanya Warren and informed her that I was not
14  returning to the Division of Child Support because I
15  had employment that was offered to me out of state.
16      Q.  So you left a phone message? Would you speak
17  to the person?
18      A.  No. I talked with her. I didn't leave a
19  message. I talked with her.
20      Q.  Who is LaTanya?
21      A.  She works at HR.
22      Q.  Do you know what her job is in HR?
23      A.  I think she was an HR specialist. She was our
24  HR representative for child support.

3  (Pages 6 to 9)



Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

**10**

1    Q.  What other things did you discuss with --
2    A.  What I discussed with her there was, when I
3  signed up for disability, it's denied.  I was told
4  there was overpayment as a result of the disability
5  being denied and discussed the process of paying the
6  money back because I was not returning back to child
7  support here in Delaware.
8    Q.  And what did you tell her you were going to do
9  or not do?  Did you tell her you were going to make
10 arrangements to pay it back?
11   A.  Well, what she told me, she had to discuss it
12 with her supervisor to see what the process was with
13 me paying it back because it never had an employee
14 that they state has overpaid as a result of disability
15 being denied that didn't come back to work.  Normal
16 procedure, she says, the person returns to work and
17 they, I guess, garnish it from earnings when they
18 return back to work.
19   Q.  In other words, they make an adjustment in
20 their paycheck until it's paid back?
21   A.  Yes.
22       So I spoke to her with regard to not
23 returning and how to pay that money back.  She told me
24 she had to follow up with her supervisor.  She'd call

**11**

1  me within 24 hours.  So I didn't get a call from her.
2  I called back.  I left a voice message 24 hours later.
3  Then I called back 48 hours later, left a voice
4  message.  Then the third day, I called because I knew
5  that was I leaving to leave the state of Delaware.
6  And spoke with the Cindi Starr who's another
7  representative in HR.  When I was informed by her that
8  LaTanya Warren was no longer employed.
9    Q.  So did you repeat everything you told LaTanya
10 to Cindi about you not coming back?
11   A.  Pardon me?
12   Q.  Did you tell Cindi Starr everything you told
13 LaTanya?
14   A.  Yes.  And also, I had attorney representation
15 for workman's comp because I was on workman's comp.
16 My attorney was informed -- who informed their legal
17 rep for the workman's comp case that I was not
18 returning back to child support.
19   Q.  All right.  So your lawyer that was
20 representing your workman's compensation case notified
21 somebody that you were not returning?
22   A.  Notified the state's legal representation for
23 the workman's comp that I wasn't coming back.
24   Q.  All right.  Have you resigned before from a

**12**

1  job?
2    A.  Yes.
3    Q.  How did you do it?
4    A.  I've done it verbally, and I've done it
5  written.  When I resigned, because I'm currently not
6  working in North Carolina, I did that verbally.
7    Q.  You just called them, told them you are not
8  coming back; same thing in North Carolina you did when
9  you called Delaware and said, "I'm not coming back to
10 work"?
11   A.  Yes.
12   Q.  Why did you not return to work in North
13 Carolina?
14   A.  Why did I not return?  Because of my mother's
15 illness.
16   Q.  How long did you work in North Carolina for
17 their Division of Child Support?
18   A.  Two days shy of a year.
19   Q.  So you worked like until the end of August of
20 2006?
21   A.  No.  I started September the 1st of 2005, and
22 on or about September 26 was when I informed them
23 verbally that I was not returning.
24   Q.  That was more than a year then?

**13**

1    A.  Hmm?
2    Q.  I thought you said two days short of a year you
3  worked for North Carolina.
4    A.  Oh.  The reason why you're saying it was longer
5  than a year, I had took a three-week leave of absence
6  which set my time back.
7    Q.  Okay.  I got you.
8    A.  I was on a three-week leave of absence from
9  work to come to Delaware to -- my mother was in the
10 hospital.  So it set my time back --
11   Q.  So you stopped?
12   A.  -- of accruing that year.
13   Q.  So you stopped in September 2006 working in
14 North Carolina.
15   A.  Yes.
16   Q.  Returned to take care of your mother?
17   A.  Yes.
18   Q.  Is your mother doing okay, or does she have
19 problems?
20   A.  She still has medical problems.
21   Q.  Are you presently employed anywhere?
22   A.  No, sir.
23   Q.  Have you been looking for a job?
24   A.  Yes, sir.

4 (Pages 10 to 13)

B-17

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

**14**

1  Q.  Where have you been looking?
2  A.  I've been looking for employment here in
3  Delaware, in Maryland, in North Carolina.
4  Q.  Well, I thought the reason you returned from
5  North Carolina to Delaware is to take care of your
6  mom?
7  A.  I did.
8  Q.  But you're saying you're still going down there
9  looking for jobs; in other words, you don't have to be
10  with your mom any more?
11  A.  Well, because of circumstances with my family
12  supporting with her being taken care of. I have a
13  family member that's going to move closer to her.
14  That's going to relieve some of my responsibilities of
15  having to take care of her.
16  Q.  What's your marital status?
17  A.  Divorced.
18  Q.  How many children do you have?
19  A.  Two.
20  Q.  What are their names?
21  A.  Shanice and Donnie.
22  Q.  You said Donnie is like 25, right?
23  A.  Yes.
24  Q.  How old is Shanice?

**15**

1  A.  14.
2  Q.  Where does she live?
3  A.  Where does Shanice live? She currently is in
4  North Carolina.
5  Q.  With --
6  A.  With my son.
7  Q.  Now, you indicated you've been trying to get a
8  job. Can you tell me the actual names of the places
9  you've been trying? Have you submitted applications
10  or something like that?
11  A.  I've just been going on line doing
12  applications. I've applied here in Delaware with the
13  State of Delaware. I've came -- I have had some
14  interviews in the last month here in Delaware. I've
15  applied for federal jobs. I've just been applying for
16  jobs. I don't -- you know, I don't have a designated
17  area I'm targeting on or designated place where I want
18  to be. I'm just applying for jobs and going to
19  school.
20  Q.  Are you going to school right now?
21  A.  I'm currently not in school. I just finished a
22  block at Wilmington College in Dover, but I'm
23  currently not enrolled at this time right now.
24  Q.  What's your course of study?

**16**

1  A.  Behavioral science.
2  Q.  When did you first start working for the State
3  of Delaware?
4  A.  It's back in the eighties. Back in the
5  eighties. I don't know the exact year, but back in
6  the eighties because my son was born in '81. I was
7  working with them prior to him being born.
8  Q.  Did you work for the State of Delaware solidly
9  continuously through that period of time --
10  A.  No.
11  Q.  -- or has it been like you'd work for like ten
12  months and then be off work for a while, then come
13  back?
14  A.  No. When I first started working with the
15  State of Delaware, I worked as a CNA. Then, when I
16  chose to want to go to school to be an social worker
17  or a -- behavioral science, then I pursued my jobs
18  toward what I was going to school for.
19  Q.  CNA is a certified nursing assistant?
20  A.  Certified nursing assistant.
21  Q.  Where did you work?
22  A.  At the Delaware Hospital For the Chronically
23  Ill in Smyrna.
24  I said the eighties? I'm trying -- I

**17**

1  think it was the seventies because I worked at the
2  Stokely Center in Georgetown. My son was born in '81.
3  So early eighties, late seventies when I started
4  working for the State. I don't recall the exact year.
5  Q.  What is your educational background?
6  A.  I am currently a senior in college. My
7  classification is a first semester senior.
8  Q.  Where did you go? What high school did you
9  attend?
10  A.  Dover High School.
11  Q.  And do you remember when you graduated from
12  Dover High?
13  A.  1975.
14  Q.  After high school, after Dover High, what
15  college did you attend?
16  A.  Delaware State College, which is now Delaware
17  State University, and Wilmington College.
18  Q.  The most recent job you had with the Division
19  of Child Support, do you know what the official title
20  for the division you worked for is or that you had
21  worked for?
22  A.  The agency in North Carolina?
23  Q.  No. The one in Delaware.
24  A.  Do I know what?

5 (Pages 14 to 17)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

18

1   Q. The actual name of the division you worked for.
2   A. The Division of Child Support Enforcement.
3   Q. Okay. Yes. Is that the official title,
4   Division of Child Support Enforcement?
5   A. To the best of my knowledge it is.
6   Q. When did you start working for them?
7   A. In 2000. I don't recall. I think it was
8   October 2000.
9   Q. And did you work continuously from 2000 to when
10  you called in and said, you weren't coming back to
11  work in 2005?
12  A. No, because I was out because of -- are you
13  asking was there a break that I left them?
14  Q. Yes. Was there a break?
15  A. No. The only break was when I went out on
16  workman's comp, but that --
17  Q. And that was when?
18  A. June of 2004.
19  Q. And what was that from? Why did you go out on
20  workman's comp in June 2004?
21  A. I was diagnosed with bilateral carpal tunnel.
22  Q. What doctor diagnosed you with that?
23  A. Dr. Evan Crain.
24  Q. What was Dr. Crain's recommendation to you

19

1   regarding work?
2   A. He agreed for me to work but with limitations,
3   no repetitive use of my hands. Because I was in a
4   customer service unit, it consisted of keying. So he
5   put limitations on how many hours a day I could key.
6   Q. Were you able to work with those modifications?
7   A. I could have, but the Division of Child
8   Support -- I was out of work. I had surgery on both
9   hands. I had to have surgery on both hands. But
10  prior to that, I was out of work because, I guess,
11  they couldn't accommodate to put me somewhere else in
12  the agency to adhere to the doctor's recommendations.
13  Q. Now, you indicated the unit you were in was
14  called customer service, is that right?
15  A. Customer service unit.
16  Q. Are there a number of customer service units
17  A. Are there a number?
18  Q. Yes?
19  A. There's one customer service unit in New
20  Castle.
21  Q. Are there any in Kent and Sussex?
22  A. No, but when you're hired at Child Support,
23  you're hired as a child support specialist, which at
24  time of hire, I was placed in the customer service

20

1   unit because that's the need where they needed help.
2   But as a specialist, you're qualified to work in
3   actually any unit within the agency itself.
4   Q. They hired you in the customer service unit.
5   Tell us what the job duties of that function are.
6   A. Customer service unit, you're taking incoming
7   calls from clientele that the agency serves. You're
8   addressing their concerns, following up if need be
9   with the appropriate worker, that is, the case worker
10  on the case. You're processing documents and mailing
11  them out. You're updating information in the system
12  in regards to the information that you obtain from the
13  call that's coming in.
14  Q. Does it require lot of computer, finger use?
15  A. Yes. Because, from the moment -- you get like
16  a minute in between each call that you take. From the
17  moment that you answer the call, you start basically
18  keying in the conversation.
19  Q. Is that everybody that works in the customer
20  service unit?
21  A. Is that what everyone does in the customer
22  service unit?
23  Q. Yes.
24  A. That's what everyone does, but there are some

21

1   other individuals that have other duties where they
2   are not on the phone as much as other individuals.
3   Q. Okay. Well, within the customer service unit,
4   is there a break down into subunits or something like
5   that?
6   A. There -- what do you mean break down?
7   Q. Where you worked, how many people were in the
8   same group as you, had the same supervisor?
9   A. Well, the overall unit itself is supervised by
10  the same supervisor.
11  Q. Who's the supervisor?
12  A. Brenda Annand.
13  Q. How many people report to Brenda Annand?
14  A. I think there was probably like 20 some people
15  in the unit. I don't know any exact amount of
16  employees in the instant.
17  Q. Now, the customer service unit you indicated,
18  are there different jobs within the customer service
19  unit or different functions within the customer
20  service unit?
21  A. Yes, there are some individuals in the customer
22  service unit that handle the constituent complaints
23  from the governor, which those are, I guess, viewing
24  the complaints that people write in to the governor

6 (Pages 18 to 21)

B-19

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

22

1  and, I guess, researching the case and getting back
2  with that individual whether it be verbally or written
3  in regards to the complaint. I know there's an
4  individual in the unit that does that. There are
5  assigned team leaders, I guess, you know, in the unit,
6  which they kind of like oversee maybe -- in each
7  assigned team leader oversees like maybe four or five
8  people on their team.
9    Q. So Brenda Annand is the supervisor of this
10 group of approximately?
11   A. She -- Brenda has been the supervisor. I
12 forgot when she came on board as a supervisor, but
13 prior to her was Joyce Updike and Dianne Walters.
14 Brenda has been the supervisor in customer service
15 unit -- I don't recall when she came in the unit, but
16 she was not always my supervisor. In the end she was.
17   Q. When you started with them in 2000, was she
18 your supervisor?
19   A. No, sir.
20   Q. And you indicated that, in addition to this
21 group of 20 people that report to Brenda, there are
22 things called team leaders?
23   A. Yes.
24   Q. And how many team leaders were there?

23

1    A. I think there was, like in the unit itself
2  there's like four or five team leaders.
3    Q. Who was your team leader?
4    A. I had a team leader. His name was Calvin
5  Parsons. Then I had a team leader. Her name was
6  Darlene Jackson.
7    Q. Who was your last team leader?
8    A. Darlene Jackson.
9    Q. Is she still there?
10   A. No. She my understanding, she transferred
11 to -- well, she transferred back to Georgetown and
12 I -- I don't know where she is now, but I know she
13 went back to Georgetown. When I returned to work from
14 workman's comp, she wasn't there.
15   Q. Well, after your workman's comp, you had
16 surgery you indicated, right? I'm just trying to make
17 sure I get this straight. In June 2004 is when you
18 stopped working because of your bilateral carpal
19 tunnel, correct?
20   A. Yes.
21   Q. Then shortly thereafter did you have surgery?
22   A. Yes.
23   Q. Do you remember when your surgery was?
24   A. I had a surgery July 17th. One surgery was in

24

1  July. One was in August. I think it was July 17 and
2  August 9th.
3    Q. All right.
4    A. I don't remember the exact date, but one was in
5  July and one was in August.
6    Q. And what was your course of treatment after you
7  had the surgery?
8    A. Physical therapy.
9    Q. And how long did that last?
10   A. I guess four to six months.
11   Q. Now, were you able to return to work after your
12 surgery?
13   A. I was with restriction, but Child Support would
14 not let me return to work.
15   Q. Did they indicate they had no available jobs
16 with those restrictions?
17   A. Yes, because I was told, because I was in the
18 customer service unit, which I guess, not wanting to
19 accommodate me, to put me somewhere else in the
20 agency, I was basically told, because I was in the
21 customer service unit, that most of my job functions
22 require a lot of keying.
23   Q. Now, what I'm going to ask you now is, one of
24 your allegations is based on race, correct?

25

1    A. Yes, sir.
2    Q. Why don't you tell us, explain to us what that
3  allegation is, what are you alleging happened because
4  of your race?
5    A. When I see preferential treatment, whether it's
6  based off your gender, your race, your age, my
7  allegation to race was because Ms. Annand showed
8  preferential treatment towards the white employees
9  versus the black employees, people of minorities.
10   Q. When was that she did that?
11   A. She's basically done that from day 1 since I
12 came into the customer service unit.
13   Q. But now, why don't you explain to us, what was
14 it that you wanted that you indicated you did not get
15 because of your race?
16   A. Just like the career ladder -- Child Support
17 has a career ladder. It would be that the white
18 employees were always given preferential treatment as
19 far as getting the necessary training for the career
20 ladder versus people of color were not signed off by
21 the supervisor to take those trainings. To actually
22 make a statement and say to a white employee, well,
23 the next test I'll make sure that you set in on the
24 next test, and make sure they get the necessary



7 (Pages 22 to 25)

B-20

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

26

1  training or whatever so they can set in on the next
2  test. Ms. Annand would show preference with her voice
3  tone and her actions when she would address concerns
4  to white employees versus black employees. With black
5  employees it was the loud harsh tone with the finger
6  pointing in your face. With white employees it was
7  honey or sweetie or something like that in a soft
8  spoken tone.
9     Q. As to you, what job opportunity, promotion, or
10  whatever did you request that you did not get you
11  think based on race?
12    A. I have a daughter that has an illness.
13    Q. What's that illness?
14    A. She has asthma, chronic asthma, diabetes.
15    Q. Type 2?
16    A. I don't know what. Doctor just said diabetes
17  to me.
18    Q. Is she insulin dependent?
19    A. No. I'm a diabetic. I'm not insulin dependent
20  either.
21    Q. Okay. And what was it you requested?
22    A. My daughter's doctor had wrote a letter for me
23  to be moved down close to Dover because I lived in
24  Dover but worked in New Castle. And it had been

27

1  discussed with Ms. Annand on repeated occasions, which
2  each and every time it was discussed with her, I was
3  told that was not going to happen. I was hired in the
4  customer service unit, which I explained to her, I was
5  hired as child support specialist, not just to be in
6  the customer service unit. I know customer service
7  unit is not housed in Kent County. Fully
8  knowledgeable and aware of that. Was not asking for
9  any preferential treatment. Just asking, if there was
10  an opportunity that an opening would have came in Kent
11  County, I would — wanted to have been considered for.
12    Q. So what you were asking for, as I understand
13  it, you were asking, if a customer service position
14  opened in Dover, you'd like to be placed in that so
15  you could be closer to your daughter?
16    A. Not customer service because customer service
17  is not in Dover.
18    Q. I'm sorry.
19    A. Specialist. If a specialist position became
20  available, I just wanted to be considered for it so I
21  could be in Dover and support the treatment plan that
22  the doctor had for my daughter, knowing that my
23  daughter's condition was worsening because I worked in
24  New Castle and was not available to take her to the

28

1  necessary appointments that the doctor wanted her to
2  go to.
3     Q. Had that changed since when you first got the
4  job with customer service in the Division of Child
5  Support Enforcement in 2000 and had your daughter's
6  situation changed or always been that situation?
7     A. No. It had changed.
8     Q. How had it changed?
9     A. How did it change?
10    Q. Mm-hmm.
11    A. Her medical condition was worsening instead of
12  getting better.
13    Q. Do you recall when it started worsening?
14    A. There was a letter that my daughter's doctor
15  faxed into the job. I don't recall the exact date. I
16  think it was in — I don't recall the exact date the
17  doctor — maybe it's in here because I sent it to you.
18  I don't recall the exact date. But my daughter's
19  doctor had called to the job one day stating that she
20  needed to see me because of some results that came
21  back from testing. She faxed a letter in, which the
22  letter stated that she wanted me to be moved closer to
23  Kent County. I don't remember the exact state on the
24  letter.

29

1     Q. Just so I understand what you told us, you told
2  us that the customer service unit you know does not
3  have a location in Dover, is that correct?
4     A. Yes, sir.
5     Q. But your position was you wanted any position
6  that opened that you could be placed into, even though
7  it wasn't in that unit, you'd like to get that —
8  you'd like to be placed in it, correct?
9     A. Just so I could have been closer to home. I
10  wouldn't have cared if it was clerical. I didn't care
11  what it was.
12    Q. Did you on your own apply for positions?
13    A. There were positions, sir, that became
14  available but they were never posted to give me an
15  opportunity or anyone else an opportunity to apply.
16    Q. Now, what division and department were they
17  with, these positions that opened?
18    A. There were two child support specialists that
19  opened in Kent County.
20    Q. What unit were they with?
21    A. Operations, which is case processing, which I
22  had experience doing it. I did that eight months in
23  Georgetown.
24    Q. And you're saying those positions were not

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477



Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

30

1  advertised?
2    A.  They were not advertised.
3    Q.  Does Brenda Annand, does she have control over
4  those jobs?
5    A.  Does she have control over — I don't think
6  that she has control over the jobs, no, sir.
7    Q.  So she couldn't give you that job anyway, could
8  she?  If one opened, could Brenda give you a job that
9  opened in operations?
10    A.  No.  And I wasn't asking Brenda to give me any
11  job.  I was asking overall the agency itself.
12  Documentation from my daughter's doctor that came
13  in — it was not directly to Brenda Annand.  It was
14  directed to the Division of Child Support Enforcement.
15    Q.  Can you tell me of an instance where Brenda
16  Annand gave somebody in her unit, customer service,
17  move or whatever they wanted because of their race?
18    A.  Yes, sir.
19    Q.  Okay.  Who would that be?
20    A.  Sandy Rossi.
21    Q.  And?
22    A.  Beth Orendorf.  I don't know if these folks are
23  married or what — and Elizabeth Price.
24    Q.  And what was it that she did for them?

31

1    A.  Those were individuals that came into the
2  division which were hired at child support after my
3  date of hire, which, for some mysterious reason, met
4  the qualifications for the career ladder.
5    Q.  So tell me what the career ladder is.  I mean,
6  when you were there, right before you resigned, what
7  was your position or your rate or whatever?  What was
8  your pay rate?
9    A.  I had pay grade ten.
10    Q.  And this career ladder, explain that to me.
11    A.  Career ladder, it is a packet that the division
12  of child support, I guess, with the assistance of HR,
13  put together that stipulates necessary training and
14  requirements that you have to meet to test to go to
15  the next step, which would resolve — in the next step
16  of pay, and the next step in your job title.
17    Q.  Okay.  So when you say next step, would that be
18  like an increase in pay grade?
19    A.  Yes, sir.
20    Q.  Or would it be an increase in the steps within
21  a pay grade?
22    A.  It's a change of your position title, and it's
23  an increase in pay.
24    Q.  So now you say these people were hired after

32

1  you?
2    A.  Yes, sir.
3    Q.  And they've advanced up the career ladder,
4  correct?
5    A.  Yes, sir.
6    Q.  And what is Sandy Rossi's race?
7    A.  White.
8    Q.  And what is Beth --
9    A.  White.
10    Q.  And Elizabeth Price?
11    A.  White.
12    Q.  Now, other than these three, were any other
13  people advanced up the career ladder?
14    A.  The only other person I know that advanced up
15  the career ladder is Carolyn Evans.  She's black.
16    Q.  So Carolyn Evans was advanced up the career
17  ladder and she is African-American?
18    A.  Yes.
19    Q.  Anybody else that advanced up the career ladder
20  that you can recall?
21    A.  That I can't recall.
22    Q.  Now, did you request to advance up the career
23  ladder?
24    A.  I submitted my — it's called the package you

33

1  have to submit.  And I've submitted it three times
2  since I've been with child support and denied three
3  times.
4    Q.  Who makes the decision about the career ladder
5  move?
6    A.  My understanding is the decision is based —
7  you have to be referred by your supervisor.  When I
8  was hired with child support in 2000, the career
9  ladder had just came into operation.  Everyone was
10  given an opportunity, to my understanding, to complete
11  their applications.  They were given necessary time at
12  work to complete their applications.  Then it goes to
13  your supervisor or your supervisor, I guess, agrees
14  and signs off, if you meet the qualifications or the
15  requirements.  And then like I guess it's submitted to
16  their panel that they have to review these
17  applications, along with your supervisor, making, you
18  know, the final say to say whether you meet the
19  requirements or have completed the necessary training
20  to go to the next step to take the test.  There is a
21  test that they take.
22    Q.  Did you ever take the test?
23    A.  I was never given an opportunity.
24    Q.  So as I understand it, you get a recommendation

9  (Pages 30 to 33)

B-22

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

34

1  from your supervisor. Then I guess you would get an
2  application form you fill in or something like that?
3     A.  Yes. There's necessary documents that you have
4  to submit of questions that you have to answer.
5     Q.  Did you do that?
6     A.  Yes, sir.
7     Q.  And then you gave them to your supervisor.
8  What did she do with them?
9     A.  What did she do with them? I guess they go
10 before the panel that they have to review these
11 applications.
12    Q.  Did they go before the panel?
13    A.  Yes. They were denied.
14    Q.  The panel denied them?
15    A.  The panel which is the -- the panel -- I don't
16 know who's on the panel, but I know the supervisor has
17 a lot of input as far as the applications and all and
18 then the information that's on your application and
19 then I guess, if all that is accepted, then you take a
20 test.
21    Q.  So the decision is made by a panel as you
22 understand it, and your supervisor has some input in
23 that, correct?
24    A.  Yes.

35

1     Q.  Do you know what your supervisor told the panel
2  about you on those various occasions?
3     A.  No. No.
4     Q.  So one of your claims of discrimination is not
5  being advanced on the career ladder, correct?
6     A.  Yes, sir.
7     Q.  What are your other claims of discrimination?
8     A.  My other claims of discrimination?
9     Q.  Mm-hmm.
10    A.  Because, as I told you, Ms. Annand always
11 showed preferential treatment toward her white
12 employees versus her black employees.
13    Q.  Well, how many black employees reported to
14 Mrs. Annand?
15    A.  How many black employees report to Mrs. Annand?
16    Q.  Mm-hmm.
17    A.  I don't recall how many employees are in her
18 unit now. When I was -- let's see. When I was in her
19 unit -- when I was in her unit, it was probably about
20 13 blacks in the unit versus the -- there were a
21 couple of Hispanics and the rest white.
22    Q.  You're saying she treated all 13 of those
23 African-Americans differently than she treated the
24 whites?

36

1     A.  She showed preferential difference with black
2  and white employees, yes, she did.
3     Q.  Now, when you saw preferential treatment, could
4  you be more specific? And I'm going to ask you first
5  about you. In other words, where was a case where she
6  treated you differently because of your race as
7  opposed to she treated a white person better because
8  of their race. Like, for instance, was there an
9  incident where you requested time off and you didn't
10 get time off but a white employee did get time off or
11 something like that?
12    A.  I would interview a lot, and I always kept
13 myself abreast and always wanting to go to necessary
14 trainings to enhance my abilities. I would be denied
15 trainings that I wanted to go to versus the white
16 employee would be accepted to go to the training. A
17 lot of times she deny me from going to training
18 because I would miss a lot of time from work because
19 of my daughter's medical condition as well as myself.
20 I had a medical condition myself. But I since then
21 have had surgery to take care of my medical condition
22 that I had family medical leave -- I had family
23 medical leave for myself as well as my daughter. And
24 I was always told, you know, that I couldn't take the

37

1  necessary trainings or something because of me being
2  out for the family medical leave.
3       Several interviews that I would go on, I
4  always had to bring her back documentation of where I
5  went for the interview, what time the interview
6  started, when the interview ended. That would never
7  happen with the white staff person.
8     Q.  How is it you know that that would never happen
9  with the white staff person?
10    A.  Because I know when they went to interviews
11 that they didn't have -- they did not bring her back
12 documentation.
13    Q.  How do you know that?
14    A.  Pardon me.
15    Q.  How do you know that?
16    A.  Because I asked.
17    Q.  You asked the person that came back?
18    A.  I asked the person.
19    Q.  Did you miss a lot of time from work?
20    A.  I did.
21    Q.  Were you late coming to work?
22    A.  No. I was not late coming to work -- you
23 know, would come to work when I was scheduled to be to
24 work with the exception of my daughter's illness and

10 (Pages 34 to 37)

B-23

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

38

1 my illness.
2    Q.  How much time did you lose from work because of
3 your illnesses?
4    A.  My illnesses?  Every month.  Every month I knew
5 that my problem I had -- I knew that every month I was
6 going to be out of work at least two, sometimes three
7 days.
8    Q.  Would you use sick leave?
9    A.  I use family medical, family medical leave.
10    Q.  Well, do you have any sick leave accrued that
11 you could use it?
12    A.  When my sick leave was exhausted as well as my
13 vacation, it was leave without pay.  It was family
14 medical leave without pay.
15    Q.  Well, did you put in for that family medical
16 leave?  Would you put in for it?  Would you apply for
17 it?
18    A.  Yes.  I had to apply for it.
19    Q.  Was that given to you?
20    A.  The family medical leave?
21    Q.  Mm-hmm.
22    A.  Yes.
23    Q.  For your own personal problems you said you'd
24 lose about three days a month, correct?

39

1    A.  Yes, sir.
2    Q.  How many times would you lose a month for your
3 daughter's medical problems?
4    A.  My daughter's time was pretty consistent.
5 Probably two to three days per month for her.
6    Q.  So a total of up to six days per month were
7 lost because of -- work days were lost because of
8 either your medical problems or your daughter's
9 medical problem?
10    A.  Yes.
11    Q.  So that was six days a month on average that
12 you were not available for work in the customer
13 service unit?
14    A.  Yes.
15    Q.  Did you have the same situation when you worked
16 for North Carolina Division of Child Support?
17    A.  Not with me.  The same situation with my
18 daughter.  And then the family medical -- for my mom.
19    Q.  You indicated there was period of time in North
20 Carolina you missed a three-week period?
21    A.  Yes.
22    Q.  Who was that for?
23    A.  My mother.
24    Q.  In front of you are the documents that we

40

1 discussed very briefly initially that have been Bates
2 stamped.  And on page Bates stamped B0002 is your
3 answer of the people that are witnesses that can
4 attest to the alleged allegation against plaintiff in
5 regards to claims of race discrimination or
6 retaliation, failure to promote plaintiff.  And you
7 indicated a number of people, correct?
8    A.  Yes, sir.
9    Q.  What is Nicole Waters -- when did you work with
10 her?
11    A.  When did I work with her.
12    Q.  Mm-hmm.
13    A.  I don't recall the exact date when Nicole came
14 to Child Support because she was hired after myself
15 and I only know the exact date when she left Child
16 Support, but she left.  I don't know the exact dates.
17 I worked with Nicole at least two years, I would say.
18    Q.  Now, what information does she have regarding
19 your claim of race discrimination.
20    A.  What information does she have?
21    Q.  Mm-hmm?
22    A.  She can attest to Ms. Annand showing
23 preferential treatment with her white employees versus
24 the black employees.  She can attest to Ms. Annand

41

1 yelling, pointing her finger, making the negative
2 remarks to me, more or less to -- you know,
3 intimidating in front of your other co-workers and
4 stuff.
5    Q.  Okay.  And what about retaliation, what
6 evidence can she give about retaliation?
7    A.  Well, she has seen Ms. Annand, you know, where
8 she has, you know, yelled at me and pointing her
9 finger and stuff.
10    Q.  No.  But now I'm asking you about the
11 retaliation.  You indicate you have a claim for
12 retaliation.  In other words, you're claiming somebody
13 did something to you because of something else you
14 did.
15    A.  Oh.  You want to know what Ms. Waters can say
16 in regards to retaliation?
17    Q.  Yes.
18    A.  I don't know if she can elaborate on
19 retaliation.
20    Q.  How about, could she give us any information on
21 failure to promote plaintiff?
22    A.  Yes, she can.
23    Q.  And what would she say?
24    A.  That there is preferential treatment shown

11 (Pages 38 to 41)



42

1 toward the white employees as far as meeting — you
2 know, being provided with the necessary trainings that
3 you have to meet in order to be considered for the
4 career ladder.
5    Q. Okay.
6    A. There was preferential treatment showed with
7 the white employees versus the black employees,
8 employees of minority. She can attest to that.
9    Q. What is Ms. Waters's race?
10    A. Black.
11    Q. And did she put in for career ladder
12 advancement and was denied?
13    A. I don't know.
14    Q. What about Nancy Santana?
15    A. She's Hispanic.
16    Q. And what information does she have about race
17 discrimination, your claim of race discrimination?
18    A. She can attest that Ms. Annand showed
19 preferential treatment towards her white employees
20 versus her black employees. She can attest that, with
21 the career ladder, that there is preferential
22 treatment showed with the white employees versus the
23 black employees.
24        As far as retaliation, Ms. Santana is

43

1 aware and knows that I do have a discrimination
2 claim — complaint against Child Support, and she can
3 attest to Ms. Annand's actions of getting in my face,
4 yelling, pointing her finger.
5    Q. Okay. When Ms. Annand would get in your face
6 and point her finger at you, would she use racial
7 epithets to describe you?
8    A. Say that again, please.
9    Q. You've indicated a number of times that
10 Ms. Annand would get in your face and point her finger
11 at you and yell. When she was doing that, was she
12 using racial slurs against you?
13    A. She said, "You people."
14    Q. In what context did she say, "You people"?
15    A. In what context would she say, "You people"?
16    Q. Yes, ma'am?
17    A. Explain to me that you mean.
18    Q. Well, you took that as being a pejorative term,
19 "you people."
20    A. Mm-hmm.
21    Q. I'm asking you to explain why that is. Put it
22 in the context. You said she put got in your face and
23 she yell at you. How many times has that happened?
24    A. Several.

44

1    Q. How many times?
2    A. If you went over all with me working at Child
3 Support, sir, when I say several, I can say
4 Ms. Annand's yelled at me over 50 some times.
5    Q. Now, she's yelled at you over 50 times. What
6 has she yelled at you about?
7    A. Unnecessary things. It may be from me being
8 away from my desk or many times, when I came back in
9 for being out for my daughter's illness or my illness,
10 she would yell at me telling me that I need to be at
11 work. The other people in the unit have to hold up
12 the fort because you're not here and...
13    Q. So when she yelled at you this 50 times from
14 the time you worked at Child Support, was it always
15 about the job?
16    A. Was it always about the job? Most of the time,
17 it would be because of me being out because of my
18 daughter's sickness and my illness.
19    Q. Is it true that Ms. Annand would tell you that,
20 if you are not at your job, other people have do your
21 work for you?
22    A. Yes, sir.
23    Q. Would other employees sometimes be angry about
24 the fact that you were not there or you were missing

45

1 time?
2    A. If they were, I don't recall. In the customer
3 service there was really not work that I'm leaving
4 behind for someone else to do. It just makes someone
5 get more calls and than if I was there that day. It's
6 not like there was paperwork. Somebody has to do it
7 or something.
8    Q. But you will agree with me that -- how many
9 people in the customer service unit when you were
10 there answered the phones, took calls about child
11 support? How many people doing just what you were
12 doing?
13    A. The people in the unit, 15, 20 some people in
14 the unit.
15    Q. And if you're not there, then somebody else has
16 to take the calls that you would have been able to
17 take had you been there, correct
18    A. That's true.
19    Q. So somebody else, co-employees are getting more
20 work to do because you're not there.
21    A. That's true.
22    Q. Is that understandable that someone would be
23 angry about that?
24    A. It may be understandable that someone would be

12 (Pages 42 to 45)




Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

46

1  angry, but when I had family medical leave, that is a
2  federal benefit. I have no control over my illnesses
3  or my daughter's illness. And each and every time I
4  missed work, the appropriate documentation was
5  provided. I could see if I was abusing time or
6  something like that, not actually being sick and not
7  coming, but I had documentation for the medical
8  reasons.
9     Q.  Now, tell me about what your claim of
10  retaliation is.
11     A.  Well, Ms. Annand has repeatedly said to me that
12  my attendance was going to affect my performance
13  reviews because of me having to be out of work because
14  of my daughter's illness and my illness. I was
15  basically told that up front.
16     Q.  Did Ms. Annand or anyone take action against
17  you because you filed an EEOC complaint?
18     A.  I was treated different. A whole – I was
19  treated in a different way after I did that versus the
20  negative way I was being treated before that; it got
21  worse after that.
22     Q.  Now, when you say it got worse, how did it get
23  worse?
24     A.  Everything that I did it seemed like it was

47

1  just never right in her vision. Anything to take a
2  pen and piece of paper to just write anything up on
3  me. I started applying more for jobs, trying to
4  interview out of the agency itself. I was not given
5  the merit benefit of the time to attend the interview.
6  I was told that if I go to a job interview from
7  home – I live in Dover, work in New Castle. If I had
8  an interview at 8:30 in the morning, I was told by
9  Ms. Annand that I had to come up to New Castle and
10  sign in and then drive back down to Dover to the
11  interview. I was not given the time to go, you know,
12  to any state interviews or anything, and when I did go
13  to interviews, I had to bring being documentation back
14  of where I went and what time it began, what time it
15  ended.
16     I noticed after I did file the complaint,
17  the negative statements and the negative treatment
18  from Ms. Annand became a bit more intense, you know,
19  than what I had tolerated prior to filing the
20  complaint.
21     Q.  Do you recall when you filed the complaint?
22     A.  Do I recall?
23     Q.  Yeah. When you filed the EEOC charge of
24  discrimination?

48

1     A.  In Philadelphia I think it was in October of
2  2004. I don't remember the exact date.
3     Q.  Let me show you a document and ask you if this
4  refreshes your memory.
5     A.  Yes.
6     Q.  What's the date on that?
7     A.  January 2005.
8     Q.  That's the date you filed your charge of
9  discrimination?
10     A.  Yes. With the Philadelphia...
11     Q.  All right. Now, did you work between January
12  12, 2005?
13     A.  Did I work?
14     Q.  At the Division of Child Support?
15     A.  I worked at the Division of Child Support until
16  August of 2005.
17     Q.  So you say the things -- I'm going to ask you
18  to be as specific as possible. After you filed that
19  complaint January 12, 2005, what actions were taken
20  against you you believe because you filed that EEOC
21  action?
22     A.  What actions were taken against me?
23     Q.  Mm-hmm.
24     A.  With Ms. Annand or Child Support?

49

1     Q.  Anyone. If you claim somebody is retaliating
2  against you for filing the EEOC action, what was it?
3     A.  Well, as I explained to you, Ms. Annand became
4  very rude toward me. Her total reaction just changed
5  toward me in the unit itself. There was really
6  nothing nice that she could say to me. When she did
7  voice or address something to me, it was in a
8  negative, rude, you know, tone with the finger
9  pointing, you know, in your face thing, snatching
10  papers from me. Stuff like that started to occur.
11     Q.  Now, during that period of time, from January
12  2005 until you resigned in August, was there anything
13  you requested or wanted from your employer that you
14  didn't get because you filed an EEOC action?
15     A.  I'm not saying there was something that I
16  didn't get because I filed the EEOC action. Just like
17  I made the request, you know, to go to Kent County,
18  I'm not saying that I didn't get it because I filed
19  the EEOC action. But as far as why I wasn't given an
20  opportunity to go to Kent County, knowing that I
21  wasn't asking for any preferential treatment, is
22  because of my daughter's medical condition and then to
23  know that positions became available and I wasn't
24  considered for them.

13 (Pages 46 to 49)

B-26

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

50

1    Q. Well, we went over that before, remember? And
2  I think you told me that Ms. Annand really has no
3  control over that; she can't give you a job outside of
4  her own unit, right?
5    A. She has no control over that, but when my
6  daughter's doctor first sent in the letter and I
7  discussed it with Ms. Annand, she just based that
8  decision off herself to tell me, no, you're not going
9  anywhere, you're just going to stay here in the
10  customer service unit, instead of actually following
11  up the protocol and the chain of command that this
12  request has been made by this employee's child's
13  physician and, you know, maybe it could have been
14  considered. She didn't do that. She didn't do
15  anything with it. She just made her own decision and
16  told me I wasn't going anywhere.
17    Q. Could you have gone over her head and made the
18  request above her head?
19    A. I probably could have, but I followed chain of
20  command which was to go and discussion it with my
21  supervisor.
22    Q. After you did that, did you say, "Well, I'd
23  like you to pass this on"?
24    A. Did I say that to Ms. Annand?

51

1    Q. Right.
2    A. No, because, to me, as her supervisor, it
3  should have been her responsibility to have the
4  knowledge and know to do that herself without me
5  having to ask her to do that.
6    Q. What information regarding race discrimination,
7  retaliation, or failure to promote can we get from
8  Tomika Lester?
9    A. Tomika Lester can basically elaborate that
10  Ms. Annand shows preferential treatment toward the
11  white employees versus the employees that are black or
12  minorities, attest that, with the career ladder
13  promotions, that blacks are denied opportunity to
14  obtain the necessary training or whatever versus the
15  whites always would meet that.
16    Q. And how about retaliation?
17    A. She can attest that Ms. Annand has told me,
18  because of my absences, because of my illness and my
19  daughter's illness, that she said it was going to
20  affect my performance review.
21    Q. Okay. What about Calvin Parson, what
22  information does he have about discrimination,
23  retaliation, failure to promote?
24    A. He can attest that Ms. Annand showed

52

1  preferential treatment toward the white employees
2  versus the black. He can attest that, with the career
3  ladder, that the blacks were denied the career ladder
4  in the unit versus the whites were always accommodated
5  with the necessary training or whatever they needed to
6  adhere to the career ladder.
7    Q. And retaliation, failure to promote, same
8  thing?
9    A. Yes, sir.
10    Q. How about Earnie Eggleston.
11    A. Earnie can attest that she shows preferential
12  treatment with her white employees versus the black.
13  He can attest to the career ladder, that the whites
14  are given preferential in getting the training or
15  whatever to go up to the next step with the career
16  ladder versus the blacks aren't.
17    Q. Now, are any of these individuals that you
18  listed here still working at Division of Child Support
19  Enforcement?
20    A. I know Nicole Waters doesn't work there because
21  she left before I left. To the best of my
22  knowledge — well, Calvin Parson, he doesn't work
23  there because he left before I left.
24    Q. How about Earnie Eggleston?

53

1    A. I assuming Earnie is still there. I'm assuming
2  Tomika is there, and Ms. Santana, I know she is still
3  there to the best of my knowledge.
4    Q. All right. Now, did you have performance
5  reviews while you worked at the Division of Child
6  Support Enforcement?
7    A. Delaware?
8    Q. Yes.
9    A. I had two.
10    Q. And how were those reviews? I mean how were
11  those evaluations?
12    A. Those evaluations contained negative comments.
13    Q. Negative meaning things that are not good about
14  you?
15    A. Right.
16    Q. And are you saying they are not true?
17    A. Yes.
18    Q. And do you know what some of them are based on,
19  these negative comments are based on?
20    A. One evaluation — I don't know which one you
21  have in front of you. The one evaluation she states
22  that she got a complaint from a client, which the
23  complaint stated negative statements that were made by
24  this client. In the customer service unit your calls

14 (Pages 50 to 53)



B-27

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

---

54

1   are monitored and they are recorded. She shared the
2   complaint with me, which I denied the allegations. I
3   would — said that I called somebody's dad a deadbeat
4   dad or something of that nature. I don't talk to
5   individuals like that, sir.
6        And in the complaint the client had
7   recommended for me to be placed out of the customer
8   service unit, performing a job duty, as they said,
9   processing payments or taking a training, maybe anger
10  management or something of that nature, which these
11  are trainings that are in our SPO training manual,
12  exactly stating the trainings as they're titled in the
13  SPO manual.
14       Some of the allegations that were made in
15  the customer's complaint would — someone calling in
16  to the division, sir, they are not going to even have
17  knowledge to even know some of the things that were
18  said in the complaint. Like the lady said she had
19  asked me had a check posted to her account. And the
20  reply, what the client said I said, no. But then the
21  client replied and said, "Well, if Jackie had looked,
22  she would have seen that a payment had posted on this
23  date and was ready to go out." A client is not going
24  to know that, you know, to call into the Division of

---

55

1   Child Support. Only you sitting there at the terminal
2   and seeing what has posted on the account or whatever,
3   you're going to know that as the employee, but not a
4   client calling into the Division of Child Support is
5   not going to know that.
6    Q.  In any event, at these evaluations, were you
7   given an opportunity to respond if you didn't agree
8   with them?
9    A.  I was given the opportunity to respond, but I
10  was told by Ms. Annand it did not make a difference
11  what my response was going to be because her rating
12  was not going to change.
13   Q.  But did you do whatever your response was? Did
14  you do your comment? You're allowed to put comments
15  in, correct?
16   A.  Pardon me?
17   Q.  You're allowed to put comments if you don't
18  agree with the evaluation, correct?
19   A.  Yes, you are.
20   Q.  Did you put any comments in?
21   A.  No, I didn't.
22   Q.  Now, you in your answers to interrogatories on
23  B00014, you talk about the charge of discrimination
24  filed by Nancy Santana. You see that?

---

56

1    A.  Yes.
2    Q.  How do they relate to your claims?
3    A.  How — how does Ms. Santana's relate to my
4   claim?
5    Q.  Well, first of all, do you know what
6   Ms. Santana is claiming?
7    A.  No. I know she has a claim in regards to race
8   discrimination because of the preferential treatment
9   that is given to the white employees versus the black
10  employees in the unit and with the career ladder, how
11  the white employees are accommodated and provided the
12  necessary training or whatever for the career ladder
13  where the blacks are denied or not given the
14  opportunity to get that necessary training.
15   Q.  Do you know if the people that are moving up
16  the career ladder, do you have the same educational or
17  background that they do?
18   A.  I have a better educational background,
19  experience background than they do.
20   Q.  What about the complaint filed with the
21  Industrial Accident Board by Calvin Parson?
22   A.  I was subpoenaed to attest to his allegations.
23  I did not get to attend because of the passing of my
24  uncle and his funeral was that day. But to the best

---

57

1   of my knowledge, I know that his complaint consisted
2   of the racism that was displayed by Ms. Annand. As
3   far as what else was in his complaint, I have no
4   knowledge. I was not there. But I know that
5   Ms. Annand showing preferential treatment with the
6   white employees versus the back employees.
7    Q.  But was that a matter that was before the
8   Industrial Accident Board?
9    A.  Pardon me?
10   Q.  Was that a workman's comp claim Mr. Parson had?
11   A.  I don't know what his claim was based off of.
12   Q.  What was your understanding of why you were
13  subpoenaed to come as a witness there?
14   A.  To — the only thing I could have witnessed
15  would be to attest to the negative treatment toward
16  Mr. Parson as by Ms. Annand and the preferential
17  treatment shown toward the white employees versus the
18  blacks.
19   Q.  What was Mr. Parson claiming his workers'
20  compensation claim was, do you know?
21   A.  I have no knowledge.
22   Q.  Was it bad back, do you know? I mean, was he
23  trying to get out work? I mean, he said he couldn't
24  work any more or something or injured or what?

---

15  (Pages 54 to 57)



B-28

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

58

1    A.  I didn't attend.
2    Q.  But you knew Mr. Parson, didn't you?
3    A.  Yes.
4    Q.  Do you know what his problem was before he went
5    to workers' comp?  Did he have a physical problem on
6    the job?
7    A.  I have no knowledge, sir.
8    Q.  You understand that generally at the Industrial
9    Accident Board, not being treated well by your
10   employer is not a basis of a workman's compensation
11   claim?
12   A.  Right.
13   Q.  Usually it's something like you were injured on
14   the job or something like that?
15   A.  Right.
16   Q.  Do you know if that was what Mr. Parson was
17   alleging?
18   A.  I have no knowledge of what he was alleging as
19   far as workman's comp.
20   Q.  Did you file a workman's comp matter?
21   A.  Yes.
22   Q.  When was that?
23   A.  It was done in 2004.
24   Q.  It was about your hands?

59

1    A.  Yes.
2    Q.  Carpal tunnel?
3    A.  Carpal tunnel.
4    Q.  And what eventually happened with that matter?
5    A.  What happened with it?
6    Q.  Mm-hmm.
7    A.  I just recently received a small computation
8    from the carrier.
9    Q.  In other words, that you were granted workman's
10   compensation benefits --
11   A.  Yes.
12   Q.  -- for your repetitive motion injury?
13   A.  Yes.
14   Q.  Now, were there any jobs in the customer
15   service unit in which you were working at when you
16   went off of workers' comp that was available to you
17   with the limitations that your doctor wanted you to
18   work under?
19   A.  Were there any jobs in the customer service
20   unit?
21   Q.  Mm-hmm.
22   A.  Not in the customer service unit, but there
23   were other jobs available within the agency itself in
24   another unit.

60

1    Q.  Now, in addition to that, did you apply for
2    disability pension?
3    A.  June 23rd I went to HR to apply for disability
4    pension.  This is prior to going out on workman's
5    comp.
6    Q.  What year did you apply for your disability
7    pension?
8    A.  Let me make sure we are -- the disability that
9    I applied for or the disability that I was eligible
10   for, the supplemental disability prior to going out on
11   workman's comp.
12   Q.  Did you apply for a state disability pension?
13   A.  I went to -- I went to the HR office to apply
14   on June 23rd for a supplemental disability.  It was
15   explained to me that this disability -- I would
16   continue to get my wages, pending whether the
17   workman's comp carrier was either going to deny or
18   accept my claim.
19   Q.  Okay.
20   A.  I went to the HR rep, Alice Bailey's office.
21   When I got to her office that day, she started to
22   elaborate when I came into her office how can I relate
23   my injuries to the job?  How can you say that you
24   obtained this carpal tunnel here?  Elaborated in

61

1    stating that there was an HR tech that I'm assuming
2    had an injury claimed with carpal tunnel and submitted
3    it and she said the claim was denied.  I responded to
4    her, "I didn't come to your office for this.  And as
5    far as you setting here dictating like you're an
6    attorney or doctor to me to tell me how I have
7    sustained the injury," I said, "Here's my attorney's
8    name," and gave her the attorney's phone number.  I
9    brought a concern to her when I looked at the injury
10   report that day -- it was my -- it was incorrect
11   address on the injury report.  And I informed that
12   that address was incorrect.  She started yelling at
13   me.  She told me that I had to leave her office.  I
14   had drove a state car from the Child Support office
15   over to her office.  She told me I had to take the car
16   back and get off state premises.
17   Q.  Who is this that told you this?
18   A.  Alice Bailey.
19        LaTanya Warren's office, who was down the
20   hall from Ms. Bailey's at that time, heard the
21   commotion down there in her office, and she got up and
22   came down to Ms. Bailey's office I guess to more or
23   less see what was going on because the lady was just
24   sitting there yelling at me.  When I told her I had a

16 (Pages 58 to 61)



Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

---

62

1  lawyer, she said she had nothing further to say to me.
2  But my intent was I was sent to go to her office by
3  Ms. Annand to complete the documents for this
4  supplemental disability which is supposed to be
5  granted prior to the workman's comp carrier picking up
6  my claim. And I never received that benefit because
7  she told me to get out of her office and leave state
8  property when I told her I had an attorney because she
9  was setting there like interrogating me, you know,
10  asking me questions, how are you going to say you got
11  in carpal tunnel here? And I said, I told her, "I
12  didn't come to your office for that. I came to fill
13  out the necessary documents." And I just told her,
14  "If you need to know anything about this workman's
15  comp injury, here's my lawyer's name and number, and
16  you can call him." And that's what I gave her.
17     Q.  You did apply for the supplemental short-term
18  disability?
19     A.  Yes. That was in 2005.
20     Q.  Same time you went off on workers' comp, right?
21     A.  I was already out on workman's comp.
22     Q.  All right. In any event, you also applied for
23  disability pension, long-term disability pension?
24     A.  Yes.

---

63

1     Q.  That was denied by the pension board?
2     A.  Yes.
3     Q.  This is one of the forms you signed in that
4  pension application. Let me just show it to you.
5  It's signed by you. Is that your signature down
6  there.
7     A.  Yeah. Yes.
8     Q.  This is a statement of credible service for
9  you, correct.
10     A.  Yes.
11     Q.  And it shows that you first started working on
12  December 1st, 1977.
13     A.  Mm-hmm.
14     Q.  Do you recall that.
15     A.  When you asked me when I started working for
16  the state, I said the eighties, but then I said the
17  seventies because worked at Stokely in Georgetown.
18     Q.  Does this refresh your memory that it was 1977
19  you started?
20     A.  Yes.
21     Q.  Okay. You see all these, even though you
22  started working in 1977, what was the total amount of
23  credible service you had?
24     A.  With the State?

---

64

1     Q.  Yeah. 11 years, 1 month, and 15 days, you see
2  right here?
3     A.  Yes.
4     Q.  You see next to it there's a description of
5  periods of time you worked for these different
6  agencies, correct?
7     A.  Mm-hmm.
8     Q.  There's a number of workman's comp with pay,
9  correct?
10     A.  Mm-hmm.
11     Q.  And in other words, you've had one, two, three,
12  four, five, six workman's compensation claims while
13  you worked for the State, correct?
14     A.  I had a workman's comp claim at the Delaware
15  Hospital for Chronically Ill. You're going to see
16  that one, and then you are going to see the workman's
17  comp claim with the Child Support. Those are the only
18  workman's comp claims I've had since working with the
19  State.
20     Q.  Okay. Well, do you recall what the first
21  workman's comp claim was when you were working at
22  DHCI?
23     A.  Yes.
24     Q.  What was that for?

---

65

1     A.  It was — I walked into a patient's room. The
2  water pitcher had been knocked over the by patient.
3  And I slipped and fell in the water. I had surgery on
4  my ankle. They had to reconstruct my ankle.
5     Q.  Then you had another workman's comp in '83 at
6  DHCI. Do you recall what that was about?
7     A.  It's all with the ankle. That was the only one
8  I've ever had at DHCI.
9     Q.  You were out three years with the ankle?
10     A.  With DHCI. Those periods in there with the
11  Delaware Hospital For Chronically Ill only related to
12  my ankle.
13     Q.  All right.
14     A.  I had to have repeated surgeries on it.
15     Q.  In '85 you had a workers' comp leave of
16  absence. Do you recall what that was for?
17     A.  Is that a Delaware Hospital for the Chronically
18  Ill?
19     Q.  It could be.
20     A.  Well, the only workman's comp I've ever had was
21  with my ankle and then with the carpal tunnel.
22     Q.  Do you remember then you had another 12
23  months -- okay. Wait a second. DMR, that was
24  Stokely?

---

17  (Pages 62 to 65)

B-30

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

66

1  A. Mm-hmm.
2  Q. 2000?
3  A. I didn't have a workman's comp there.
4  Q. Were you on workman's comp in 2004 and 2005?
5  A. Was I?
6  Q. Yeah. Did you have a workman's comp claim in
7  2004 and 2005?
8  A. With Child Support.
9  Q. Right. What was the one in 2004 about?
10  A. The only workman's comp I've had with Child
11  Support was with the carpal tunnel. I've never had
12  any workman's comp claim with Child Support.
13  Q. See, I thought you went off work for workers'
14  comp in 2005, but that's not correct; you went out in
15  2004?
16  A. 2004.
17  Q. But your surgery wasn't done until 2005?
18  A. No. I had both surgeries in 2004.
19  Q. Do you know who the division director of the
20  Division of Child Support Enforcement is?
21  A. Chuck Hayward.
22  Q. What's his race?
23  A. Black.
24  Q. When you saw or you indicate you saw these

67

1  various preferential treatments, did you complain to
2  anyone?
3  A. To my -- I had called -- I spoke with
4  Ms. Loretta Brase in regards to my concerns. I spoke
5  with a Mr. Craig Chambers, which he explained to me
6  that he was the EEOC for the State and referred me to
7  Ms. Rossi, which he stated that she was the EEOC
8  person for our agency itself, our labor relations.
9  Q. Mm-hmm.
10  A. I had spoke with Ms. Annand's supervisor Dianne
11  Walters in regards to -- when I talked with her, it
12  was in regards to Ms. Annand yelling and the finger
13  pointing that any face, which I let her know that
14  appears threatening to me and I will not tolerate it.
15  She elaborated and stated that Ms. Annand had a
16  hearing impairment. I replied and told her that I
17  disagreed with her because, if you have a hearing
18  impairment, which I have a family member that has a
19  hearing impairment, you're not going to show that
20  difference in treatment versus to a black person
21  versus a white. But if you have a hearing impairment,
22  if you're yelling, you're going to yell at them
23  whether they are black or white. But that wasn't the
24  case with Ms. Annand.

68

1  Q. Ms. Annand, you talked to her supervisor
2  Ms. Walters?
3  A. I talked -- I had opportunity to meet with
4  Ms. Walters and address my concerns about Ms. Walters.
5  Q. What race is Ms. Walters?
6  A. She's white.
7  Q. And who does she report to?
8  A. Ms. Walters's supervisor I'm assuming would be
9  Chuck Hayward. I don't --
10  Q. All right. So you discussed it with her. What
11  happened after you discussed it with Ms. Walters?
12  A. Well, when -- the day I discussed it with her,
13  she stated that she had, you know, complaints about
14  Ms. Annand with the same thing I was addressing, and
15  she was working on it, going to address it. But she
16  also ended in closing saying that Ms. Annand yells
17  because she has a hearing impairment. I says, "Well,
18  if she has a hearing impairment, I don't see her
19  yelling at the white employees like that." And I
20  said, "Even if she has a hearing impairment, it has
21  nothing to do with this. Your hearing has nothing to
22  do with pointing your finger up in somebody's face."
23  Q. Are you saying Ms. Annand has never pointed her
24  finger at a Caucasian employee?

69

1  A. I've never seen her raise her voice or point
2  her finger at a Caucasian employee in that customer
3  service unit.
4  Q. Is it possible it's happened and you haven't
5  seen it?
6  A. Pardon me?
7  Q. It's possible it's happened, you just haven't
8  seen it?
9  A. It's not going to happen.
10  Q. Well, my point is, there's a lot of time you
11  missed from work, six days on average a month. So a
12  lot could have happened on the six days that you are
13  not there, correct?
14  A. Correct.
15  Q. I mean, that's a work week, six, days, right
16  every month you're missing a work week?
17  A. Correct. But to answer your question, sir,
18  Ms. Annand is not going to yell at a white employee or
19  get up in their face and point their finger.
20  Q. All right. Does the Division of Child Support
21  Enforcement have a policy regarding race relations and
22  equal opportunity and equal treatment of people?
23  A. Mm-hmm.
24  Q. And you're familiar with that?

18 (Pages 66 to 69)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

70

1    A. Somewhat.
2    Q. All right. And have you received training as
3    to, if you have a complaint, where to make the
4    complaint?
5    A. Where to make the complaint?
6    Q. Mm-hmm.
7    A. Yes.
8    Q. And when was it you did that, you made those
9    complaints?
10    A. I went and I met with — as I told you, I spoke
11    with Loretta Brase, which my contact to her has been
12    denied. I spoke with her in regards to the complaints
13    of negative —
14    Q. Do you recall when?
15    A. When I spoke with Ms. Brase? It was — I was
16    out on workman's comp when I spoke with her. July, I
17    could say, July of '04 when I spoke with her.
18        And I also then with LaTanya Warren and
19    Alice Bailey. I don't remember the exact date when I
20    met with them. I have it in my documents. It's in
21    regards to the harsh treatment about — from
22    Ms. Annand as well as the request for me to be
23    transferred to Kent County.
24    Q. Who is Bailey?

71

1    A. Alice Bailey is HR tech or rep that works on
2    the Herman Holloway campus.
3    Q. What's her race?
4    A. White.
5    Q. And LaTanya, who is the other person?
6    A. Warren. She's black.
7    Q. Where does she work?
8    A. She worked on the Herman Holloway campus.
9    Q. And what did they say they were going to do for
10    you?
11    A. They said that they were going to discuss —
12    well, Ms. Warren said she was going to discuss it with
13    her supervisor.
14    Q. Did she discuss it with her supervisor?
15    A. I don't know if she did or didn't.
16    Q. Right. Now, in 2004, were you working anywhere
17    other than for the State?
18    A. In 2004?
19    Q. Mm-hmm.
20    A. I worked a part-time job on weekends at Dover
21    Downs. I quit that job on May 31st. That job was
22    quit before I went out on workman's comp.
23    Q. 2004 you quit?
24    A. Mm-hmm.

72

1    Q. What would you do at Dover Downs?
2    A. I was what they call the cage cashier. When
3    people had winnings, I would count the money out to
4    them of their winnings.
5    Q. Okay. And you were not terminated from your
6    position, correct?
7    A. From where?
8    Q. DCSE?
9    A. From Child Support?
10    Q. Correct.
11    A. Child Support in Delaware?
12    Q. Yes.
13    A. I resigned, but after I resigned, I got a
14    letter from them telling me that I was dismissed.
15    Q. But you indicated you had already quit?
16    A. Pardon me?
17    Q. You had already quit yourself, correct?
18    A. I verbally contacted LaTanya Warren in August
19    and let her know I was not returning to child support.
20    Q. Okay. That was because you got a job and
21    accepted employment in North Carolina?
22    A. Yes.
23    Q. You wanted — well, you needed to go down and
24    be with your son?

73

1    A. I — yes.
2    Q. Is that something you and your son had planned
3    for some period of time?
4    A. Planned what?
5    Q. On leaving, going to North Carolina.
6    A. No.
7    Q. It just came up suddenly?
8    A. My son went to college in North Carolina.
9    Q. Yeah. I know. What I'm trying to figure out
10    is, my understanding from your testimony is that
11    sometime in August 2005 you called LaTanya and told
12    her you resigned?
13    A. Right.
14    Q. You weren't coming back to work?
15    A. Right.
16    Q. The reason you told her was because you had
17    accepted a job in North Carolina?
18    A. Right.
19    Q. You were going to live with your son there?
20    A. Right.
21    Q. My question is, prior to you making that call
22    and resigning from state service, had you already made
23    arrangements before that with your son to go down to
24    North Carolina?

19 (Pages 70 to 73)

B-32

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

74

1   A. No.
2   Q. It was a kind of a spur of the --
3   A. When I was offered the job at the beginning of
4   August was when I decided that I was going to take the
5   job. And that was when I decided to go to North
6   Carolina.
7   Q. Now, how much did they pay you in North
8   Carolina?
9   A. How much did they paid me?
10  Q. Mm-hmm.
11  A. My starting salary was 30,000 -- I think 30,200
12  a year or something like that.
13  Q. Is that more than you were making in Delaware?
14  A. Yes.
15  Q. So you resigned to get a better position and
16  you were getting paid more money in the North Carolina
17  position?
18  A. Yes. Delaware position -- I worked down in
19  Georgetown, Sussex County. When I went to Georgetown
20  and Sussex County, my salary was 20 -- it was higher
21  than 27,000. I did a lateral transfer from Georgetown
22  to come back to New Castle at the same job title and
23  the Division demoted my salary. It was a lateral
24  transfer. For what reason, I don't know.

75

1   Q. When was that? When was that move from Sussex
2   County?
3   A. When was the move from Sussex County?
4   Q. Mm-hmm.
5   A. In 2000 -- I think it's 2003. 2003 when I came
6   back from -- when I left Georgetown Child Support
7   office and came back up to New Castle.
8   Q. How long were you in the Georgetown Child
9   Support office?
10  A. Like eight months.
11  Q. And you asked to be laterally transferred to
12  New Castle?
13  A. Yes. I was -- it was a lateral transfer.
14  Q. You lived in Dover at the time, correct?
15  A. Yes. I left. I worked at customer service. I
16  interviewed out of customer service and got a job for
17  a caseworker in Georgetown, Georgetown Child Support
18  office. I went down to the Georgetown Child Support
19  office to work. I went down for like about eight
20  months, and I transferred back up to New Castle
21  because my daughter was seen by -- was being seen by a
22  specialist at A.I. duPont. That's the only reason why
23  I went back to New Castle customer service. God only
24  knows. I left that unit. I would have never gone

76

1   back, but my daughter was being seen by a specialist
2   of A.I. duPont at Wilmington. So it was beneficial
3   for me to be back up New Castle to get her to her
4   appointments than to be down in Georgetown.
5   Q. Let me just make sure I've got this straight.
6   When you first started working for the Division of
7   Child Support Enforcement, what was your work
8   location?
9   A. Stockton Building in Newark.
10  Q. That was in 2000?
11  A. Mm-hmm.
12  Q. Then you were transferred at your request to
13  Sussex, Georgetown?
14  A. Yes. Yes.
15  Q. You worked there for eight months?
16  A. Yes. I interviewed. They had a posting and I
17  interviewed for child support specialist job in
18  Georgetown.
19  Q. In 2000 who was your supervisor?
20  A. In Georgetown?
21  Q. When you worked at the Stockton Building.
22  A. Joyce Updike.
23  Q. Then you transferred to Georgetown?
24  A. Yes.

77

1   Q. You stayed there for about eight months?
2   A. Yes.
3   Q. Then you transferred to New Castle?
4   A. Yes. When I came back to New Castle, my
5   supervisor was still Joyce Updike and Brenda Annand.
6   And then Ms. Updike retired, and then it was just
7   Ms. Annand.
8   Q. How was it the two of them were your
9   supervisor?
10  A. Because we had two supervisors in the unit.
11  Q. I mean, would certain employees report to one
12  and certain employees report to the other one?
13  A. Not to the best of -- at that time when
14  Ms. Updike was there --
15  Q. Would you report to both of them?
16  A. Mm-hmm.
17  Q. That was in 2000, or is that when you came back
18  and -- when you were in Georgetown? What year?
19  A. I don't remember the exact year, sir. I think
20  it was 2002. I don't remember the exact year or
21  months that I worked in Georgetown.
22  Q. Then you returned back to New Castle sometime
23  in 2003?
24  A. Yes.

20 (Pages 74 to 77)

B-33

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

78

1  Q. Is that about right?
2  A. Yes.
3  Q. And when you returned it was Updike and Annand
4  that were your supervisors?
5  A. Yes.
6  Q. Now, how was the work environment in 2003?
7  A. How was it?
8  Q. Mm-hmm.
9  A. With Ms. Annand, it was very harsh. With
10  Ms. Updike not.
11  Q. Have you ever filed any other EEOC complaints?
12  A. No.
13  Q. Have you filed any discrimination complaints --
14  A. No.
15  Q. -- with any employer?
16  A. No.
17  Q. Let me show you this document. It's been Bates
18  stamped B00041. It's one of the documents you
19  provided. Do you see that B00041? It appears to be
20  an e-mail with your writing on it, is that correct?
21  A. Mm-hmm.
22  Q. And my understanding is you sent an e-mail to
23  Ms. Annand on February 6, 2004, subject, testing and
24  interview schedule, correct?

79

1  A. Mm-hmm.
2  Q. It says, "Brenda, I am scheduled to test for a
3  state job position on 2/11/04 at the state fire school
4  in Dover from 9:00 a.m. to 11:30 a.m. Also on
5  02/24/04, I'm scheduled to interview for a state job
6  posting. I will need to leave work at 9:30 a.m. to
7  attend a 10:00 a.m. scheduled interview. Would you
8  please mark your calendar for these dates? You are
9  not in today. So this is why e-mail was sent. I will
10  be returning to work after scheduled events."
11      Did I correctly read what you e-mailed to
12  your supervisor?
13  A. Mm-hmm.
14  Q. Above that, is from Brenda Annand to Alice
15  Bailey?
16  A. Mm-hmm.
17  Q. And it says, "Could you please let me know when
18  Jackie arrived today to review her file and when she
19  left. She sent me the e-mail below on 2/6/04 and
20  stated she had an interview for a state job 10:00
21  o'clock this morning and would be leaving at 9:30.
22  It's now 12:40 p.m. and she's still not back and I
23  haven't heard from her."
24      And then you wrote something at the

80

1  bottom. What did you write?
2  A. I said my reason for the visit to human
3  resources was not revealed to Ms. Annand. I didn't
4  tell Ms. Annand why I was going to HR. She knew that
5  I had the interview, which was with the division of --
6  Division of Visually Impaired. I told her I had an
7  appointment at HR to discuss a concern. For her to
8  put in here when did I arrive to review my file, I
9  didn't tell her what I was going to HR for.
10  Q. Well, correct me if I'm wrong, but in your
11  e-mail February 6, 2004, it doesn't state anything
12  about you going to HR.
13  A. No, it doesn't.
14  Q. I'm confused.
15  A. It doesn't -- no, it doesn't state that I am
16  going to HR, but Ms. Annand was informed. Prior to me
17  going over to HR, I told her I had the interview and I
18  had an appointment at HR. I basically went to HR
19  because I wanted to talk to someone about the negative
20  treatment and statements made by Ms. Annand toward
21  myself.
22  Q. Okay. But you agree with me that nowhere in
23  your e-mail does it say you're going to HR?
24  A. No. It doesn't.

81

1  Q. What does it say?
2  A. It says that I'm going to interview.
3  Q. "I'm scheduled to interview for a state job
4  posting"?
5  A. Mm-hmm.
6  Q. That wasn't true?
7  A. I did go to an interview. I interviewed with
8  the Division of Visually Impaired and then, after I
9  left the interview, I had my appointment scheduled
10  over at HR. That appointment was done in writing. I
11  had to write a request in writing to come over and
12  view my file. But I did have an interview on that
13  day. That's not a false statement. I had an
14  interview.
15  Q. Okay. So she was inquiring where you were
16  because you told her that you were going to be
17  interviewing on the 24th and it was 12:30. At that
18  time she said she hadn't heard anything from you.
19  A. Yeah. But then, when she inquired, when did
20  I -- please let her know when Jackie arrived to review
21  her file. I didn't tell her what I was going to HR
22  for. I just told her I had an appointment at HR. I
23  did not tell her I was going to review my personnel
24  file.

21 (Pages 78 to 81)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

82

1    Q.  Well, didn't you have to put in a written
2    request to review your personnel file?
3    A.  Which was faxed to LaTanya Warren.  It wasn't
4    faxed to Brenda Annand.
5    Q.  All right.
6    A.  That was basically — to review my file was
7    basically an excuse that I used to get over to HR to
8    address my concerns about Ms. Annand without her
9    having knowledge and knowing why I was going over
10   there and what I was doing.
11   Q.  All right.  Did you review your file?
12   A.  My file was not reviewed.
13   Q.  You wrote a letter requesting to review your
14   file, but you didn't actually review?
15   A.  The information I requested to see in my file
16   was not contained in my file they said.  What I asked
17   them to review in my file is, when you go on
18   interviews for employment, if an employer calls to get
19   a reference on you and it's provided by the agency, I
20   wanted to know what employers had called and
21   obtained — to obtain a reference on me.  And I wanted
22   to know what was contained in the reference.  When
23   I got over to HR, they said I would have to go back to
24   those employment agencies that I interviewed with to

83

1    get that information.
2    Q.  You wanted to know that, in your personnel
3    file, when a potential employer reference checked on
4    you, you wanted to know who it was that checked on
5    you?
6    A.  Yes.  I wanted to know who it was that checked
7    on me and what information was provided to them.  That
8    was what I was asking when.
9    Q.  Why is it you wanted to know that?
10   A.  Because of all my years of employment out of
11   the state government or in the state government, when
12   I got hired with Child Support, and the negative
13   relationship came about with Ms. Annand and myself, it
14   just seemed — and I was going repeatedly on
15   interviews trying to interview to get out of the
16   agency.  I was trying to get away from the situation
17   myself.  And I had been called back several times for
18   second interview, had even been contacted from
19   directors of agencies for second interviews, and I
20   wasn't getting the job.  So I was feeling that maybe
21   negative information was being provided to these
22   individuals or why I wasn't being considered for the
23   employment.
24   Q.  Is it possible you were not the better

84

1    candidate?
2    A.  That's — that's possible.  But I wanted to see
3    what was in my personnel file.
4    Q.  At B00053, it appears to be a DSC May 11, 2005,
5    hearing.
6    A.  Pardon me?
7    Q.  A transcript of a hearing.
8    A.  Mm-hmm.
9    Q.  Who is obligator?
10   A.  That is the non-custodial parent.  That's the
11   person —
12   Q.  That owes the child support?
13   A.  Yes.  That owes child support.
14   Q.  Who is Showard?
15   A.  She is the supervisor in the accounting unit.
16   Q.  And Kirk Ryan?
17   A.  That's the attorney that's hired, who's not a
18   state employee, but they are hired by Division to
19   facilitate these administrative hearings.
20   Q.  In this case, the obligator is telling -- at
21   the hearing, he's saying, the beginning of the middle
22   of the page, he says, "Okay.  Upon that conversation,
23   was that conversation with Jacqueline Berry?
24        "Yes."

85

1         The obligator says, "Okay.  She told me
2    verbally on the phone, it made no difference if I were
3    to request an administrative hearing because DSC
4    already made a decision to attach the tax, to
5    intercept them."
6         Do you see that?
7    A.  Mm-hmm.
8    Q.  Is that something you said?
9    A.  No, sir.
10   Q.  If you say something like that, that would be
11   wrong, right?
12   A.  It would be exactly wrong, sir, because I would
13   violate basically their rights.  The Division has to
14   allow them the opportunity to come in and show burden
15   of proof of why they feel their taxes should not be
16   intercepted.
17   Q.  Then there's another document, B00055.  It's
18   another transcript of another hearing, is it not?
19   A.  Mm-hmm.
20   Q.  And the obligator is telling the hearing
21   officer, "There's one lady that keeps calling me up
22   telling me I shouldn't come to this and I shouldn't
23   waste my time and I shouldn't take a day off.  And I
24   don't know why you're doing it.  She called me like

22 (Pages 82 to 85)

B-35

HS-8

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

86

1   seven times in two weeks."
2       And then the hearing officer, Kirk Ryan,
3   asking, "Do you know who that is?"
4   A.  Mm-hmm.
5   Q.  "That would be helpful to know because you have
6   the wrong information."
7   A.  Yes.
8   Q.  Her name is, and they -- he looks at the paper
9   and he say that's you, correct?
10  A.  Pardon me?
11  Q.  He identified you as being the one?
12  A.  No.  Ms. Showard, who led the witness or the
13  obligor, she's looking at the paper and says that
14  that's Berry.  There were two individuals in the
15  accounting unit.  There was a Rose Bailey and
16  Jacqueline Berry.  So each and every time when she led
17  these people -- and this one here, this administrative
18  hearing here never took place.
19  Q.  It never took place?
20  A.  No, sir.
21  Q.  Why did it never take place?
22  A.  The obligor never met with a Kirk Ryan.  The
23  obligor only met with Ms. Showard.  So I was wondering
24  how was there a recording of a tape of an

87

1   administrative hearing that was held -- the obligor
2   ever never had administrative hearing.
3   Q.  You're saying there was no such hearing?
4   A.  No, sir.
5   Q.  So this was a forgery?
6   A.  I don't know what you want to call it, but no
7   administrative hearing took place on this here.
8   Q.  Why is that you say that?
9   A.  Because I interviewed the obligor.
10  Q.  What did he say?
11  A.  That he met with a Ms. Showard.  I asked, was
12  there anyone attending this meeting?  And the obligor
13  stated, no, he met with a short, white, blonde-haired
14  lady.  That was Ms. Showard.  I knew who he was
15  talking about.  There was no Kirk Ryan present at such
16  a meeting.  There was no administrative hearing held.
17  All Ms. Showard did was explain to the obligor the
18  account statement that I had sent to the obligor in
19  the mail.  She explained to him how to read the
20  account statements, which I had suggested to him to
21  come in and sit down with someone in accounting to go
22  over and read that account statement with him.  He
23  would get a better hand with someone showing him than
24  trying to explain it to him over the telephone.

88

1   Q.  When was it that you interviewed this obligor?
2   A.  About two weeks ago.  It was after I sent these
3   documents to you.
4   Q.  You interview this guy two weeks ago?
5   A.  Yes, I did.
6   Q.  How did you get his telephone number?
7   A.  Pardon me?
8   Q.  How did you get his telephone number?
9   A.  How did I get his telephone number?
10  Q.  Yeah.
11  A.  You look on the case.
12  Q.  Did you -- is that --
13  A.  I have this.
14  Q.  What's the source of these documents?  Where
15  did you get these?
16  A.  Where did I get those documents?
17  Q.  Mm-hmm.
18  A.  The day that Ms. Annand gave me my performance
19  review --
20  Q.  Mm-hmm.
21  A.  -- she gave me these to copy.
22  Q.  Okay.
23  A.  I went to the copier and copied them.  But
24  someone had took them out of the copier.  You want to

89

1   find e-mails that I showed you where I tried to obtain
2   this information from Ms. Dianne Walters, who she said
3   she couldn't find it and they would not give it to me.
4   One of my co-workers had retrieved my documents out of
5   the copier and gave them to me at a later time.  That
6   was how I got a copy of this stuff.  It was used on my
7   performance review.
8   Q.  So you're saying this April 29, 2005, hearing
9   never took place?
10  A.  It never took place.
11  Q.  Based on your conversation, your --
12  A.  With the obligor.
13  Q.  Now, the obligor's name is not here, is it?
14  A.  Hmm?
15  Q.  The obligator's name is redacted?
16  A.  No.  It's on -- Mr. Sherwood.
17  Q.  I mean, were you instructed to contact these
18  people after the fact --
19  A.  Pardon me?
20  Q.  -- to verify this?
21  A.  Was I instructed to contact him after the fact
22  to verify it?  No.
23  Q.  Why did you do that?
24  A.  Because I sent you the documents.  I had called

23  (Pages 86 to 89)

B-36

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

---

90

1    your secretary and told her that I had an addendum. I
2    called because I knew that I did not say this to this
3    man. And that was why I called him.
4        Q. Well, is it possible that the gentleman you
5    talked to after the case forgot that he was at a
6    hearing?
7        A. If he had an administrative hearing, sir,
8    that's like a formal process. It's recorded. I don't
9    think that he or anyone would forget that they were at
10   a hearing.
11       Q. Now, there was another transcript for May 13th,
12   2005, request for continuance, teleconference?
13       A. Which number are you looking at?
14       Q. It's B00057.
15       A. Okay.
16       Q. Did this happen?
17       A. This is with Mr. Faron Daniels, who states I
18   say his name funny.
19       Q. And he is saying you're telling him certain
20   things, correct?
21       A. Pardon me?
22       Q. He's reporting in this teleconference that you
23   told him certain things. It's underlined what you
24   purportedly told him, correct?

---

91

1        A. Which one are you looking at again, sir?
2        Q. It starts at page 57 and goes to 58, I believe.
3        A. Okay. This same person here --
4        Q. It appears to be the same person, correct?
5        A. I guess.
6        Q. And underlined is what purportedly -- maybe
7    these are two different teleconferences. I don't
8    know.
9            Anyway on the first one I showed you, 57,
10   are you saying you didn't say those things he's saying
11   you said?
12       A. I'm not -- no. I didn't say this to this guy.
13       Q. So what he's reporting is false?
14       A. Yeah. What she says that -- I told her that
15   the guy had -- she's saying I told her that
16   Mr. Daniels, Faron Daniels had stated that he wanted
17   to be deleted from administrative hearing. If you
18   look at these case notes here, there was a case note
19   that I did send to Ms. -- to the tax unit telling them
20   that he wanted to be deleted -- let me see. There's
21   one where he wanted to be deleted, and then there was
22   one where he called back and he asked to proceed with
23   the tax administrative hearing, the latest one on page
24   00076.

---

92

1        Q. Mm-hmm.
2        A. On this one here, he changed his mind and he
3    wanted to proceed with the tax administrative hearing.
4    But the complaint was that I sent a request that the
5    man wanted to be deleted. At one time did he want to
6    be deleted because I have the e-mail here. He wanted
7    to withdraw. 0079. I have on here that he's
8    requesting to proceed with the tax administrative
9    hearing. But then 0076, he's asking to proceed.
10       Q. Okay. Now, would you look at B00058? This is
11   another teleconference hearing, correct?
12       A. Mm-hmm.
13       Q. And they underlined, I believe, what they
14   believe what this person is telling the hearing
15   officer what he was told by you?
16       A. I read everything what these accusations are so
17   called made by me, but I did not say this to these
18   individuals.
19       Q. Okay. So this person as well is not telling
20   the truth, is that correct?
21       A. I did say that to the person.
22       Q. So if he's saying you said that, that's not
23   correct; that's a lie?
24       A. That's not correct.

---

93

1        Q. So he --
2        A. I never made an allegation to anybody trying to
3    distract them to come in for an administrative hearing
4    because I know that's their right, that's their way of
5    proving that their taxes should not be intercepted. I
6    never try to distract anybody from coming in to Child
7    Support to have an administrative hearing.
8        Q. Okay. Then the next document, B00059, looks
9    like a request for an administrative hearing.
10       A. This is the letter that Ms. Showard said the NC
11   sent in stating that he wanted an administrative
12   hearing, stating that I had informed her that he
13   wanted to withdraw. And as I said, the case notes do
14   show where I did send her a case note that he
15   requested to withdraw but then he called back and
16   wanted to proceed. So there's a case note to document
17   and justify that.
18       Q. He's complaining that, according to him, "I was
19   asked by Jackie Berry, Newark office, if I would like
20   to postpone this hearing until they received my fax
21   (copies of my stubs) and reviewed my case. I agreed
22   to this, hoping this would put an end to this
23   bookkeeping error. I received a letter from DCSC on
24   March 19th indicating I had discharged my hearing. My

---

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

94

1    account was being transferred to a collecting agent.
2    This was a falsehood. I never discharged the hearing.
3    I respectfully request a hearing to resolve this
4    issue."
5        In other words he's saying that you told
6    him that you were going to postpone the hearing until
7    he could collect his -- and instead, it indicates that
8    you discharged the hearing. It says he never wanted
9    that.
10   **A. He never wanted a hearing?**
11   Q. He never wanted you to discharge the hearing.
12   **A. I don't have a right to discharge anything.**
13   **When someone makes a request to be discharged from a**
14   **hearing, it goes to Ms. Showard. I don't discharge**
15   **anything. I don't -- I didn't have the right to do**
16   **that. But as I said, if you look at the case notes,**
17   **at one point, the NCP had requested to withdraw. But**
18   **then he called back again and requested to proceed.**
19   **There are case notes to justify it.**
20   Q. Why would Mr. Showard make a false statement
21   about you? Do you know him?
22   **A. Ms. Showard?**
23   Q. You said --
24   **A. Why would who?**

95

1    Q. Under B00061 you say, "Document was printed to
2    support false complaints made by Ms. Showard."
3    **A. Why -- you're asking me why would Mr. Sherwood**
4    **make a false complaint?**
5    Q. What did you write? What does your handwriting
6    on that document say?
7    **A. "Documents I printed to support false**
8    **complaints made by Ms. Showard.**
9    Q. Okay.
10   **A. So the complaints made by Ms. Showard were in**
11   **that so-called administrative hearing with Kirk Ryan**
12   **present that Mr. Sherwood say did not take place.**
13   **There was no administrative hearing held.**
14   Q. I'm confused. Ms. Showard is merely one of the
15   persons in the transcript. She's not making any
16   statements about what you said to anyone. She's
17   asking him.
18   **A. Exactly.**
19   Q. How is it her false statement then?
20   **A. Pardon me?**
21   Q. How would it be her false statement?
22   **A. How is it her false statement?**
23   Q. Yeah. That's what I don't understand. In your
24   document -- and I'm talking about B00062 --

96

1    **A. Because --**
2    Q. -- or 61. I'm sorry.
3    **A. The allegations made in the administrative**
4    **hearing were used in my performance review. She's**
5    **stating -- Ms. Showard wrote a letter to Ms. Annand**
6    **and Ms. Walters, stating that she got complaints from**
7    **these individuals, and she couldn't have gotten the**
8    **complaint from someone if the administrative hearing**
9    **didn't take place.**
10   Q. Suppose when you interviewed the guy he was
11   scared of you and didn't want to talk about so he told
12   you there was no hearing?
13   **A. That may have been the case, but if the**
14   **Division of Child Support has an administrative**
15   **hearing, it was recorded. They have that recording of**
16   **that hearing with the guy making the statements.**
17   Q. So if I get the tape and there was, in fact, a
18   hearing and he said those things and it's an accurate
19   transcript, what would you say then?
20   **A. That there's administrative hearing that took**
21   **place and accurate transcript, basically, he can**
22   **attest in the witness, you know, to what is said on**
23   **that transcript.**
24   Q. Ms. Showard is not your supervisor, is she?

97

1    **A. No. She was when I worked in accounting, just**
2    **alternate duty assignment for two months that they had**
3    **me over there, and I was --**
4    Q. That was alternate duty assignment they gave
5    you?
6    **A. Yeah.**
7    Q. When was that they gave you that?
8    **A. That wasn't until 2005, June 2005 or something.**
9    Q. Was that because of your limitations?
10   **A. Yes.**
11   Q. So they did give you an alternate duty,
12   temporary alternate duty?
13   **A. For two months in the accounting unit**
14   **eventually they did.**
15   Q. Okay.
16   **A. It was like a year went by, you know.**
17   Q. Is that because somebody else had the job
18   before?
19   **A. In accounting?**
20   Q. Well, who was the tax intercept person before
21   you?
22   **A. Before --**
23   Q. You got this temporary assignment for two
24   months.

25 (Pages 94 to 97)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

---

**98**

1  A. Mm-hmm.
2  Q. Who was doing it before you?
3  A. I don't know who was doing it before me.
4  Q. Could it be that you only got it when it became
5  open?
6  A. I don't know.
7  Q. To your knowledge, document B00086, there's a
8  letter to you dated October 22nd, 2004.
9  A. Mm-hmm.
10 Q. What is this letter about?
11 A. What is this letter about?
12 Q. Mm-hmm.
13 A. It's saying they are recommending my dismissal
14 from my position.
15 Q. And what was it for? Why were they
16 recommending your dismissal?
17 A. It says, "Due to my unavailability for work."
18 Q. Is it true that you hadn't been to work in
19 quite some time?
20 A. I was out for carpal tunnel, both my hands. I
21 had surgery.
22 Q. He indicates in the letter on the second page,
23 the end of the first paragraph, the top, "Your absence
24 from September 20, 2004, to date are unauthorized and

---

**99**

1  subject to disciplinary action."
2  Were they unauthorized?
3  A. No, sir. What had happened, Ms. Annand said
4  that I had left work and abandoned my job and she did
5  not know what was going on with me while I was out on
6  workman's comp. I was told when I was put out on
7  workman's comp that -- by Alice Bailey because she was
8  informed that I had an attorney, that any
9  communication or anything had to be with the attorney
10 and not myself. So all documents that were pertaining
11 to my workman's comp injury were sent to my doctor,
12 which my doctor sent them to the state's legal rep for
13 them.
14     But she had said that I had abandoned my
15 job and she didn't know what was going on with me or
16 anything. So I ended up having a predecision hearing
17 or something to come back to work, and it was narrowed
18 down that miscommunication, lack of communication
19 between the legal reps are why such an statement was
20 put in there.
21 Q. Did you return to work shortly thereafter?
22 A. Yes, sir.
23 Q. For how long?
24 A. How long did I return to work?

---

**100**

1  Q. Mm-hmm.
2  A. I don't know how long. You want to know how
3  long it was after this letter that I returned or how
4  long --
5  Q. Yeah.
6  A. -- when I returned.
7  Q. When did you return to work after that letter?
8  A. I don't -- I don't recall the date, sir, when I
9  initially returned to work because there were several
10 occasions where I would return to work but then go
11 back to the workman's comp carrier physician that was
12 treating me and he would change something on my
13 prescription and then I would be put back out of work.
14     I had a predecision hearing on November
15 19, 2004, to return me back to work.
16 Q. Turning to B00097 through B00099, just tell us
17 what these are.
18 A. This is a copy of information that Ms. Santana
19 used with filing her complaint.
20 Q. Did she give it to you?
21 A. Pardon me?
22 Q. Did she give it to you?
23 A. Ms. Santana?
24 Q. Yes.

---

**101**

1  A. Yes.
2  Q. How are your hands now that you've had the
3  surgery for release done for the carpal tunnel?
4  A. I'm still diagnosed with carpal tunnel, sir. I
5  followed up with a physician and had another nerve
6  conduct study in North Carolina. And results were
7  revealed that I have carpal tunnel and they are
8  recommending a second surgery. After what I went
9  through with the first surgery, I just haven't
10 considered having that second surgery.
11 Q. So you're getting the symptoms back?
12 A. I -- even when I had the first surgery, I
13 always slightly did have the symptoms and which my
14 doctor, treating physician here had recommended and
15 referred me to go to voc rehab and had recommended a
16 second surgery too, but you know, I -- I just haven't
17 considered having that done yet.
18 Q. Turn your attention to B00125. It's an e-mail
19 from you to your supervisor Brenda Annand.
20 A. Mm-hmm.
21 Q. It's "request of my daughter's treating doctor,
22 move to Kent County employment." You indicate -- you
23 don't call her Brenda, you call her Brend.
24 A. No. The A is missing.

---

26 (Pages 98 to 101)

B-39

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

102

1    Q. I mean, is that just a mistake?
2    A. Mistake.
3    Q. Okay. "Brenda, per visit on 2/10/04, my
4  daughter's doctor wrote another request for me to be
5  employed closer to work due to my daughter's medical
6  condition." And then you recount, "per our discussion
7  of November 13, '04, and one in January 6, '04, I was
8  informed by you that the request made by my daughter's
9  doctor would not be granted. Due that I received the
10 same request again, I'm requesting in writing from you
11 of why such request cannot be granted. Please provide
12 me with such documentation at your earliest
13 convenience. I did not discuss letter received
14 2/10/04 with you due to same concern already discussed
15 twice and not granted."
16       Then she responded to your e-mail, did she
17 not?
18   A. Mm-hmm.
19   Q. And what did she say?
20   A. She said that I "applied and was hired to be a
21 child support specialist 1 in the customer service
22 unit, which is located here in New Castle. There was
23 no customer service unit position located in Kent
24 County is an automated call center is ran in the

103

1  Churchman's building. At this present time there are
2  also no CTS 1 vacancy in Kent County. If one becomes
3  available, you can follow normal procedures and apply
4  for it."
5       Fully aware of that, that I can apply, but
6  if not given the opportunity to apply, if the
7  positions become available and they are not posted,
8  you're not given the opportunity to apply.
9       As well as saying that I was hired to be a
10 child support specialist 1 in the customer service
11 unit, I was hired by the agency as a child support
12 specialist 1, which means, within the Division of
13 Child Support, I can go to any agency within any unit
14 within that agency if I qualify. It's not necessarily
15 saying when I got hired by Child Support that I'm just
16 in customer service because, if that was the case,
17 other co-workers that there were hired in customer
18 service would not be in the other units with an agency
19 today themselves. It would just hired in customer
20 service.
21   Q. Did they apply for those transfers, do you
22 know?
23   A. Pardon me?
24   Q. The other employees that transferred from the

104

1  customer service unit, did they apply for those
2  positions?
3    A. Some applied and some were just lateral moved.
4    Q. At their request?
5    A. Pardon me?
6    Q. At their request?
7    A. It could have been at their request or not. I
8  don't know.
9    Q. Well, you were laterally moved, were you not,
10 at your request?
11   A. I interviewed for the position back up in New
12 Castle and was offered the position and took the
13 lateral move back up.
14   Q. You applied for it or you made a request for
15 it?
16   A. I applied. I interviewed.
17   Q. So you've done it before; you've applied and
18 been laterally moved to transfer, correct?
19   A. Yes, sir.
20   Q. So if you wanted to be transferred to Kent
21 County, you could do the same thing, right?
22   A. Apply if you're given the opportunity to apply.
23 They had two openings. They never posted the
24 positions. They just did in-house moves that no one

105

1  was aware even if they knew of.
2    Q. There's nothing that violates the merit rules
3  about that, is there?
4    A. I don't know.
5    Q. Would you turn to B00126.
6    A. Mm-hmm.
7    Q. This is a letter from Linda --
8    A. Caballero.
9    Q. She's a doctor at the Nemours Children's
10 Clinic --
11   A. Yes.
12   Q. -- in Dover, correct?
13   A. Yes.
14   Q. And who is it addressed to?
15   A. Chuck Hayward and Mr. Vince Meconi.
16   Q. And the doctor is saying essentially that he's
17 been requesting a change of employment site so that
18 you may be close to your daughter to bring her into
19 emergency appointments and have requested this
20 position change since January. At this point, there
21 is no one to honor this medical necessity letter.
22 Shanice Morris -- is that your daughter?
23   A. Mm-hmm.
24   Q. "Has medical conditions and necessitates her

27 (Pages 102 to 105)




Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

106

1  mother being nearby and easily available in order to
2  take her to emergency appointments or to the ER. Her
3  diagnosis is considered a critical chronic condition.
4  It's medically necessary for her mother to be
5  available, present for her medical appointments. Due
6  to HIPPA, I do not have to divulge her diagnosis, but
7  she does have medical conditions that require her
8  presence of her mother. Your prompt attention to this
9  matter is greatly appreciated. Any further questions
10  or comments, you can direct them to me." And it gives
11  her name and phone number, correct?
12  A.  Mm-hmm.
13  Q.  And who is it addressed to?
14  A.  Who's the letter addressed to?
15  Q.  Yes.
16  A.  Chuck Hayward and Vincent Meconi.
17  Q.  And who is Chuck Hayward?
18  A.  He is director of Child Support.
19  Q.  Who is Vincent Meconi.
20  A.  Secretary of DHSS.
21  Q.  Then at the bottom there's some handwriting.
22  Is that your handwriting?
23  A.  Yeah.
24  Q.  What's it say?

107

1  A.  It says, "This document was withheld from EEOC
2  Philadelphia district office as evidence to my
3  allegations of discrimination."
4      This document here was not turned in to
5  the federal EEOC office. I obtained all documents at
6  child support used to attest the allegations I made
7  against them under the Freedom of Information Act and
8  this is one document that they withheld and did not
9  give them. It was not in the information.
10  Q.  Then there was an e-mail at B00127 from Dianne
11  Walters, correct?
12  A.  Mm-hmm.
13  Q.  And she is your supervisor's supervisor,
14  correct?
15  A.  Yes.
16  Q.  And she's referring to the letter --
17  A.  Mm-hmm.
18  Q.  -- from doctors. She says, "Jackie, I wanted
19  to let you know that Chuck is in receipt of your
20  doctor's letter requesting that you be allowed to work
21  from the Kent County office. I'd like to meet with
22  you and Brenda to discuss this situation. When you
23  return to work tomorrow, please see me to set up a
24  time that is convenient."

108

1      That's dated April 7, 2004, correct?
2  A.  Mm-hmm.  Yes.
3  Q.  The next document, B00128, appears to be
4  memorandum written by --
5  A.  Dianne Walters.
6  Q.  To you, correct?
7  A.  Yes.
8  Q.  That's dated April 12, 2004, and the subject is
9  "transfer to Kent County."
10  A.  Yes.
11  Q.  And she recounts that you were hired into the
12  "customer service unit as a child support specialist,
13  that this is presently housed in the New Castle County
14  office. We are unable to move you as your doctor has
15  requested. There are no vacancies at this time in the
16  Kent county office."
17  A.  Yes.
18  Q.  "If there were, you could apply for a position
19  to another unit, hence allowing for your transfer."
20  A.  Mm-hmm.
21  Q.  "In an effort to accommodate your request, the
22  director did canvass the Dover office to see if anyone
23  would be interested in a switch of positions. Again,
24  unfortunately, there is no one that was interested in

109

1  such a switch. As we discussed, should you wish to
2  pursue employment in Kent County, I'm sure with the
3  lifting of a hiring freeze, positions will be opening
4  that you could apply for inside the division as well
5  as outside."
6      Then she closes by saying, "Until that
7  time both Brenda and I will work with you to
8  accommodate your child's health care needs. As we are
9  both parents, we understand we need to put our
10  children first in some instances. Feel free to
11  discuss this with either Brenda or myself at any
12  time."
13      Is that how she closes with?
14  A.  Yes, sir.
15  Q.  Was there a hiring freeze on at this time,
16  prior to this?
17  A.  May have been a hiring freeze at that time. My
18  daughter started right — my daughter's doctor started
19  writing letters to the Division of Child Support,
20  which the first letter they received requesting for a
21  transfer to Kent County was on October 22nd, 2003.
22  This letter dated by Ms. Annand is April 12, 2004. So
23  there had been ample amount of time that had went by
24  with my daughter's doctor repeatedly writing requests.

28 (Pages 106 to 109)

B-41

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

110

1    Q.  Do you understand that there is no legal
2  obligation they have to transfer you to Kent County?
3    A.  I thoroughly understand.
4    Q.  You were asking them to do that and they were
5  trying to tell you, well, here's the things you can do
6  to get transferred to Kent County, correct?
7    A.  Right.  They said that I could apply, but like
8  I said, when openings became available, they weren't
9  posted giving me the opportunity to apply.
10   Q.  Who would --
11   A.  I know they are not under any preferential --
12 you know, give me any preferential treatment to move
13 me to Kent County.
14   Q.  Right.  Now, my point is, who's not posting
15 these positions that are opening in Kent County?
16   A.  I guess it has to do with HR.  I don't know
17 who's -- I don't know who is responsible for posting
18 the positions.
19   Q.  Was it Brenda Annand?
20   A.  Was it Brenda Annand?
21   Q.  Is this the reason they are not posting them in
22 Kent County?  Do you have any information that it was
23 Brenda Annand that made it so it wouldn't be posted?
24   A.  I have no knowledge, sir, why, when positions

111

1  became available in Kent County, they were not posted.
2    Q.  Did Dianne Walters have something to do with
3  it?
4    A.  I'm not saying who had anything to do with it.
5  I'm just saying, when available positions became
6  available in Kent County, they were not posted
7  allowing me the opportunity or anyone else with the
8  Division of Child Support to apply in interviews for
9  such postings.
10   Q.  All right.
11   A.  And it was not until the agency even really
12 addressed the concern of me going to Kent County until
13 my daughter's doctor sent this letter here to Chuck
14 Hayward and Vincent Meconi, which at the time I didn't
15 even have knowledge and know that she was doing that.
16 But it was the agency didn't even really address the
17 concern until that letter that was received.
18   Q.  In fact, you had discussed it with Brenda prior
19 to that?
20   A.  That I discussed it with Brenda and that's the
21 only -- she didn't take it any further or pursue it
22 any further or anything.
23   Q.  She did correctly tell you that the customer
24 service unit doesn't have positions in Kent County,

112

1  correct?
2    A.  Which I'm fully aware.
3    Q.  Okay.  And she did indicate, however, that you
4  could, of course, always apply for a position if it
5  became open, some other position became open?
6    A.  If --
7    Q.  You say if you knew about them.
8    A.  If the positions, when they became available
9  were posted, allowing me the opportunity to apply.
10   Q.  And you and I, through prior discussion, have
11 determined that that's not Brenda Annand's fault they
12 weren't posted?
13   A.  I'm fully aware of that.
14   Q.  Okay.  And it's not Dianne Walters fault they
15 are not posted?
16   A.  I'm fully aware.  But for either -- for either
17 one, Brenda or Dianne, to tell me that I am hired as a
18 child support specialist in customer service unit,
19 when you're hired at Child Support, it doesn't label
20 you to a direct unit.  You are hired as a child
21 support specialist 1, which any department in that
22 agency that you qualify for or in any county that you
23 qualify for, you can go there and work.
24   Q.  In other words, you're free to transfer if

113

1  there's an opening?
2    A.  Yes.  Yes.
3    Q.  And you yourself have already done that at
4  least once, maybe twice?
5    A.  Pardon me?
6    Q.  You've transferred yourself?
7    A.  Yes.
8    Q.  On two occasions?
9    A.  I applied and interviewed.
10   Q.  Right.
11   A.  Yes.
12   Q.  And that's always available to you, correct?
13   A.  It's not always available because when the
14 openings came in the Kent County office, they were not
15 posted allowing me the opportunity to apply.
16   Q.  Okay.  I understand.
17       The next document is B00133 to B00137,
18 B00138 -- I don't know.  No.  Maybe that's a different
19 document.
20       The first document is -- it's Internal
21 Revenue Service tax return transcript?
22   A.  Mm-hmm.
23   Q.  What is this?
24   A.  It's my tax file and status for 2005.

29 (Pages 110 to 113)

B-42

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

114

1   Q.  Did you file electronically?
2   A.  Yes.
3   Q.  Is that the only tax return you have?
4   A.  That was the only one that I — I filed
5   electronically.
6   Q.  Okay.
7   A.  I had to call them to have them send me a copy
8   of that.
9   Q.  Now, would you explain to me what B00138 --
10  A.  What this is, this is a print-out —
11  Q.  Wait a second.  Let me get done the question.
12  Okay?
13      -- through B00152, what are those things?
14  A.  This is a print-out that was sent to me from
15  Coventry.  I had medical — I had to have a surgery
16  while I was out on workman's comp.  Medically
17  necessitated that I had to have that surgery.  The
18  bill was paid by my — Coventry, the insurance
19  carrier.  But seven months later someone from Coventry
20  informed me that someone from HR at Child Support
21  called and told them to reverse the bill for covered
22  charges for services on August 2nd, 2004.
23  Q.  Did that have to do with your carpal tunnel?
24  A.  No.

115

1   Q.  Now, you recall in my discovery request to you
2   I asked to you list your health care providers and
3   practitioners for the last number of years, and I
4   think you only told me about Dr. Crain, correct?
5   A.  No.  You have more than Dr. Crain.  It's
6   number 12.
7   Q.  All right.
8   A.  11 and 12.
9   Q.  Okay.  So you told me about Dr. Patel's
10  treatment related to hypertension, is that what it
11  says?
12  A.  Mm-hmm.
13  Q.  Dr. Crain.  And then you answered "objection to
14  all health care providers due to information is
15  irrelevant and has no bearing on this case," correct?
16  A.  You have CNMRI, that's Dr. Varipapa.
17  Q.  Where is that?
18  A.  Page 11.
19  Q.  Yes.
20  A.  Where it says answer, that's a doctor's office
21  there.
22  Q.  CNMRI?
23  A.  Mm-hmm.  It's a neurologist.
24  Q.  Okay.  CNMRI is actually the name of a doctor

116

1   or is it just --
2   A.  It's Dr. Varipapa.  That's the name of the...
3   Q.  What have you been treating and how long have
4   you been treating with him?
5   A.  How long?
6   Q.  Mm-hmm.
7   A.  I don't know the time frame how long I had
8   treated with them, but it was in 2004 that he put me
9   on anxiety medication.
10  Q.  Okay.  How long had you been seeing him before
11  he put you on anxiety medication?
12  A.  How long had I been seeing him?
13  Q.  Yes.
14  A.  I can't give you an exact time frame as far as
15  month or years, but I guess I can say about a year.  I
16  don't —
17  Q.  What were you seeing him for before he
18  prescribed your anxiety medication?
19  A.  This is the doctor that did the nerve
20  conduction study for the carpal tunnel.
21  Q.  Okay.  And he also gave you anxiety medication?
22  A.  Yes, sir.
23  Q.  What about Dr. Ashok Patel?
24  A.  This is medication I was on for hypertension.

117

1   Q.  How long have you been seeing him?
2   A.  For years.
3   Q.  In other words, you've had hypertension for
4   years?
5   A.  You asked me how long had I been seeing him.
6   Q.  Yes.
7   A.  He's been my family doctor for some time.  I
8   was placed on hypertension medication when I came to
9   Child Support.
10  Q.  In 2000?
11  A.  I'm not going to say in 2000.  It was when I
12  started working for Child Support.  I know it was when
13  I was placed on hypertension medication.  Since I've
14  left Child Support, I'm no longer on hypertension
15  medication.
16  Q.  Now, I asked you a question 5.  It's at
17  page 12.  What other lawsuit or administrative bodies
18  or proceedings have you had or you've objected and
19  said, "Other requested information is irrelevant.  No
20  bearing on this case."  Is that correct?  Am I reading
21  correctly your response?
22  A.  I put the U.S. Equal Employment Opportunity.
23  Q.  Right.
24  A.  Right.  That's the only one I put.  I didn't

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

B-43

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

118

1  put the workman's comp one from back in 1997 on here
2  with DHCI, but...
3     Q.  Well, other than that those two -- so this EEOC
4  thing that you're identifying here is the one for
5  which you brought this lawsuit, correct?
6     A.  Yes.
7     Q.  Now, other than that, what other lawsuits have
8  you been a party to?
9     A.  The only other one I had was when I had the
10  workman's comp injury years ago at DHCI.
11    Q.  And there was nothing else; there's no other
12  lawsuits?
13    A.  No.
14    Q.  And you never filed a discrimination complaint
15  before?
16    A.  Never.
17    Q.  How are you presently supported?
18    A.  My son.
19    Q.  He sends you money?
20    A.  My son.
21    Q.  Sends you money?
22    A.  Mm-hmm.
23        And I get child support for my daughter.
24    Q.  When you left the New Jersey Division of Child

119

1  Support --
2     A.  New Jersey?
3     Q.  Yes.  I'm sorry.  North Carolina.
4        Did you get evaluations done when you were
5  at North Carolina?
6     A.  Yes sir.
7     Q.  How were your evaluations?
8     A.  I got -- their evaluations or rating is below,
9  good, very good, and outstanding.  My evaluation was
10  very good.
11    Q.  And you will not sign these authorizations for
12  the release of information?
13    A.  No, sir.
14    Q.  All right.  That's all the questions I have for
15  right now.  Obviously, if you had signed these
16  authorizations and releases to me, I would have been
17  able to get some records and I would have been asking
18  about those additional records.
19    A.  I have already contacted my physicians to get
20  my records from my physicians for you.
21    Q.  Yeah.  But see, I have a right under the law to
22  get them myself --
23    A.  Mm-hmm.
24    Q.  -- but you refuse to sign the authorizations.

120

1        Now, because of that, discovery closes
2  tomorrow in this case.
3     A.  Mm-hmm.
4     Q.  And I will need to go to the Court to get the
5  Court to force you to sign these authorizations for
6  me.
7     A.  Okay.
8     Q.  So then I will need additional time to do
9  discovery?
10    A.  Okay.
11    Q.  So what's your position on an extension of time
12  to continue discovery?  Do you oppose it or are you
13  for it or what?
14    A.  Say that again, please.
15    Q.  I want to know what your position is.  I'm
16  going to request an extension of time to complete
17  discovery.  Because I've not been able to get these
18  hospital, doctor's records, and employment records?
19    A.  Mm-hmm.
20    Q.  And what I want to know is, what's your
21  position regarding my request for an extension of the
22  discovery period?
23    A.  I will oppose it.
24    Q.  You will oppose it?

121

1     A.  Mm-hmm.
2     Q.  Okay.  That's fine.  Thank you very much.
3     A.  Okay.
4     Q.  Oh, listen, you have a right to read and sign,
5  if you wish, your transcript.  In other words, if you
6  do that, they would tell you when to come in and to
7  review the transcript in their office.  You would
8  come, look it over.  You can make changes to the
9  transcript.  You can sign, and that would be included
10  in the transcript, or you can say, "I'm going to waive
11  that right."
12    A.  I don't want to do that.
13    Q.  It's up to you.
14    A.  I'm not going to waive my right to --
15    Q.  To read the transcript?
16    A.  Right.
17    Q.  Okay.  After you read the transcript, did you
18  want to buy a copy?
19    A.  Yes.
20    Q.  There you have it.
21        (Deposition ended at approximately
22  3:50 p.m.)
23
24

31 (Pages 118 to 121)

Berry v. State of Delaware, Division of Child Support

122

```
 1
 2
 3
 4
 5
 6
 7
           REPLACE THIS PAGE
 8
 9         WITH THE ERRATA SHEET
10
           AFTER IT HAS BEEN
11
12         COMPLETED AND SIGNED
13
           BY THE DEPONENT.
14
15
16
17
18
19
20
21
22
23
24
```

123

```
 1    State of Delaware )
                       )
 2    New Castle County )
 3
 4           CERTIFICATE OF REPORTER
 5
          I, Ann M. Calligan, Registered Merit
 6    Reporter and Notary Public, do hereby certify that
      there came before me on the 27th day of February,
 7    2007, the deponent herein, JACQUELINE D. Berry, who
      was duly sworn by me and thereafter examined by
 8    counsel for the respective parties; that the questions
      asked of said deponent and the answers given were
 9    taken down by me in Stenotype notes and thereafter
      transcribed by use of computer-aided transcription and
10    computer printer under my direction.
11         I further certify that the foregoing is a true
      and correct transcript of the testimony given at said
12    examination of said witness.
13         I further certify that I am not counsel,
      attorney, or relative of either party, or otherwise
14    interested in the event of this suit.
15
16
17           Ann M. Calligan, RMR
             (Certification No. 186-RPR)
18           (Expires January 31, 2008)
19
      DATED: March 15, 2007
20
21
22
23
24
```

32 (Pages 122 to 123)

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

-----Original Message-----
**From:** Santana Nancy (DHSS)
**Sent:** Tuesday, April 05, 2005 1:50 PM
**To:** Annand Brenda (DHSS)
**Cc:** Valiante Lou (DHSS); Lester Tomeka (DHSS)
**Subject:** RE: Unavailable

*Exhibit 3*

Brenda:

After talking to team leader Lou Valiante, just now, it was brought to my attention (and also confirmed to Tomeka Lester) that you went around to Tomeka's cubicle to tell her she & Marjorie were at lunch. Since I don't take my lunch until 2 p.m., I did not sign out for lunch because I never got clarification as to whether we were at lunch or not.

After speaking to Tomeka @ 12: 45 p.m., she told me that our lunch hour was from 12:45 - 1:15 p.m. No clarification was ever giving to me; you never spoke to me in person either. I got this from Tomeka Lester herself.

If you were sincere in your intent to take lunch at a certain time, you should have sent an email to everyone. I was not at my desk therefore you did not extend a notice to me about taking my lunch verbally.

This is a serious miscommunication on your part. You didn't speak to me directly, therefore no displinary action is need.
You need to clarify your intent clearly.

  -----Original Message-----
  **From:** Annand Brenda (DHSS)
  **Sent:** Tuesday, April 05, 2005 1:25 PM
  **To:** Santana Nancy (DHSS)
  **Cc:** Walters Dianne (DHSS)
  **Subject:** Unavailable

  *Apr. 1 5, 2005*

  Nancy,

  It was after 1:00 and you have been unavailable for over 14 minutes without using the wallboard to notify supervision as to why. I attempted to call you but you didn't answer and when I went to your desk you were not there. In addition, you were not signed out for lunch or anywhere in the CSU unit. When the phones came back on, you were needed to take incoming calls.

  As stated before, you need to remember to use the wallboard to notify supervision when you are unavailable for over 4 minutes so we know why. This is not the first time this issue has been brought to your attention. If this continues to be an issue and you fail to follow unit procedures, I will have no recourse but to take discliplanary action.

  As always, if you have any questions or concerns, please let me know.

4/6/2005

B- 46

Subject: RE: Unavailable    *Exhibit 3*

Nancy,

I am aware that your lunch is from 2-2:30. The discussion I had with Tomeka and Marjorie applied to their lunch schedule. If my intent had been to have all CSSs take their lunch from 12:45 - 1:15 I would have indeed sent an e-mail to all staff.

Since the system has been so unpredictable today, I suggested that Marjorie and Tomeka take their lunch at that time in the hope that they would be back at their desks should the phone system issues be resolved. I was anticipating increased call volume once the repairs were made. There was no reason for all CSSs to adjust their schedules, as we obviously needed coverage for those calls still coming through.

Having said that, your e-mail does not explain to me why you were unavailable for an extended period of time. As mentioned you were not signed out for lunch or break.....had you thought it was my wish for all CSU to take their lunch, signing out would still have been required. Had you had any questions concerning whether you were or were not supposed to take you lunch at that time, the wallboard could also be used to ask me that question.

If you are not comfortable with using the wallboard as part of your CSU duties, feel free to speak to me or Stacy and we sill see that you get trained on its proper use.

----Original Message-----
From: Santana Nancy (DHSS)
Sent: Tuesday, April 05, 2005 1:50 PM
To: Annand Brenda (DHSS)
Cc: Valiante Lou (DHSS); Lester Tomeka (DHSS)
Subject: RE: Unavailable

Brenda:

After talking to team leader Lou Valiante, just now, it was brought to my attention (and also confirmed to Tomeka Lester) that you went around to Tomeka's cubicle to tell her she & Marjorie were at lunch. Since I don't take my lunch until 2 p.m., I did not sign out for lunch because I never got clarification as to whether we were at lunch or not.

After speaking to Tomeka @ 12: 45 p.m., she told me that our lunch hour was from 12:45 - 1:15 p.m. No clarification was ever giving to me; you never spoke to me in person either. I got this from Tomeka Lester herself.

If you were sincere in your intent to take lunch at a certain time, you should have sent an email to everyone. I was not at my desk therefore you did not extend a notice to me about taking my lunch verbally.

This is a serious miscommunication on your part. You didn't speak to me directly, therefore no displinary action is need.
You need to clarify your intent clearly.

----Original Message-----
From: Annand Brenda (DHSS)
Sent: Tuesday, April 05, 2005 1:25 PM
To: Santana Nancy (DHSS)
Cc: Walters Dianne (DHSS)
Subject: Unavailable

*April 5, 2005*

*Targeted Harassment*

Nancy,

It was after 1:00 and you have been unavailable for over 14 minutes without using the

**B-47**

wallbopard to notify supervision as to why.  I attempted to call you but you didn't answer and when I went to your desk you were not there.  In addition, you were not signed out for lunch or anywhere in the CSU unit.  When the phones came back on, you were needed to take incoming calls.

As stated before, you need to remember to use the wallboard to notify supervision when you are unavailable for over 4 minutes so we know why.  This is not the first time this issue has been brought to your attention.  If this continues to be an issue and you fail to follow unit procedures, I will have no recourse but to take discliplanary action.

As always, if you have any questions or concerns, please let me know.

B-48

*Exhibit 3*

## Walters Dianne (DHSS)

**From:** Annand Brenda (DHSS)
**Sent:** Tuesday, April 05, 2005 3:41 PM
**To:** Walters Dianne (DHSS)
**Subject:** FW: Unavailable

-----Original Message-----
**From:** Santana Nancy (DHSS)
**Sent:** Tuesday, April 05, 2005 3:22 PM
**To:** Annand Brenda (DHSS)
**Cc:** Valiante Lou (DHSS); Santana Nancy (DHSS)
**Subject:** RE: Unavailable

Brenda:

I didn't know if any clarification was needed as I was not sure of what was going on.
All I saw was people being away from their desks. Since I was not sure whether I was at lunch or not, I left to speak to Darlene Rodgers with the notion that "signing" out was not needed, and I would clarify with Lou Valiante what was going on or what I needed to do. I didn't sign out because I was not sure of what the procedures were in place for an "impromptu lunch."

Obviously Lou was not available & Tomeka told me, unofficially, that I was at lunch. I didn't sign out because I needed further "clarification" as to whether I was to go to lunch or not. Your earlier email was certainly an indication that I was not supposed to be at lunch. I was definitely "not" sure of what my "true status" was @ the time so I could not sign out on your log sheet.

I did not sign out @ all until I spoke to Lou about this confusion & further clarification.

You were not clear, and I could not get any current information from Lou as he also was away from his desk. After I clarified what was going on, I did plan on signing in for lunch or "break." Now I can't sign anything as I don't truly know if I was @ lunch or not....

This miscommunication could have been avoided if I was clearly informed of what it was I was supposed to do while the phones were down. I don't need to be warned of any disciplinary action as being away from my desk is not a "pattern" for you to be concerned with. I don't take breaks either so I don't feel the need to look @ any wall boards either.

When the staff meets for customer service issues, in the future, this will be brought up as an issue in miscommunication by myself. I had spoke to Lou twice today, and he also stated that there are a lot of miscommunication issues in the customer service unit.

Thanks,

Nancy

-----Original Message-----
**From:** Annand Brenda (DHSS)
**Sent:** Tuesday, April 05, 2005 2:30 PM
**To:** Santana Nancy (DHSS)
**Cc:** Walters Dianne (DHSS)

B-49

*Exhibit 3*

**Santana Nancy (DHSS)**

| | |
|---|---|
| **From:** | Lloyd Selena (DHSS) |
| **Sent:** | Tuesday, April 05, 2005 2:43 PM |
| **To:** | Santana Nancy (DHSS) |
| **Subject:** | RE: Unavailable |

Nancy,

   Try to remain calm. You responded without being rude (very good)so hopefully that will be the end of that. You should also always watch your back. I learned that little lesson myself. Breathe......relax.....think of a happy place.......breathe.......

> -----Original Message-----
> **From:** Santana Nancy (DHSS)
> **Sent:** Tuesday, April 05, 2005 2:24 PM
> **To:** Lloyd Selena (DHSS)
> **Cc:** James Carrie (DHSS)
> **Subject:** FW: Unavailable
>
> Selena/Carrie:
>
> I was so mad about this email that I didn't even spell check before I sent it back to Brenda today. Many apologies for the typos @ the very end.
>
> I was so ANGRY, when I submitted this email, that my hands were shaking. Working in customer service is totally like working in Hell with Satan @ the helm.
>
> I am trying to calm down now. I had to cc Tomeka & Lou to "watch my back." Brenda cannot be trusted @ all costs.
>
> Now I am hungry & can't take lunch,
>
> Nancy
>
> P.S. I don't feel a need to go in Brenda's office to speak to her because I may not be able to keep my composure. No need to yell & scream on my part. I guess Brenda is trying to get even for the subpoena testimony that I gave against her on Mar 24.05(Thursday). Unfortunately, she is not going to win. I got "MY BACK!"
>
>
> -----Original Message-----
> **From:** Santana Nancy (DHSS)
> **Sent:** Tuesday, April 05, 2005 1:54 PM
> **To:** Santana Nancy (DHSS)
> **Subject:** FW: Unavailable
>
>
> -----Original Message-----
> **From:** Lester Tomeka (DHSS)
> **Sent:** Tuesday, April 05, 2005 1:52 PM
> **To:** Santana Nancy (DHSS)
> **Subject:** FW: Unavailable

B- 50

*Exhibit 3*

**Santana Nancy (DHSS)**

| | |
|---|---|
| **From:** | James Carrie (DHSS) |
| **Sent:** | Tuesday, April 05, 2005 3:36 PM |
| **To:** | Santana Nancy (DHSS) |
| **Subject:** | xxxx |

Nancy, I get chills everytime I think that this is how the division is letting her run that unit. Nancy, this is a very critical time... do everything by the book until God makes his move. Like you say the Devil can't win....he will be removed maybe not in your time but in his... God is going to take care of you...... and get the "Monkey" off of your back.
Keep every good/bad deed for your record. delete/ delete.

B-51



*Exhibit 4*

# The State *of* Delaware  Employee Performance Review

Name, Job Title: **Nancy Santana, Child Support Specialist I**        [SS#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]
Department-Division-Section: **DHSS/Division of Child Support Enforcement, Customer Service Unit**
Supervisors, Job Title: **Brenda Annand and Stacy Saylor, Child Support Supervisors**
Date, or time period covered: **January 1, 2004-December 31, 2004**

Areas where performance is distinguished or exceeds expectations, if any:

Areas of specific performance deficiencies or unsatisfactory work, if any:

Areas where growth or skills/knowledge development is suggested or needed. If not applicable, please use this space and/or attach summary explanation of how employee met expectations.
**Nancy meets the expectations of the unit. She is professional, courteous to clients, and goes the extra mile to give callers quality customer service. Her notes are thorough and contain the needed information to expedite resolution.**

**Since her last performance review, Nancy's call volume has increased which indicates that she has improved in the area of not getting too involved in a case then she should.**

**One area that Nancy needs to focus on improving is her ability to retain information. In addition, she needs to focus on keeping her email up to date so she is aware of policy changes. CSU is a fast paced environment with constant changes and because of this, emails need to be read in a timely manner. This helps to ensure our customers are receiving consistent, accurate information which in turn, helps prevent complaints.**

**The other area Nancy to to focus on improving is following the unit policies and procedures. This entails notifying supervision when she's unavailable for over 4 minutes and submitting leave requests within 1 hour of return to work after an absence from the office.**

**Nancy needs to focus on retaining information provided to her so once she receives the required training as outlined in the "Career Ladder Workplan", she will be able to move up the career ladder and advance to a CSSII.**

Employee documentation of performance events, comments and/or self-review:

We have met and discussed this document. The employee's overall performance is (Distinguished), (Exceeds Expectations), **(Meets Expectations)**, (Needs Improvement) or is (Unsatisfactory).
*Please circle one*

Employee/date 29Apr05        Evaluator/date 4/29/05        Evaluator/date 4/29/05

Reviewer/date  5/11/05

B-52

BEFORE THE INDUSTRIAL ACCIDENT BOARD
OF THE STATE OF DELAWARE

SUBPOENA DUCES TECUM

Calvin E. Parsons,
      Employee,

     v.                          IAB No. 1257126

Division of Child Support Enforcement,
      Employer,

---

TO:    Nancy Santana
        950 Janvier Court
        Middletown, DE 19709

YOU ARE commanded to appear at the place, date and time specified below:

PLACE:                          DATE and TIME:

Industrial Accident Board               **Thursday, March 24, 2005 at 1:00 p.m.**
Carvel Building
820 North French Street, 2nd Floor
Wilmington, DE 19801

REQUESTING PARTY'S NAME, ADDRESS AND PHONE NUMBER:

Calvin Parson
303 8th Avenue
Wilmington, DE 19805
(302)392-3035

                         Date: 2/18/05

If you object to this subpoena you must immediately contact the Department of Labor, Office of Worker's Compensation and request a hearing to present your objections. Objections may be made if the subpoena (a) fails to allow reasonable time for compliance; (b) requires disclosure of privileged or other protected matter and no exception or waiver applies; or (c) subjects a person to undue burden.

STATEMENT OF SERVICE:
Date of Service: 2/18/05
Manner of Service: 1st Class Mail
Name(s) of person(s) served:

B-53

# INDUSTRIAL ACCIDENT BOARD

## STATE OF DELAWARE

| | | | |
|---|---|---|---|
| CALVIN PARSONS | ) | | |
| | ) | IAB#: | 1257126 |
| vs. | ) | | |
| | ) | Hearing: | 03/24/04 |
| STATE OF DELAWARE | ) | | |

Department of Labor
Division of Industrial Affairs
First Federal Plaza
8th & King Streets
Wilmington, Delaware

BEFORE:          WILLIAM O'BRIEN, Hearing Officer
                 LOWELL GROUNDLAND, Member
                 ANTHONY MUROWANY JR., Member

APPEARANCES:     MS. YEARICK, Representing the Carrier
                 MR. PARSONS, Pro Say

                 CALVIN PARSONS, Claimant

Witnesses:
                 CALVIN PARSONS
                 NICOLE WATERS
                 NANCY SANTANA
                 ERNEST EGGLESTON

## TRANSCRIPT OF HEARING

3-54

Calvin Parsons vs. State of Delaware
Hearing No.:        1257126

# CONTENTS

FIRST REPORT OF INJURY:        08/18/04

PETITION TO DETERMINE COMPENSATION DUE

DATE OF HEARING: 03/24/046

AWARD

APPEAL

DEPOSITION(S)

EXHIBIT(S)

1.    Claimant's Exhibit #1 (Document of Incidents Occurring in Work Place)
2.    Employer's Exhibit #1 (Document of Retirement)
3.    Employer's Exhibit #2 (Performance Review from January 1st, 2003 to December 1st, 2003)

B-55

# INDEX

Page No.

Opening Statement – Calvin Parsons .................................................................. 1

Opening Statement – Ms. Yearick ...................................................................... 3

Direct Testimony of Calvin Parsons .................................................................. 6

Claimant's Exhibit #1
    Document of Incidents Occurring in Work Place ............................................. 9

Direct Exam of Calvin Parsons – Ms. Yearick .................................................. 16

Employer's Exhibit #1
    Document of Retirement .............................................................................. 22

Employer's Exhibit #2
    Performance Review from January 1st, 2003 to December 1st, 2003 ............. 28

Re-Direct Exam of Calvin Parsons .................................................................... 36

Direct Exam of Nicole Waters – Calvin Parsons ................................................ 39

Cross Exam of Nicole Waters - Ms. Yearick ...................................................... 46

Re-Direct Exam of Nicole Waters – Calvin Parsons ........................................... 47

Direct Exam of Nancy Santana – Calvin Parsons .............................................. 49

Re-Direct Exam of Nancy Santana – Calvin Parsons ......................................... 56

Direct Exam of Ernest Eggleston – Calvin Parsons ........................................... 58

Cross Exam of Ernest Eggleston – Ms. Yearick ................................................ 63

B-56

INDUSTRIAL ACCIDENT BOARD

STATE OF DELAWARE


Wilmington, Delaware


TO THE HONORABLE JUDGES OF THE SUPERIOR COURT IN

AND FOR NEW CASTLE COUNTY, STATE OF DELAWARE, I

hereby certify that this is a true and correct copy of the record in

the case of <u>Calvin Parsons vs. State of Delaware.</u>


INDUSTRIAL ACCIDENT BOARD


By _____
                    ADMINISTRATOR


DATE: _____

B-57

1

1    HEARING OFFICER:    This is an Industrial Accident

2    Board hearing conducted in Wilmington Delaware on March 24th, 2004, 2005

3    that is. Present for the Board are Lowell Groundland and Anthony Murowany Jr.

4    I am William O'Brien Hearing Officer for the Board. This is the matter of Calvin

5    Parsons vs. State of Delaware.    This hearing is on Claimant's petition to

6    determine compensation due filed September 23rd, 2004.    The date of the

7    alleged injury is August 18th, 2004. This is IAB number 1257126. The Claimant

8    Calvin Parsons is here pro say.    Danielle Yearick represents the State of

9    Delaware.

10    CALVIN PARSONS:    I am here for mental stress to

11    pursue Workman's Compensation for mental stress. I have a disorder that has

12    been diagnosed as mood disorder adjustment with mixed, mixed with

13    depression and anxiety.

14    HEARING OFFICER:    Are you seeking any particular

15    benefits such as time off from work, medical expenses?

16    CALVIN PARSONS:    I am here for relief Workman's

17    Compensation for the time period that I left the work place till I was released to

18    return to work.

19    BOARD MEMBER:    What    periods    does    that

20    encompass?


B-58

2

| | | |
|---|---|---|
| 1 | CALVIN PARSONS: | August the 18th, 2004 to |

1    CALVIN PARSONS:    August the 18th, 2004 to

2    November 26th.

3    BOARD MEMBER:    You're saying were you out of

4    work during that period of time?

5    CALVIN PARSONS:    Yes.

6    BOARD MEMBER:    November 26th of 2004.

7    HEARING OFFICER:    And do you have a number for

8    medical expenses that you are going to be seeking should you win your claim?

9    CALVIN PARSONS:    No.

10    HEARING OFFICER:    Okay.

11    BOARD MEMBER:    Let me make certain I understand

12    your seeking total disability for that period of time?

13    CALVIN PARSONS:    No.

14    HEARING OFFICER:    Well that would mean lost wages.

15    CALVIN PARSONS:    Lost wages.

16    BOARD MEMBER:    Okay go ahead.

17    HEARING OFFICER:    Okay well just for your

18    information that means today your gonna need to prove that the injury occurred

19    at work, that you have an injury and that, that injury caused you to be out of

20    work during those days.

B-59

3

1    BOARD MEMBER:            You understand that, that's really

2    why we're here alright, sir.  Ms. Yearick.

3    MS. YEARICK:             Yes thank you.   The Employer

4    will present the testimony of Dr. Neil Kay as well as three witnesses and

5    representatives from the Employer including Brenda Annan and will show that

6    there were no sufficient evidence of objective work stressors and we have a

7    perception issue.  As well as through the medical testimony we'll show that the

8    work related issues including performance reviews essentially and disciplinary

9    actions were not substantial cause of the diagnosis.   In addition there is a

10   statute of limitations defense.  Mr. Parsons has identified in his statement of

11   facts and petition with the Industrial Accident Board that was filed of alleged

12   harassment or mental stress from work dating as far back as 2000 and the first

13   report of this was on 8/18/04.

14   BOARD MEMBER:            With  regard  to  the  statute  of

15   limitations defense the Board will withhold the decision in regard to that matter.

16   MS. YEARICK:             I agree I believe it's an issue that

17   will be determined after the testimony.

18   BOARD MEMBER:            Very well thank you.

19   HEARING OFFICER:         Mr. Parsons, you  may  call  your

20   first witness whether that be yourself or your medical witness.

21   CALVIN PARSONS:          I call myself.

B-60

_____    4

1          HEARING OFFICER:          You can take your statement if

2     you want to.

3          BOARD MEMBER:          Remain standing to be sworn in.

4     Put your hand on the Bible.   The testimony that you are about to give is the

5     truth, the whole truth and nothing but the truth?

6          CALVIN PARSONS:          Yes.

7          BOARD MEMBER:          Give us your name and address.

8          CALVIN PARSONS:          My name is Calvin Parsons my

9     address is 10 Hibiscus Road, Middletown, Delaware.

10          BOARD MEMBER:          Please be seated.   Mr. Parsons,

11     before we begin I do want to re-iterate that these microphones do not enhance

12     or amplify the sound and for that they merely record.   So for that reason it is

13     going to be important for you to make an effort to keep your voice elevated so

14     that we can here you and that your testimony is recording okay.

15          CALVIN PARSONS:          Before   I   begin   reading   this

16     statement this is additional information that I would like to submit as testimony

17     and I didn't want to delay the court's time by reading all of this.   I have copies for

18     the attorney as well as the Board okay though it be admitable.

19          HEARING OFFICER:          Can you tell us what it is?

20          CALVIN PARSONS:          It is a currency of incidents that

21     occurred in the work place.

B-61

5

| | | |
|---|---|---|
| 1 | HEARING OFFICER: | It's written out by you? |
| 2 | BOARD MEMBER: | Ms. Yearick. |
| 3 | MS. YEARICK: | I am gonna have to object only |

4    because its not anything I've ever seen despite outstanding request for

5    production of the preparation for today and the testimony today is based upon

6    the submissions that received thus far from Mr. Parson. Obviously he can testify

7    regarding specific incidents at issue. But its difficult for me to say let this

8    evidence in it looks to be rather lengthy piece of paper that I have never seen.

| | | |
|---|---|---|
| 9 | CALVIN PARSONS: | I can sit here and read it. |
| 10 | MS. YEARICK: | So for that reason I have to |

11    object to the admissibility of it.

| | | |
|---|---|---|
| 12 | CALVIN PARSONS: | I can read it then. |
| 13 | BOARD MEMBER: | Well for the purposes of today's |

14    hearing that appears to be a rather lengthy document and I don't think that the

15    Board is going to, how many pages is that?

| | | |
|---|---|---|
| 16 | CALVIN PARSONS: | 20. |
| 17 | BOARD MEMBER: | 20 written pages. |
| 18 | CALVIN PARSONS: | 20 written pages with 26, 27 |

19    occurrences.



6

1    BOARD MEMBER:    I don't think that the Board is

2    going to is there any way that you can shall we say pick out select examples

3    rather then reading that entire document?

4    CALVIN PARSONS:    I'll make an effort.

5    HEARING OFFICER:    If you might want to allow it I

6    mean he this is his day in court I mean.

7    BOARD MEMBER:    I know why don't we do this you

8    have something that you do wish to read that you started to read earlier why

9    don't we do that first okay.

10    MS. YEARICK:    If I could I'd be happy to take a

11    look at the document.  My objection is really I don't know what its contents are it

12    could be here say within here say I'd rather not complicate matters but.

13    BOARD MEMBER:    Lets here your statement first and

14    then we'll deal with that.

15    HEARING OFFICER:    And then we'll let Ms. Yearick

16    take a look at the document.

17    CALVIN PARSONS:    I the Claimant Calvin Parsons

18    declare that I sustained a mental distress from supervisor Brenda Annan while

19    working at the Division of Child Support Enforcement.  She was relentlessly

20    abusive, retaliatory and vindictive in her obsession to manufacture my demise.

21    Ms. Annan's obsessive assaults have caused me such harm that she has

B-63

7

1    damaged my physical and mental state of well being.  Medical documentation

2    has been provided to the Board that clinically diagnoses a severe disorder as

3    disabilitating and requires long term treatment for psychotherapy, psychiatric

4    medication and vocational rehabilitation.   Expert witnesses have been

5    subpoenaed and are here to give testimony of their diagnosis.   Without

6    medication my mind is racy, multiple thoughts are all running together, I am

7    unable to keep a focus concentration and process definitive conclusions, I am

8    jittery, I experience head and facial tension, and adrenaline rushes.  It feels like

9    myself is trying to escape from my body.  With medication I feel lulled into limbo

10   however my physical and mental capacity is strained and reduced to a lower

11   degree of functionality.  Concentration is slightly improved but I have bouts of

12   short term memory loss moments when I can not remember what I was thinking

13   or what I was about to do or hear what someone has just said to me.  I have no

14   history of drug addition nor history of being in a rehab program.  On August 18th,

15   2004 I fled from the work place after reporting to supervisor Brenda Annan that I

16   needed to leave for a medical emergency.  When I arrived at work that morning I

17   was sensing something unusual and abnormal was occurring with my person.  I

18   went to Christiana Hospital and checked in at the emergency unit.   After

19   Christiana examination they gave me an ultimatum to agree to voluntary

20   admission for psychiatric evaluation or they would get an order to commit me for

21   an evaluation.  After they explained the difference I voluntarily agreed and was

B-64

8

1   discharged to the Rockford Center by ambulance.  Upon admission to Rockford

2   my global assessment of functionality scale rating was noted at 30.  Behavior is

3   considerably influenced by delusions or hallucinations or serious impairment in

4   communication or judgment or ability to function in almost all areas.  Admission

5   notes that I was laughing inappropriately and they identified as my stressors as

6   work discrimination and management retaliation.  I will submit documented

7   occurrences as my testimony that date back to 2001 and up to the date of my

8   hospitalization.  Witnesses from the Division have been subpoenaed to give

9   testimony of Ms. Annan's never ending persecution and berating abuse.

10          BOARD MEMBER:              Okay thank you.  Why don't we

11  proceed to let Ms. Yearick.

12          HEARING OFFICER:           Do you want to go off the record

13  for a couple of minutes?

14          BOARD MEMBER:              Yeah.  Excuse me we're back on

15  the record, Ms. Yearick, you've had an opportunity to review the document in

16  question?

17          MS. YEARICK:               I just started I'm on page three

18  and I see multiple, multiple references that would be inadmissible here say.

19  Many individuals that are not here today who have not been identified who I

20  don't know with comments.  And again I'm only page three there are a number

21  of quotes in here from other people and my position this is inadmissible not only

**B-65**

9

1    for its here say but also for prejudice. I haven't had an opportunity to and again

2    for expediency purposes I just initially went through the initial parts of this with to

3    many individuals and alleged quotes from them. So I maintain my objection for

4    the admissibility of this document. My proposal is simply that Mr. Parsons and

5    as with all Claimant's be provided the opportunity to testify as to the specific

6    incidents in which he basis his claim.

7                    HEARING OFFICER:              Alright the Board is going to allow

8    the document as Exhibit Number One. The Board certainly understands the

9    reliability concerns of the Employer and will assign the appropriate weight to any

10   particular statements from dilatants who are not here. We also though instruct

11   the Claimant to go ahead and testify in his own words as to the major incidents

12   at work that form the basis of your claim so that Ms. Yearick will have an

13   opportunity to cross examine you live here today. So we are going to admit the

14   document but a lot of those statements in there were going to look at but there

15   not going to have a lot of weight attached to them if those people aren't here to

16   back it up. But we do want you to know that right now you should go ahead and

17   tell us what the incidents were at work that caused your mental disorder that

18   forms the basis of your claim and then Ms. Yearick will have a chance to cross

19   examine you on those incidents do you understand?

B-66

10

1    MS. YEARICK:    If I could simply to preserve the

2    record note my objection not only in here say but also on prejudice imperative to

3    this document.

4    BOARD MEMBER:    The    Board    recognizes    and

5    understands the nature of your objection.

6    MS. YEARICK:    Thank you.

7    BOARD MEMBER:    Okay,  Mr.  Parsons  are  you

8    prepared to recount the alleged incidents?

9    CALVIN PARSONS:    My    first    encounter    with    Ms.

10    Annan when she was assigned as one of the supervisors in the customer

11    service unit.  She called me into her office and she said to me your reputation

12    precedes you.  I am not going to have any shenanigans out of you and if so you

13    are going to be out of here.  Following that there was an incident where she and

14    Ms. Walters bombarded me and interrogated me for having taken time from

15    work to provide gifts and refreshments for persons who are leaving unemployed.

16    I had been asked to do this by one of the agency managers and given additional

17    permission by one of the supervisors of that unit of my unit.  And they literally

18    told me you're a liar and Ms. Walters said to me that I had told her that I wanted

19    to go home and she said you might as well were not gonna get anything out of

20    you anyway.  Following that there was another occurrence where she called me

21    into her office and she began ranting and yelling and being very loud about

B-67

1    issues regarding everything from A to Z.  It was so bad that everyone in that

2    particular section which is a room about twice this size over heard the

3    conversation and one of the managers had come out and had said something to

4    her boss which is an administrator about Ms. Annan's conduct.    That

5    administrator in turn did a communication with Ms. Annan's boss and Ms.

6    Annan's boss sent me an apology said that she would speak with her about that.

7    I do have a document a record that shows that incident.  Following that there

8    was another occurrence where she had followed me into the break room and

9    created a scene.  She was loud and she was attacking and she was ... and she

10    was all up in my face with her teeth clenched and she was threatening me you

11    shouldn't be in here.  There were several witnesses in there after she departed

12    and they wanted to know what was her problem and I said I don't know and they

13    said well what did you do

14    MS. YEARICK:                Objection here say.

15    BOARD MEMBER:                Sustained explain that to him.

16    HEARING OFFICER:                When you refer to another person

17    and what they said if your relying on the truth of the matter that there asserting

18    in order to make your case and there not here to explain why or what they said

19    then your subject to a here say objection.  And in this case the Board sustained

20    the objection so just tell us in your own words your understanding of what was

21    said and we'll go on from there.  Because what your really talking about is yoru

B-68

12

1    reaction to what was said as opposed to whether what she said was true or not.

2    So you can continue on.

3              CALVIN PARSONS:              Again she went on about me

4    being there shouldn't be there she was going to tell Dianne Walters and how

5    was she going to explain this to the director if he came and he saw me getting

6    coffee and that was that occurrence.  And that went on for about five or ten

7    minutes.  I was at my desk on another occasion and she came in came to my

8    cubicle and again she was very vocal very loud and she was ranting about I had

9    been away from my desk for a period of time which I found that to be true.

10   Because I had not going anywhere I have a witness here today that can testify

11   that, that particular occurrence where she was alleging that I was away from my

12   desk for that period of time was not true.  I received a five day suspension for

13   failure to follow leave procedures.  Prior to a merge hearing Ms. Walters called

14   me into her office and she apologized to me and she said after further review

15   they realized that I had not violated any leave procedure.  But because the

16   matter had been turned over to personal and the hearing was scheduled that

17   they were going to move forward with it.

18             BOARD MEMBER:              Move forward with what, sir?

19             CALVIN PARSONS:              It was a merge hearing I was

20   grieving the decision for a suspension.

21             BOARD MEMBER:              I got you okay thank you.



13

CALVIN PARSONS:                Another occurrence took place at

my desk where she came and she again was loud and vocal and she was

asking me questions about my unavailability and what I was doing.  And what I

was doing was I was responding to an e-mail communication that she had sent

to me and she said well you took to long and you shouldn't of been doing that.

But she was asking me a question which required a response.  On another

occasions she came to me and she asked me if my daughter was living with me

and I said I answered her question and then I asked here why did she ask her

question and she said no reason and she walked off and I thought that was kind

of strange.  About two weeks later she calls me into her office and she tells me

she is putting me on corrective action for performance.   That was around

December of 2003.  About two months after that she called me into her office

and we were discussing the performance plan.  She told me at that time that she

wasn't going to change it.  I went and I talked with some persons at a higher

level about the situation and there was no resolve they.

BOARD MEMBER:                Repeat   what    you're   saying

please.

CALVIN PARSONS:                I   talked   to   some   persons   of

higher authority about that matter and they could not offer me any resolve

accept to seek outside help. Following that meeting we were at the conclusion

of that meeting we were supposed to meet every other week to work on the

**B-70**

1    corrective plan to make sure that I was meeting whatever standards she had set

2    for me. But those meetings did not occur. About a day or two before I was

3    leaving for vacation in July of 2004 June 29th she called me into her office and

4    again we discussed the corrective plan and she said at that time that she was

5    willing to work me and if it killed her she said she was going to get me to a

6    meets expectations to resolve the performance plan.

7            HEARING OFFICER:          I just want to make sure I'm still

8    on the same page the she you're referring to is whom?

9            CALVIN PARSONS:           Brenda    Annan    the    supervisor

10   Brenda Annan.

11           HEARING OFFICER:          Thank you.

12           CALVIN PARSONS:           Following that meeting it was a

13   holiday weekend July 4th. I was on vacation for seven days. On my return to

14   work I was told that my termination was discussed at a direct reports meeting. I

15   found that kind of surprising cause we had just met prior to my leaving for

16   vacation and she had just said she was working with me to ensure that I was

17   going to meet expectations. About a week after my return she called me in and

18   she said I've had it I can't do it no more you leave me no choice and I'm looking

19   at her and I'm not understanding where she's going with that. But she says I'm

20   submitting a proposal for your termination. My impression is that the

B-71

15

1   occurrences that took place following the five day suspension were actions of

2   retaliation.

3                   BOARD MEMBER:              Just something missing here and

4   I can pick up on it.  You say that Ms. Annan was recommending your termination

5   then you said something about suspension.  When did the suspension occur?

6                   CALVIN PARSONS:            The suspension was proposed

7   around May of 2002.

8                   BOARD MEMBER:              Okay.

9                   CALVIN PARSONS:            The date that they said I created

10  the infraction was April the 15th.  The grievance process for that took a full year

11  of preparation and back and forth, and back and forth and lawyers and da, da,

12  da, da, da.  And right around that time is when is started to experience a great

13  deal of stress.  And from that time forward it just didn't seem it's nothing I did or

14  anything I could do that was going to change her attitude towards me.  I have

15  one more occurrence that I would like to just give you.  In August of 2004 she

16  came to me ranting and yelling about she came to me yelling Ms. Annan came

17  to me yelling about the break policy and she asked me why was I signed out for

18  break.  And I told her that I was out having a cigarette.  She said well the break

19  process stipulates at particular times she said if you're going to be out beyond

20  that you need to let me know.  And but there were earlier communications that if

21  we were tied up with our phone calls at the break time then we would be given

B-72

16

1    consideration to again take the break. When I arrived outside there was another

2    co-worker from my unit that was out there. I re-entered the building and he was

3    still out there. Upon my re-entry I checked the sign out sheet for breaks and he

4    was not signed out for a break. When he eventually returned into the building I

5    asked him had he been approached about being away from his desk or about

6    being outside on a break and he said no. I asked him if he was ever

7    approached about that and he says no he never signs out for break and he

8    never has been chastised about it. I do remember in a meeting with Ms. Annan

9    in her office and Ms. Walters her making a comment about because I brought

10   that up at that time and she said oh well he's just having a quick cigarette break

11   so it's no big deal.

12            BOARD MEMBER:              Okay does that complete your

13   testimony at this time?

14            CALVIN PARSONS:            At this time yes.

15            BOARD MEMBER:              Ms. Yearick has the opportunity

16   to examine you.

17            MS. YEARICK:               Good afternoon, Mr. Parsons.

18   Your job consisted of monitoring and taking telephone calls correct?

19            CALVIN PARSONS:            Yes.

20            MS. YEARICK:               And what was the importance of

21   that job of your job duties?

B-73

17

1      CALVIN PARSONS:              Customer satisfaction.

2      MS. YEARICK:                 Did you have any other duties

3      besides taking phone calls and taking information from those calls?

4      BOARD MEMBER:                I'm having a little trouble hearing

5      you Ms. Yearick.

6      MS. YEARICK:                 Sure that's unusual I'm sorry.

7      BOARD MEMBER:                That's okay.

8      CALVIN PARSONS:              Would you repeat your question?

9      MS. YEARICK:                 I will what were your other duties

10     if any other then taking incoming telephone calls to take information on clients?

11     CALVIN PARSONS:              Duties in relation to what?

12     MS. YEARICK:                 What were your job duties, sir?

13     CALVIN PARSONS:              Answer the phone.

14     MS. YEARICK:                 Did you have any other?

15     CALVIN PARSONS:              We kept a record of the calls we

16     took we received I provided assistance to the child support specialists ones and

17     twos.

18     MS. YEARICK:                 And how long had you been

19     working with this facility as of 2004?

20     CALVIN PARSONS:              14 years.

B-74

18

1    MS. YEARICK:        You're familiar with the policies,

2    guidelines and your requirements as an employee?

3    CALVIN PARSONS:        I knew what my job was.

4    MS. YEARICK:        Before the form that you

5    completed in 2004 had you submitted a similar report of injury or Worker's

6    Compensation claim for the treatment or stress or anxiety that you are alleging

7    you received from Ms. Annan from Ms. Walter's for the past three years?

8    CALVIN PARSONS:        I submitted a note from a doctor

9    for a visit that I had with him and he treated me for work stress and prescribed

10    medication.

11    MS. YEARICK:        And when was that?

12    CALVIN PARSONS:        June.

13    MS. YEARICK:        Of what year?

14    CALVIN PARSONS:        2004.

15    MS. YEARICK:        The other treatment that you

16    referenced goes as far as back at least until 2002 had you submitted any forms

17    or issued any written reports of stress claims back then?

18    CALVIN PARSONS:        No.

19    MS. YEARICK:        When did Ms. Annan first

20    become your supervisor?

21    CALVIN PARSONS:        2001.

B-75

19

1      MS. YEARICK:                And is that when your problems

2   with stress and anxiety began?

3      CALVIN PARSONS:            No.

4      MS. YEARICK:                Was she treating you okay in

5   2001?

6      CALVIN PARSONS:            No.

7      MS. YEARICK:                Did you ask to be transferred at

8   any point?

9      CALVIN PARSONS:            I talked with some other persons

10  about getting out and they said that it was probably not going to be doable.

11     MS. YEARICK:                So did you fill out a transfer

12  request form of any kind?

13     CALVIN PARSONS:            We don't have a transfer request

14  form.

15     MS. YEARICK:                Did you take any formal action to

16  be transferred from 2001 up through 2004?

17     CALVIN PARSONS:            I asked I verbally asked.

18     MS. YEARICK:                Who did you ask?

19     CALVIN PARSONS:            I asked the administrator for

20  operations about a vacancy that she had.

B-76

20

1          MS. YEARICK:           So you were looking for a

2  different position an opening?

3          CALVIN PARSONS:        Again I was still where all child

4  support specialist I still would have been a child support specialist.

5          MS. YEARICK:           And who was this person that you

6  asked?

7          CALVIN PARSONS:        Linda Murphy.

8          MS. YEARICK:           Did you ask for a transfer from

9  anybody else at any other time between 2001 and 2004?

10          CALVIN PARSONS:        I made other inquiries with other

11  supervisors if they had any vacancies within there unit.

12          MS. YEARICK:           Sir, you had prepared and

13  provided to me a letter of retirement dated August 31st, 2004 to the State of

14  Delaware did you prepare that document?  If you need I'll show it to you.

15          CALVIN PARSONS:        Yes I did.

16          MS. YEARICK:           Can you read that document as

17  you wrote it to the Board?

18          CALVIN PARSONS:        This document was never

19  officially submitted.

20          MS. YEARICK:           Could you read that document

21  that you prepared please?

B-77

1    CALVIN PARSONS:          That I prepared.  I regret having

2  to leave but I am currently experiencing medical issues that prevent me from

3  continuing in my current position.   My decision to leave is based on both

4  personal and professional reasons but please understand that I have thoroughly

5  enjoyed my employment with the State of Delaware.  It is my hope that the State

6  of Delaware will consider me for future employment if I am able to recover from

7  my medical condition.

8    MS. YEARICK:             And that letter is dated August

9  31st, 2004 correct?

10    CALVIN PARSONS:          Yes.

11    MS. YEARICK:             I'd like to submit this document

12  as Employer's Exhibit Number One.

13    CALVIN PARSONS:          Objection I did not officially

14  submit the letter.

15    MS. YEARICK:             Mr. Parsons has acknowledged

16  he's prepared the document acknowledged it as his own therefore it's a

17  representation prepared by him and produced to me that's the purpose of its

18  admissibility.

19    CALVIN PARSONS:          I did not submit the letter.

20    BOARD MEMBER:            How did the letter come into your

21  possession?


B-78

22

1       MS. YEARICK:       It was produced to me from I

2  believe documentations from Mr. Parsons.  It is a letter acknowledged to have

3  been written drafted prepared by him it's a representation and an admission on

4  behalf of the Claimant.

5       BOARD MEMBER:      Over ruled we'll allow it in and

6  give it its appropriate weight between deliberations.

7       MS. YEARICK:       Thank you.

8       HEARING OFFICER:     We'll call this Employer's One.

9       MS. YEARICK:       Sir, if I understood your testimony

10  correctly and correct me if I'm wrong you believe the mistreatment began after

11  your five day suspension in 2002?

12       CALVIN PARSONS:     No.

13       MS. YEARICK:       When did your mistreatment

14  begin then, sir?

15       CALVIN PARSONS:     2001.

16       MS. YEARICK:       And what was that mistreatment

17  in 2001?

18       CALVIN PARSONS:     Harassment.

19       MS. YEARICK:       And who was harassing you?

20       CALVIN PARSONS:     Brenda Annan.


B-79

23

1    MS. YEARICK:    And did you file some form of

2    complaint with the employment EEOC or with another supervisor?

3    CALVIN PARSONS:    I had conversations with persons

4    at a higher level.

5    MS. YEARICK:    That wasn't my question, sir, my

6    question was whether you filed any specific claim an EEOC or with another

7    supervisor or a higher entity?

8    CALVIN PARSONS:    Not with the EEOC at that time.

9    MS. YEARICK:    Did you file a specific claim in

10   2001 against Brenda Annan to anyone?

11   CALVIN PARSONS:    No I made verbal complaints.

12   MS. YEARICK:    You were disciplined and had

13   poor performance reviews even before Brenda Annan became your supervisor

14   am I correct?

15   CALVIN PARSONS:    No.

16   MS. YEARICK:    You were not suspended before

17   2001?

18   CALVIN PARSONS:    Yes.

19   MS. YEARICK:    You were suspended before

20   2001?

B-80

24

1    CALVIN PARSONS:    I had been suspended previously

2    but that's not a performance review.

3    MS. YEARICK:    Okay had you received any

4    needs improvement or unacceptable or does not meet standards performance

5    reviews before 2001?

6    CALVIN PARSONS:    I'm sorry repeat it again?

7    MS. YEARICK:    Sure had any of your

8    performance reviews before 2001 not met standards in other words they came

9    out as needs improvement or didn't meet expectations?

10    CALVIN PARSONS:    No.

11    MS. YEARICK:    And what had you been

12    suspended for before 2001?

13    CALVIN PARSONS:    You have the record.

14    MS. YEARICK:    Well you already told me you

15    were suspended you don't remember why?

16    CALVIN PARSONS:    I got a one day suspension for

17    they said it was being on the phone to long.

18    MS. YEARICK:    Had you had any other

19    suspensions or disciplinary actions before 2001?

20    CALVIN PARSONS:    Yes.

B-81

25

1    MS. YEARICK:    Okay what were you disciplined

2    for before 2001?

3    CALVIN PARSONS:    I left the premises. I left our state

4    facility to go to another state facility.

5    MS. YEARICK:    Barbara Lamont was at one point

6    your supervisor in 1998 correct?

7    CALVIN PARSONS:    Yes.

8    MS. YEARICK:    Barbara Lamont gave you an

9    unsatisfactory performance review in 1998 and you had unauthorized absences

10   do you remember that?

11   CALVIN PARSONS:    I remember unauthorized

12   absence.

13   MS. YEARICK:    You do remember that?

14   CALVIN PARSONS:    An unauthorized absence.

15   MS. YEARICK:    What was the disciplinary action

16   the suspension in 2002 for?

17   CALVIN PARSONS:    In 2002?

18   MS. YEARICK:    The five day suspension?

19   CALVIN PARSONS:    Failure to adhere to follow proper

20   leave policy.


B-82

26

1          MS. YEARICK:          And did you fail to follow proper

2    policy?

3          CALVIN PARSONS:       No.

4          MS. YEARICK:          Did you go to your supervisor

5    Joyce first and ask for a leave of absence on this day to attend a defensive

6    driving class?

7          CALVIN PARSONS:       No.

8          MS. YEARICK:          Why did you miss that day it was

9    not to go to a defensive driving class?

10         CALVIN PARSONS:       I called in the policy for non-

11   emergency leave.  If you are not coming to work you needed to notify the office I

12   notified the office.

13         MS. YEARICK:          Why did you get suspended for

14   five days?

15         CALVIN PARSONS:       I don't know.

16         MS. YEARICK:          You believe that it was retaliation

17   to you for something?

18         CALVIN PARSONS:       Yes.

19         MS. YEARICK:          Did you suffer harassment of

20   mistreatment from Dianne Walters?

21         CALVIN PARSONS:       No.

B-83

27

| | | |
|---|---|---|
| 1 | MS. YEARICK: | So your allegations are only |
| 2 | against Brenda Annan? | |
| 3 | CALVIN PARSONS: | Yes. |
| 4 | MS. YEARICK: | You were given performance |
| 5 | reviews by Brenda Annan correct? | |
| 6 | CALVIN PARSONS: | Yes. |
| 7 | MS. YEARICK: | And when you were given |
| 8 | performance reviews you had an opportunity to go over those performance | |
| 9 | reviews and make your own comments on them correct? | |
| 10 | CALVIN PARSONS: | Yes. |
| 11 | MS. YEARICK: | Sir, I am going to show you a |
| 12 | performance review from January 1st, 2003 to December 1st, 2003. If you look | |
| 13 | at the second page you signed that document correct? | |
| 14 | CALVIN PARSONS: | Yes. |
| 15 | MS. YEARICK: | And Brenda Annan and Dianne |
| 16 | Walters signed that document as well? | |
| 17 | CALVIN PARSONS: | Yes. |
| 18 | MS. YEARICK: | And it was an unsatisfactory |
| 19 | performance review? | |
| 20 | CALVIN PARSONS: | Yes. |

B-84

28

1        MS. YEARICK:              And where you have an

2    opportunity to make any comments you made none correct?

3        CALVIN PARSONS:           At that time yes it was my focus

4    to try and mend the fence and not make any further waves or cost myself any

5    unnecessary attention to get out from under that ugliness that I was receiving

6    from Ms. Annan.

7        MS. YEARICK:              I'd like to have this document

8    marked as Employer's Exhibit Number Two.

9        HEARING OFFICER:          So marked.

10       MS. YEARICK:              Thank you.

11       HEARING OFFICER:          This is marked for identification

12   purposes.

13       MS. YEARICK:              Your suspension in 2002 was

14   confirmed by Charles Hayward by letter to you in July of 2002 correct?

15       CALVIN PARSONS:           If you say so if that's the letter.

16       MS. YEARICK:              Sure I'll show you the letter.  Do

17   you remember receiving that letter?

18       CALVIN PARSONS:           I remember getting a letter yes.

19       MS. YEARICK:              And who is Charles Hayward?

20       CALVIN PARSONS:           He is the director.



29

1        MS. YEARICK:            Okay and do you have any

2 claims of harassment of mistreatment or that you believe he gave to you did he

3 mistreat you or harass you?

4        CALVIN PARSONS:       No.

5        MS. YEARICK:            He confirmed your five day

6 suspension correct?

7        CALVIN PARSONS:       Yes.

8        MS. YEARICK:            And you don't really know why

9 you were suspended?

10        CALVIN PARSONS:       No I don't they again the charge

11 was failure to adhere to leave policy I adhered to it.

12        MS. YEARICK:            Do you know what policies you

13 were told by Brenda to have violated?

14        CALVIN PARSONS:       Again the document says leave.

15        MS. YEARICK:            How about your performance

16 reviews in 2003 with the policy issues and the reprimands that you said Brenda

17 Annan was giving , was issuing to you do you know what you were doing wrong

18 if anything?

19        CALVIN PARSONS:       I read that document this one I

20 read it.



30

1    MS. YEARICK:                    How about any of these other

2    instances that you walked us through were you violating any policies on any of

3    those occasions?

4    CALVIN PARSONS:                 No I'm not sure which occasions

5    you're talking about.

6    MS. YEARICK:                    Well were any of them warranted

7    in your mind?

8    CALVIN PARSONS:                 What?

9    MS. YEARICK:                    Any of these instances you've

10    outlined to the Board you outlined about 11 instances in which Brenda Annan

11    approached you?

12    CALVIN PARSONS:                 Did they occur is that your

13    question?

14    MS. YEARICK:                    No were any of them justified in

15    your mind in other words had you done something wrong in any of those

16    instances?

17    CALVIN PARSONS:                 No.

18    MS. YEARICK:                    Sir, you specifically denied in

19    your statement that you initially were reading into the Industrial Accident Board

20    any substance abuse. Your medical records from Rockford Center indicate that

21    you were in rehabilitation for cocaine addiction for 11 years so that's wrong?

B-87

31

1        CALVIN PARSONS:          Wrong that is incorrect.

2        MS. YEARICK:             You did not have a problem with

3   cocaine addiction?

4        CALVIN PARSONS:          No, ma'am.

5        MS. YEARICK:             You did not have any substance

6   abuse issues with cocaine?

7        CALVIN PARSONS:          No, ma'am.

8        MS. YEARICK:             You have no idea why that would

9   be in the records?

10       CALVIN PARSONS:          I do not.

11       MS. YEARICK:             Your statement of facts that you

12  submitted when you filed this petition with the Industrial Accident Board

13  indicates in 2000 you had panic attacks and anxiety due to job stress what was

14  the cause of that in 2000? I'll show you the file and you can read it.

15       CALVIN PARSONS:          Tell me what this document is?

16       MS. YEARICK:             That's your statement of facts, sir

17  that you filed with the Industrial Accident Board.

18       CALVIN PARSONS:          Yes that is my handwriting.

19       MS. YEARICK:             And what was the job related

20  stressor that caused the panic attacks that you reference in 2000?


B-88

1            CALVIN PARSONS:        The treatment from Brenda

2    Annan.

3            MS. YEARICK:          And did you file a claim with the

4    Worker's Compensation or with your employer at that time?

5            CALVIN PARSONS:        No.

6            MS. YEARICK:          Okay you next identify in 2001

7    panic attacks and anxiety due to job stress correct?

8            CALVIN PARSONS:        Yes.

9            MS. YEARICK:          And what was the job stress what

10   was the incident or incidents then in 2001?

11           CALVIN PARSONS:        Again it was the treatment that I

12   was experiencing in the work place.

13           MS. YEARICK:         And did you file a Worker's

14   Compensation claim or report an injury with the employer then?

15           CALVIN PARSONS:        No but I did go and get a visit

16   with the doctor.

17           MS. YEARICK:         And then you next refer to 2002

18   for panic attacks and anxiety from job stress correct?

19           CALVIN PARSONS:        Yes.

20           MS. YEARICK:         And did you file a Worker's

21   Compensation claim or report of injury that year?

B-89

1      CALVIN PARSONS:          No.

2      MS. YEARICK:             You next refer to 2003 panic

3  attacks and anxiety for job stress did you file a Worker's Compensation claim or

4  report of injury then?

5      CALVIN PARSONS:          No.

6      MS. YEARICK:             Your first report of injury that was

7  filed was in 2004 which is your last reference for panic attacks and anxiety for

8  job stress correct?

9      CALVIN PARSONS:          Yes.

10     MS. YEARICK:             You treated with Dr. Alvin Turner

11 in 2001?

12     CALVIN PARSONS:          Yes.

13     MS. YEARICK:             And you treated with him for job

14 stress?

15     CALVIN PARSONS:          Yes.

16     MS. YEARICK:             That's your opinion?

17     CALVIN PARSONS:          Yes I saw Dr. Turner in 2001

18 under an order of the court for anger management.

19     MS. YEARICK:             You were given a court order for

20 anger management correct?

21     CALVIN PARSONS:          Yes.

B-90

34

1          MS. YEARICK:              And that was for domestic abuse

2    issues with your spouse correct?

3          CALVIN PARSONS:           Yes.

4          MS. YEARICK:              Did   you   believe   you   needed

5    anger management?

6          CALVIN PARSONS:           No.

7          MS. YEARICK:              You had psychiatric treatment in

8    1993 and 1994 according to your response to request for production with Dr. Jay

9    Weisberg?

10         CALVIN PARSONS:           No.

11         MS. YEARICK:              I am going to show you a copy of

12   your response to request for production that you provided to me.  That's your

13   signature?

14         CALVIN PARSONS:           You      said      for      psychiatric

15   treatment.

16         MS. YEARICK:              It says 1993 to 1994 Dr. Jay

17   Weisberg psychiatry?

18         CALVIN PARSONS:           Yes.

19         MS. YEARICK:              What treatment did you receive

20   from that psychiatrist?

B-91

1    CALVIN PARSONS:        He gave me medication for

2    chemical imbalance.

3    MS. YEARICK:        And you saw Dr. Patricia Liffratt

4    psychiatry in 1994 as well?

5    CALVIN PARSONS:        Yes.

6    MS. YEARICK:        And what was that for?

7    CALVIN PARSONS:        It was a follow up from treating

8    with Weisberg.

9    MS. YEARICK:        For a chemical imbalance?

10    CALVIN PARSONS:        Yes.

11    MS. YEARICK:        You had physical you had injured

12    yourself your knee or another part of your body while working in the course of

13    your employment correct over the years?

14    CALVIN PARSONS:        Yes.

15    MS. YEARICK:        Okay you filled out a first report of

16    injury and a Worker's Compensation claim at that time correct?

17    CALVIN PARSONS:        Yes.

18    MS. YEARICK:        That's all the questions I have

19    thank you.

20    CALVIN PARSONS:        No prior claims were filed

21    because I didn't know I could Department of Labor informed me that, that was

B-92

36

1   something I could file a claim for up until that time no one had informed me that,

2   that was something I could submit a claim for.

3         HEARING OFFICER:          Mr. Parsons this is your

4   opportunity to further explain anything that Ms. Yearick brought out on cross

5   examination.   For instance the Board accepted as an Employer's Exhibit

6   Number One your letter of retirement although you did indicate that you had not

7   submitted this.   If you wanted to further explain that situation you could or

8   anything else that you talked about with Ms. Yearick.

9         CALVIN PARSONS:          I had prepared that document

10  with the Intention of going and getting information about that process and how it

11  worked from my human resource department. I showed them the letter and they

12  reviewed and we sat down and we talked about what that meant and they gave

13  ~~me a recommendation not to do it.~~ As she said the letter is not signed.

14        HEARING OFFICER:          Is there anything else you like to

15  explain for re-direct?

16        CALVIN PARSONS:          I don't remember what she said.

17        BOARD MEMBER:          Is there anything else pertaining

18  to the questions that you were asked by Ms. Yearick that you feel requires

19  further explanation or clarification?

20        CALVIN PARSONS:          Again I don't remember what she

21  said.

B-93

1        BOARD MEMBER:            When you say that they had

2    arguments with you when the problem was from A to Z what do you mean by

3    that?

4        CALVIN PARSONS:          There was an occasion she had

5    attacked me for going to the bathroom, there was several occasions she had

6    attacked me for getting coffee, there were several occasions she attacked me

7    while I was on break and she said she didn't see me or she didn't see me sign in

8    or she had looked at the sheet.

9        BOARD MEMBER:            Are you working now?

10        CALVIN PARSONS:          No.

11        BOARD MEMBER:            Did they have a schedule on how

12    long it would take for coffee and for bathroom and so forth?

13        CALVIN PARSONS:          No.

14        BOARD MEMBER:            For breaks there was nothing?

15        CALVIN PARSONS:          Break ten minutes.

16        BOARD MEMBER:            Ten minutes.

17        CALVIN PARSONS:          There is no restrictions for getting

18    coffee or going to the bathroom or getting water.

19        BOARD MEMBER:            Did you have a problem taking

20    orders from people?

21        CALVIN PARSONS:          No.

B-94

38

1    BOARD MEMBER:    It appears that you know you sort

2    of disagree with almost everything they had to say?

3    CALVIN PARSONS:    No I don't have a problem taking

4    orders 14 years it would have showed.

5    BOARD MEMBER:    Is there a Union in this company

6    of yours?

7    CALVIN PARSONS:    No.

8    BOARD MEMBER:    Thank you that's all.

9    HEARING OFFICER:    Just the last day that you worked

10    for the State what was that date do you have the dates?

11    CALVIN PARSONS:    August the 18th.

12    HEARING OFFICER:    Of 2004?

13    CALVIN PARSONS:    Yes, sir.

14    HEARING OFFICER:    And you're claiming that you've

15    been out of work based on your stress claim since that date?

16    CALVIN PARSONS:    I left the work place because of

17    that I did get a temporary assignment in December after I got the notice for

18    termination.

19    HEARING OFFICER:    Is that with the State?

20    CALVIN PARSONS:    No that was through a temp

21    agency.

B-95

39

| | | |
|---|---|---|
| 1 | HEARING OFFICER: | Do you know how long that |
| 2 | lasted? | |
| 3 | CALVIN PARSONS: | About three weeks. |
| 4 | HEARING OFFICER: | And August 18th, 2004 was the |
| 5 | effective date of your termination from the State? | |
| 6 | CALVIN PARSONS: | I received a letter and I think it |
| 7 | was dated December 1st. I asked for a letter to return to work and I received | |
| 8 | that after being evaluated and it was dated for November 26th. So it was about | |
| 9 | that time and I made that request and insisted on that from the doctor at that | |
| 10 | time because I had no income. But it was against his medical advice. | |
| 11 | BOARD MEMBER: | Alright, sir, you can return to your |
| 12 | seat if you will. Please remain standing to be sworn if you will please. Put your | |
| 13 | right hand on the Bible. The testimony that you are about to give is the truth, the | |
| 14 | whole truth and nothing but the truth? | |
| 15 | NICOLE WATERS: | Yes. |
| 16 | BOARD MEMBER: | Give us your name and address? |
| 17 | NICOLE WATERS: | Nicole Waters 552 Janvier Drive |
| 18 | Middletown Delaware. | |
| 19 | BOARD MEMBER: | Please be seated. Please spell |
| 20 | your last name? | |
| 21 | NICOLE WATERS: | Waters. |

B-96

40

1        BOARD MEMBER:            Thank you your witness.

2        CALVIN PARSONS:          Ms. Waters how do you know

3    me?

4        NICOLE WATERS:           I worked with you when I was

5    employed with the Division of Child Support Enforcement.

6        CALVIN PARSONS:          And how long have you known

7    me?

8        NICOLE WATERS:           I came there in November of

9    1991 so I've known you since I'm sorry 2001 I'm sorry.

10       CALVIN PARSONS:          And was Brenda Annan the

11   supervisor of the customer service unit while you were there?

12       NICOLE WATERS:           Yes she was.

13       CALVIN PARSONS:          During the first years that we

14   worked together would you describe my character?

15       NICOLE WATERS:           Sure you were the person who

16   trained me you were my team leader I sat next to you and Ernie I was between

17   the both of you.  We never had any problems I came to you virtually every day

18   for assistance so you trained me in that position.   I felt you were very

19   knowledgeable of child support their policy and procedure easy going.  You

20   never once acted like I got on your nerves for asking you questions over and

21   over again.

B-97

41

1    CALVIN PARSONS:    Did I ever give you the

2    impression of being aggressive?

3    NICOLE WATERS:    No not at all.

4    . CALVIN PARSONS:    Okay while you were employed

5    there can you describe the atmosphere at work?

6    NICOLE WATERS:    Sure when I first came there I

7    was pregnant I just found out that I was pregnant and I was in the customer

8    service unit. The first two weeks of being there and being in my training I really

9    questioned my decision to come there. I had even thought about perhaps going

10   back to my old position and they had informed me that it was open if I wanted to

11   come back. But I took advantage of child support for the career ladder so I

12   decided to try to stick it out. But I just noticed that there didn't seem to be a lot

13   of comradely amongst everyone there trust.

14   CALVIN PARSONS:    So would you say it's clickish?

15   NICOLE WATERS:    Yes I would say that.

16   CALVIN PARSONS:    Is it racially clickish?

17   NICOLE WATERS:    I can't really say that I kind of

18   kept to myself tried not to get into any clicks tried to you know just treat

19   everybody the same.

20   CALVIN PARSONS:    Did you observe any difference in

21   treatment between different groups?

B-98

42

| | | |
|---|---|---|
| 1 | NICOLE WATERS: | Towards the end yes. |
| 2 | CALVIN PARSONS: | And was Ms. Annan your |
| 3 | supervisor you did say yes for that question? | |
| 4 | NICOLE WATERS: | Yes she was. |
| 5 | CALVIN PARSONS: | Did you have any confrontations |
| 6 | with Ms. Annan? | |
| 7 | MS. YEARICK: | Objection relevance. |
| 8 | HEARING OFFICER: | Mr. Parsons if you could just try |
| 9 | to describe for the Board what it is about your claim that you hoping to support | |
| 10 | with this line of questioning why is this relevant? | |
| 11 | CALVIN PARSONS: | I wanted to establish that there is |
| 12 | a pattern of behavior with Ms. Annan and it was experienced by other persons. | |
| 13 | BOARD MEMBER: | Over ruled. |
| 14 | HEARING OFFICER: | That means you're allowed to |
| 15 | answer the question. | |
| 16 | NICOLE WATERS: | Okay. |
| 17 | CALVIN PARSONS: | And the question was did you |
| 18 | ever have any conflicts or confrontation with Ms. Annan? | |
| 19 | NICOLE WATERS: | Yes I did. |
| 20 | CALVIN PARSONS: | Would you explain? |

B-99

1    NICOLE WATERS:    Sure it was one day I there I was

2    at my desk and I was trying to get in touch with my son's doctor because we

3    were trying to get together for a doctor's appointment and I kept missing the

4    doctor and the nurse kept missing me. And on this particular day she got me I

5    went on unavailable in my phone cube and at the time there were no calls in the

6    cube. I took the call to talk to the nurse and Ms. Annan came around to my desk

7    after about three minutes and began yelling at me so much to the point that the

8    nurse on the other end was like what's going on is it okay because she could

9    hear the trembling in my voice because I was very upset. And I told her I'm

10   gonna have to call you back when I get home and she said okay. When I hung

11   up the phone and everybody could hear and I was embarrassed.

12   CALVIN PARSONS:    I'm sorry you were saying she

13   was doing this while you were on the phone?

14   NICOLE WATERS:    Yes I was on the phone when

15   she came there and it hurt me because I was not a person who took advantage

16   of phone time I was very seldom ever on the phone like that.

17   CALVIN PARSONS:    Have you ever witnessed Ms.

18   Annan take this kind of behavior or attitude with any other employee's?

19   NICOLE WATERS:    Yes.

20   CALVIN PARSONS:    Did you witness her take that kind

21   of behavior and attitude with me?

B-100

44

1    NICOLE WATERS:        Yes.

2    CALVIN PARSONS:        Do you recall and incident where

3    Ms. Annan appeared at my cubicle and accused me of being away from my

4    desk when I wasn't?

5    NICOLE WATERS:        There were several times I didn't

6    document times that she came to your cubicle but I can recall times that she had

7    come to your cubicle talking to you and after she would leave you'd say wasn't I

8    sitting here.  And at one time I felt well maybe is something wrong with your

9    phone because you are sitting there and you're not on the phone I don't know

10   why she would perceive that you're not at your desk.

11   CALVIN PARSONS:        About how often did you witness

12   this kind of behavior from Ms. Annan?

13   NICOLE WATERS:        Enough to the point where when

14   that day it happened with Brenda and I, I actually went to her office and when I

15   went to her office cause I couldn't get back on the phone I was just so upset and

16   I did not want to take a call and treat a person any type of way because I was

17   upset.  And I went to her office and over heard her talking about me to another

18   co-worker and I just stood there I was shocked I couldn't believe it.  And I went

19   into her office and at that time she was her voice was loud and she does have a

20   hearing problem and I understand that my grandmother has a hearing problem

21   but I feel your tone and the infliction in your voice it wasn't just loud it was loud

B-101

1    and rude.  And at that time that's when I did explain to Ms. Annan that I felt her

2    behavior was unprofessional and that I noticed on other accounts where she

3    was unprofessional and that I could not work in an environment like that and I

4    would be looking for another job.

5              CALVIN PARSONS:              There is something I want to ask

6    you in regards to the start times.  Do you recall a memorandum or a minutes

7    meeting talking about the start time was it 8:00 the phones go on at 8:00 but

8    there was a grace period in which to prepare yourself the days work?

9              NICOLE WATERS:              I'm sorry I don't quite recall.

10             CALVIN PARSONS:              There was a meeting with the

11   child support specialist and the supervisors.  After that meeting it was agreed

12   that the phones would come on ten minutes after the hour of 8:00 do you recall

13   that?

14             NICOLE WATERS:              I don't recall it...

15             BOARD MEMBER:              Excuse me your going to have to

16   speak up we tried to communicate this before but its difficult for us to hear you

17   as your voice is presented to me so try to remember that.

18             CALVIN PARSONS:              Yes.

19             NICOLE WATERS:              I don't recall the memorandum I

20   road the van so normally I was there quarter of logged on and normally one of

B - 102

46

1    the first couple to be logged on.   So I really don't I don't remember the

2    memorandum I really don't sorry.

3            CALVIN PARSONS:            Do you ever recall Ms. Annan

4    having issues with persons getting coffee or being in the break room?

5            NICOLE WATERS:            Again I'm sorry but normally

6    when I went in it got to the point where I just didn't like being there I went to my

7    desk logged on and sat there and tried to just things around me to just block

8    them out.  I know that people were still getting yelled at and I heard conversation

9    all the time but I'm sorry I don't really remember.

10            CALVIN PARSONS:            But did you witness her having a

11    conversation with me or a yelling session with me about the coffee?

12            NICOLE WATERS:            Was this I've experienced yelling

13    sessions I can't say...

14            CALVIN PARSONS:            What they were about.

15            NICOLE WATERS:            Exactly what it was.  When you

16    were moved across the room I kind of you know didn't hear as much because

17    you were farther away.  When you were across from me that's when I noticed

18    and was able to hear things.

19            CALVIN PARSONS:            So was your decision to leave

20    influenced by Ms. Annan?

21            NICOLE WATERS:            Yes.

B-103

47

1      CALVIN PARSONS:              No further questions.

2      BOARD MEMBER:                Thank you cross examination.

3      MS. YEARICK:                 Ms. Waters, hi my name is

4  Danielle Yearick. You started there in 2001 and you worked with Mr. Parsons?

5      NICOLE WATERS:               Yes I believe it was 2001.

6      MS. YEARICK:                 And was it in 2001 at some point

7  that he was moved to a different area in the office?

8      NICOLE WATERS:               No he didn't get moved until later

9  much later. It was when we were in the new building and we had been in the

10  new building for some time before he was moved.

11      MS. YEARICK:                 When did you leave?

12      NICOLE WATERS:               I left in 2004 May of 2004.

13      MS. YEARICK:                 Were you ever involved or

14  participated in any of the performance reviews or meetings with Mr. Parson and

15  his supervisors?

16      NICOLE WATERS:               No.

17      MS. YEARICK:                 And after the incident you had

18  with Ms. Annan you approached her went to her office and talked to her about it

19  correct?

20      NICOLE WATERS:               Yes.


B-104

48

1    MS. YEARICK:            That's all the questions I have
2  thank you.

3    BOARD MEMBER:           Anything further Mr. Parsons.

4    CALVIN PARSONS:         Ms. Waters, while you were a
5  member of my team and I was your team leader I used to prepare your
6  performance review.    Were there any differences in the reviews that you
7  received from me versus the reviews you received from Ms. Annan?

8    NICOLE WATERS:          The reviews as far as my calls
9  and how I, I can't really compare those two reviews your talking about my
10  evaluations my reviews.  No I mean you were my team leader those reviews
11  were smaller so I can't really.

12    CALVIN PARSONS:         But were they in agreement?

13    NICOLE WATERS:          Yes they were in agreement.

14    CALVIN PARSONS:         No further questions.

15    HEARING OFFICER:        Ms. Waters do you still work for
16  the State?

17    NICOLE WATERS:          No I do not.

18    BOARD MEMBER:           Thank you you're excused.  Next
19  witness please.

20    CALVIN PARSONS:         This is Nancy Santana.



49

| | | |
|---|---|---|
| 1 | BOARD MEMBER: | Please remain standing to be |
| 2 | sworn. Put your hand on the Bible. The testimony you are about to give is the |
| 3 | truth, the whole truth and nothing but the truth? |
| 4 | NANCY SANTANA: | Yes. |
| 5 | BOARD MEMBER: | Give us your name and address? |
| 6 | NANCY SANTANA: | Nancy Santana my address is 14 |
| 7 | White Oak Drive, Middletown, Delaware. |
| 8 | HEARING OFFICER: | Can you spell your last name |
| 9 | please? |
| 10 | NANCY SANTANA: | Santana. |
| 11 | HEARING OFFICER: | Thank you. |
| 12 | BOARD MEMBER: | Please be seated. Ms. Santana |
| 13 | try to relax its important for you to keep your voice elevated because these |
| 14 | microphones don't do anything but record they don't increase or make the sound |
| 15 | louder. |
| 16 | NANCY SANTANA: | Okay. |
| 17 | BOARD MEMBER: | Thank you your witness. |
| 18 | CALVIN PARSONS: | Ms. Santana, how long have you |
| 19 | known me? |
| 20 | NANCY SANTANA: | Since I started with the Division |
| 21 | of Child Support on January 4th, 1999. |

B-106

50

1    CALVIN PARSONS:    And what is your impression of

2    my character?

3    NANCY SANTANA:    Okay when I first met you Calvin

4    was very outspoken person very nice he was friendly he had a lot of friends at

5    Child Support and you know he was just a very people friendly person. So as

6    soon as you met him he extended a welcome to you and told them who he was

7    and he just an overall nice person to me.

8    CALVIN PARSONS:    During our employee in the

9    customer service unit when we were working there together did I ever provide

10    any assistance to you with calls?

11    NANCY SANTANA:    Calvin was always there anytime

12    I had a question or had a concern Calvin would always come off the phones to

13    talk to me and you know assured me everything is okay if I said the right thing to

14    the person. If a person was on hold I would go back on to the phone with him

15    and say what Calvin was saying you know as far as telling them what the right

16    things to say were. Sometimes I wasn't to sure and Calvin was a very good

17    guidance for me as far as what I needed to do and what I needed to say he was

18    a very good customer service rep.

19    CALVIN PARSONS:    So in the times that I assisted you

20    I have never provided you with any information that was incorrect or inaccurate?

B-107

51

1    NANCY SANTANA:        No he was very accurate very

2    precise and exactly what I needed to know and provided to the call I was given

3    he was very good at what he was doing.

4    CALVIN PARSONS:        During my last days before

5    leaving the work place had you noticed any change in my demeanor?

6    NANCY SANTANA:        As far as I looked at you he was

7    very shoulders were slumped he looked very easily excitable he was very

8    irritated and he looked very much down and out it just looked like he aged he

9    looked very stressed out and just like I said he looked very much on edge.  So

10   he was not very happy and obviously he didn't speak to hardly anyone just very

11   much close minded and just wasn't the way he used to be he changed.

12   CALVIN PARSONS:        Would you describe the work

13   environment?

14   NANCY SANTANA:        The work environment I looked at

15   it as hostile because obviously if you have supervisors that are monitoring

16   everything you do and following you around buildings and clocking you and

17   coming to your desk and reporting you as away from your desk and all kinds of

18   things she said to him was out in the open.  And people heard things that she

19   said to Calvin that to say he was away from his desk and things were not very

20   good and she made it open and openly known that she did not like Calvin.  And

21   being away from his desk was definitely what Calvin needed to be doing and



B-108

52

1   every time that Calvin left he had to report to her every movement that he made

2   during the day and she emphasized that.

3          CALVIN PARSONS:              And who are you referring to?

4          NANCY SANTANA:              Talking about your supervisor or

5   used to be supervisor Brenda Annan.

6          CALVIN PARSONS:              Thank you. Have you witnessed

7   her in this behavior with other employees?

8          NANCY SANTANA:              Yes she seems to have a habit of

9   going after people outside of any location and telling them they needed to be

10  working the desk. If she mentioned while you was away from your desk she

11  would openly be in their face pointing a finger her face would become very red.

12  She would mention all kinds of interesting about your vacation, your sick leave

13  you being away, your daughter being sick. I mean she rambled on about a lot of

14  things but she didn't really you know she per say answer the problem while

15  working the desk she seemed just to go on and on about other things about her

16  about me.

17         CALVIN PARSONS:              So  am  I  understanding  you

18  experienced this with her?

19         NANCY SANTANA:              Yes most recent experience of

20  Brenda was on March 1st when I went to get something from the copy machine

21  and she confronted me outside the bathroom and clocked how much time I was



53

1    away from desk and I told her I was stressed out about a call. She said I don't

2    care what the reason was you weren't supposed to be away from your desk.

3    Then she went on about my vacation sick leave my daughter me being sick and

4    how everything was going to affect me.

5              CALVIN PARSONS:              And was she talking to you in a

6    quite professional tone?

7              NANCY SANTANA:              No she was loud she was

8    boisterous people were around she didn't exactly know who was around her but

9    obviously I was not prepared to handle her being in my face, pointing at me,

10   face turning red I wasn't prepared for that.

11             CALVIN PARSONS:              And after that encounter with her

12   did any of your co-workers ask you about it or come to you about it or come and

13   offer you any comfort?

14             NANCY SANTANA:              No, no.

15             CALVIN PARSONS:              So no one witnessed it?

16             NANCY SANTANA:              Oh there was people around just

17   like I said I was just trying to diffuse the situation people were around like I said I

18   just tried to calm down say what I had to say and hurry up and leave the area.

19             CALVIN PARSONS:              How often or frequent infrequent

20   a lot a little is she like this?

B-110

54

1    NANCY SANTANA:        Brenda is you don't know when

2    Brenda is going to come at you, you don't know what situation is going to come.

3    Its not like its predictable obviously if your away from your desk and she sees

4    you I don't know what comes into Brenda but you know you don't know when

5    she's gonna came at you why she's gonna come at you.  But when it is its out in

6    the open it's unpredictable and she tends to ramble on about other things that

7    you have done.

8    CALVIN PARSONS:        But do you notice it on everyday,

9    once a week, occasionally?

10    NANCY SANTANA:        I seen her do that with quite a few

11    of us in customer service there's not you know its quite occasional but I'm just

12    saying she's done it a lot with different people in different locations.  It's very

13    observant people have come to me and told me what was said to me and what

14    was done to them so it's a pattern.

15    CALVIN PARSONS:        So would you say the work

16    environment is clickish?

17    NANCY SANTANA:        Clickish I don't understand what

18    that means?

19    CALVIN PARSONS:        Ties or groups of individuals

20    clustering together?



55

1    NANCY SANTANA:    I think basically it's an open

2    hostile environment and I think there is preparation treatment for certain people

3    in there and there is some other people that basically know that it is a hostile

4    environment and pretty much we keep to ourselves and we don't really say

5    much to other folks. We notice certain patterns happening in customer service.

6    CALVIN PARSONS:    Would you say it's racial?

7    NANCY SANTANA:    It's what?

8    CALVIN PARSONS:    Racial?

9    NANCY SANTANA:    I think its racial yes.

10    CALVIN PARSONS:    Thank you.

11    BOARD MEMBER:    Any further questions for you

12    okay cross exam.

13    MS. YEARICK:    No questions.

14    BOARD MEMBER:    Mr. Murowany?

15    BOARD MEMBER:    Nothing.

16    BOARD MEMBER:    When you say you think it's racial

17    what do you mean by that please?

18    NANCY SANTANA:    What I think is racial is it seems

19    like the only people that I here that Brenda goes off on seems to be people of

20    color I've never noticed a white person out in the hallway or any inappropriate

21    moments having a finger stuck in their face or her yelling at them. I've always

B-112

56

1    noticed black folks that were always on the firing line and other people of color

2    come to me saying that she got them and different locations and yelled at them

3    about them being away.  But I've never had any instances or either of us ever

4    saw any instances of any white people in there that got caught off guard by

5    Brenda approaching them about different things that they were doing while they

6    were away from their desk.

7            BOARD MEMBER:            The    episodes    that    you    are

8    describing of yelling being in your face pointing fingers and so forth where does

9    this happen?

10           NANCY SANTANA:            Well  the  thing  is  it  could  be

11   anywhere she sees you taking something from the copy machine it could

12   happen in the lunch room it could happen near your cubicle there's no specific

13   place.

14           BOARD MEMBER:            You're saying it's happening out

15   in the open within ear shot of other people?

16           NANCY SANTANA:            Yes.

17           BOARD MEMBER:            Are  there  any  private  offices  in

18   the work area?

19           NANCY SANTANA:            There's quite a few private offices

20   in the work areas.



57

| | | |
|---|---|---|
| 1 | BOARD MEMBER: | Behind   closed   doors,   closed |
| 2 | doors are available? | |
| 3 | NANCY SANTANA: | Yes. |
| 4 | CALVIN PARSONS: | May   I   ask   her   one   more |
| 5 | question? | |
| 6 | BOARD MEMBER: | Yes go ahead. |
| 7 | CALVIN PARSONS: | Have you heard Brenda from her |
| 8 | office with her door closed? | |
| 9 | NANCY SANTANA: | Yes, yes I have heard Brenda |
| 10 | screaming at Calvin with the door closed you can hear her it's loud other people | |
| 11 | have come in and voiced who is that in the office and oh it was Calvin.  Basically | |
| 12 | when he came out and he went in we knew it was him. | |
| 13 | CALVIN PARSONS: | No further questions. |
| 14 | HEARING OFFICER: | Ms. Santana are you still working |
| 15 | for the division? | |
| 16 | NANCY SANTANA: | Yes. |
| 17 | HEARING OFFICER: | Thank you. |
| 18 | BOARD MEMBER: | Thank   you   Ms.   Santana |
| 19 | appreciates your coming in. | |
| 20 | CALVIN PARSONS: | My next witness is Mr. Eggleston. |



B-114

58

1        BOARD MEMBER:              Remain standing, sir.   Put your

2    hand on the Bible.  The testimony that you are about to give is the truth, the

3    whole truth and nothing but the truth?

4        ERNEST EGGLESTON:          It is.

5        BOARD MEMBER:              Say yes.

6        ERNEST EGGLESTON:          Yes.

7        BOARD MEMBER:              Give us your name and address?

8        ERNEST EGGLESTON:          My name is Ernest Eggleston I

9    reside at 117 Caravel Ave. Number Four New Castle Delaware 19720.

10       BOARD MEMBER:              Please be seated.  Sir, could you

11   kindly spell your last name?

12       ERNEST EGGLESTON:          Eggleston.

13       BOARD MEMBER:              Thank you your witness.

14       CALVIN PARSONS:            Mr. Eggleston, could you tell or

15   tell the Board how long you and I have worked together?

16       ERNEST EGGLESTON:          Ever since 1997.

17       CALVIN PARSONS:            And  would  you  describe  my

18   character?

19       ERNEST EGGLESTON:          Your  articulate,  honest  good

20   friend.


B-115

                                                                          59
_____

1        CALVIN PARSONS:            And during our working years

2   together in the customer service unit did I ever provide to you with any work

3   related assistance?

4        ERNEST EGGLESTON:          Yes.

5        CALVIN PARSONS:            Any information that I have ever

6   provided you with did you find it to be untrue or inaccurate or wrong?

7        ERNEST EGGLESTON:          No.

8        CALVIN PARSONS:            Mr. Eggleston, I want to ask you

9   about an occurrence with you and I and I spoke to you about it.  Do you recall

10  one day over this summer the past summer I came to you and I had asked you if

11  Ms. Annan had approached you about being outside on a break?

12       ERNEST EGGLESTON:          Yes.

13       CALVIN PARSONS:            And what was your response?

14       ERNEST EGGLESTON:          That particular time she hadn't

15  come to me.

16       CALVIN PARSONS:            She had not?

17       ERNEST EGGLESTON:          No.

18       CALVIN PARSONS:            At that particular day had you

19  signed out for break when we were outside?

20       ERNEST EGGLESTON:          No I hadn't.

B-116

60

1    CALVIN PARSONS:        Have you had any confrontations

2    with Ms. Annan?

3    ERNEST EGGLESTON:       I have been counseled on that

4    very same thing about taking breaks.

5    CALVIN PARSONS:        Okay when she has counseled

6    you tell me what was her demeanor was she loud was she threatening?

7    MS. YEARICK:        Objection.

8    BOARD MEMBER:        Sustained.

9    HEARING OFFICER:       Just let the witness describe it

10    himself.

11    ERNEST EGGLESTON:       For me no but she could be

12    perceived that way and has been perceived that way by others.  But she has her

13    managerial style just like everybody else has their managerial style.

14    CALVIN PARSONS:        Have you witnessed her be loud

15    with me?

16    ERNEST EGGLESTON:       Yes.

17    CALVIN PARSONS:         On more then one occasion?

18    ERNEST EGGLESTON:       Yes.

19    CALVIN PARSONS:        You and I are office buddies

20    correct?

21    ERNEST EGGLESTON:       Yes.

B-117

61

1    CALVIN PARSONS:          And we have shared stories?

2    ERNEST EGGLESTON:        Yes.

3    CALVIN PARSONS:          Some of the stories that I have

4    shared with you that I have been corrected on is it common place with all of the

5    employees within that customer service unit?

6    ERNEST EGGLESTON:        No.

7    CALVIN PARSONS:          I want to jog your memory on

8    another occurrence probably around I think 2001 we used to car pool together to

9    work is that correct?

10   ERNEST EGGLESTON:        That's correct.

11   CALVIN PARSONS:          And I would pick you up?

12   ERNEST EGGLESTON:        Yes.

13   CALVIN PARSONS:          And we would arrive at work at

14   the same time?

15   ERNEST EGGLESTON:        Yeah.

16   CALVIN PARSONS:          During that year I received a

17   reprehended for tardiness?

18   ERNEST EGGLESTON:        Yes.

19   CALVIN PARSONS:          You remember that and I came to

20   you and asked you if the management or supervisory staff had approached you

21   about that?

B-118

62

1       ERNEST EGGLESTON:        Yes.

2       CALVIN PARSONS:          Had they?

3       ERNEST EGGLESTON:        Subsequent to that they have

4    talked to me about.

5       CALVIN PARSONS:          So you're saying since that

6    occurrence?

7       ERNEST EGGLESTON:        Yes since that occurrence yes.

8       CALVIN PARSONS:          Are you experiencing any stress

9    that you believe may be caused by your work place?

10      MS. YEARICK:             Objection relevance.

11      BOARD MEMBER:            Where are you going to go with

12   this line of questioning what's the reason for this?

13      CALVIN PARSONS:          I was posing the question

14   because again if we are establishing a pattern of behavior from Ms. Annan I

15   want to see if it is having that same affect on other people.

16      MS. YEARICK:             It's not relevant for the purposes

17   of this hearing.  The pattern of behavior objective behavior can be testified to.

18      HEARING OFFICER:         You have to show whether the

19   stressors are objective and it's relevant to whether those stressors are objective.

20      BOARD MEMBER:            I am going to over rule you won't

21   be allowed to pursue that line of questioning.

B-119

63

1    CALVIN PARSONS:    Are you on medication?

2    HEARING OFFICER:    I'm sorry you can ask that

3    question I don't think we got an answer.

4    CALVIN PARSONS:    Could you answer that question

5    or would you like me to repeat it?

6    ERNEST EGGLESTON:    Customer service is a stressful

7    area anyway.

8    CALVIN PARSONS:    Does Ms. Annan's behavior...

9    ERNEST EGGLESTON:    Let me finish.

10    CALVIN PARSONS:    Go ahead, sir.

11    ERNEST EGGLESTON:    It's a stressful area the nature of

12    answering calls for both clients and non-custodial parents and their questions

13    and payments.  Sanctions that either the division has taken or the division of

14    social services has taken makes it a very, very stressful area anyway.  The fact

15    that during the period of time that were talking about the State had a freeze on

16    and there was a the unit has never been fully up to staff.

17    CALVIN PARSONS:    So is that a yes?

18    ERNEST EGGLESTON:    Quite candidly Ms. Annan's

19    management style is from my experience okay she is a micro manager.  And in

20    an environment that is normally stressful it adds a dimension of stress.

21    CALVIN PARSONS:    Thank you no further questions.

B-120

64

1              BOARD MEMBER:              Cross exam.

2              MS. YEARICK:               Have you ever participated in or

3    sat in any of Mr. Parsons's performance reviews?

4              ERNEST EGGLESTON:          No.

5              MS. YEARICK:               No other questions thank you.

6              BOARD MEMBER:              Mr. Murowany.

7              BOARD MEMBER:              Nothing.

8              BOARD MEMBER:              Mr. O'Brien.

9              HEARING OFFICER:           Are you still working for the

10   division, Mr. Eggleston?

11             ERNEST EGGLESTON:          Yes I am and I am still with that

12   unit.

13             BOARD MEMBER:              Thank you, sir.

B-121

Blank

B-122

EXHIBIT

# RACE DISCRIMINATION

(1) MARCH 1, 2005

Customer Service Supervisor Brenda Annand Abruptly yelled at me in the hallway when I stepped away from my desk to retrieve documents from a printer. Brenda asked me why I was away from my desk and I mentioned that I had gotten a nasty, disturbing customer call (I work as a customer service representative) and I stepped away from my desk to calm down + also retrieve my documents from the printer. She said she didn't care and I had no right to be away from my desk for any reason. She also insulted me by saying that my fellow co-workers didn't like me and that the clientele that I speak to everyday, as a customer service representative, didn't like me either; also she stated that clientele made complaints against me. I then told her that I was never made aware, by Brenda, that my co-workers didn't like me nor was I counseled about any complaints that were made against by clientele. I told Brenda that she never mentioned any of these problems to me formally in her office.

RECEIVED
PRIVATE
PHILADELPHIA D.O.
05 MAR
2:2

**B-123**

Brenda always points her finger in my face after warning me that incidents, such

# Race Discrimination

as this would be brought to my attention, in my annual performance review. Brenda then rambled on about my sick leave and military leave being a problem as I am always out of the office. I told Brenda there is nothing I can do about my sick leave or my military leave. Brenda Annand repeatedly harasses me verbally in inappropriate places like the hallway, near my cubicle, in the lunch room, etc. I have never, ever noticed any white co-workers in the customer service unit being yelled at or reprimanded in inappropriate settings.

Customer Service Supervisor Brenda Annand talks to white, female subordinates addressing them as "sweetie" or "honey" which is heard on numerous occasions by persons of color in Brenda's unit. Never has Brenda addressed "persons of color" as "sweetie" or "honey" which denotes special treatment and/or favoritism of white subordinates in her unit.

RECEIVED - EEOC
PHILADELPHIA D.O.
'05 MAR 24 AM 2:21

B-124

(2) IN Closure, I have asked to be TRANSFERRED twice out of the customer service unit, but my requests were always denied stating transfers were allowed that were beneficial to the operational needs of the Division of Child Support.

With ease, one after another, white former co-workers of the customer service unit, were allowed to transfer without any stipulation made to them that they meet the operational needs of the Division of Child Support.

White co-workers who were transferred or upgraded out of the customer service unit who were white are: Tammy Halter, Kim Ritter, Paul Brzozowski, Stacy Saylor, Kevin Williams, Darlene Jackson, Lynn Galloway and Elaine Daniels

Persons of color requesting transfer but were denied, for one reason or another, Jackie Berry, Selena Lloyd, Ernest Eggleston, Judine Gaines and myself, Nancy Santana

Former white co-worker Kevin Williams was promoted to a supervisory position because he was white as opposed to black applicants, with the Division of Child Support, who were better qualified, & had more years of experience working for the Division of Child Support Enforcement

B-125

 Exhibit 7

# Santana Nancy (DHSS)

**From:** Annand Brenda (DHSS)
**Sent:** Thursday, June 16, 2005 4:59 PM
**To:** Santana Nancy (DHSS)
**Cc:** Saylor Stacy (DHSS)
**Subject:** Leave slips

June 16, 2005

Nancy,

I received and approved 3 of the 4 leave slips left on the corner of my desk this afternoon. Unfortunately I couldn't approve your request to leave at 2:00 on Monday, 6/20/05 as we already have 3 staff on vacation that day and Monday's are our highest volume days. In addition, we expect the call volume to be higher than usual since most of the CSU staff, including yourself are attending the Employee Picnic on Friday, 6/17/05. If circumstances change, we may be able to reconsider your request but we won't know until that afternoon

B-126

EEOC Charge# 170-2005-01120    Exhibit 7

3033

# APPLICATION FOR LEAVE
## DELAWARE HEALTH AND SOCIAL SERVICES

Employee's Name (Please Print): Nancy Santana

Employee I.D. Number: 04-2008

Date: 6/3/05

Division: DCSE

Facility/Section: Children's Ctr.

I am applying for the following leave:

- [X] Sick
- [ ] FMLA/Sick
- [ ] Military
- [ ] Other (Please Explain)

- [ ] Vacation
- [ ] FMLA/Vacation
- [ ] Compassionate

- [ ] Leave Without Pay
- [ ] FMLA/Leave Without Pay
- [ ] Compensatory

Beginning: 6/20/05    Time: 2:30 AM/(PM)
Date

Ending: 6/20/05    Time: 4:00 AM/(PM)
Date

Hours Scheduled - 6.0    Hours Worked = 1.5    Hours to be Charged

7.5

Doctor's Appointment - Location

Time: 2:00 - 2:35 (work)

REMARKS: (Can't approve due to anticipated high volume of calls expected
because at Employee being out, we may reconsider. Reid req. 6/16/05 if at 2:00, volume is
low.

Employee's Signature/Date: Nancy Santana 6/3/05

Supervisor's Signature/Date: Brenda Annand 6/16/05

- [X] Approved
- [X] Disapproved

White Copy: Human Resources Office    Yellow Copy: Supervisor    Pink Copy: Employee    Goldenrod: Timekeeper    Doc. No. 35-01-20-04-10-02

Note: Sick leave slip disapproved by
Supervisor Brenda Annand because
of anticipated high call volume
at work.

B-127

EEOC charge # 170-2005-01720

Pt was seen today
at WILM VAMC

| | Imprint from Patient Data Card or type or print name, ident. no., name of facility visited | | | |
|---|---|---|---|---|
| **PURPOSE** | **HOSPITALIZATION** | | **OUTPATIENT SERVICE** | |
| | **DATE** | | **DATE AND HOUR** | |
| | FROM | TO | REPORTED 8:00 AM | DEPARTED 10:30 AM |
| | I certify that the above-named veteran visited this facility on the date and for the purpose as indicated. | | | |
| | SIGNATURE OF CHIEF, MEDICAL ADMINISTRATION SERVICE DESIGNEE | | | DATE 6/20/05 |
| | VA FORM MAY 1999(R) **10-2382** | | | ☆ U.S.GPO:2000 518-536/94261 |

Note:
Dr's Appt
Slip.

I was SEEN FOR STRESS at
The VA Hospital — JUNE 20, 2005

Nancy Sartori

B-128

Exhibit-8



## Santana Nancy (DHSS)

**From:** Valiante Lou (DHSS)
**Sent:** Tuesday, June 28, 2005 2:49 PM
**To:** Walters Dianne (DHSS)
**Subject:** FW: Late due to Accident

Was this a ruling made division wide?

-----Original Message-----
**From:** Santana Nancy (DHSS)
**Sent:** Tuesday, June 28, 2005 11:30 AM
**To:** Valiante Lou (DHSS)
**Subject:** FW: Late due to Accident

-----Original Message-----
**From:** Annand Brenda (DHSS)
**Sent:** Tuesday, June 28, 2005 10:52 AM
**To:** Amann Sharon (DHSS); Adams Anita (DHSS); Santana Nancy (DHSS); Weathers Kelly (DHSS)
**Cc:** Saylor Stacy (DHSS)
**Subject:** Late due to Accident

*JUNE 28, 2005*

As we all know, there was an accident on Route 1 this morning that caused traffic to back-up and be re-routed. This caused staff to be late, due to no fault of their own however, all staff need to account for 7.5 hours each day. Because of this, we are offering staff the option of flexing their hours or submitting a leave slip to make up the missed time.

Please contact me to discuss which option you want to choose and to determine the amount of time you need to account for.

B-129

Exhibit 9

## Santana Nancy (DHSS)

**To:**     Annand Brenda (DHSS)

**Subject:** RE: Leave Requests

Brenda:

Since our computers are down this morning, I had a chance to talk to other customer service personnel. They had told me that they don't always fill out their "leave slips" correctly, but they had never gotten an email such as yours.

I don't want to be "targeted" especially since others stated to me that they don't always "fill out their slips slips perfectly either!"

Please make a record of my email response.

-----Original Message-----
**From:** Annand Brenda (DHSS)
**Sent:** Thursday, June 30, 2005 4:22 PM
**To:** Santana Nancy (DHSS)
**Cc:** Saylor Stacy (DHSS); Walters Dianne (DHSS)
**Subject:** Leave Requests

June 30, 2005

Nancy,

This is written to document that today, we again met and discussed the importance of completing your leave requests correctly before submitting them to me for approval. When completing a leave slip you need to focus on the following points:

1.) The beginning and ending period of time, is the time that you were out of the office, not the time you worked.
2.) Leave slips are to be submitted within one(1) hour of your arrival after returning from the absence
3.) You need to press hard when writing to ensure all four(4) copies are legible.
4.) The leave slip should be completely filled out, signed, and dated.

I have the responsibility of overseeing the entire unit's leave keeping and when your slips are not correctly submitted, it creates unnecessary, additional work for me and the official timekeeper for CSU. Because of this, I will no longer approve any slip that is not correctly submitted to me as outlined above.

If you have any questions or concerns and want to meet to review these points again, please let me know and I'll schedule time to sit with you next week.

7/1/2005

B-130

## Santana Nancy (DHSS)

**To:**     Annand Brenda (DHSS)
**Subject:** RE: Leave Requests

-----Original Message-----
**From:** Annand Brenda (DHSS)
**Sent:** Thursday, June 30, 2005 4:22 PM
**To:** Santana Nancy (DHSS)
**Cc:** Saylor Stacy (DHSS); Walters Dianne (DHSS)
**Subject:** Leave Requests

Nancy,

This is written to document that today, we again met and discussed the importance of completing your leave requests correctly before submitting them to me for approval. When completing a leave slip you need to focus on the following points:

1.) The beginning and ending period of time, is the time that you were out of the office, not the time you worked.
2.) Leave slips are to be submitted within one(1) hour of your arrival after returning from the absence
3.) You need to press hard when writing to ensure all four(4) copies are legible.
4.) The leave slip should be completely filled out, signed, and dated.

I have the responsibility of overseeing the entire unit's leave keeping and when your slips are not correctly submitted, it creates unnecessary, additional work for me and the official timekeeper for CSU. Because of this, I will no longer approve any slip that is not correctly submitted to me as outlined above.

If you have any questions or concerns and want to meet to review these points again, please let me know and I'll schedule time to sit with you next week.

B-131

**Santana Nancy (DHSS)**

Exhibit 12

| | |
|---|---|
| **From:** | Annand Brenda (DHSS) |
| **Sent:** | Tuesday, September 27, 2005 3:49 PM |
| **To:** | Santana Nancy (DHSS) |
| **Cc:** | Saylor Stacy (DHSS) |
| **Subject:** | Printing account statements |

Nancy,

In the past, I have brought to your attention the issue of printing more than needed when sending account statements to callers. When generating an account statement to send to an NCP/CP, you should be using the one in the generate letters(10) screen in the case action menu. In most cases the parties are wanting to know recent information so the statement with the cover letter should be sufficient since it contains 2 years worth of accounting information. The only time a full account statement should be generated is after sending the one with the cover letter, contact is made requesting additional information.

As we discussed this afternoon, generating full account statements creates additional work for the staff responsible for retrieving account statements and costs more money to mail. In addition, there was a conversation at the Direct Reports meeting regarding the amount of paper that we are going through these days.

If you have any questions or concerns, please let me know.

B-132

9/27/2005

October 31, 2005

*Exhibit 12 (continued)*

# LAST PROBLEM WITH SUPERVISOR BRENDA ANNAND/Customer Service (see attached)

On my last working day at child support for eighteen (18) months (September 27, 2005) Supervisor Brenda Annand (Customer Service Unit) called me into her office @ 3:40 p.m. to discuss account print-outs that I was mailing to customer service clients.

She stated, in her office, that I had the highest number of print-outs being mailed out to clients who called into the customer service unit each day. She also stated that these printouts (account summaries) were not necessary and was a "waste" of paper. She stated that just because a customer asks for an account summary doesn't mean that they have to be mailed one each and every time they requested one.

Also, she mentioned that at a previous meeting, which she attended, that there were too many copies/print-outs being mailed out from child support. I was not at this meeting, as I assumed this meeting was with management and their subordinate supervisors/managers.

## MY PROBLEM WITH THIS EMAIL ON MY LAST DAY OF WORK.....

I am having problems with Ms. Brenda Annand's emailed notation "IN THE PAST." This "NOTATION" was on a recent email sent to me previously. I have never spoken to her "in the past" in regards to a lot of account summaries being mailed out by myself to clients who requested them from me.

Also, this is not her "job" to collect account summaries/print-outs that her subordinate staff print out every day so to say that I had "a lot" of print-outs going out every day is incorrect as she is not responsible for collecting print-outs day in and day out, five (5) days a week.

B-133

**PAGE TWO (2)**

*Exhibit 12 (continued)*

To my dismay, Ms. Annand, during our discussion in her office, was so "loud" verbally that another co-worker (Mrs. Sandra Rossi – sitting in her partitioned cubicle near-by) had stopped by and told Brenda that she was too loud and she couldn't hear the customers calling into her work area via her headsets.

I have never had a "previous" discussion about my print-outs/account summaries being a problem so I resent her email stating "IN THE PAST." She has no factual basis to say that I have the highest number of print-outs, in the customer service unit, as this is not her job to hand out print-outs/account summaries to subordinate customer service staff five days a week (Monday thru Friday).

I resent being called into her office at 3:40 p.m. (last day before leaving for 18 months) as I felt that this whole discussion was unnecessary. This is not a problem, in my opinion, but on-going **harassment** from Supervisor Brenda Annand, Customer Service Department - Division of Child Support.

Brenda actually sent me a former email, after our conversation in her office, with a carbon copy to another supervisor – Stacy Saylor at 3:50 p.m. WHY? This ENTIRE conversation didn't NEED TO TAKE place in the first place. A former email further irritated me.

Why was all this <u>necessary</u> on my LAST DAY OF WORK, fifteen minutes PRIOR to leaving at 4:00 p.m. (end of my work day)?

I consider this harassment against me and an "<u>insignificant</u>" problem that did not require a discussion in her office let alone a "former" email sent to me prior to my last day in the customer service unit (20 minutes before the END of my work day).

Thank you,

*Nancy Santana*

Captain Nancy Santana
U.S. Army
Fort Bragg, North Carolina

B-134

JC Form 5 (5/01)

## CHARGE OF DISCRIMINATION

| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| | ☐ FEPA | |
| | ☒ EEOC | 170-2005-01720 |

**Delaware Department of Labor** _____ and EEOC

*State or local Agency, if any*

| Name *(Indicate Mr., Ms., Mrs.)* | Home Phone No. *(Incl Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Nancy Santana** | **(302) 378-0344** | **03-16-1963** |

| Street Address | City, State and ZIP Code |
|---|---|
| **14 White Oak Drive Middletown, DE 19709** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **DEL. DIVISION OF CHILD SUPPORT** | **500 or More** | **(302) 326-6024** |

| Street Address | City, State and ZIP Code |
|---|---|
| **84a Christlana Road,  Churchmen's Center,  New Castle, DE 19720** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

**DISCRIMINATION BASED ON** *(Check appropriate box(es).)*

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☒ NATIONAL ORIGIN

☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **03-01-2005**   Latest **04-29-2005**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I.    I was hired on or about January 4, 1999 for the position of Child Support Specialist I.  At hire my immediate supervisor was Diane Walters (W).  Since approximately April 2001 Brenda Annand (W), Child Support Supervisor has been my immediate supervisor.  Ms. Walters is Ms. Annand's immediate supervisor.  On or about March 1, 2005 I received a verbal warning.   On or about April 5, 2005 I received a written warning.  On or about April 29, 2005 I received my annual Employee Performance Review.  This review contained negative comments.

II.    I believe that I have been discriminated against because of my national origin, Hispanic.  Ms. Annand supervises approximately eighteen (18) employees, of whom ten (10) are black, two (2) are Hispanic and six (6) are white.  On or about March 1, 2005 Ms. Annand "screamed" at me for being away from my desk.  I stepped away from my desk to retrieve documents from the printer.  On or about April 5, 2005 Ms. Annand sent me an e-mail about being away from my desk for more than fourteen (14) minutes.  I acknowledge being away from my desk because of a mis-communication regarding when I was to take my lunch.  On or about April 20, 2005 my Employee Performance Review contained negative comments regarding my improving in the policies and procedures of notifying supervision when I am unavailable for more than four (4) minutes.   I further allege that I have been subjected to retaliation

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Jun 03, 2005** Date        *Nancy Santana*   Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

B-135

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 170-2005-01720 |

| | |
|---|---|
| Delaware Department of Labor | and EEOC |
| State or local Agency, if any | |

THE PARTICULARS ARE *(Continued from previous page):*

**(704a) because on March 24, 2005 I testified on behalf of a former employee, who was discharged, against Ms. Annand. In my statement I indicated that Ms. Annand treats non-white employees in a less favorable manner in comparison to her treatment of white employees.**

**III. I allege that Ms. Annand subjects her non-white employees to disparate treatment in the terms and conditions of their employment.**



| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Jun 03, 2005** _____*Nancy Sartory*_____<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

B-136