IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NANCY SANTANA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06-666 GMS |
| ) | |
| STATE OF DELAWARE DEPARTMENT ) | |
| OF HEALTH & SOCIAL SERVICES, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

**I.     INTRODUCTION**

On October 30, 2006, the plaintiff, Nancy Santana ("Santana"), filed the present lawsuit against the State of Delaware Department of Health & Social Services, Division of Child Support Enforcement (the "DCSE" or the "defendant"), alleging racial discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), and the racial and national origin discrimination provisions of the Delaware Code, Del. Code Ann. tit. 19, § 710 *et seq*. Specifically, Santana, an Hispanic female, alleges that she was treated differently than Caucasian employees, subjected to a hostile work environment, and retaliated against by her supervisor at the DCSE, Brenda Annand ("Annand").

Presently before the court is the defendant's motion for summary judgment on all claims. For the reasons that follow, the court will grant the motion.

**II.    BACKGROUND**

Santana started working at the DCSE on January 4, 1999. (D.I. 22-2, at 16.) While at the DCSE, Santana worked primarily in the customer service unit, a call-in center to which clients would call with questions about their cases. Her job, as a Child Support Specialist ("CSS"), was to provide

clients information about how to handle cases and send emails to other workers when necessary. (Id. at 18.) In other words, Santana's position required her to answer the phone and type on her computer for the entire day. (Id. at 22-25.) Interspersed with her civilian employment, Santana has served in the armed forces. (Id. at 5-11.) As of the time of the parties submissions, Santana was on involuntary leave from DCSE from September 30, 2005, and serving full-time with the Army Reserves. (Id. at 11.) In about 2001 or 2002, Annand became Santana's supervisor, and remained her supervisory until Santana left for active duty. (Id. at 41-42.)

Santana avers that, throughout her tenure working under Annand, she was subjected to disparate treatment and a racially hostile work environment. More particularly, in her complaint, Santana recounts three incidents which occurred while Annand was her supervisor. (See D.I. 1.) First, Santana relates that, on or about March 1, 2005, she received a loud, screaming, and derogatory verbal warning for being away from her desk. (Id. ¶ 12.) According to Santana, Annand "came to [her] face, and started yelling and screaming about [her] being a bad worker, people talking about [her]." (D.I. 22-2, at 45.) At that point, Santana decided to "write [Annand] up." (Id.) Santana further explains that there was a series of incidents when she was away from her desk and Annand would come at her yelling and screaming, telling her she was a terrible person, and reprimanding her for taking sick leave. (Id.)

Next, on April 5, 2005, Santana received an email from Annand reprimanding her for being unavailable to take phone calls for more than 14 minutes. (D.I. 26-2, at B-46.) The email further states that Annand attempted to call Santana and speak to her at her desk, but failed in her efforts because Santana was not at her desk. (Id.) Finally, Annand reminds Santana to remember to use the wallboard to notify supervisors when she is unavailable for more than 4 minutes. (Id.) Santana

acknowledged that she was away from her desk, but attributed that fact to a miscommunication regarding when she could take her lunch. (Id.; see D.I. 22-2, at 48.) Santana testified at deposition that she sent an email back to Annand explaining her position and noting that it was a miscommunication. (D.I. 26-2, at B-46; D.I. 22-2, at 48-52.) Annand did not apologize for the miscommunication and did not clarify whether she could take lunch; she only clarified her own position. (D.I. 22-2, at 48-52.)

In addition, on April 20, 2005, Santana received a performance evaluation from Annand and Stacy Saylor ("Saylor"), another supervisor. (D.I. 26-2, at B-52.) The performance evaluation concluded that Santana's overall performance "Meets Expectations" and contained positive comments about Santana's work, as well as comments related to areas in which Santana needed to improve. (See id.) More particularly, Annand and Saylor stated that Santana is "professional, courteous to clients, and goes the extra mile to give callers quality customer service." (Id.) They also stated that her notes were thorough and that her call volume had increased, indicating that Santana had "improved in the area of not getting too involved in a case." (Id.) Annand and Saylor then noted that Santana needed to focus on two areas: "her ability to retain information," and "following the unit policies and procedures." (Id.) As to her ability to retain information, the evaluators wrote that Santana needed to focus on reading her email in timely fashion, so that she was aware of policy changes to ensure that customers received consistent and accurate information. (Id.) They also wrote that improving her ability to retain information will facilitate her movement up the career ladder and her advancement to a CSSII. (Id.) Regarding her inability to follow unit policies, Annand and Saylor identified Santana's failure to notify her supervisors when she was away from her desk for more than four minutes and her failure to timely submit leave forms. (Id.)

3

Santana further avers that Annand retaliated against her for testifying at an Industrial Accident Board hearing (the "IAB hearing") on behalf of Calvin Parsons ("Parsons"), one of her coworkers. (See D.I. 22-2, at 57-58.) Specifically, Santana contends that Annand provided the negative comments on her evaluation in retaliation for testifying at Parsons' IAB hearing. (See id.) The gravamen of Parsons' claim was that he "sustained mental distress from [Annand]." (D.I. 26-2, at B-63.) Santana testified that the work environment in her unit was "hostile," and that Annand "made it . . . openly known that she did not like [Parsons]." (Id. at B-108.) Santana further testified that she had observed Annand verbally attack workers in the unit "quite occasional[ly]," and that she had attacked "a lot of different people in different locations." (Id. at B-111.) Santana also testified that the environment was "racial," in that Annand only seemed to verbally attack "people of color," not white people. (Id. at B-112-113.)

Finally, Santana contends that there were other instances of alleged hostile and discriminatory management by Annand. More particularly, Santana testified at deposition that Annand harassed Jacqueline Berry ("Berry") and Parsons for being away from their desks, and once referred to Berry as "you people." (D.I. 22-2, at 72-75.)

On March 24, 2005, Santana filed a document with the Equal Employment Opportunity Commission ("EEOC"). (See D.I. 26-3, at B-123-25.) Although not a formal Charge of Discrimination, Santana describes the March 1, 2005 incident and states that she has never observed Annand yelling at or reprimanding white coworkers in inappropriate settings. (Id. at B-123-24.) Santana's document also notes that white coworkers of the customer service unit were permitted to transfer with ease, while persons of color requesting a transfer were denied for one reason or another. (Id. at B-125.) On June 3, 2005, Santana filed a formal Charge of Discrimination with the EEOC,

4

which summarizes her complaints set forth in the March 24, 2005 document. (D.I. 22-3, at 1.) After investigating, the EEOC issued a dismissal and notice of rights, giving Santana the right to sue. (D.I. 1 ¶ 17.)

## III. STANDARD OF REVIEW

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©; *Biener v. Calio*, 361 F.3d 206, 210 (3d Cir. 2004). In reviewing summary judgment decisions, the Third Circuit views all evidence and draws all inferences in the light most favorable to the non-movant, affirming if no reasonable jury could find for the non-movant. *See Whiteland Woods, L.P. v. Twp. of West Whiteland*, 193 F.3d 177, 180 (3d Cir. 1999). Thus, a trial court should only grant summary judgment if it determines that no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If a moving party has demonstrated the absence of a genuine issue of material fact – meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole – concerns regarding the credibility of witnesses cannot defeat summary judgment. Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Liberty Lobby*, 477 U.S. at 257. Thus, summary judgment is particularly appropriate where, notwithstanding issues of credibility, the nonmoving party has presented no evidence or inferences that would allow a reasonable mind to rule in its favor. In this situation, it may be said that the record as a whole points in one direction and the dispute is not "genuine."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

## IV. DISCUSSION

The DCSE filed a motion for summary judgment, asserting that there are no genuine issues of material fact as to Santana's disparate treatment claim, hostile work environment claim, retaliation claim, and state law claim. Santana filed a brief opposing the motion. The brief, however, addresses only Santana's hostile work environment and retaliation claims. The court, therefore, will grant the defendant's motion with respect to Santana's disparate treatment and state law claims, because she has not provided any affirmative evidence with respect to those claims as required under the summary judgment standard.[1] The court now turns to Santana's hostile work environment and retaliation claims.

### A. Hostile Work Environment

Under Title VII, it is unlawful for any employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a claim under Title VII based on a hostile work environment, a plaintiff must show: (1) that she suffered intentional discrimination because of race; (2) the discrimination was pervasive and severe; (3) it detrimentally affected her; (4) it would have detrimentally affected a reasonable person of the same protected class in her position; and (5) there is a basis for vicarious liability. *Cardenas v. Massey,* 269 F.3d 251, 260 (3d Cir. 2001); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996). In making its determination, the court must examine all of the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or

---

[1] Santana is not a pro se plaintiff, but represented by counsel.

humiliating, and whether it unreasonably interferes with an employee's work performance. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Put differently, the court must evaluate the record as a whole to determine whether Santana has proven her case, because "'[particularly in the discrimination area, it is often difficult to determine the motivations of an action and any analysis is filled with pitfalls and ambiguities. . . . [A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario.'" *Cardenas*, 269 F.3d at 261 (quoting *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 149 (3d Cir. 1999)).

In the present case, Santana contends that Annand's discriminatory attitude, the disputes that erupted after Santana testified about racial problems and a hostile environment at Parsons' hearing, and Annand's yelling and screaming at minorities are sufficient to create genuine issues of fact as to her hostile work environment claim.[2] Conversely, DCSE asserts that Santana did not even attempt to prove that she has made out a prima facie case for a hostile work environment, which is her burden of proof. The defendant also asserts that it will demonstrate that the record does not supply the required evidence and that it is entitled to summary judgment on the hostile work environment claim.

Because the court finds that Santana has failed to present a triable issue of fact with respect to at least elements one and two of the prima facie case for a hostile work environment claim, it will grant the defendant's summary judgment motion on this claim.

---

[2] Although Santana's brief in opposition to the defendant's motion for summary judgment sets forth the five elements a plaintiff must show to establish a prima facie case of hostile work environment, it does not analyze any of the factors. Instead, it merely recites all of the facts Santana has presented and states that they are sufficient to create genuine issues of material fact.

1. Intentional Discrimination on the Basis of Race

Racial discrimination in the workplace manifests itself in two forms, overt conduct and facially neutral conduct, either of which can support a plaintiff's claim for hostile work environment. *Cardenas*, 269 F.3d at 260-61. A plaintiff alleging discrimination through facially neutral conduct, however, must show some "surrounding circumstances that would expose the purportedly discriminatory nature of what is otherwise racially neutral conduct." *Brooks v. CBS Radio, Inc.*, Civil Action No. 07-0519, 2007 WL 4454312, at *12 (E.D. Pa. Dec. 17, 2007).

According to Santana, the specific conduct that contributed to her hostile work environment includes: (1) the March 1, 2005 reprimand she received from Annand when she was away from her desk; (2) the April 5, 2005 email reprimand she received from Annand for being away from her desk and unavailable for more than 14 minutes; and (3) the April 20, 2005 evaluation completed by Annand and Saylor, which contained negative comments.[3] Accordingly, Santana's claim can be classified as one that is facially neutral. Santana also has submitted affidavits from several coworkers, Ernest Eggleston ("Eggleston"), Marjorie Marion-Lindsay ("Marion-Lindsay"), Tomeka Lester ("Lester"), Berry, which describe Annand's workplace conduct. All four of Santana's coworkers observed Annand yelling at or criticizing Santana, although none specifically point to the three incidents of which Santana complains. (See D.I. 26, at B-2, B-6-B-8, B-10.) Both Eggleston and Lester refer to Annand being upset with Santana for having to leave for military duty. (Id. at B-2, B-7.) All believe that Annand has problems with or a negative attitude toward minorities that she does not exhibit toward Caucasians. (Id. at B-1, B-4, B-8, B-11.) Eggleston attributes Annand's

---

[3] Santana also testified at her deposition that she overheard Annand talking to Berry and referring to her as "you people." (D.I. 22-2, at 106-07.)

conduct toward Santana and others, including Parsons, to "her unfair and discriminatory attitude toward people of color." (Id. at B-3.) According to Berry, Annand showed Caucasian employees preferential treatment over black, Hispanic, and minority employees by, for example, referring to Caucasian employees as "honey" and "sweetie" instead of yelling at them. (Id.) Berry also states that she "know[s] for a fact that certain Caucasian employees, such as Sandy Rossi, Elizabeth Orndorff, and 'Cathy' . . . had lower credentials than [Santana] or [her], but were allowed to take career ladder tests by Annand." (Id.)

Here, the evidence in the record fails to demonstrate or raise a triable issue of fact as to whether the Annand's alleged conduct was intentionally based on race for several reasons. First, Santana does not point to any racist comment either spoken or written to her or anyone else. That is, there are no surrounding circumstances that indicate the facially neutral conduct of which Santana complains is actually discriminatory. While Annand's public reprimands of Santana are certainly potentially offensive, they are facially unrelated to Santana's race. In fact, Santana even testified during her deposition that she was away from her desk on the two occasions for which she received reprimands. (D.I. 22-2, at 45, 70-71.) Moreover, Santana, Eggleston, Marion-Lindsay, Lester, and Berry's beliefs that Annand is a racist are based on mere speculation, which is insufficient to prove discrimination. *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 490 (E.D. Pa. 1999). Accordingly, the facts raised by Santana fail to establish the first element of a hostile work environment.

2. Whether the Alleged Discrimination was Pervasive and Severe

Even assuming that the record evidence was sufficient to raise a triable issue of fact as to whether Annand subjected Santana to intentional race discrimination, the record is insufficient to

9

support a finding that the alleged discrimination was pervasive and severe. To be actionable under Title VII, the harassment to which the plaintiff is subjected must be sufficiently "'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (quoting *Meritor Sav. Bank., FSB v. Vinson*, 477 U.S. 57, 67 (1982)). In other words, "'simple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citation omitted) ("These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' . . . Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender [or race] related jokes, and occasional teasing."). In *Faragher*, the Supreme Court reiterated that it has "made clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.* at 788.

In *Cardenas*, the defendants subjected the plaintiff, a Mexican-American, to ethnic slurs and comments, including referring to the plaintiff as the "boy from the barrio," "mojado," or "wetback," and "an affirmative-action hire." 269 F.3d at 258-59. The defendants also rounded up the scores of non-Hispanic employees on evaluations, while rounding down the plaintiff's evaluation scores, disproportionately assigned minorities to the plaintiff's unit, and set the plaintiff up to fail by giving him knowingly contradictory instructions and assignments incompatible with his staff resources. *Id.* at 259. After examining the totality of the circumstances, the Third Circuit held that the plaintiff had provided sufficient evidence from which a jury could conclude that the defendants' conduct was pervasive and severe. *Id.* at 263.

The Third Circuit reached a similar conclusion in *Aman*, when the plaintiff produced evidence that African American employees were referred to as "another one," "one of them," "that one in there," and "all of you," were told "don't touch anything," and "don't steal," subjected to apparently false accusations of favoritism and incompetence, made to do menial jobs, threatened with termination, had their time cards stolen, had information necessary to perform their jobs withheld, and were given conflicting orders. 85 F.3d at 1078, 1082; *see Andrews v. City of Phila.*, 895 F.2d 1469, 1486 (concluding that missing files, anonymous calls, and vandalism could be evidence of a hostile environment).

In *Woodard v. PHB Die Casting*, No. 05-5485, 2007 WL 3257201 (3d Cir. Nov. 6, 2007), however, the Third Circuit held that the evidence produced by the plaintiff, including allegedly racist comments by coworkers to him and others, the fact that he was given less favorable job assignments than non-African American employees, and his observation of a burning cross and KKK sign drawn on a bathroom wall, was not sufficient to raise a genuine issue of material fact with respect to whether the defendant's conduct was pervasive and severe. 2007 WL 3257201, at *1-2. The Third Circuit also found the plaintiff's proffered evidence insufficient in *Sherrod v. Philadelphia Gas Works*, 57 Fed. Appx. 68 (3d Cir. 2003). There, the plaintiff produced evidence that her manager commented on minorities, specifically stating that "he didn't like the way [two African American] employees were eating at their desks, it must be their culture," and that if certain coworkers did not do their work he was "going to sit at their desks with a whip." 57 Fed. Appx. at 75-76. The plaintiff also provided evidence of facially neutral alleged mistreatment, such as members of management screaming at her and treating her badly, and being told not to attend a meeting despite the fact that her presentation was on the agenda. *Id.* at 76.

When compared to the above cases, Annand's conduct falls short of, and is distinguishable from, the severe and pervasive conduct in *Cardenas* and *Aman*. Indeed, the conduct in the present case is akin to the conduct in both *Woodard* and *Sherrod* and, therefore, not sufficient to satisfy the pervasive and severe requirement of a hostile work environment claim. Unlike the plaintiffs in *Cardenas* and *Aman*, there is no evidence that Annand ever used a racial slur, much less referred to the plaintiff using a racial slur. *See Woodard v. PHB Die Casting*, No. Civ. A. 04-141, 2005 WL 3083180, at * 5 (E.D. Pa. Nov. 18, 2005), *aff'd*, *Woodard*, 2007 WL 3257201 (affirming grant of summary judgment to the defendant when plaintiff overheard direct racial slurs and stereotypes). That is, the statements which Santana considers offensive had nothing to do with her race. Moreover, even though Santana was reprimanded in public for leaving her desk and given allegedly negative comments on her evaluation, there is no evidence suggesting that Annand's conduct unreasonably interfered with her work performance. Based on the foregoing, the court concludes that Santana has failed to present sufficient evidence from which a jury could conclude that her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment." *Harris*, 510 U.S. at 21. Thus, the court will grant the defendant's summary judgment motion as to Santana's hostile work environment claim.

**B.    Retaliation**

The statutory prohibition against retaliation reads as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). The proper mode of analysis for a claim of retaliation under this provision is the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in which the plaintiff bears the initial burden of establishing a prima facie case of retaliation, the defendant bears the subsequent burden of proffering a non-discriminatory reason for its actions, and the plaintiff bears the final burden of undermining the defendant's proffered reason. 411 U.S. at 802-04. At stage one, the plaintiff's prima facie case of retaliation consists of three elements: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Kachmar v. SunGard Data Sys.*, 109 F.3d 173, 177 (3d Cir. 1997).

Once the plaintiff has established a prima facie case of discrimination, the burden of production switches to the defendant, who must "articulate some legitimate, nondiscriminatory reason" for the adverse employment decision. *McDonnell Douglas*, 411 U.S. at 802. If the defendant produces sufficient reasons for its actions, the burden switches back to the plaintiff to demonstrate that the defendant's reasons are merely a pretext for discrimination. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). To defeat a motion for summary judgment under this framework, plaintiff must point to some evidence from which the "factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764.

In the present case, Santana alleges that Annand reprimanded her and gave her negative comments on her evaluation in retaliation for testifying at Parsons' IAB worker's compensation

hearing, on March 24, 2005. (D.I. 22-1, at 58.) During the course of Parsons' hearing, Santana testified that the work environment at DCSE was hostile because the supervisors monitored everything the employees did, followed them around, and clocked them. (D.I. 26-3, at B-108.) According to Santana, this was due, in part, to Annand's yelling, reprimanding, and pointing fingers at employees who were away from their desks. (Id. at B-109.) Annand acted this way with "quite a few" customer service employees and also with a lot of "different people in different locations." (Id. at B-111.) Finally, Santana testified that she believed that her work environment was "racial," because the only people that Annand reprimanded were minorities. (Id. at B-112-B-113.)

The defendant contends that Santana's retaliation claim should be dismissed because she has failed to carry her burden of proving a prima facie case of retaliation. Specifically, DCSE contends that Santana has failed to prove that she engaged in activity protected by Title VII and that she has failed to produce any evidence that she suffered an adverse employment action. With respect to Santana's alleged protected activity, DCSE argues that testifying at a state worker's compensation hearing is not protected, because it is not related to Title VII activity. The court is not persuaded. As stated above, the statutory prohibition against retaliation applies to both an employee who has participated in any proceeding under Title VII and an employee who has *opposed* any practice made unlawful under Title VII. The Third Circuit has explained that "[o]pposition" to discrimination can take the form of "informal protests of discriminatory employment practices. . . ." *Curay-Cramer v. Ursuline Acad. of Wilmington Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006). To determine if a retaliation plaintiff sufficiently "opposed" discrimination, the Third Circuit has advised the courts to "look to the message being conveyed rather than the means of conveyance." *Id.* Here, Santana testified at a state IAB hearing that her employment environment was openly hostile and racial. (D.I.

14

26-3, at B-112.) When asked by a board member what she meant by her testimony, Santana responded:

> What I think is racial is it seems like the only people that I hear Annand goes off on seems to be people of color. I've never noticed a white person out in the hallway or any inappropriate moments having a finger stuck in their face or her [Annand] yelling at them. I've always noticed black folks that were always on the firing line and other people of color came to me saying that she got them . . . and yelled at them about them being away [from their desks].

(Id. at B-112-B-113.) Viewing this testimony in the light most favorable to Santana, the court concludes that she has satisfied the first element of a prima facie case of retaliation.

Regarding the second element of Santana's prima facie case, DCSE argues that she has failed to present any evidence of an adverse employment action. In *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006), the Supreme Court adopted a single approach for courts to apply in determining whether an employer took an adverse employment action against an employee. 126 S.Ct. at 2414-15. The Court concluded that "the anti-retaliation provision [of Title VII] . . . is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 2412-13. In reaching its conclusion, the Court noted that "[i]nterpreting the anti-retaliation provision to provide broad protection from retaliation helps assure the cooperation upon which accomplishment of [Title VII's] primary object depends." *Id.* at 2414. Consistent with this view, the Court held that, to satisfy the second element of a prima facie case, the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (internal quotations and citations omitted) ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms. Title VII, we

have said, does not set forth 'a general civility code for the American workplace.'") "Normally, petty slights, minor annoyances, and simple lack of good manners, will not create such deterrence." *Id.*

Here, Santana claims that she has raised a genuine issue of material fact under the *Burlington*, standard. The court disagrees. As previously discussed, Santana alleges that Annand retaliated against her by reprimanding or yelling at her and by providing negative comments on her April 20, 2005 performance evaluation. Santana, however, never fully develops this claim. Indeed, in addressing the incidents in her brief, she argues that Annand's conduct constituted retaliation, but does not address any of the elements of her prima facie case. In addition, an examination of the evidence demonstrates that Annand's actions were not such as to deter a reasonable worker from making a charge of discrimination. First, Annand's yelling at Santana occurred both before and after she testified at Parsons' IAB hearing. As discussed above, Annand reprimanded Santana on March 1, 2005 for being away from her desk. This reprimand occurred almost one month prior to Santana's testimony in Parsons' hearing and cannot serve as a basis for retaliation. Annand's next reprimand occurred on April 5, 2005, via email, and concerned the same subject matter as the March 1st reprimand – Santana's failure to be at her desk and available to take phone calls. Further, Santana's brief in opposition does not contain any argument or point to any evidence linking the April 5, 2005 reprimand to her testimony at Parsons' IAB hearing. Nor does her brief contain any evidence linking the April 20, 2005 evaluation to her protected conduct.

Moreover, Santana does not complain that Annand retaliated against her by concluding that her overall performance "Meets Expectations." Rather, Santana contends that the alleged "negative comments" contained within the evaluation constitute the adverse employment action. The court

16

is not persuaded. At the outset, the court notes that two supervisors evaluated Santana and signed off on the evaluation – Annand and Saylor.[4] The evaluation, therefore, did not consist of only Annand's comments. To this end, Santana has not provided any evidence that it was Annand who authored the alleged negative comments. Santana also has not set forth any evidence demonstrating that the evaluation rating was lower than the ratings she historically received while at the DCSE. Furthermore, the alleged negative comments on the evaluation relate to Santana being away from her desk for more than 4 minutes – the same conduct for which Annand had reprimanded Santana on March 1, 2005 (prior to the IAB hearing). Given the foregoing, the court concludes that Santana has not presented sufficient evidence for a jury to find that her April 20, 2005 performance evaluation would have contained different information had she not testified at the IAB hearing.

Finally, it cannot be said that Annand's conduct was likely to deter victims of discrimination from complaining to the EEOC, because Santana filed a formal charge of discrimination with the EEOC, which set forth Annand's conduct, on June 3, 2005 – after the alleged retaliation occurred. In sum, based on the record before it, the court cannot say that Santana has presented sufficient evidence to establish a prima facie case of retaliation. Thus, the court will grant the defendant's motion for summary judgment on Santana's retaliation claim.[5]

---

[4] Santana testified at deposition that she did not have any problems with Saylor, and that she preferred to discuss any issues that arose in the workplace with Saylor. (See D.I. 22-2, at 43.)

[5] The court need not address the third element of Santana's prima facie case, because it has determined that Santana did not suffer an adverse employment action.

## IV. CONCLUSION

For the aforementioned reasons, the court concludes that Santana has not met her burden of raising genuine issues of material fact with respect to any of her claims. Accordingly, the court will grant the defendant's motion for summary judgment.


Dated: February 13, 2008                                /s/ Gregory M. Sleet
                                                        CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NANCY SANTANA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06-666 GMS |
| ) | |
| STATE OF DELAWARE DEPARTMENT ) | |
| OF HEALTH & SOCIAL SERVICES, ) | |
| ) | |
| Defendant. ) | |

## **ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion for Summary Judgment (D.I. 21) is GRANTED.

2. The Clerk of Court is directed to close this case.

Dated: February 13, 2008

/s/ Gregory M. Sleet
CHIEF, UNITED STATES DISTRICT JUDGE